were meeting could not be contacted in time, the United States prevented any lawyer from attending the meetings. Not only does this show the degree of American control over whole process before the IST, but also how prerogatives of security are exercised in such a way to prevent defense counsel from being able to prepare a defense and this significantly disadvantaging them in relation to the prosecution.

Equality of arms requires both procedural and substantive equality between the President and the prosecution. established in article 20(a) of the original Statute of the IST and article 19(First) of the new Statute that entered to force on 11 October 2005 as well as the Statute of the ICTY (article 20), the Statute of the ICTR (article 20) and the Statute of the ICC (article 67)

*No Security of the Person*

Additionally, the right to security of person has been violated by the arbitrary arrest of the President as a consequence of an illegal use of force against his country and the denying him of the right to challenge his arrest before a court that can fully review its legality. The African Commission on Human and Peoples' Rights has held that "even where it cannot be proved that violations were committed by government agents, the government had a responsibility to secure the safety and the liberty of its citizens. . ."[202]

In this case, the arrest is *prima facie* illegal because such arrest took place in furtherance of a violation of international law, and as a result of an illegal action. An illegal arrest is a violation of the human right to security of person.

Furthermore, after arresting the President his human right to security of person was violated by: (a) the detaining powers' failure to inform him in a timely manner of the reasons for his arrest and any of the charges against him; (b) the detaining powers' failure to bring him promptly before a court so as to allow him the opportunity to challenge the legality of his arrest and denied him legal representation; and (c) the detaining powers' failure to provide him a means of seeking compensation for the violation of his rights, which included the theft of money allegedly found on the President's person at the onset of his illegal detention.

The President was not informed of the charges against him for more than a year and half of detention. The President was only formally charged on 15 May 2006 the same day he was forced to start to present his defense and only a months before the Judge interfered with the defense denying it the right to continue and forcing it to make closing arguments. The President and his lawyers had not time to prepare a defense.

Dockets.Justia.com

The President was held incommunicado from 13 December 2005 to 1 July 2004 before he was brought before an investigative judge. During this time and until December 2004 the President was denied any access to a lawyer. As such, he was denied the right to appear before a court of law to challenge the legality of his defense. All attempts by lawyers to whom the President has explicitly requested access have been denied or have received no response.

Moreover, the trial chamber of the IST has failed to provide the President a meaningful process by which he might be compensated for the violation of his rights. When a preliminary petition was submitted challenging the legality of the IST, this submission was rejected. The IST did not even consider defense counsel's submissions as was indicated by the fact that the clerk of the IST asked the defense lawyers to "take it back" because the judges "did not want to respond to it."[203]

The right to security of person is found most notably in article 10 of the International Covenant of Civil and Political Rights as well as article 3 of the Universal Declaration of Human Rights, article 7 of the American Convention on Human Rights, article XXV of the American Declaration of the Rights and Duties of Man, article 5 of the European Convention on Human Rights, and article 6 of the African Charter of Human and Peoples' Rights.

The European Court, while interpreting the right to the security of persons listed in article 5 of the European Convention on Human Rights, a right which is stated in similar language in article 10 of the International Covenant of Civil and Political Rights, stated that "an arrest made by the authorities of one State on the territory of another State, without the consent of the latter, affects the person's individual rights to security under Article 5 §1."[204] To show that his rights have been violated, the Applicant must establish "that the authorities of the State to which the applicant has been transferred have acted extra-territorially in a manner that is inconsistent with the sovereignty of the host State and therefore contrary to international law."[205]

# Part III

# Illegal Application of Death Penalty

On 5 November 2006 the trial chamber of the IST decided that President Saddam Hussein should be sentenced to death. The application of the death penalty will be a violation of international and Iraqi law.

Not only has the Prosecutor of the IST expressly called for the death penalty,[206] but United States President George W. Bush,[207] Iraqi President Jalal Talabani,[208] Iraqi Prime Minister Nouri Al-Maliki,[209] and, allegedly, the Chief Judge even before the trial started,[210] have all said that the death penalty should be implemented.

To implement the death penalty in this case will violate the prohibition of the *ex post facto* application of the death penalty under international law and result in the application of the death penalty after a clearly unfair trial.

### No Ex Post Facto Application of the Death Penalty

Iraq did not have the death penalty for the crimes that may be tried before the IST prior to the United States' aggression against the Iraqi people because those crimes did not even exist under Iraqi law. Immediately after the invasion the United States established CPA suspended the death penalty completely as of June 2003.

Moreover, in 1982, when the acts complained of allegedly took place, there was no death penalty for the alleged crimes because the alleged crimes did not exist at that time under Iraqi law. Even when the President and his colleagues were detained there was no death penalty. The crimes with which the President and his colleagues have been charged were only created by the American occupying powers in Iraq subsequent to their illegal aggression against the people of Iraq.

The majority of states in the international community do not have the death penalty and the death penalty has been rejected by every judicial body applying international criminal law without exception. It is excluded as a penalty from the Statutes of the International Criminal Court, the International Criminal Tribunals for the former Yugoslavia and for Rwanda, the Special Court for Sierra Leone, the Special Panels for East Timor, the special panels in Kosovo, and the Extraordinary Chambers in Cambodia.

In addition, despite the United States suspension of the death penalty by section 3(1) of CPA Order No. 7 of 9 June 2003, the Statute of the IST attempts to reinstate it with retroactive effect. Section 2(2) of the Iraqi Penal Code, to which sections 17(a) (ii) and 24 of the Statute of the IST refers, clearly says that if there are changes in the law after a certain offence then the

most favorable, not the latest law, must be applied. This requires that once the death penalty has been abolished as was done it cannot be re-instated with retroactive effect, but that the most favorable law in the intervening period of time must be given effect.

Nevertheless, on 8 August 2004 the death penalty was reinstated in Iraq for for the crimes in the Statute of the Iraqi Special Tribunal. Under article 24(a) of the Statute, penalties for offenses 'shall be those prescribed by Iraqi law [...].' And under article 24(e) of the Statute, penalties that 'do not have a counterpart under Iraqi law shall be determined by the Trial Chambers taking into account such factors as the gravity of the crime, the individual circumstances of the convicted person and relevant international precedents.'

The retroactive application of the death penalty violates the Iraqi Penal Code, which states in Article 1 that "no act or omission shall be penalized except in accordance with a legislative provision under which the said act or omission is regarded as a criminal offense at the time of its occurrence." It also violates article 6, paragraph 2, of the International Covenant of Civil and Political Rights that prohibits imposition of the death penalty when it does not apply "in accordance with the law in force at the time of the commission of the crime." Consequently, this arbitrary application of the death penalty is also a violation of the right to life in article 6 of the International Covenant of Civil and Political Rights.

*No Death Penalty after an Unfair Trial*

The death penalty may not be applied after an unfair trial. The death penalty may only be applied "pursuant to a final judgment rendered by a competent court after legal process which gives all possible safeguards to ensure a fair trial, at least equal to those contained in article 14 of the International Covenant on Civil and Political Rights, including the right of anyone suspected of or charged with a crime for which capital punishment may be imposed to adequate legal assistance at all stages of the proceedings," according to Safeguard 4 of the authoritative UN Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty.

As indicated above by the extensive examples of unfairness, the proceedings before the IST are extremely unfair and unjust. Many of the above examples include interferences urging that the death penalty by applied.

Execution after an unfair trial will violate the non-derogable right not to be arbitrarily deprived of life, guaranteed by Article 6 of the International Covenant of Civil and Political Rights.

# CONCLUSION

*Conclusion*

The trial is widely perceived to be illegal and unable to ensure fundamental human rights. This observation has been made by numerous human rights bodies including non-governmental organizations and intergovernmental organizations.

Having observed the IST since its inception the United Nations expert on fair trial, Professor Leandro Despouy, has stated that[211]

> 56. This [IST] has been the subject of analysis and special concern for the Special Rapporteur since 10 December 2003 when the Statute of the Iraqi Special Tribunal (IST) was adopted and throughout its development. Already in his reports to the Commission and the General Assembly in 2005, he had the opportunity to express his reservations regarding the legitimacy of the tribunal, its limited competence in terms of people and time [footnote omitted] and the breach of international human rights principles and standards to which it gives rise. But beyond these serious objections of a legal nature, to which should be added the possibility that the death penalty might be applied, the Special Rapporteur has observed the terrible conditions in which the trial has been taking place and in particular the climate of insecurity in the country, which in turn has affected its development.

> 57. The level of violence is such that one of the judges and another five candidates for the post have been assassinated. The same fate was met by one of the defence lawyers of Saddam Hussein on the day after the trial began; on 8 November 2005 another defence lawyer was murdered and in the course of the same attack a third one was wounded. Pressure has grown for the trial to be removed from Iraq. The protests of non-Iraqi lawyers have increased, and they maintain they are not allowed enough time to put forward their pleas. All this led at E/CN.4/2006/52 page 18 the beginning of December 2005 to the temporary suspension of the trial, to the withdrawal and return of the defence team, to the absence of the main person accused and to the possibility that the trial might be continued behind closed doors.

> 58. Although it is generally agreed that Saddam Hussein should be tried for the atrocities committed, what is needed is an institution which has the material capacity to do so, which respects international human rights standards and which offers the necessary security guarantees, and this is obviously not the case at present. The experience of the various international tribunals established by the United Nations shows that there are alternatives to the IST, even within the Organization, since the trial of the former dictator and his

> collaborators can offer a valuable model for combating impunity, provided that the rules of due process are respected and that the community at large understands that it is a real act of justice and not the verdict of the victors over the vanquished.

This statement reflected widely held concerns by the Commission, but it does not state the consequences of these concerns. International law requires certain consequences.

First and foremost among these consequences is that all violations of international human rights law should be brought to an end.

This can only be done if the current proceedings are stopped, a mistrial declared, and all the current judges of the IST are disqualified.

In addition, all the defendants should be immediately compensated for the violations of their human rights and provided the resources equivalent to those provided to the prosecution in order to prepare their defense.

The irreparable violations of human rights make continuation of the trial before the IST impossible and allowing the trial to continue will send a message to the world that force can be used to launch assaults on the rule of law with impunity as the United States government has done.

An even more immediate consequence will be continued violence in Iraq. The unfairness of the trial has already heightened tensions between section of the population that opposed the President and supported the aggression against their country, and the increasing number of people whose security was better ensured under their own government rather than under a government put in place by a foreign and oppressive occupier.

Stability, peace, and reconciliation must be prompted. These goals cannot be achieved by victors' injustice imposed by those whose *de facto* authority is based on their illegal aggression against the Iraqi people. Far too many people have already died. If these proceedings continue, they will contribute to the death of many more.

Urgent action is needed by the international community if it is to preserve the rule of law.

Having regards for the international condemnation of the proceedings before the IST and the serious violations of Iraqi and international law, the appellate division of the IST is requested to annul the judgment of the trial chamber of the IST handed down on 5 November 2006.

To carry out an execution after an unfair trial is a serious violation of international. The death penalty decreed on 5 November 2006 should be immediately and irrevocably annulled.

# Annexes

Annex A
30 November 2005
Decision of the United Nations Working Group on Arbitrary Detention

OPINION No. 46/2005 (Iraq and United States of America)
Communication addressed to the Governments on 9 March 2005,
Concerning: Mr. Saddam Hussein Al-Tikriti
Both States are Parties to the International Covenant on Civil and Political
Rights

1. The Working Group on Arbitrary Detention was established by resolution
1991/42 of the Commission on Human Rights. The mandate of the Working
Group was clarified and extended by resolution *1997/50* and confirmed by
resolution 2003/31. Acting in accordance with its methods of work, the
Working Group forwarded the above-mentioned communication to the
Governments of Iraq and the United States of America.

2. The Working Group conveys its appreciation to both Governments for
having submitted information with regard to this communication.

3. The Working Group regards deprivation of liberty as arbitrary in the
following cases:

I. When it manifestly cannot be justified on any legal basis (such as continued
detention after the sentence has been served or despite an applicable amnesty
act) (Category I);

II. When the deprivation of liberty is the result of a judgement or sentence for
the exercise of the rights and freedoms proclaimed in articles 7, 13, 14, 18,
19,20 and 21 of the Universal Declaration of Human Rights and also, in
respect of States parties, by articles 12. 18, 19, 21, 22, *25,* 26 and 27 of the
International Covenant on Civil and Political Rights (Category II);

III. When the complete or partial non-observance of the relevant international
standards set forth in the Universal Declaration of Human Rights and in the
relevant international instruments accepted by the States concerned relating to
the right to a fair trial is of such gravity as to confer on the deprivation of
liberty, of whatever kind, an arbitrary character (Category III);

4. In the light of the allegations made the Working Group welcomes the
cooperation of the Governments of Iraq and of the United States of America.

The Working Group transmitted the replies provided by the two Governments to the source and received its comments.

5. According to the information received from the source, Mr. Saddam Hussein Al-Tikriti, born on 28 April 1937, of Iraqi nationality, is the former President of Iraq.

6, According to information publicly available, on 20 March 2003 military forces belonging primarily to the United States of America ("US") and the United Kingdom of Great Britain and Northern Ireland ("UK") began the invasion of Iraq. On 9 April 2003, Baghdad was formally secured by US forces and the Iraqi regime headed by President Saddam Hussein was declared to have ended, On 1 May 2003 the President of the United States announced the end of major combat operations in the Iraq war, As recognized in UN Security Council resolution 1483 (2003), [page 1] around this date the US and the UK "assumed the specific authorities, responsibilities, and obligations under applicable international law .as occupying powers under unified command". The Coalition forces established a Coalition Provisional Authority (CPA) under an Administrator named by the US. The CPA named an Interim Iraqi Governing Council. On 30 June 2004, the occupation of Iraq ended and the CPA ceased to exist. As of that date, Iraq reasserted its full sovereignty and an Interim Government of Iraq assumed full responsibility for governing Iraq (see paragraphs 1 and 2 of UN Security Council resolution 1546 (2004)). In accordance with Security Council resolution 1546, however, a multinational force, composed primarily of US and UK military forces, remains in Iraq at the request of the Iraqi Government.

7. On 13 December 2003, Mr. Saddam Hussein was captured in Tikrit by military forces of the United States, then the occupying power in Iraq, and was taken into custody at an undisclosed location. From that date until the time of submission of the communication, his only contact with his defence team was on 16 December 2004 with one of his attorneys, under supervision of at least two United States military guards who were present during this interview. The source states that despite repeated requests before and after this interview, the lawyers of the defence committee were denied the possibility to hold other meetings with their client.

8. The source alleges that Mr. Saddam Hussein was initially detained as a prisoner of war wider the terms of the Third Geneva Convention Relative to the Protection of Prisoners of War. However, the United States Government has since then claimed that he is no longer a prisoner of war but a prisoner of the Iraqi Government. The source adds that, despite this claim by the United States Government, Saddam Hussein remains under the complete control of the United States Government.

9. On 10 December 2003, the Iraqi Governing Council established the Iraqi Special Tribunal. According to Article 1 (b) of its Statute, "[t]he Tribunal shall have jurisdiction over any Iraqi national or resident of Iraq accused of the crimes listed in Articles 11 to 14 below, committed since July 17, 1968 and up until and including May 1, 2003, in the territory of the Republic of Iraq or elsewhere, including crimes committed in connection with Iraq's wars against the Islamic Republic of Iran and the State of Kuwait." The crimes listed in Articles 11 to 14 of the Statute are genocide, crimes against humanity, war crimes, and violations of certain Iraqi laws listed in Article 14. On 11 October 2005, the President of Iraq signed a new statute and new rules of procedure of the court, which rename it Supreme Iraqi Criminal Tribunal (which is the term used hereinafter).

10. According to information publicly available, Mr. Saddam Hussein appeared before the Supreme Iraqi Criminal Tribunal for his first hearing (arraignment) on 1 July 2004. The hearing took place in a Secret location and the defendant was not assisted by counsel, the investigating judge confined himself to ascertaining the identity of the accused. In addition, Mr. Saddam Hussein was informed of seven charges brought against him. Because he was not assisted by legal counsel, he refused to sign the record of proceedings.

11. The source further submits that Mr. Saddam Hussein's status should be covered by the Third Geneva Convention Relative to the Protection of Prisoners of War, since he was captured because of his participation in an armed conflict. However, he is being denied such protection by the United States Government as occupying power and custodian authority, and the Iraqi authorities have brought charges against him before the Supreme Iraqi Criminal Tribunal, [page 2] Therefore, the source is of the opinion that legal responsibility for Ms arbitrary detention attaches to both Iraq and the United States of America.

12. The source alleges that the detention of Mr. Saddam Hussein is arbitrary because he has not been charged in a timely manner, has not been granted the full privileges of a prisoner of war (for example, to be allowed to communicate with his family without undue delays or to receive documents pertaining to his legal representation), has been forced to prepare his trial in conditions of complete isolation from the outside world, detained at a secret location, severely restricted in the contact with legal counsel (although the charges raised against him must be of the most serious nature to fall within the mandate of the Supreme Iraqi Criminal Tribunal). The source concludes that the non-observance of international norms relating to fair trial is so serious as to render his pre-trial detention, as well as any detention upon conviction, arbitrary. Furthermore, the source alleges that Mr. Saddam Hussein has been denied the right to challenge the legality of his detention. Finally, the source expresses doubts as to whether a fair trial can at all take place under the

current security situation in Iraq, before a special tribunal that lacks the independence and impartiality needed.

13. In its reply to the communication, dated 2 May 2005, the Government of Iraq states that Saddam Hussein is awaiting trial, and that it is premature to discuss matters relating to his right to prepare his defence and to a fair hearing. As to his place of detention, it is kept secret in order to protect him. The Government further reports that Saddam Hussein was allowed to meet one of his lawyers on 27 April 2005, that this meeting had lasted six hours, and that the lawyer was able to freely interview Saddam Hussein in the presence of an officer.

14. In its reply to the communication, the Government of the United States underlines that, as also noted by the source, Saddam Hussein is in physical custody of the Multinational Forces in Iraq (MNF-I) pursuant to arrangements between MNF-I and the Iraqi Ministry of Justice, but is being held under the legal authority of an Iraqi court. The Government of the United States therefore considers that the Government of Iraq is best placed to clarify the legal basis of the detention of Saddam Hussein.

15. In replying to the statement by the Government of the United States, the source argues that as the State actually detaining Saddam Hussein, the United States is responsible for respect of his right to security of person, a responsibility it cannot disclaim on the basis of the argument that Saddam Hussein is kept in custody on behalf of the Government of Iraq or of the argument that he is not detained on US territory.

16. As to the reply of the Iraqi Government, the source asserts that the Iraqi Government confirms the accuracy of all its allegations. The source argues that Saddam Hussein's rights to counsel, to prepare his defence, and to a fair hearing have been violated (as of mid-August 2005) for more than 20 months, It adds that a single meeting between counsel and defendant in the presence of a United States military officer clearly does not fulfill the requirements of the right to be assisted by counsel, Finally, the source argues that the violation of Saddam Hussein's rights is exacerbated by the repeated attacks against the house of his defence counsel, as well as by his humiliation through the circulation of pictures showing him in partial undress, and by the Government allowing physical attacks against him while in custody. [page 3]

17. To be able to spell out the law applicable to the *different* issues raised by the source and *identify* the Government(s) responsible under international law for the legality of the detention and the eventual violation of the rights of Mr. Saddam Hussein, if any, the Working Group considers necessary to highlight the particularity of the circumstances of the case before it.

18. The Working Group would like to stress that Mr. Saddam Hussein was the President of the Republic when armed forces of the United States and the United Kingdom of Great Britain and Northern Ireland invaded Iraq on 20 March. On 1 May 2003, the Security Council in its resolution 1483 admitted that the United States and the United Kingdom of Great Britain had assumed the authority, responsibility and applicable obligations under international law in the territory of Iraq. On 13 December 2003, Saddam Hussein was captured in Tikrit by US military forces. Later, the occupying forces constituted the CPA as the Coalition Provisional Authority under the control of an envoy named by the Government of the United States. On 30 June 2004, the occupation ended and the full sovereignty of Iraq was restored through the Interim Government of Iraq. In accordance with Security Council resolution 1546 of 8 June 2004, however, a multinational force (MNF-I), composed primarily of United States of America and United Kingdom military forces, remained in Iraq at the  request of the Iraqi Government. At some point before the restoration of sovereignty to Iraq, Mr. Saddam Hussein and other members of the former Iraqi' regime were "formally" or *"de jure"* transferred by the CPA to Iraqi custody.

19. According to some developments publicly reported in the case under consideration, on 1 July 2005, Saddam Hussein and 11 other members of the former Baathist leadership appeared before the Supreme Iraqi Criminal Tribunal's chief investigating judge. The defendants were reportedly informed of the charges against them and questioned by the investigating judge. The defendants did not have legal counsel present, and no full public transcript of the proceedings exists.

20. On 19 October 2005, the trial before the Supreme Iraqi Criminal Tribunal against Saddam Hussein and seven co-defendants in the *Dujail* case opened. At the hearing, defense counsel and some of the defendants raised three challenges: the lack of adequate time given to the defense to study the final dossier and prepare its case; the lack of sufficient access to the accused by defense counsel; and concerns regarding the court's legitimacy and competence. The court granted an adjournment of the trial until 28 November 2005. At the time of drafting this Opinion (30 November 2005) another adjournment had been granted to 5 December 2005.

21. On 20 October 2005, the day following the opening hearing, Mr. Sadoum al-Janabi, counsel of one of Saddam Hussein's co-defendants, was abducted from his office by armed men. He was subsequently found dead with two bullet wounds to the head. On 8 November 2005, in a drive-by shooting in Baghdad, gunmen killed Mr. Adel Muhammad al-Zubaidi, who represented another defendant in the *Dujail* trial, and injured a further defense lawyer, Mr. Thamer al-Khuzaie.

22. The source alleges that Mr. Saddam Hussein was initially detained as a prisoner of war, but has not been granted the full privileges of a prisoner of war under the terms of the Third Geneva Convention Relative to the Protection of Prisoners of War of 12 August 1949, In their replies, neither the US Government nor the Iraqi Government provided information on this allegation. It is however well known that from the early days of the conflict in Iraq, the US [page 4] Government recognized that the Geneva Conventions applied comprehensively to individuals captured in the *conflict* in Iraq. The US Government also gave assurances that it intended to comply with article 5 of the Third Geneva Convention by treating all belligerents captured in Iraq as prisoners of war unless and until a competent tribunal determines that they were not entitled to POW status.[1]

23. The position of the Working Group is that although the invading coalition stated that the major combat operations finished on 1 May 2003, the total occupation still continued until 30 June 2004. Therefore as Saddam Hussein's detention took place in the context of an international armed conflict resulting in the invasion of Iraq by the American Government's forces and the armed coalition, his status is protected by the Third Geneva Convention at least until 30 June 2004.

24. consequently, and in accordance with paragraph 16 of its methods of work and 14 of its revised methods of work,[2] the Working Group will not assess the lawfulness of Mr. Saddam's detention for the period taking place between 13 December 2003 and 30 June 2004, as it occurred during an ongoing international armed conflict and the United States Government recognized that the Geneva conventions applied to individuals captured in the conflict in Iraq.

*25.* According to the fifth paragraph of Article 119 of the Third Geneva Convention it is permissible that prisoners of war against whom penal proceedings are pending may be detained until the close of such proceedings. The Working Group is also not in a position to assess the conformity to the applicable provisions of international humanitarian law (Arts. 12, 1 18 and 1 19 of the Third Geneva Convention to which the US and Iraq are parties) of the procedure under which Mr. Saddam Hussein was transferred by the CPA to the Interim Government of Iraq. It is, however, not disputed that, while *de jute* transferred, Mr. Saddam remains *de facto* in US custody. The United States Government, in its reply to the Working Group, recognises that *"the detainee is under the custody of the "Multinational Force Iraq" according to an agreement reached with the Minister of Iraqi Justice although he is under the authority of an Iraqi court"*.

26. The Working Group concludes that until 1 July 2004 Saddam 1-lussein was detained under the sole responsibility of the Coalition members as occupying powers or, to be more precise, under the responsibility of the US

Government. Since then, and as the Iraqi criminal Tribunal is a court of the sovereign State of Iraq, the pre-trial detention of a person charged before the Tribunal is within the responsibility of Iraq. In light of the fact that Saddam Hussein is in the physical custody of the US authorities, any possible conclusion as to the arbitrary nature of his deprivation of liberty may involve the international responsibility of the US Government.

27. As of the period of detention subsequent to 30 June 2004, Saddam Hussein appeared before the Supreme Iraqi Criminal Tribunal for his first hearing on 1 July 2004. The hearing took place in a secret location and the defendant was not assisted by counsel, In addition, Mr. Saddam Hussein was informed of the charges brought against him. Because he was not assisted by legal [page 5] counsel, he refused to sign the record of proceedings. Therefore, whatever the status under which he was detained prior to the 1 July 2004, he subsequently became a defendant in a criminal procedure, entitled to the protection of the International Covenant on Civil and Political Rights. Both the US and Iraq have ratified the ICCPR and therefore articles 9(3) and 14 ICCPR are applicable to his detention.

28. Although neither the Iraqi Government nor the US Government have provided detailed answers to the allegations concerning the characteristics of the process and the violations affecting the right of the defence, as invoked by the source, the Working Group had access to, and gathered information regarding the Supreme Iraqi Criminal Tribunal and its rules of procedure.

29. This tribunal was established by the Iraqi Governing Council on 10 December 2003, and in the first days of August 2004 the Interim Iraqi Assembly modified the statute that was regulating it. The Working Group does not know the criteria under which the Iraqi Government has nominated the judges who form this tribunal. However, the alleged withdrawal or substitution of several judges is a matter of concern. The atmosphere surrounding the preparation of the trial, which can negatively affect the independence and impartiality of the Tribunal — or at least give the impression that the tribunal lacks the requisite independence and impartiality—, is also a matter of concern to the Working Group. The murder of defence lawyers, the threatening behaviour of the crowd against some of the accused, motivated by past wrongs suffered in the previous regime, might exert an undue pressure on the tribunal. More specifically, the fact that capital punishment was recently re-established and that no appeal is allowed against conviction and sentence, which is in complete disregard of Article 14 paragraph 5 of the International Covenant on Civil and Political Rights, may cast a shadow over the requisite fairness of the process.

30. In his annual report (2005) to the UN General Assembly, Leandro Despouy, the Special Rapporteur on the independence of judges and lawyers,

raised his own concerns about the judicial proceedings taking place before the "Iraqi Special Tribunal". He stated that: *"Despite the commitment and personal efforts of the judges and the cooperation provided by several countries in setting up the tribunal, he is concerned that the pressure weighing on the judges and the prevailing insecurity in Iraq may undermine its independence. Moreover, the tribunal itself has its deficiencies, some of which can be traced back to the manner in which it was set up, and in particular to the restriction of its jurisdiction to specific people and a specific time frame; i.e., the tribunal may only try Iraqi citizens for acts committed prior to F' May 2003, when the occupation began. The tribunal 's power to impose the death penalty demonstrates the extent to which it contravenes international human rights standards, Because it was established during an occupation and was financed primarily by the United States, its legitimacy has been widely questioned, with the result that its credibility has been tarnished. The Special Rapporteur urges the Iraqi authorities to follow the example set by other countries with deficient judicial systems by asking the United Nations to set up an independent tribunal which complies with international human rights standards3. "*

31. The Working Group shares these concerns. It is also concerned about the criminal proceedings in Saddam Hussein's case, notably the right to counsel. Apparently Saddam can only See (*150/321) page *15.* [page 6] meet his defence counsel in the presence of US officials; it is not clear whether he can meet them often enough to have the significant exchange necessary for such a complicated case, On 19 October 2005, at the hearing, defense counsel and some of the defendants raised three challenges: the lack of adequate time given to the defense to study the final dossier and prepare its case; the lack of sufficient access to the accused by defense counsel; and concerns regarding the court's legitimacy and competence. The Working Group was also made aware that there are discrepancies between the old Iraqi criminal procedure code and the rules of procedure of the SICT on important points, and it is not clear which law prevails.

32. Since procedural flaws amounting to the violation of the right to a fair trial may, in principle, be redressed during the subsequent stages of the criminal proceedings, the Working Group would find premature to take a position now on this point. The Working Group is fully aware that the ongoing judicial procedure in Iraq is aimed to bringing to justice the highest- ranking leaders of the past Iraqi regime of Saddam Hussein, including himself, for the most serious crimes they allegedly committed against the Iraqi people and some neighboring nations. The crimes for which they are prosecuted comprise, but are not limited to genocide, crimes against humanity and war crimes.

33. As one of the mechanisms of the United Nations Commission on Human Rights, the Working Group is deeply committed to the principle that any

violation of human rights, whether committed by politicians or others, must be inquired into and redressed, if necessary by putting the perpetrators to justice. Yet, any procedure aiming to put right gross human rights violation ,as such welcomed by the Working Group, shall scrupulously respect the rules and standards elaborated and accepted by the international community to respect the rights of any person charged of a criminal offence. The violation of the rights of the person charged may easily backfire. This is particularly true in the instant case; any lack of respect for the rights of the leaders of the former regime in the criminal proceedings against them may undermine the credibility of the Justice system of the newly emerging democratic Iraq.

34. The Working Group believes that under the circumstances the proper way to ensure that the detention of Saddam Hussein does not amount to arbitrary deprivation of liberty would be to ensure that his trial is conducted by an independent and impartial tribunal in strict conformity with international human rights standards.

35. On the basis of what precedes, the Opinion of the Working Group is that

a) It will not take a position on the alleged arbitrariness of the deprivation of liberty of Mr. Saddam Hussein during the period of international armed conflict;

b) The Working Group will follow the development of the process and will request more information from both concerned Governments and from the source. In the meantime and referring to paragraph 17(c) of its methods of work, it decides to keep the case pending until further information is received.

Adopted on 30 November 2005.

Notes:

1. Statement made in April 2003 see e g. "Briefing on Geneva Convention, EPW and war crimes." 7 April 2003, available at: <www.defenselink.mil/transcripts/2003t04072003_t407genv.html>.

2. "The Working Group will not deal with situations of international armed conflict in so far as they are covered by the Geneva Conventions of 12 August 1949 and their Additional Protocols, particularly when the International Committee of the Red Cross (ICRC) has competence".

Annex B
Excerpt from the 2005 Report of the UN Special Rapporteur on the
Independence of Judges and Lawyers

United Nations Doc. No. A/60/321
General Assembly
Distr.: General
31 August 2005
English
Original: Spanish
Sixtieth session
Item 73 (b) of the provisional agenda*
Human rights questions: human rights questions including alternative
approaches for improving the effective enjoyment of human rights and
fundamental freedoms Civil and political rights, including the questions of
independence of the judiciary, administration of justice, impunity
Note by the Secretary-General

The Secretary-General has the honour to transmit to the members of the
General Assembly the report of the Special Rapporteur of the Commission on
Human Rights on the independence of judges and lawyers, Leandro Despouy,
submitted in accordance with Commission resolution 2005/33 of 19 April
2005.

... [Page 15] ...

VII. The Iraqi Special Tribunal

42. At the time of writing (August 2005), the Special Rapporteur is concerned about the judicial proceedings taking place before the Iraqi Special Tribunal. Despite the commitment and personal efforts of the judges and the cooperation provided by several countries in setting up the Tribunal, he is concerned that the pressure weighing on the judges and the prevailing insecurity in Iraq may undermine its independence. Moreover, the Tribunal itself has certain deficiencies, some of which can be traced back to the manner in which it was set up and, in particular, to the restriction of its jurisdiction to specific people and a specific time frame; i.e., the Tribunal may only try Iraqi citizens for acts committed prior to 1 May 2003, when the occupation began. The Tribunal's power to impose the death penalty demonstrates the extent to which it contravenes international human rights standards. Because it was established during an occupation and was financed primarily by the United States, its legitimacy has been widely questioned, with the result that its credibility has been tarnished.

43. The Special Rapporteur urges the Iraqi authorities to follow the example set by their countries with deficient judicial systems by asking the United Nations to set up an independent tribunal which complies with international human rights standards.

...

IX. Conclusions and recommendations

... [page 17]

51. The Special Rapporteur points out that the Iraqi Special Tribunal has certain deficiencies and that its legitimacy has been rightfully criticized, with the result that its credibility has been called into question. He is alarmed that it is empowered to impose the death penalty, that its jurisdiction is restricted to specific persons and a specific time frame, and that it otherwise violates international human rights standards. He hopes that the Iraqi authorities will adopt relevant measures to ensure that the barbaric crimes committed in Iraq will be prosecuted by independent and impartial tribunals, in strict compliance with international human rights standards, as other countries in similar circumstances, such as Sierra Leone, have done with the active cooperation of the international community. As mentioned earlier, mankind has admirably demonstrated that it is possible to overcome legal or material constraints at the national level, combat impunity and dispense justice, on the basis of different international precedents.

Annex C
Excerpt from the 2006 Report of the UN Special Rapporteur on the
Independence of Judges and Lawyers

UNITED NATIONS
Economic and Social Council
Distr.: GENERAL
UN Doc. No. E/CN.4/2006/52
23 January 2006
ENGLISH
Original: SPANISH
COMMISSION ON HUMAN RIGHTS
Sixty-second session
Item 11 (d) of the provisional agenda
CIVIL AND POLITICAL RIGHTS, INCLUDING THE QUESTIONS
OF INDEPENDENCE OF THE JUDICIARY, ADMINISTRATION,
OF JUSTICE, IMPUNITY
Report of the Special Rapporteur on the independence of judges and lawyers,
Leandro Despouy

... [Page 17] ....

V. IRAQI SPECIAL TRIBUNAL

56. This has been the subject of analysis and special concern for the Special Rapporteur since 10 December 2003 when the Statute of the Iraqi Special Tribunal (IST) was adopted and throughout its development. Already in his reports to the Commission and the General Assembly in 2005, he had the opportunity to express his reservations regarding the legitimacy of the tribunal, its limited competence in terms of people and time25 and the breach of international human rights principles and standards to which it gives rise. But beyond these serious objections of a legal nature, to which should be added the possibility that the death penalty might be applied, the Special Rapporteur has observed the terrible conditions in which the trial has been taking place and in particular the climate of insecurity in the country, which in turn has affected its development.

57. The level of violence is such that one of the judges and another five candidates for the post have been assassinated. The same fate was met by one of the defence lawyers of Saddam Hussein on the day after the trial began; on 8 November 2005 another defence lawyer was murdered and in the course of the same attack a third one was wounded. Pressure has grown for the trial to be removed from Iraq. The protests of non-Iraqi lawyers have increased, and they maintain they are not allowed enough time to put forward their pleas. All this led at [page 18] the beginning of December 2005 to the temporary suspension of the trial, to the withdrawal and return of the defence team, to the absence of the main person accused and to the possibility that the trial might be continued behind closed doors.

58. Although it is generally agreed that Saddam Hussein should be tried for the atrocities committed, what is needed is an institution which has the material capacity to do so, which respects international human rights standards and which offers the necessary security guarantees, and this is obviously not the case at present. The experience of the various international tribunals established by the United Nations shows that there are alternatives to the IST, even within the Organization, since the trial of the former dictator and his collaborators can offer a valuable model for combating impunity, provided that the rules of due process are respected and that the community at large understands that it is a real act of justice and not the verdict of the victors over the vanquished.

… [page 21] …

77. The notorious shortcomings apparent in the trial of Saddam Hussein and his main collaborators and the climate of insecurity in which the trial is being conducted make it advisable to transfer the trial to an international tribunal with United Nations cooperation.

Annex D
28 November 2005
Submission Requesting Security Arrangements be put in Place

## SECURITY REQUIREMENTS FOR IRAQI DEFENSE COUNSEL

Iraqi defense counsel and their families are living in great danger. They have no protection. They receive death threats frequently. Two of those who appeared in Court on October 18, 2005 have been executed, courageous colleagues Sadoun al-Janabi and Adel al-Zubadi. Several Iraqi T.V. stations regularly broadcast that defense counsel are criminals for representing the accused, fanning the flames of hatred. The identities of some of the defense counsel are known to forces that seek to execute them. The identities of all will become known as the trial proceeds.

By serving as defense counsel they and their families are placed in grave danger. Levels of violence in Iraq continue to grow. Attacks, kidnappings and executions of Sunni men by armed forces, some apparently controlled by the Interior Ministry and other parts of the government, are committing summary executions. Defense counsel are prime targets.

It does not appear that the risk of assassination for defense counsel will decrease anytime soon and will linger for years even after peace and reconciliation among Iraqi people, for which defense counsel work and pray is achieved.

As a consequence, all defense counsel have decided that their families will be safe only if they leave Iraq for the foreseeable future. This decision is reached with great sorrow because they love their country, and their children and grand children will grow up strangers to Iraq.

But defense counsel will not desert their clients. The security requirements they require are as follows:

1. Family Relocation: The immediate relocation of their entire families to include parents, wives, children, grand children and minor, elderly, or handicapped relatives for whom they presently provide care. They seek relocation in an Arab State. All believe Qatar would provide the best security. Arrangements should be made immediately. Dwellings for each family acceptable to them should be found and the families relocated as soon as possible. All persons relocated should be granted political asylum in the state where they relocate and their rights and the rights of offspring born to them to remain in the country to which they are relocated must be equal to citizens of that country.

Funds for the transportation and support of the families should be provided. These must be agreed upon and adjusted periodically to changes in

the cost of living where they reside, and right to such funds must be inviolable, unless and until they become self sufficient from their own labors.

Any property the families own in Iraq and must leave behind must be protected until sold.

Defense counsel must be provided funds to travel to visit their families wherever there is time to do so until they are able to safely join them after the conclusion of all trials in which they participate.

Funds for family living expenses in Iraq until families are relocated shall be provided.

2. Immediate Protection for all defense counsel: Defense counsel shall be immediately provided funds for the full time employment of ten trained guards for himself and his family until the family has been safely relocated outside Iraq. Guards shall be authorized to possess machine guns, automatic rifles, and pistols and such other weapons as are needed to defend the family and counsel. Top quality body armor shall be provided. All passes necessary for travel by counsel and family, from both Iraqi and United States authorities, shall be provided, including passes to use roads including single lane roads exclusively for U.S. military and VIPs wherever such roads are available to the Airport, Court, between office, home, court, the international zone, and elsewhere, and passes for expedited passage through all checkpoints. Family members and defense counsel shall receive personal I.D. passes for checkpoints and military assistance.

3. Emergency Telephone Access for U.S. Military Protection: Defense counsel and senior family members shall be provided emergency telephone equipment and access to the U.S. military to call for military protection whenever threatened, attacked, traveling in dangerous zones, or otherwise necessary.

4. Funding for Defense Counsel Expenses of Living and Working: Defense counsel shall be provided funds for his living expenses paid regularly, during the continuation of the trial sufficient to cover all expenses related to his presence in Iraq to serve as defense counsel.

5. Witness Protection and Relocation: Funds for locating, interviewing, transporting, protecting, living expenses and relocating and providing new identities to witnesses for the defense shall be provided by the U.S. in a timely manner.

6. Protection, and funds for Investigators and Experts: Protection and funding for defense investigators and experts to meet the all efforts in preparing and presenting the defense shall be provided by the U.S. in a timely basis.

Annex E
19 September 2005
Letter to the UN Secretary-General


The Honorable Kofi Annan
Secretary General of the United Nations


        **Re:**    **Urgent Request for the Immediate Investigation
                   by the United Nations of the Kidnapping and**

**Murder**

                **of Sadoum al-Janabi**

Dear Mr. Secretary-General,

      A United Nations investigation of the kidnapping and murder in
Baghdad on October 20, 2005 of Sadoun al-Janabi, defense attorney for Awad
Hamed al-Bander, the day after the televised exposure of defense attorneys for
eight leaders of the former government of Iraq, including President Saddam
Hussein, is an urgent necessity.

      Investigations by the interim government of Iraq and the United States
will have no credibility. Leaders of both governments have repeatedly
expressed hostility toward the accused persons and both governments have
resorted to criminal violence against supporters of the former government of
Iraq.

      The New York Times reported Saturday, October 22, 2005 in a first
page story:

>       "Eyewitnesses quoted on Friday on the television station Al
> Arabiya said that Mr. Janabi's abductors, dressed in suits and ties,
> identified themselves as officials of the Interior Ministry, which has
> faced accusations in recent months that it has harbored Shiite death
> squads that hunt down members of the Sunni Arab community with
> links to Mr. Hussein's years in power." N.Y. Times, October 22, 2005,
> at p. 10.

      Mr. Janabi, a Sunni, was reported to be a personal friend of President
Hussein. He spoke out repeatedly during the hearing on October 19, once
accusing the prosecutor of making a "political speech."

      President Bush failed to answer a letter from our committee dated June
15, 2005 in which we addressed the necessity of "...immediate, full and secure

access to President Saddam Hussein for defense counsel and their assistants and investigators" and security measures to enable them "to perform their work safely" without interference in preparing and presenting the defense case.

Previously President Bush, Secretary Rumsfeld and the Commanding Generals of U.S. Forces in Iraq had consistently rejected all requests to consult with prisoners, including former Deputy Prime Minister Tariq Aziz beginning in May 2003, and later with President Saddam Hussein beginning in December 2004, keeping Saddam Hussein in complete isolation for more than a year with only one limited contact thereafter with individuals who were chosen or approved by the U.S.

As the first day of proceedings began, President Bush announced that he is "confident" that President Saddam Hussein will get a fair trial.  See London Herald Sun, October 19, 2005.
He earlier described Saddam Hussein as "the guy who tried to kill my dad."

The truth about the kidnapping and murder of Mr. Janabi is critically important to the future of Iraq, peace in the Middle East and beyond and "to reaffirm faith in fundamental human rights, in the dignity and worth of the human person, in the equal rights of men and women and of nations large and small."

The failure of the U.S. and Iraq to provide protection to the defense and access to the defendants requires the transfer of any trials to a legal international forum if there is to be fairness in appearance and fact.

Respectfully submitted,

Ahmed Ben Bella, former President of Algeria
Tun Dr. Mahathir Mohamad, former Prime Minister of Malaysia
Roland Dumas, former Foreign Minister of France
Ramsey Clark, former Attorney General of the United States

Annex F
29 January 2006
Repeated Request for Security

Att. The Presiding Judge of the Tribunal which we do not recognize its legality.

Submitted by Mr. Kaleel al-Dolami

On behalf of the Defense Committee, we would like to state before this Tribunal and for the world the following arguments of our challenge:

We are committed to defend our clients and we will never abandon them.

We cannot continue the proceedings before this tribunal until security for the lawyers and their families is provided in an affirmative manner. Also all the essential conditions for a fair trial should be provided.

Since it's creation, this tribunal could not meet the standards of an independent, impartial and legal court of law:

Mr. Rizgar Amin has resigned and he declared that interference of the political authority and other parties in the work of the tribunal has led him to resign. Although Judge Saeed Hammashi has been a part of this illegal court since it was established, he was recently removed under the pretext of Debaathification. Judge Raouf Rasheed Abdul-Rahman has been appointed as a presiding judge and a session on Jan. 24th 2006 was determined. After days of traveling from many Arab and foreign states, we had to wait for more than seven hours. A clerk of the tribunal came to us with two packs of paper in his hand, they were the submissions that we have submitted to the tribunal on Dec.21, 2005. The documents were divided into two parts. The clerk handed the first part to us saying that we can publish it in any of the political papers, or that we may read it before a political conference. He kept the second part with him saying that they will respond to it. We were astonished at such an act, and asked the clerk repeatedly whether he was sure that the presiding judge had said this and he said:" Yes". We said to him:" you can either review them as they were presented or reject them totally by a reasoned decision issued by your court". Could the court be dysfunctional, feeble and unable to deal with the case before it? We are not astonished for this state of affairs because the tribunal is a creation of the occupying power and not the Iraqi people.

Is it reasonable for the president of the U.S.A. to interfere in the proceedings of the court by proclaiming, "That the court is on the track and that the butcher will have the punishment he deserves". Bush violated one of the principles of justice, which is provided for in the constitution of the U.S. and all constitutions of the states of the world, i.e.the presumption of innocence. The

question is: "how does Bush know that H. E. President Saddam has been found guilty of the false allegations attributed to him?" We hope that Bush will refrain in the future from forcing his electoral problems and political purposes and aims on this illegal trial. Besides, is there any law that permits this unjustified interference?

Mr. Rizgar Amin, the former president of the trial panel, was accused of being too slow and too lenient with the defendants. Later, Raed Juhi, the investigative judge, stated that the trial would end within two months. Everyone knows that an investigation judge is not entitled to make any public statements or to act as a spokesperson for the tribunal. Such statements violate his responsibilities. By doing so, he has deprived our clients from their right to defend themselves as provided for in local and international laws.

The tribunal is indecisive in making decisions in important issues such as the legality of the tribunal, the protection of the defense lawyers and their families and making decisions on the various submissions that were submitted before it, including the legal request to establish an investigation in torturing our clients. The detainees and the prisoners of war were tortured physically. While physical torture discontinued, psychological torture continued. Investigations were conducted based on avowed enmity of some judges against our clients. Such investigations are defected so we demand that all previous investigations be deemed as null and void, and that judges who have a vowed enmity with our clients should not conduct such investigations in the future. We have demanded also, that all the letters and information that were exchanged between the American investigators, the FBI and other elated parties should be revealed. The tribunal has not responded to our requests about torturing our clients. That we, and the Iraqi people should be informed about the details of the investigation that the appointed government and its establishments have promised to conduct about the terrorist criminals and killers who have executed our colleagues: martyr Saadoun Al-Janabi and martyr Adel Al-Zubaidi. The reasons for the delay in revealing the results of such investigations should also be made public.

The tribunal continues to refuse to respond to the Defense' requests to enable the defense team to meet their clients according to time schedules that suit the defense rather than the detaining power. This serves the right of the defense lawyers to meet their clients in any time. This right should not be subject to the unpredictable mood of the detaining power or any other party.

The Defense Committee for the Iraqi President
Saddam Hussein

Annex G
19 February 2006
Decision of President of the IST
[English translation of Arabic original]

Decision of 19 February 2006 Concerning Judge Abdel Rahman

Applicant/lawyer Kaleel Dolami, President of the Defense Committee in the Dujail Case.

Lawyer Kaleel Dolami has submitted argument to disqualify the Presiding Judge of the First Trial Panel on 15 February 2006.

The Presiding Judge Raouf Rasheed Abdel Rahman replied that he has no bias against the defendant Saddam Hussein or against any other defendant in the Dujail case, and that impartiality and justice are his guiding principles

Upon review and consideration, it has been found that article 95/1 of the Code of Civil Procedure, law no. 83 of 1969, provides that a disqualification request must be made before entering onto the merits of the case, otherwise it shall be dismissed...

As the applicant has made his request after the merits stage of the case has been reached, it is decided that his request shall be dismissed and the applicant should be fined an amount of one thousand Iraqi Dinars in accordance with article 96/4 of the said law.

This decision has been made in agreement as for the subject and by majority on 19 February 2006.

The President of the Court
[Signed]

Annex H
6 April 2006
Decision of Appeals body of the IST
[English translation of Arabic original]

Decision of 3 April 2006 Concerning Presiding Judge of the First Trial Panel

The Appellate Chamber of the Iraqi High Criminal Court on 3 April 2006. The session was presided over by the President and two other judges in the name of the people and makes the following decision:

Applicant/lawyer Kaleel Dolami, President of the Defense Committee for the defendant Saddam Hussein al-Majeed.

Lawyer Kaleel Dolami submitted a request to disqualify the Presiding Judge of the First Trial Panel Judge Raouf Rasheed Abdel Rahman pursuant to article 96/2 of the Code of Civil Procedure and Rules number 7 and 8 of the Rules of Procedure on the grounds hat the Presiding Judge, during the session of 15 March 2006 addressed his client by saying that he is accused of killing innocent persons in the Dujail case and that he was the cause of the injustice inflicted upon the Iraqi people because of the oil coupons. The judge also threatened to have any defense lawyer who breached the law handcuffed.

Judge Raouf Rasheed Abdul Rahman replied that the statements attributed to him do not constitute a biased opinion.

Upon review and consideration it has been found that the statements included in the disqualification request do not reflect a pre-mature opinion in accordance with article 3/93 of the Code of Civil Procedure. This request is dismissed and the applicant shall be fined two thousand Iraqi Dinar in accordance with article 96(4) of the Code of Civil Procedure. The decision is made by agreement on 3 April 2006.

The President of the Court
[Signed]

Annex I
26 March 2006
Affidavit by Jordanian Lawyer of Statements of Bias Against President
Made By IST-Appointed Lawyer Who Made Closing Statement for Defense
[English translation of Arabic original]

## An AFFIDAVIT

<u>Subject</u>: Statement of Lawyer Mazin Abdul Hameed Jabbar,
one of the lawyer's appointed by the Iraqi Higher Criminal Court

I, the undersigned, testify that the information given in this
affidavit is correct and was given under oath.
During repeated meetings with the above mentioned lawyer, he
stated without equivocation that the "defendants in this case do
not deserve being tried, and that they should be left in the streets
for people to directly take their revenge on them. This because
death penalty is a rather mild sentence when compared to the
crimes they committed against the Iraqi people".
Showing his contempt for the President (i.e.H.E.Saddam
Hussein) and the other co-defendants, the said lawyer added that
he feels ashamed because those people have governed his
country for more than thirty years. He accused them of
committing crimes, of ignorance an absurdity.
He deplored the existence of Defense lawyers of our choice for
the defendants saying that the reason behind the lawyers
decision to defend those people is "that you had earned
millions". He said also that "the amounts that have been paid
for the Court, to prepare for the trials and to train the judges,
should have been spent on the people who suffered injustice and
on the victims of the regime. The trials during the days of the
past regime were artificial and very quick. Now, they should be
treated equally".
I informed Captain Mike McCoy of the (RCLO) about the
statements of the said appointed lawyer during the session of

March 15th 2006. I told Captain McCoy that such a person should no longer remain in the Defense Office of the Court. Captain McCoy supported my view and asked the appointed lawyer whether I have said the truth. He replied:" yes, but I did not speak about my client".

I give this affidavit to the best of my knowledge and memory.

Lawyer
Issam Ghazzawi

On this day the 26th of March 2006

Annex J
2005
Arte France and KS Visions DVD
[English language]

Available as a separate item.

Annex K

Final Decision of the UN Working Group on Arbitrary Detention

OPINION No. 46/2005 (Iraq and United States of America)

Communication addressed to the Governments on 9 March 2005,

Concerning: Mr. Saddam Hussein Al-Tikriti

Both States are Parties to the International Covenant on Civil and Political Rights

1. The Working Group on Arbitrary Detention was established by resolution 1991/42 of the Commission on Human Rights. The mandate of the Working Group was clarified and extended by resolution *1997/50* and confirmed by resolution 2003/31. Acting in accordance with its methods of work, the Working Group forwarded the above-mentioned communication to the Governments of Iraq and the United States of America.

2. The Working Group conveys its appreciation to both Governments for having submitted information with regard to this communication.

3. The Working Group regards deprivation of liberty as arbitrary in the following cases:

I. When it manifestly cannot be justified on any legal basis (such as continued detention after the sentence has been served or despite an applicable amnesty act) (Category I);

II. When the deprivation of liberty is the result of a judgement or sentence for the exercise of the rights and freedoms proclaimed in articles 7, 13, 14, 18, 19,20 and 21 of the Universal Declaration of Human Rights and also, in respect of States parties, by articles 12. 18, 19, 21, 22, *25,* 26 and 27 of the International Covenant on Civil and Political Rights (Category II);

III. When the complete or partial non-observance of the relevant international standards set forth in the Universal Declaration of Human Rights and in the relevant international instruments accepted by the States concerned relating to the right to a fair trial is of such gravity as to confer on the deprivation of liberty, of whatever kind, an arbitrary character (Category III);

- 111 -

4. In the light of the allegations made the Working Group welcomes the cooperation of the Governments of Iraq and of the United States of America. The Working Group transmitted the replies provided by the two Governments to the source and received its comments.

5. According to the information received from the source, Mr. Saddam Hussein Al-Tikriti, born on 28 April 1937, of Iraqi nationality, is the former President of Iraq.

6, According to information publicly available, on 20 March 2003 military forces belonging primarily to the United States of America ("US") and the United Kingdom of Great Britain and Northern Ireland ("UK") began the invasion of Iraq. On 9 April 2003, Baghdad was formally secured by US forces and the Iraqi regime headed by President Saddam Hussein was declared to have ended, On 1 May 2003 the President of the United States announced the end of major combat operations in the Iraq war, As recognized in UN Security Council resolution 1483 (2003),  around this date the US and the UK "assumed the specific authorities, responsibilities, and obligations under applicable international law _as occupying powers under unified command". The Coalition forces established a Coalition Provisional Authority (CPA) under an Administrator named by the US. The CPA named an Interim Iraqi Governing Council. On 30 June 2004. the occupation of Iraq ended and the *CPA* ceased to exist. As of that date, Iraq reasserted its full sovereignty and an Interim Government of Iraq assumed full responsibility for governing Iraq (see paragraphs 1 and 2 of UN Security Council resolution 1546 (2004)). In accordance with Security Council resolution 1546. however, a multinational force, composed primarily ofUS and UK military forces, remains in Iraq at the request of the Iraqi Government.

7. On 13 December 2003, Mr. Saddam Hussein was captured in Tikrit by military forces of the United States, then th occupying power in Iraq, and was taken into custody at an undisclosed location. From that date until the time of submission of the communication, his only contact with his defence team was on 16 December 2004 with one of his attorneys, under supervision of at least two United States military guards who Were present during this interview. The source states that despite repeated requests before and after this interview, the lawyers of the defence committee Were denied the possibility to hold other meetings with their client.

8. The source alleges that Mr. Saddam Hussein was initially detained as a prisoner of war wider the terms of the Third Geneva Convention Relative to the Protection of Prisoners of War. However, the United States Government has Since then claimed that he is no longer a prisoner of war but a prisoner of the Iraqi Government. The source adds that, despite this claim by the United

States Government, Saddam Hussein remains under the complete control of the United States Government.

9. On 10 December 2003, the Iraqi Governing Council established the Iraqi Special Tribunal. According to Article 1 (b) of its Statute, "[t]he Tribunal shall have jurisdiction over any Iraqi national or resident of Iraq accused of the crimes listed in Articles 1 1 to 14 below, committed since July 17, 1968 and up until and including May 1, 2003, in the territory of the Republic of Iraq or elsewhere, including crimes committed in connection with Iraq's wars against the Islamic Republic of Iran and the State of Kuwait." The crimes listed in Articles 11 to 14 of the Statute are genocide, crimes against humanity, war crimes, and violations of certain Iraqi laws listed in Article 14, On 11 October 2005, the President of Iraq signed a new statute and new rules of procedure of the court, which rename it Supreme Iraqi Criminal Tribunal (Which is the term used hereinafter).

10. According to information publicly available, Mr. Saddam Hussein appeared before the Supreme Iraqi Criminal Tribunal for his first hearing (arraignment) on 1 July 2004. The hearing took place in a Secret location and the defendant was not assisted by counsel, the investigating judge confined himself to ascertaining the identity of the accused. In addition, Mr. Saddam Hussein was informed of seven charges brought against him. Because he was not assisted by legal counsel, he refused to sign the record of proceedings.

11. The source further submits that Mr. Saddens Hussein's status should be covered by the Third Geneva Convention Relative to the Protection of Prisoners of War, Since he was captured because Of his participation in an armed conflict. However, he is being denied such protection by the United States Government as occupying power and custodian authority, and the Iraqi authorities have brought charges against him before the Supreme Iraqi Criminal Tribunal,

Therefore, the source is of the opinion that legal responsibility for Ms arbitrary detention attaches to both Iraq and the United States of America.

12. The source alleges that the detention of Mr. Saddam Hussein is arbitrary because he has not been charged in a timely manner, has not been granted the full privileges of a prisoner of war *(for* example, to be allowed to communicate with his family without undue delays or to receive documents pertaining to his legal representation), has been forced to prepare his trIal in conditions of complete isolation from the outside world, detained at a secret location, severely restricted in the contact with legal counsel (although the charges raised against him must be of the most serious nature to fall within the mandate of the Supreme Iraqi Criminal Tribunal). The source concludes that the non-observance of international norms relating to fair trial is so serious as

to render his pre-trial detention, as well as any detention upon conviction, arbitrary. Furthermore, the source alleges that Mr. Saddam Hussein has been denied the right to challenge the legality of his detention. Finally, the source expresses doubts as to whether a fair trial can at all take place under the current security situation in Iraq, before a special tribunal that lacks the independence and impartiality needed.

13. In its reply to the communication, dated 2 May 2005, the Government of Iraq states that Saddam Hussein is awaiting trial, and that it is premature to discuss matters relating to his right to prepare his defence and to a fair hearing. As to his place of detention, it is kept secret in order to protect him. The Government further reports that Saddam Hussein was allowed to meet one of his lawyers on 27 April 2005, that this meeting had lasted six hours, and that the lawyer was able to freely interview Saddam Hussein in the presence of an officer.

14. In its reply to the communication, the Government of the United States underlines that, as also noted by the source, Saddam Hussein is in physical custody of the Multinational Forces _Iraq (MNF-I) pursuant to arrangements between MNF-I and the Iraqi Ministry of Justice, but is being held under the legal authority of an Iraqi court. The Government of the United States therefore considers that the Government of Iraq is best placed to clarify the legal basis of the detention of Saddam Hussein.

15. In replying to the statement by the Government of the United States, the source argues that as the State actually detaining Saddam Hussein, the United States is responsible for respect of his right to security of person, a responsibility it cannot disclaim on the basis of the argument that Saddam Hussein is kept in custody on behalf of the Government of Iraq or of the argument that he is not detained on US territory.

16, As to the reply of the Iraqi Government, the source asserts that the Iraqi Government confirms the accuracy of all its allegations. The source argues that Saddam Hussein's rights to counsel, to prepare his defence, and to a fair hearing have been violated (as of mid-August 2005) for more than 20 months, It adds that a single meeting between counsel and defendant in the presence of a United States military officer clearly does not fulfil the requirements of the right to be assisted by counsel, Finally, the source argues that the violation of Saddam Hussein's rights is exacerbated by the repeated attacks against the house of his defence counsel, as well as by his humiliation through the circulation of pictures showing him in partial undress, and by the Government allowing physical attacks against him while in custody.

17. To be able to spell out the law applicable to the *different* issues raised by the source and *identify* the Government(s) responsible under international law for the legality of the detention and the eventual violation of the rights of Mr. Saddam Hussein, if any, the Working Group considers necessary to highlight the particularity of the circumstances of the case before it.

18. The Working Group would like to stress that Mr. Saddam Hussein was the President of the Republic when armed forces of the United States and the United Kingdom of Great Britain and Northern Ireland invaded Iraq on 20 March. On 1 May 2003, the Security Council in its resolution 1483 admitted that the United States and the United Kingdom of Great Britain had assumed the authority, responsibility and applicable obligations under international law in the territory of Iraq. On 13 December 2003, Saddam Hussein was captured in Tikrit by US military forces, Later, the occupying forces constituted the *CPA* as the Coalition Provisional Authority under the control of an envoy named by the Government of the United States. On 30 June 2004, the occupation ended and the full sovereignty of Iraq was restored through the Interim Government of Iraq. In accordance with Security Council resolution *1546* of 8 June 2004, however, a multinational force (MNF-I), composed primarily of United States of America and United Kingdom military forces, remained in Iraq at the request of the Iraqi Government. At some point before the restoration of sovereignty to Iraq, Mr. Saddam Hussein and other members of the former Iraqi' regime were "formally" or *"de jure"* transferred by the *CPA* to Iraqi custody.

19. According to some developments publicly reported in the case under consideration, on 1 July 2005, Saddam Hussein and 11 other members of the former Baathist leadership appeared before the Supreme Iraqi Criminal Tribunal's chief investigating judge. The defendants were reportedly informed of the charges against them and questioned by the investigating judge. The defendants did not have legal counsel present, and no full public transcript of the proceedings exists.

20. On 19 October 2005, the trial before the Supreme Iraqi Criminal Tribunal against Saddam Hussein and seven co-defendants in the *Dujail* case opened. At the hearing, defense counsel and some of the defendants raised three challenges: the lack of adequate time given to the defense to study the final dossier and prepare its case; the lack of sufficient access to the accused by defense counsel; and concerns regarding the court's legitimacy and competence. The court granted an adjournment of the trial until 28 November 2005. At the time of drafting this Opinion (30 November 2005) another adjournment had been granted to 5 December 2005.

21. On 20 October 2005, the day following the opening hearing, Mr. Sadoum al-Janabi, counsel of one of Saddam Hussein's co-defendants, was abducted

from his office by armed men. He was subsequently found dead with two bullet wounds to the head. On 8 November 2005, in a drive-by shooting in Baghdad, gunmen killed Mr. Adel Muhammad al-Zubaidi, who represented another defendant in the *Dujail* trial, and injured a further defense lawyer, Mr. Thamer al-Khuzaie.

22. The source alleges that Mr. Saddam Hussein was initially detained as a prisoner of war, but has not been granted the full privileges of a prisoner of war under the terms of the Third Geneva Convention Relative to the Protection of Prisoners of War of 12 August 1949, In their replies, neither the US Government nor the Iraqi Government provided information on this allegation. It is however well known that from the early days of the conflict in Iraq, the US Government recognized that the Geneva Conventions applied comprehensively to individuals captured in the *conflict* in Iraq. The US Government also gave assurances that it intended to comply with article 5 of the Third Geneva Convention by treating all belligerents captured in Iraq as prisoners of war unless and until a competent tribunal determines that they were not entitled to POW status.[1]

23. The position of the Working Group is that although the invading coalition stated that the major combat operations finished on 1 May 2003, the total occupation still continued until 30 June 2004. Therefore as Saddam Hussein's detention took place in the context of an international armed conflict resulting in the invasion of Iraq by the American Government's forces and the armed coalition, his status is protected by the Third Geneva Convention at least until 30 June 2004.

24. consequently, and in accordance with paragraph 16 of its methods of work and 14 of its revised methods of work,[2] the Working Group will not assess the lawfulness of Mr. Saddam's detention for the period taking place between 13 December 2003 and 30 June 2004, as it occurred during an ongoing international armed conflict and the United States Government recognized that the Geneva conventions applied to individuals captured in the conflict in Iraq.

*25.* According to the fifth paragraph of Article 119 of the Third Geneva Convention it is permissible that prisoners of war against whom penal proceedings are pending may be detained until the close of such proceedings. The Working Group is also not in a position to assess the conformity to the applicable provisions of international humanitarian law (Arts. 12, 1 18 and 1 19 of the Third Geneva Convention to which the US and Iraq are parties) of the procedure under which Mr. Saddam Hussein was transferred by the CPA to the Interim Government of Iraq. It is, however, not disputed that, while *de jute* transferred, Mr. Saddam remains *de facto* in US custody. The United States Government, in its reply to the Working Group, recognises that *"the detainee is under the custody of the "Multinational Force Iraq" according to*

*an agreement reached with the Minister of Iraqi Justice although he is under the authority of an Iraqi court".*

26. The Working Group concludes that until 1 July 2004 Saddam 1-lussein was detained under the sole responsibility of the Coalition members as occupying powers or, to be more precise, under the responsibility of the US Government. Since then, and as the Iraqi criminal Tribunal is a court of the sovereign State of Iraq, the pre-trial detention of a person charged before the Tribunal is within the responsibility of Iraq. In light of the fact that Saddam Hussein is in the physical custody of the US authorities, any possible conclusion as to the arbitrary nature of his deprivation of liberty may involve the international responsibility of the US Government.

27. As of the period of detention subsequent to 30 June 2004, Saddam Hussein appeared before the Supreme Iraqi Criminal Tribunal for his first hearing on 1 July 2004. The hearing took place in a secret location and the defendant was not assisted by counsel, In addition, Mr. Saddam Hussein was informed of the charges brought against him. Because he was not assisted by legal counsel, he refused to sign the record of proceedings. Therefore, whatever the status under which he was detained prior to the 1 July 2004, he subsequently became a defendant in a criminal procedure, entitled to the protection of the International Covenant on Civil and Political Rights. Both the US and Iraq have ratified the ICCPR and therefore articles 9(3) and 14 ICCPR are applicable to his detention.

28. Although neither the Iraqi Government nor the US Government have provided detailed answers to the allegations concerning the characteristics of the process and the violations affecting the right of the defence, as invoked by the source, the Working Group had access to, and gathered information regarding the Supreme Iraqi Criminal Tribunal and its rules of procedure.

29. This tribunal was established by the Iraqi Governing Council on 10 December 2003, and in the first days of August 2004 the Interim Iraqi Assembly modified the statute that was regulating it. The Working Group does not know the criteria under which the Iraqi Government has nominated the judges who form this tribunal. However, the alleged withdrawal or substitution of several judges is a matter of concern. The atmosphere surrounding the preparation of the trial, which can negatively affect the independence and impartiality of the Tribunal — or at least give the impression that the tribunal lacks the requisite independence and impartiality—, is also a matter of concern to the Working Group. The murder of defence lawyers, the threatening behaviour of the crowd against some of the accused, motivated by past wrongs suffered in the previous regime, might exert an undue pressure on the tribunal. More specifically, the fact that capital punishment was recently re-established and that no appeal is allowed against conviction and sentence, which is in

complete disregard of Article 14 paragraph 5 of the International Covenant on Civil and Political Rights, may cast a shadow over the requisite fairness of the process.

30. In his annual report (2005) to the UN General Assembly, Leandro Despuy, the Special Rapporteur on the independence of judges and lawyers, raised his own conceilis about the judicial proceedings taking place before the "Iraqi Special Tribunal". He stated that: *"Despite the commitment and personal efforts of the judges and the cooperation provided by several countries in setting up the tribunal, he is concerned that the pressure weighing on the judges and the prevailing insecurity in Iraq may undermine its independence. Moreover, the tribunal itself has its deficiencies, some of which can be traced back to the manner in which it was set up, and in particular to the restriction of its jurisdiction to specific people and a specific time frame; i.e., the tribunal may only try Iraqi citizens for acts committed prior to F' May 2003, when the occupation began. The tribunal 's power to impose the death penalty demonstrates the extent to which it contravenes international human rights standards, Because it was established during an occupation and was financed primarily by the United States, its legitimacy has been widely questioned, with the result that its credibility has been tarnished. The Special Rapporteur urges the Iraqi authorities to follow the example set by other countries with deficient judicial systems by asking the United Nations to set up an independent tribunal which complies with international human rights standards3."*

31. The Working Group shares these concerns. It is also concerned about the criminal proceedings in Saddam Hussein's case, notably the right to counsel. Apparently Saddam can only meet his defence counsel in the presence of US officials; it is not clear whether he can meet them often enough to have the significant exchange necessary for such a complicated case, On 19 October 2005, at the hearing, defense counsel and some of the defendants raised three challenges: the lack of adequate time given to the defense to study the final dossier and prepare its case; the lack of sufficient access to the accused by defense counsel; and concerns regarding the court's legitimacy and competence. The Working Group was also made aware that there are discrepancies between the old Iraqi criminal procedure code and the rules of procedure of the SICT on important points, and it is not clear which law prevails.

32. Since procedural flaws amounting to the violation of the right to a fair trial may, in principle, be redressed during the subsequent stages of the criminal proceedings, the Working Group would find premature to take a position now on this point. The Working Group is fully aware that the ongoing judicial procedure in Iraq is aimed to bringing to justice the highest- ranking leaders of the past Iraqi regime of Saddam Hussein, including himself, for the most serious crimes they allegedly committed against the Iraqi people and some

neighboring nations. The crimes for which they are prosecuted comprise, but are not limited to genocide, crimes against humanity and war crimes.

33. As one of the mechanisms of the United Nations Commission on Human Rights, the Working Group is deeply committed to the principle that any violation of human rights, whether committed by politicians or others, must be inquired into and redressed, if necessary by putting the perpetrators to justice. Yet, any procedure aiming to put right gross human rights violation ,as such welcomed by the Working Group, shall scrupulously respect the rules and standards elaborated and accepted by the international community to respect the rights of any person charged of a criminal offence. The violation of the rights of the person charged may easily backfire. This is particularly true in the instant case; any lack of respect for the rights of the leaders of the former regime in the criminal proceedings against them may undermine the credibility of the Justice system of the newly emerging democratic Iraq.

34. The Working Group believes that under the circumstances the proper way to ensure that the detention of Saddam Hussein does not amount to arbitrary deprivation of liberty would be to ensure that his trial is conducted by an independent and impartial tribunal in strict conformity with international human rights standards.

35. On the basis of what precedes, the Opinion of the Working Group is that

a) It will not take a position on the alleged arbitrariness of the deprivation of liberty of Mr. Saddam Hussein during the period of international armed conflict;

b) The Working Group will follow the development of the process and will request more information from both concerned Governments and from the source. In the meantime and referring to paragraph 17(c) of its methods of work, it decides to keep the case pending until further information is received.

Adopted on 30 November 2005.

# Endnotes

*Endnotes*

[1] *Judgment of the Nuremberg International Military Tribunal*, 1949, *reprinted in* Trial of the Major War Criminals before the International Criminal Tribunal, Nuremberg, Vol. 1, p. 186 (1947).

[2] Para. 8(g) of UNSC Res. 1483, UN Doc. S/RES/1483 (22 May 2003).

[3] *See* National Security Decision Directive No. 139 of 5 April 1984 (still partially classified).

[4] *Id.*

[5] *See, for example*, Ramsey Clark, *Challenge to Genocide: Let Iraq Live* (New York: International Action Center, 1998); Ramsey Clark et al., *The Children Are Dying: the Impact of Sanctions on Iraq* (New York: International Action Center, 1998). Both these works argue that the people of Iraqi must be put ahead of narrow-sighted United States foreign policy objectives.

[6] Garfield, R., *Morbidity and Mortality among Iraqi Children from 1990 through 1998: Assessing the Impact of the Gulf War and Economic Sanctions* (March 1999) (a report evaluating the various studies on child mortality in Iraq and concluding that "Sustained increases in young child mortality are extremely rare in this century. Such a large increase as that found here [in Iraq] is almost unknown in the public health literature. In Iraq, a rate of mortality among under-five-year-olds in excess of 80 per one thousand births was last experienced about twenty years ago. Living conditions in Iraq, thus, represent a loss of several decades of progress in reducing mortality. This is a social disaster which should be urgently addressed. To the degree that economic sanctions complicate access to and utilization of essential goods, sanctions regulations should be modified immediately. In addition, the international community should urgently make available to Iraq materials and expertise to improve child health programs and policies in the fields of feeding and weaning practices, diarrhea and respiratory infection recognition and care, and maternal and child health care, family income, and education" at 38 [footnotes omitted]). *Also see* Food and Agriculture Organization (FAO), *Evaluation of Food and Nutrition Situation in Iraq*, Iraq, Doc. No. TCP/IRQ/4553 (Rome, Italy, 1995); Harvard Study Team, "Special Report: The Effect of the Gulf Crisis on the Children in Iraq," 325 *New England Journal of Medicine* 997-980 (1991); Alberto Arscherio, Robert Chase, Tim Cote et al Special Article: Effect of the Gulf War on Infant and child Mortality in Iraq. The New England Journal of Medicine Vol 327(1 3), p.931-936, 1992; "International Notes: Public Health Consequences of Acute Displacement of Iraqi Citizens-March-May 1991," 40(26) *Morbidity and Mortality Weekly Review* 443-446 (1991); Physicians for Human Rights, "The Children of Iraq on the Brink of Disaster," Briefing Memorandum (revised), Somerville, MA, USA (1991); Schaller, E., and Nightingale, E., "Children and Childhoods: Hidden Casualties of War and Civil Unrest," 268 *Journal of the American Medical Association* 642-44 (1992); Jeremy Bowen, "World, Middle East: Iraqis blame Sanctions for Child Deaths," *BBC* accessed at *news.bbc.co.uk* (12 August 1999); Reuters, "UN Says Sanctions have killed some 500,000 Iraqi children" (21 July 2000) (quoting Ms Anupama Rao Singh, country director for the UNICEF stating that `"In absolute terms we estimate that perhaps about half a million children under 5 years of age have died, who ordinarily would not have died had the decline in mortality that was prevalent over the 70s and the 80s continued through the 90s").

[7] Several Senior United Nations staff resigned because of the deadly impact of the sanctions including Mr. Denis Halliday, who had been appointed United Nations Humanitarian Coordinator in Iraq at the Assistant Secretary-General level in 1997; his successor Mr. Hans von Sponeck (who stated that he "cannot any longer be associated with a programme that prolongs sufferings of the people and which has no chance to meet even the basic needs of the civilian population"); and Ms Jutta Burghardt, head of the World Food Program in Iraq.

[8] Statement of Madeleine Albright on "60 Minutes," *CBS* (10 May 1986).

[9] "Statement of White House Press Secretary Ari Fleisher on 24 March 2003" accessed at http://www.whitehouse.gov/news/releases/2003/03/20030324-4.html (12 September 2005).

[10] William H. Taft, IV, and Bushwald, T.F., "Preemption , Iraq and International Law," 77, 83 in Falk , R., Gendzier, I., and Lifton, R.J., (eds.), *Crimes of War: Iraq* New York, USA: Nation Books (2006).

[11] Mathew Rycroft, "Memorandum to David Manning recording a meeting with Prime Minister Tony Blair," (marked Secret Strictly Personal – UK Eyes Only, also known as the "Downing Street Memo"), SI 95/02 (23 July 2002).

[12] *See, for example, Yearbook of the International Law Commission,* Part II, 247-9 (1966) (Commentary on draft Art. 50 of the Draft Articles on the Law of Treaties) and *Military and Paramilitary Activities Case, ICJ Reports* pp. 100-101 (1986). Both authoritative sources find that the prohibition of the use of force is *jus cogens.*

[13] Center for Economic and Social Rights, *UN Sanctioned Suffering: A Human Rights Assessment of United Nations on Iraq*1 (New York: Center for Economic and Social Rights, May 1996).

[14] International Study Team, *Aftermath of the Gulf War on Civilians* (March 1991) (the assessment of the rationing system was done by leading development economists Professor Jean Dreze and Dr. Haris Gazdar, working with a team of independent researchers, including but not limited to Iraqis).

[15] Roberts, L., Lafta, R., Garfield, R., Khudhairi, J., Burnham, G., "Mortality before and after the 2003 invasion of Iraq: cluster sample survey," 364 *The Lancet* 1857 (20 November 2004).

[16] On 5 March 2003 France, Germany and Russia issued a joint declaration. Available at http://www.un.int/france/documents_anglais/030305_mae_france_irak.htm. China's Foreign Minister Tang Jiaxuan's stated on 6 March that "China's position is consistent with the joint statement. China endorses and supports the content of the joint statement." Martin Parry, "Beijing Vows to Block New UN War Resolution," *Middle East Online* (6 March 2003). The European Parliament condemned any unilateral strike against Iraq on 9 January 2003 in a Resolution; the United Nations Secretary General Kofi Annan condemned the attack as illegal in a public statement on 16 September 2004; the Arab League, the African Union, and Organization of Islamic Conferences with a combined membership of more than 125 states all condemned the war as illegal; the majority of Permanent Member states in the United Nations Security Council (France, China and Russia) and the two most populous states in the world, China and India, both unequivocally condemned the invasion as illegal as did numerous other states, including, Canada, Belgium, Germany, Switzerland, The Vatican, India, Indonesia, Malaysia, Brazil, and Mexico. Numerous legal commentators also condemned the attack as illegal: News.com.au, "Iraq Invasion Violated UN Charter" (7 August 7, 2003); Statement by 500 Law Professors for the Rule of Law; Severin Carrell and Robert Verkaik, "War on Iraq Was Illegal, Say Top Lawyers," *The Independent* (25 May 2003); Peter Schwarz, "International Legal Experts Regard Iraq War as Illegal," *World Socialist Web Site* (March 26, 2003); Center for Economic and Social Rights, "Tearing up the Rules: The Illegality of Invading Iraq," (March 2003); Henry Michaels, "Canadian Law Professors Declare US-Led War Illegal," *World Socialist Web Site* (22 March 2003); Robin Miller, "This War Is Illegal," (21 March 2003); *Middle East Online,* "Chirac: Iraq War Breaches International Law" (21 March 2003); Irwin Cotler, "Is the War on Iraq illegal?" *The Globe and Mail* (21 March 2003); Jim Lobe, "Law Groups Say U.S. Invasion Illegal," *OneWorld.net* (21 March 2003); Joan Russow, "U.S. Engaged in an Illegal Act," *OneWorld.net* (20 March 2003); International Appeal by Lawyers and Jurists against the "Preventive" Use of Force (2003); Michael C. Dorf, "Is the War on Iraq Lawful?" *Findlaw* (19 March 2003); Emma Thomasson, "Iraq War Illegal but Trial Unlikely, Lawyers Say," *Reuters* (19 March 2003); Hilary Charlesworth and Andrew Byrnes, "No, This War Is Illegal, *The Age* [Melbourne, Australia] (19 March 2003); Matthew Happold, "A Talented Lawyer Arguing a Weak Case," *The Guardian* (17 March 2003); Keir Starmer, "Sorry, Mr Blair, But 1441 Does Not Authorise Force," *The Guardian* (17 March 2003); Greenpeace, "Analysis of the US Legal Position on the Use of Force Against Iraq" (16 March 2003); Richard Norton-Taylor, "Law Unto Themselves," *The Guardian* (14 March 2003); Robert Verkaik, "'Illegal War' Could Mean Soldiers Face Prosecution," *The*

*Independent* (12 March 2003); Anthony Howard, "War Against Iraq--The Legal Dilemma," *The Times* [London] (11 March 2003); Mark Littman, "A Supreme International Crime," *The Guardian* (10 March 2003); Johanna Neuman, "Pope's Emissary Meets With Bush, Calls War 'Unjust'," *Los Angeles Times accessed at* http://www.commondreams.org/headlines03/0306-04.htm (6 March 2003); "The UN Must Take Mr Blix's Report Seriously—by Voting Against Military Action," *The Independent* (editorial) (8 March 2003); "War Would Be Illegal," *The Guardian* (7 March 2003); Michael White and Patrick Wintour, "No Case for Iraq Attack Say Lawyers," *The Guardian* (7 March 2003); "War With Iraq 'Could Be Illegal,'" *BBC* (6 March 2003); Alan Elsner, "US War Without UN Approval Would Be Seen as Illegal," *Reuters* (6 March 2003); James Conachy, "Australian Legal Experts Declare an Invasion of Iraq a War Crime," *World Socialist Web Site* (27 February 2003); Bill Bowring, "Bush and Blair Must See Law Has a Life of Its Own," *AlertNet* (21 February 2003); Julie Mertus, "The Law(?) of Regime Change," *JURspecial Court* (www.jurist.com) (20 February 2003); Thalif Deen, "Of Man and God and Law," *Asia Times* (14 February 2003); Nathaniel Hurd, "UN SCR 1141 and Potential Use of Force Against Iraq," (6 December 2002); "In The Matter of the Potential Use of Armed Force by the UK Against Iraq and in the Matter of Reliance for that Use of Force on United Nations Security Council Resolution 1441," Campaign for Nuclear Disarmament, (November 2002); "Lawyers Statement on UN Resolution 1441 on Iraq," (27 November 2002); Mary Ellen O'Connell, "UN Resolution 1441: Compelling Saddam, Restraining Bush," *JURspecial Court* (www.jurist.com) (21 November 2002); Marjorie Cohn, "UN Resolution 1441: Blackmailing the Security Council," *JURspecial Court* (www.jurist.com) (21 November 2002); George P. Fletcher, "Did the UN Security Council Violate Its Own Rules in Passing the Iraq Resolution?" *CounterPunch* (6 November 2002); Public Interest Lawyers on behalf of Peacerights, "Legality of Use of Force against Iraq" (10 September 2002); and Mary Ellen O'Connell, "The Myth of Preemptive Self-Defense," (August 2002).

[17] Michael Scharf, who has both criticized and praised the court, but who is know as a defender of the court, benefits from the exposure and funding provided to academic projects to which he is connected. Mark Ellis and the International Bar Association [IBA] of which he is the Executive Director, has benefited handsomely from grants given to train the judges and other lawyers in Iraq. *See, for example,* House of Commons, International Development Committee, *Development Assistance in Iraq: Interim Report (Evidence)*, at p. 58 (7th Report of Session 2004-05) (Indicating that between September and March 2005 the IBA was given a grant of £1,300,000 GBP (approximately 2.4 million USD) to provide support (training) to the Iraqi Special Tribunal.

[18] Authorization for Use of Military Force Against Iraq Resolution of 2002, p. 116, *Stat.* 1498, Public Law 107-243, 107th Congress, H.J. Res. 114 (16 October 2002).

[19] "United States President George W. Bush's Statement to the Nation from the Oval Office of the White House" at 22:16 EST on 19 March 2003 accessed at www.whtehouse.gov on 21 March 2003. *Also see* Statement by White House Press Secretary Ari Fleisher on 24 March 2003 accessed at http://www.whitehouse.gov (12 September 2005).

[20] "Statement by Ambassador John D. Negroponte, United States Permanent Representative to the United Nations, on Iraq, Before the Security Council" on 27 March 2003, United States Permanent Mission to the United Nations, Press Release No. 40(03) (27 March 2003).

[21] *Judgment of the Nuremberg International Military Tribunal*, 1949, *reprinted in Trial of the Major War Criminals before the International Criminal Tribunal, Nuremberg*, vol. 1, p. 186 (1947).

[22] Statements of the United States government before the International Court of Justice in the *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States) (Merits), I.C.J. Reports* 1986, p. 14 at p. 99, para. 187.

[23] *International Law Commission Yearbook*, Vol. II, 247 (1966) *reaffirmed by* the International Court of Justice in the *Nicaragua Case, infra*, at para. 187, p. 99.

[24] 94 *L.N.T.S.* 57 (1929)

[25] *Report of the 38th Conference of the International Law Association Budapest* 67 (1934).

[26] *Case Concerning Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. United States), I.C.J. Reports*, No. 70, para. 181, p. 97 (27 June 1996),

[27] *International Law Commission Yearbook,* vol. II, 247 (1966).

[28] *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States) (Merits), I.C.J. Reports* 1986, p. 14 at pp. 100-101, para. 190.

[29] Article 53 of the International Law Commission's Draft Articles on State Responsibility for International Wrongful Acts, International Law Commission, Draft articles on the Responsibility of States for Internationally Wrongful Acts, *Report of the International Law Commission on the work of its Fifty-third session*, U.N. GAOR, 56th Sess. Supp. No. 10 (A/56/10), chp.IV.E.1 (2001)

[30] United Nations Conference on the Law of Treaties, First Session, UN. Doc. A/CONF.39/11 (1969).

[31] UNGA Res. No. 2625(XXV), adopted without vote, (24 October 1970).

[32] Donald H. Berchoff, (Lieutenant Colonel in the United States Air Force ), "Critical Analysis of US Policy and Options in Dealing with Iraq," National Defense University National War College, United States Air Force Doc. No. 5601/5602, p. 4 (2003) (citing the Report signed by CIA Deputy Director John McLaughlin).

[33] Explanation of Vote by Ambassador John D. Negroponte, United States Permanent Representative to the United Nations, following the vote on the Iraq Resolution, Security Council, November 8, 2002, United States permanent Mission to the United Nations Press Release No. 187(02) (Revised) (8 November 2002).

[34] On 5 March 2003 France, Germany and Russia issued a joint declaration. Available at http://www.un.int/france/documents_anglais/030305_mae_france_irak.htm. China's Foreign Minister Tang Jiaxuan's stated on 6 March that "China's position is consistent with the joint statement. China endorses and supports the content of the joint statement." Martin Parry, "Beijing Vows to Block New UN War Resolution," *Middle East Online* (6 March 2003).

[35] The European Parliament condemned any unilateral strike against Iraq on 9 January 2003 in a Resolution, European Parliament Resolution, EP Res. PS_TA (2003)0032 (9 January 2003); the United Nations Secretary General Kofi Annan condemned the attack as illegal in a public statement on 16 September 2004, UN News Service, "Lessons of Iraq war underscore importance of UN Charter – Annan" (16 September 2004); the Arab League, the African Union, and Organization of Islamic Conferences with a combined membership of more than 125 states all condemned the war as illegal; the majority of Permanent Member states in the United Nations Security Council (France, China and Russia) and the two most populous states in the world, China and India, both unequivocally condemned the invasion as illegal as did numerous other states, including, Canada, Belgium, Germany, Switzerland, The Vatican, India, Indonesia, Malaysia, Brazil, and Mexico. *Also see* cited sources at note 16.

[36] *See* sources cited in note 16.

[37] Andrew Grice, "Thatcher reveals her doubts over basis for Iraqi war," *The Independent* (14 October 2005), accessed at http://news.independent.co.uk/uk/politics/article319542.ece (14 October 2005).

[38] *See* "Opposition to the Iraq War" in Wikipedia at en.wikipedia.org for an updated list of opposition to the war.

[39] This resolution was accepted by Iraq on 6 April 1991 in a letter from its Minister of Foreign Affairs to the UN Secretary-General.

[40] Para. 10 of the Declaration on Principles of International Law Concerning Friendly Relations and Cooperation Among States in Accordance with the Charter of the United Nations, UN Doc. A/RES/2625 (XXV) (24 October 1970) (widely agreed to reflect customary international law) and *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), ICJ Reports 1971,* p. 16, at pp. 54-56, paras. 117-127.

[41] ILC Draft Articles on the Responsibility of States for Internationally Wrongful Acts, Report of the 53rd Sess., I.L.C. (2001), G.O.A.R., 56th Sess., Supp. 10.

[42] *Ratified on* 29 June 1934, *T.S.* 881, 49 Stat. 3097, *entered into force* for the United States on 26 December 1934.

[43] Bin Cheng, General Principles of Law as Applied by International Courts and Tribunals, Cambridge: Grotius Press, 1987, p. 389.

[44] According to CPA Doc. No. CPA/ORD/9 Dec 2003/48.

[45] CPA Doc. No. CPA/REG/16 May 2003/01.

[46] Speech by United States President George W. Bush on 14 December 2005 *available at* www.whitehouse.gov (*accessed* 15 December 2005); Speech by United States President George W. Bush on 12 December 2005 *available at* www.whitehouse.gov (*accessed* 15 December 2005); Speech by United States President George W. Bush on 7 December 2005 *available at* www.whitehouse.gov (*accessed* 15 December 2005).

[47] CPA Doc. No. CPA/ORD/9 Dec 2003/48.

[48] 6 *UST* 3516, 75 *UNTS* 287 (1950).

[49] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, [1971] *ICJ Reports* 16 at para. 119 and 120-125.

[50] UNSC Resolution 1483, UN Doc. S/RES/1483 (22 May 2003).

[51] 12 August 1949, 6 *UST* 3516, 75 *UNTS* 287 (1950)

[52] *See* art. 43 of the Hague Regulations.

[53] *Commentary to the (IV) Geneva Convention Relative to the Protection of Civilian Persons in the Time of War*, p. 306 (1958, under the editorship of Jean S. Pictet) (hereinafter "*Commentary to GC IV*").

[54] *Id.* at 335.

[55] *Id.* at 337.

[56] Not only does the United States government control Iraqi militarily. Not only is Iraq dependent on United States aid. But the United States government also excluded from all political posts in Iraq all those individuals who oppose its illegal invasion of Iraq and those whose political views it does not agree. The interference of the occupying powers in the Iraqi government has been apparent from its formation in early 2006. On 1 February 2006 the United States intervened in the negotiations over the government with American Ambassador to Iraq Zalmay Khalilzad threatening to cut aid saying "[w]e are saying, if you choose the wrong candidate, that will affect US aid." Gareth Porter, "US shifts Iraq loyalities," *Asia Times* (1 February 2006). The Foreign Minister of the United Kingdom, a staunch United States ally participating in the occupation of Iraq, in talks with Iraqi President Jalal Talabani also threatened to cut aid and perhaps even withdraw British troops unless the Iraqis choose persons for their government who were acceptable to the United Kingdom. *See* Anne Penketh, "US threatens to cut aid to Iraq if new government is sectarian," *The Independent* (UK) (7 August 2006).

[57] Iraqi Law No. 160 of 1979 published in *Alwaqai Aliraqiya*, No. 2746 of December 1979.

[58] *Id.*

[59] *Id.*

[60] CPA Doc. CPA/ORD/16 May 2003/01.

[61] Mariam Karouny, "Iraqi says to ask U.N. to end US Immunity," *Reuters*, Monday, 10 July 2006 at 5:07 p.m. EST *accessed at* today.reuters.com (12 July 2006).

[62] Iraqi Law No. 160 of 1979 published in *Alwaqai Aliraqiya*, No. 2746 of December 1979.

[63] UN SCOR, 58th Sess., 4844th mtg., UN Doc. S/RES/1511 (2003)

[64] *Record of Negotiations of the ICCPR*, UN Doc. A/2929, Chap. VI, sec. 77

[65] Adopted by the 7th United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Milan, 26 August to 6 September 1985, UN Doc. A/CONF.121/22/Rev.1 at 59 (1985).

[66] Report of the Working Group on Arbitrary Detention, UN Doc E/CN.4/1996/40 at 26.

[67] 999 *UNTS* 171 (adopted 1966).

[68] 993 *UNTS* 3 (adopted 1966).

[69] 1577 *UNTS* 3 (entered into force 1990).

[70] 1249 *UNTS* 13 (entered into force 1980).

[71] 660 *UNTS* 195 (entered into force 1969).

[72] *TS* No. 539, 1 *Bevans* 631, *signed at* the Hague, 18 October 1907, *entered into force* 26 January 1910.

[73] 75 *UNTS* 135 (1950).

[74] 75 *UNTS* 135 (1950).

[75] O.A.S. Doc. OEA/SER.L.V/II.82 doc.6, rev. 1 at 17 (1992).

[76] *See, generally,* Muhammad Salim Awa, *Punishment in Islamic Law: A Comparative Study.* Indianapolis: American Trust Publications (1982), M. Cherif Bassiouni, (ed.), *The Islamic Criminal Justice System.* London: Oceana, (1982): Wael B. Hallaq, *Law and Legal Theory in Classical and Medieval Islam.* Brookfield, Vt.: Variorum (1995).

[77] *See* art. 9 of the Constitution of the Kingdom of Iraq (1925) and art. 20 of the Iraqi Constitution (1990). *Also see* art. 15 of the Transitional Administrative Law (2004), and art. 19 of the Iraqi Constitution of 2005 (adopted under occupation).

[78] *See, for example, Prosecutor v. Furundžija (Appeal),* ICTY Appeals Chamber, Case No. IT-95-17/1-A (21 July 2000) at para. 177.

[79] Nihal Jayawickrama, *The Judicial Application of Human Rights Law: National, Regional and International Jurisprudence* 480, Cambridge, UK: Cambridge University Press (2002).

[80] *See* Human Rights Watch, "Past U.S. Criticism of Military Tribunals," Washington, D.C, USA: Human Rights Watch (28 November 2001).

[81] A decision by the Court dated 19 February 2006 rejected this application claiming that it should have been submitted before 19 October 2005, an impossibility as the judge whose disqualification was sought did not join the IST until February 2006. This decision contained no explanation as to how defense could were suppose to have challenged the impartiality of a judge who was not on the IST and who was entirely unknown to them. Moreover, the decisions failed to respond to any of the issues raised in the disqualification motion, including witnesses allegations that the judge had said that President Saddam Hussein was guilty should be executed without trial.

[82] This motion received no response as it was only submitted to the IST on 20 February 2006, the day after the decision to the 1 February 2006 motion was apparent given according to its date (19 February 2006) and despite the fact that the decision of 19 February 2006 was no delivered to defense counsel until mid-March 2006.

[83] CPA Doc. No. CPA/REG/16 May 2003/01.

[84] Ryan J. Leibl, "Rule of Law in Postwar Iraq: From Saddam Hussein to the American Soldiers involved in the Abu Ghraib Prison Scandal, What Law Governs Whose Actions?" 28(1) *Hamline Law Review* 92, 94 (2004).

[85] CPA Doc. No. CPA/REG/13 July 2003/06.

[86] Jean-Pierre Krief, "Saddam Hussein: The Trial," for Arte France and KS Visions (French and English) (2005).

[87] Human Rights Watch, *The Former Iraqi Government on Trial: A Human Rights Watch Briefing Paper* 3 (16 October 2005).

[88] AI Doc. No. MDE 14/007/2005 (13 May 2005).

[89] CPA Doc. No. CPA/ORD/9 Dec 2003/48.

[90] Doc. No. CPA/REG/13 July 2003/06.

[91] CPA Doc. No. CPA/ORD/9 Dec 2003/48.

[92] Doc. No. CPA/REG/16 May 2003/01.

[93] Bassouni, C.M., Post-Conflict Justice in Iraq: An Appraisal of the "Iraq Special Tribunal," 38 *Cornell International Law Journal* 327, 345 (2005).

[94] CPA Order 17 (entitled "Status of the Coalition Provisional Authority, MNF—Iraq, Certain Missions and Personnel in Iraq") (27 June 2004).

[95] Bassouni, C.M., Post-Conflict Justice in Iraq: An Appraisal of the "Iraq Special Tribunal," 38 *Cornell International Law Journal* 327, 346, fn 27(2005).

[96] *See* Will Dunham, "US Formally Declares Saddam Enemy Prisoner of War," *Reuters* (9 January 2004) *accessed at* http://www.commondreams.org/ and "U.S. Gives Saddam POW Status," *BBC News* (9 January 2004) *accessed at* http://news.bbc.co.uk/ ("A Pentagon spokesman said he was given the status as he was the leader of the "old regime's military forces").

[97] For example, on 20 May 2005 the Sun (UK) newspaper published photographs of Iraqi President Saddam Hussein claming to have received these photographs from the United States military.

[98] Associated Press, "Hussein Judge Target of Plot" (28 November 2005).

[99] Associated Press, "Chief Judge in Hussein trial steps down" (15 January 2006) and Borzou Daragahi and Saad Fakhrildeen, "The World; Allawi Flees Mob in Najaf, Says He Escaped Assassins; Officials dispute the ex-Iraqi leader's claim; the melee worsens strife between Shiite factions. Plot to attack site of the Hussein trial is reported," *Los Angeles Times*, Part A, p. 3 (5 December 2005) (stating that "one of the five trial judges has recused himself after a document surfaced linking a defendant to the killing of the jurist's brother, a court official said. An alternate judge was reportedly ready to step in").

[100] Hamza Hendawi, "Saddam Lashes out at U.S. as Trial Resumes," *Associated Press* (28 November 2005).

[101] Ahmed Rasheed, "Government tries to persuade Saddam judge not to quit," *Reuters* (15 January 2006).

[102] Middle East Online, "Rizkar Mohammed Amin left his position for good, Hameesh named as new chief Saddam judge, New Chief Judge will hold post temporarily until judges elect new permanent replacement," at www.middlie-east-online.com (First Published 2006-01-17, Last Updated 2006-01-17 09:50:54).

[103] BBC News (Middle East), "New Saddam judge 'should resign'," Wednesday, 18 January 2006 at 19:04 GMT.

[104] Hamza Hendawi and Qassim Abdul-Zahra, "Saddam trial plunges deeper into disarray," *Jordan Times* p. 1 (25 January 2006).

[105] *Id.* at para. 5

[106] Hamza Hendawi, "Saddam Trial Goes On Without Defendants," *Associated Press* (2 February 2006).

[107] AFP and Middle East Times, "Court to Rule this Week on Saddam–less Trial" (7 February 2006).

[108] KUNA, "Saddam trial judge dies of heart attack," KurdishMedia.com (10 February 2006).

[109] Louise Roug and Borzou Daragahi, "Baghdad Violence Upstages Saddam Trial Resumption," *LA Times* (17 April 2006).

[110] At one point Judge Abdel Rahman criticized one of the defense lawyers for "daring to wear a red tie in this courtroom." All the lawyers were required, and were wearing, the usual bar robes over their suits.

[111] The statements in this paragraph are based on defense counsel's notes and recollection as no transcript has ever been provided despite repeated requests by defense counsel and the fact that the there is extensive audio visual surveillance of the courtroom by the United States authorities who could easily produce a transcript. By contrast, transcripts are provided the same day at the International Criminal Tribunal for the Former Yugoslavia.

[112] On 19 February 2006, the President of the IST issued a decision saying that the application to disqualify Judge Abdel Rahman should have been made before the proceedings on the merits had begun on 19 October 2005. On 3 April 2006, an appeals panel of the IST upheld this decision. Neither of these decisions was communicated to defense counsel until late in March 2006. Neither decision was based on any decision by the trial chamber of the IST because that chamber had refused to determine its own competence. Moreover, it was, of course, impossible for defense counsel to make and application to remove Judge Abdel Rahman on 19 October 2005, as Judge Abdel Rahman did not join the court until February 2006. At the start of proceedings on the merits in October 2005 Judge Abdel-Rahman was not

known to the defense lawyers and was not even one of the judges trained by foreign experts to be a judge of the IST. The reasoning of the President and appellate body of the IST contained no reasoning as required by the right to fair trial under international human rights law. In addition, defense counsel were not allowed to make any oral representations and the most experienced lawyers on the defense team were not even provided a copy of the 19 February and 3 April 2006 decisions until June 2006.

[113] This supplementary motion was apparently not even considered by the IST as the decision on the 1 February 2006 motion was handed down 19 February 2006, the day before this supplementary motion was submitted.

[114] John F. Burns, "Lawyer's Slaying Raises Questions on Hussein Trial," Late Edition - Final, Section A, p. 1, Col. 1, *New York Times* (22 October 2005) (also reporting the *Al-Arabiya* interviews).

[115] *See, for example,* Associated Press, "A Second Lawyer in Saddam Trial Killed," on *NewsMax.com Wires* (9 November 2005).

[116] Solomon Moore, "Killings Linked to Shiite Hit Squads in Iraqi Police Force," *Los Angeles Times* (29 November 2005); Paul Garwood, "Iraqi Sunni party says govt-backed hit squads should be confronted after raid," *Associated Press* (24 January 2006); and Paul Martin, "Iraqi interior chief aims to end corruption, rights abuses," *Washington Times* (11 January 2006).

[117] Statement attributable to the Spokesman for the Secretary-General on Iraq issued by United Nations Headquarters in New York on 8 November 2005.

[118] *See, for example,* Ahmed Rasheed and Michael Georgy, "Saddam's lawyer pays price for principles," *Reuters* (21 June 2006).

[119] Adam Ereli, Deputy Spokesman for the United States Department of State, Daily Press Briefing, Washington, D.C. USA, June 21, 2006, 12:40 p.m. EDT.

[120] John F. Burns and Christine Hauser, "Third Lawyer in Hussein Trial Is Killed," *New York Times* (21 June 2006).

[121] Ahmed Rasheed, "Saddam's daughter and wife on wanted list," *Reuters*, Sunday, July 2, 2006.

[122] Bushra Juhi, "Saddam Trial Adjourns 'Til October Verdict," *Associated Press* (27 July 2006).

[123] The position of the defense lawyers stands in stark contrast to the prosecution which had more than two years to prepare and present a defense, eight of tens months allocated fro the trial to present their case in court, and more than 200 million dollars of foreign funds provided by the occupying powers.

[124] On 13 June 2006, Mr. William Wiley who claimed to act on behalf of the IST, told the defense lawyers that e had copies of the Dujail court papers, but refused to give them to the lawyers saying he would do so at later date. Until this time, the IST had claimed that these papers were not available.

[125] BBC, "Interview with Sir David Frost" (broadcast on *BBC Radio* on 20 June 2004).

[126] See the section below on the lack of independence of the IST.

[127] Record of Negotiations of the International Covenant of Civil and Political Rights, U.N. Doc. A/2929, Chap. VI, sec. 77.

[128] U.N.S.C. Res. 1511, U.N. SCOR, 58th Sess., 4844th mtg., U.N. Doc. S/RES/1511 (2003).

[129] Art. 9 of Iraqi Law No. (160) of 1979, Judicial Organization, *The Official Gazette*, No (27) 2 July 1980.

[130] 312 *UNTS* 221 (1950).

[131] 1144 *UNTS* 123 (1978).

[132] O.A.U. Doc. No. CAB/LEG/67/3 Rev. 5 (1986).

[133] Adopted by the 7th United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Milan, 26 August to 6 September 1985, U.N. Doc. A/CONF.121/22/Rev.1 at 59 (1985).

[134] Report of the Working Group on Arbitrary Detention, U.N. Doc E/CN.4/1996/40 at 26.

[135] *Castillo Petruzzi et al. v. Peru*, Ser. C, No. 52, Inter-American Court of Human Rights, para. 129 (30 May 1999).

[136] Hamza Hendawi, *Saddam Lashes out at U.S. as Trial Resumes, Associated Press* (28 November 2005).

[137] Ahmed Rasheed, "Government tries to persuade Saddam judge not to quit," *Reuters* (15 January 2006).

[138] Middle East Online, "Rizkar Mohammed Amin left his position for good, Hameesh named as new chief Saddam judge, New Chief Judge will hold post temporarily until judges elect new permanent replacement," at www.middlle-east-online.com (First Published 2006-01-17, Last Updated 2006-01-17 09:50:54).

[139] BBC News (Middle East), "New Saddam judge 'should resign'," reported on Wednesday, 18 January 2006 at 19:04 GMT.

[140] Interview with Jalal Talabani, *Radio Free Europe* (5 October 2005).

[141] "Saddam judge denies links with Baath party," *Reuters* (19 January 2006).

[142] Arab Times (Kuwait), "Execution of Saddam Soon," (6 July 2006).

[143] CNN, "Talabani: Saddam confesses to execution orders," reported on Tuesday, 6 September 2005 at 7:00 p.m. EDT (23:00 GMT).

[144] Francis Curta, "Saddam defense wants trial delayed," *AFP* (28 November 2005).

[145] Associated Press, "Iraqi Shi'ite cleric calls U.S., Britain and Israel a 'Triad of Evil'," (11 March 2006).

[146] Associated Press, "Hussein Judge Target of Plot" (28 November 2005).

[147] Thanassis Cambanis, "Flash of old Hussein Sets off Ripples," *Boston Globe* (29 November 2005).

[148] Patrick Cockburn,"Delay in Putting Saddam on Trial is 'damaging the country'," *The Independent* (8 September 2005).

[149] Adam Nichols, *Saddam Executioners Lining Up*, New York Daily News, Oct. 16, 2005.

[150] Online NewsHour on 30 June 2004 accessed at *www.pbs.org* (1 October 2005).

[151] Luke Baker, *Doubts and questions deepen as Saddam trial to resume, Reuters* (4 December 2005).

[152] Art. 5(c) of the Statute of the IST.

[153] Basic Principles of the Independence of the Judiciary, 7th UN Congress on the Prevention of Crime and the Treatment of Offenders, U.N. Doc. A/CONF.121/22/Rev.1 (1985); U.N. GAOR, 40th Sess., Supp. No. 38, U.N. Doc. A/40/146 (1985).

[154] Artt. 7(a) and 8(j) of the Statute of the IST.

[155] Art. 41 of the Law of Prosecutors, Law No. 159 (1979).

[156] Basic Law of Germany, art. 97(1) (official trans.) ("Judges shall be independent and subject only to the law"); Constitution of France art. 64 ("The President of the Republic shall be the guarantor of the independence of the judicial authority"); Constitution of Japan, art. 76(3) (official translation) ("All judges shall be independent in the exercise of their conscience and shall be bound only by this Constitution and the laws"); Constitution of the Russian Federation, art. 120 ("Judges shall be independent and subject only to the Constitution of the Russian Federation and federal law"); Constitution of China (1982), art. 126 ("exercise judicial power independently, in accordance with the provisions of the law").

[157] Art. 14 of the International Covenant of Civil and Political Rights, art. 84 of the Third Geneva Convention, art. 26 of the African Charter on Human and Peoples' Rights, art. 40 of the Rome Statute of the International Criminal Court, art. 6 of the European Convention for the Protection of Human Rights and Fundamental Freedoms, art. 8 of the American Convention on Human Rights, art. XVIII of the American Declaration on the Rights and Duties of Man.

[158] *Gonzáles del Rio v. Peru*, Communications to the UN Human Rights Committee No. 263/1987 (28 October 1992).

[159] *See, for example, Gregory v. United Kingdom*, European Court of Human Rights, 25 *EHHR* 577 (1997).

[160] This anecdote is related by Professor M. Cherif Bassiouni who is a person intimately familiar with the IST. *See* M. Cherif Bassiouni, "Post-Conflict Justice in Iraq: An Appraisal of the Iraq Special Tribunal," 38 *Cornell International Law Journal* 327, 371-372, fn. 346 (2005).

[161] United States Department of State, *Country Reports on Human Rights Practices for 1995*, 366, Washington, D.C., USA: U.S. Government Printing Office (April 1996).

[162] CPA Regulation No. 1, Doc. No. CPA/ORD/16 May 2003/01 (De-Ba'athification Order) and CPR Memorandum No. 1 on the Implementation of De-Ba'athification Order No. 1. *Also see* art. 33 of the Statute of the Tribunal that prohibits from being a judge any persons who was "a member of the Ba'ath Party.

[163] "Saddam Hussein: The Trial," a film by Jean-Pierre Krief for Arte France and KS Visions (2005).

[164] Film by Jean-Pierre Krief produced for Arte France and KS Visions and shown in France in 2005.

[165] BBC profile of Judge Raouf Abdel-Rahman at http://news.bbc.co.uk/2/hi/middle_east/4659836.stm (3 March 2006). Also reported in EIN News at http://www.einnews.com (1 March 2006 at 9:52 GMT); CBS News, "More Chaos At Saddam Trial," at http://www.cbsnews.com (29 January 2006).

[166] BBC profile of Judge Raouf Abdel-Rahman at http://news.bbc.co.uk/2/hi/middle_east/4659836.stm (3 March 2006).

[167] CBS News, "More Chaos at Saddam Trial," at http://www.cbsnews.com (29 January 2006).

[168] Kuwait Times, "Defense Team to Meet Saddam May End Trial," (27 January 2006).

[169] Mussab al-Khairalla, "Saddam and defense team boycott trial," accessed at http://www.int.iol.co.za story attributed to Reuters (1 February 2006 at 7:09 a.m.).

[170] Richard Boudreaux, "Iraqi Trial Adjourns at Impasse," *Los Angles Times* (3 February 2006) accessed at http://www.latimes.com (3 March 2006).

[171] This statement is reported on the Transitional Justice Forum at *tj-forum.org* by Christopher J. Le Mon at 12:02 on 7 February 2006.

[172] BBC News, "Iraq trial resumes without Saddam," published on 24 July 2006 at 15:30:12 GMT accessed at http://news.bbc.co.uk/go/pr/fr/-/1/hi/world/middle_east/5209018.stm (15 August 2006).

[173] Film by Jean-Pierre Krief produced for Arte France and KS Visions and shown in France in 2005.

[174] *Karttunen v. Finland*, Comm. No. 387/1989 (23 October 1992), UN Doc. A/48/40 (1993) at p. 120, para7.2.

[175] Comments made on 13 June 2006 after claiming to have submitted a motion to the special Court to have Mr. Wiley prevented from speaking to defense witnesses or defense lawyers.

[176] *Suarez-Rosero Case*, IACHR 8, para. 70 (12 November 1997). *Also see Annette Pagnoulle (on behalf of Abdoulaye Mazou) v. Cameroon*, ACHPR, Com. No. 39/90 (2000) (holding that administrative detention of two years without reason violated the defendant's human rights).

[177] *Civil Liberties Organisation, Legal Defense Centre, Legal Defense and Assistance Project vs. Nigeria*, African Comm. Hum. & Peoples' Rights, Comm. No. 218/98 (not dated), para. 31.

[178] *McVicar v United Kingdom* ECHR 46311/99 (2002).

[179] *See Ocalan v. Turkey*, ECHR 46221/99 at § 162 (2005).

[180] *Further Decision on Motion by Defense of Milan Martic For Access to Confidential Transcripts and Documents, Prosecutor v. Radoslav Brdanin*, IT-95-11-PT (26 May 2004).

[181] *Avocats Sans Frontieres (on behalf of Gaetan Bwampamye) v. Burundi*, ACPHR, Comm. No. 231/99 (2000).

[182] *Ocalan v. Turkey, ECHR* 46221/99 at §131 (2005).

[183] Article 19(Fourth)(B) of the new Statute of the IST and article 18(c) of the old Statute of the IST.

[184] Basic Principles on the Role of Lawyers, adopted 8th UN Congress on the Prevention of Crime and the Treatment of Offenders in Havana, Cuba from 27 August to 7 September 2006, U.N. Doc A/CONF/.144/28/Rev.1 at 118 (1990).

[185] Law No. 111 (1969), published in *Al-Waqai' Al-'Iraqiya*, No 2796 (26 September 1980).

[186] *See Prosecutor v. Dusko Tadiç, a.k.a. 'Dule', Decision on the Defense Motion for Interlocutory Appeal on Jurisdiction*, para. 141, ICTY Case No. IT-94-I (2 October 1995).

[187] *See, for example, Judgment of the International Military Tribunal at Nüremberg* (30 September and 1 October 1946) (stating in relevant part that "[t]o constitute crimes against humanity, the acts relied on ... must have been in execution of, or in connection with, any crime within the jurisdiction of the Tribunal...). *See, for example*, Peter Calvocoressi, *Nuremberg—The Facts, the Law and the Consequences* 57-58 (1948).

[188] *Veeber v. Estonia*, (No. 2), Appl. No. 45771/99 at §31 (21 January 2003).

[189] *See* Cherif Bassiouni, "Post-Conflict Justice in Iraq: An Appraisal of the Iraq Special Tribunal," 38 *Cornell International Law Journal* 327, 373 (2005).

[190] *Allenet de Ribemont v. France, ECHR*, Ser. A, No. 308, at p. 16, para. 35 (10 February 1995).

[191] *Minnelli v. Switzerland, ECHR*, Appl. No. 8660/79 (1983).

[192] Film by Jean-Pierre Krief produced for Arte France and KS Visions and shown in France in 2005.

[193] *Id.*

[194] UNGA Res. 43/173 (9 December 1988).

[195] Statement by L. Paul Bremer in CPA Transcripts 23 April 2004, entitled "Bremer affirms: Iraq Turns the Page."

[196] Edwards Wong and John Burns, "Saddam Hussein Goes on Trial for Crimes Against Humanity," *New York Times* (19 October 2005) at http://johnfburns.blogspot.com/2005/10/saddam-hussein-goes-on-trial-for.html.

[197] *See* Neil A. Lewis and David Johnston, "The Struggle for Iraq: War Crimes; U.S. Team is Sent to Develop Case in Hussein Trial," *New York Times* p. 1 (7 March 2004).

[198] Nick Wadhams, "The Ex-Dictator: Hussein Unlikely to Be Tried Till 2006," *Associated Press* (13 December 2004).

[199] Alissa J. Rubin, "The Conflict in Iraq: Trials to Start for Heads of Former Iraqi Regime," *Los Angeles Times* (15 December 2004).

[200] Art. 59 of the Third Geneva Convention, *supra*, note 13.

[201] Email from Capt McCoy, Michael D (Baghdad) McCoyMD@state.gov entitled "Transportation and Housing Arrangements for Baghdad" (sent 1 December 2005 3:18 PM).

[202] *Commission Nationale des Droits de l'Homme et des Libertes vs. Chad*, African Comm. Hum. & Peoples' Rights, Comm. No. 74/92 (1992), § 22.

[203] IST Clerk Riza Hasan made this statement to defense counsel on 21 December 2005.

[204] *Öcalan v. Turkey*, Appl. No. 46221/99 (12 March 2003) at para. 88.

[205] *Id.*

[206] The Prosecutor called for the death penalty for President Saddam Hussein in the hearing on 10 July 2006.

[207] American President George W. Bush, the commander-and-chief of the army illegally occupying Iraq and the author of the war of aggression against the Iraqi people stated that "I think he ought to receive the ultimate penalty ... for what he has done to his people. I mean, he is a torturer, a murderer. They had rape rooms. This is a disgusting tyrant who deserves justice, the ultimate justice." U.S. President George Bush in an interview with ABC News' Diane Sawyer (16 December 2003).

[208] Interview with Jalal Talabani, *Radio Free Europe* (5 October 2005).

[209] Arab Times (Kuwait), "Execution of Saddam Soon," (6 July 2006).

[210] Judge Abdel-Rahman has never refuted the allegations made on "information and belief" and submitted by the defense lawyers to the IST on 20 February 2006 that alleged that on the Iraqi television station Al-Fayha he "called for imposing death penalty against President

Saddam Hussein claiming at a demonstration that took place in Halabja that there is no need for any trial to try Saddam for the crimes he committed against the Iraqi people."

[211] Report of the Special Rapporteur on the independence of judges and lawyers to the UN Commission on Human Rights (now Council on Human Rights), Professor Leandro Despouy, UN Doc. E/CN.4/2006/52 (23 January 2006) excerpt from page 17, paras. 56-58.