Iraqis had adopted the Statute. The IGC, however, had been installed by the
United States government when it occupied Iraq. Mr. Bremer then signed the
Statute into law the next day as is stated in CPA Regulation No. 6.[90] On 10
December 2003 the signed order was published in the CPA's Official
Gazette.[91]

At the time of its promulgation, the controlling language of the Statute of the
Iraqi IST was English—not Arabic. This is evidenced by CPA Regulation No.
1 that was first promulgated in English and signed by the American
Administrator Paul L. Bremer, who does not understand Arabic.[92] The official
languages of Iraq, however, are Arabic and Kurdish, according to article 9 of
the Law of Administration for the State of Iraq for the Transitional Period that
was promulgated by the CPA on 8 March 2004. With this action, as Professor
Cherif Bassouni points out, the IST now "became an official institution of the
"occupying powers"."[93]

The IST was created while Iraq had no functioning government and was under
foreign occupation. Moreover, as if to emphasize that the creation of the IST
was the will of the occupier, the United States occupying power also
promulgated CPA Order 17 giving complete immunity to American soldiers
for their international crimes committed in Iraq just weeks later.[94]

As an occupying power in Iraq the United States government "issued orders in
the same way as it did during the post-World War II occupation of Germany
and Japan. In Germany, these orders were issued by the Allied Control
Council, while in Japan they were issued by the Supreme Allied
Commander."[95] In Iraq these orders are called 'CPA orders'.

### The Flawed Functioning of the IST

The official language used by the IST is Arabic according to article 34 of its
Statute, even though the Statute was first drafted in English.

The Statute of the IST provides for the punishment of the crimes of genocide
(art. 11), crimes against humanity (art. 12), war crimes (art.13) and selected
Iraqi criminal laws (art. 14) which have been adapted to prevent the
prosecution of soldiers from the occupying powers.

Articles 1 and 2 of CPA Order No. 48 also declared that drafting of the
Elements of Crimes and Rules of Procedures had to be approved by the CPA.
Consequently different drafts of the Revised Rules of Procedure and Evidence
have been circulated on the internet and it is not clear whether or not this
instrument has entered into force even after the conclusion of the Dujail trial.
It is also not clear which version is authoritative. Likewise, the draft 'Elements
of Crimes' have not been officially circulated and it is not clear which version

Dockets.Justia.com

is operative. The resulting confusion makes it impossible for defense lawyers to prepare a defense or even challenge many of the actions or arguments of the prosecution or the IST that may be inconsistent with the rules or elements of crimes.

Since the beginning of the American-led invasion, Iraqis have fought against the occupying powers. On or around 13 December 2003, one of those Iraqis fighting the occupation, President Saddam Hussein, was captured in the vicinity of Tikrit, Iraq, under circumstances largely unknown. In any event, President Saddam Hussein was quickly transferred to the custody of the United States, in whose *de facto* custody he remains today.

The United States repeatedly stated that it is detaining the President as a prisoner of war.[96] At the same time, it has failed to respect his human rights under international humanitarian law. These rights include those under the Third Geneva Convention that provides for the human rights to security of person, privacy, respect, humane treatment, and fair trial.

The United States violated these rights by several times permitting the release of embarrassing information, including pictures, to the media.[97] This information has aimed at humiliating the President. The IST did nothing to respond to these actions.

According to article 3, the TAL is "the Supreme Law of the land and shall be binding in all parts of Iraq without exception" while "[a]ny legal provision that conflicts with this Law is null and void." According to paragraph C of article 3, the TAL is to remain in effect until the "formation of an elected government pursuant to a permanent constitution" has taken place. Article 13 of the Permanent Constitution of the Republic of Iraq that was adopted on 15 October 2005 states that the Constitution is the "supreme law in Iraq and shall be binding in all parts of Iraq without exception" and that "[n]o law shall be enacted that contradicts this Constitution" and text "that contradicts is deemed void."

On 30 June 2004, the occupying powers attempted to transfer authority to the IGC for acts that had been committed under the exclusive authority of the CPA. On 30 January 2005, the Iraqi elections were held as another attempt to transfer authority exercised by the CPA to the Iraqi Interim Government which was to serve until an Iraqi government could be elected under a permanent constitution. The elections where held with inadequate security and with candidates who were not to the liking of the United States government being prevented from standing for office.

At the hearing of 19 October 2005, President had still not consulted with counsel retained by his family, in spite of the latter's numerous written

requests for access. Defense counsel also complained at the opening of hearings that they had been denied the right to meet their client together with numerous other violations of their client's human rights. They also complained about the legality of the IST and the lack of basic security for witnesses and lawyers.

At the hearing on 19 October 2005 defense counsel filed a motion indicating that notice of evidence and witnesses had not been provided to defense counsel in a timely manner. The defense also filed a motion calling for the proceedings to be suspended due to insecurity. Before this date defense counsel were not able to communicate with the IST despite numerous attempts.

On 26 November 2005, followers of Shiite cleric Muqtada al-Sadr, who controls a faction of at least thirty members of the Iraqi Parliament, called for the summary execution of President Saddam Hussein. On that same day, the Associated Press reported that "the leader of the biggest Shiite party, Abdul-Aziz al-Hakim, accused the IST of "weakness" for not having sentenced Hussein to death already" and that an attempt had been made on the life of another IST judge.[98]

In contrast to the defense lawyers, the judges and the prosecutors are provided around the clock security, secure living and working quarters, and residence outside of Iraq. The defense lawyers are sometimes provided security when they travel in the Green Zone and sometime denied any security; they were promised money for three guards that was never paid; and they were repeatedly told that no adequate security would be provided with replies that incorrectly claim that security is being provided.

Nevertheless, despite the insecurity, the IST hearings continued on 27 and 28 November 2005 without the IST addressing the security concerns of the lawyers.

Around the same time, a judge of the IST reportedly "recused himself in late November because one of the co-defendants may have been involved in the execution of his brother. That judge was replaced."[99]

At the hearings on 7 and 8 December 2005 a preliminary motion challenging the legality of the IST and its failure to ensure respect for the defendants' human rights was submitted to the IST by defense counsel.

At the hearing on 21 December 2005, the IST refused defense counsel the opportunity to make arguments challenging its legality.

Also on 21 December 2005 a supplementary motion again challenging the legality of the IST was submitted by defense counsel to the IST.

The same day, 21 December 2005, Dr. Curtis F.J. Doebbler, who possesses written powers of representation from the Iraqi President Saddam Hussein, again requested access to his client by presenting the documentation requested by the IST in both Arabic and English.

Captain Philip Lynch asked Dr. Doebbler to wait outside the courtroom and to speak to Judge Amin Rizgar when he arrived. When Amin Rizgar appeared, Dr. Doebbler greeted him and was immediately attacked by United States Marshall Bartlett, who physically assaulted Dr. Doebbler and threatened to "permanently remove him" if he came close again.

A few minutes later, United States military Captain Philip Lynch told Dr. Doebbler that the IST had approved his request, but that the decision had been "reversed by a Canadian judge named Howard Davidson," an individual apparently acting as an advisor to the IST.

Dr. Doebbler was then told to return to a 'safe-house' were he was forced to remain under house arrest guarded by two Bulgarian guards who claimed to be working for the United States government.

On 22 December 2005, before the IST session began the IST provided defense counsel a two-page letter summarily asserting its own competence to try the defendants without providing a reasoned legal analysis on the issue and after denying defense counsel the right to make oral arguments on this issue. This statement did not address the violations of human rights or provide any substantive reasoning to support its decision.

Later, also on 22 December 2005 and in the courtroom, defense counsel again requested time to make oral argument on the question of legality and requested that the IST consider this issue as a preliminary issue. The IST refused this request without giving any reasons. The Chief Judge said the question had been decided. To date no reasoned decision has been provided to this or any of the other requests to the IST.

On 17 January 2006, defense counsel requested the permission of the United States authorities to visit their client. The United States officials stated that only five of the nine defense counsel requested by the President, were allowed to visit.

Other lawyers were told they first had to be admitted to by the IST, although some, such as Dr. Doebbler, could not be admitted because he was not allowed into the courtroom. At the same time Dr. Doebbler was told by United States'

and Canadian officials, who clamed to act on behalf of the IST, that only if he proffered his original papers to the IST in the courtroom could he be admitted.

On 18 January 2006, it was publicly reported that Special Tribunal Chief Judge Rizgar Amin had been pressured into resigning. This pressure had been exerted by Mr. Ali al-Adeeb, a senior Shiite official in Prime Minister Ibrahim al-Jaafari's party and member of the Interim legislature, who publicly declared that "[t]he Chief Judge should be changed and replaced by someone who is strict and courageous."[100]

After Judge Rizgar Amin resigned he was then pressured to rescind his resignation, according to "sources close to the Chief Judge" who told Reuters that the Chief Judge "…tendered his resignation to the court a few days ago, but the court rejected it … talks are under way to convince him to go back on his decision … He's under a lot of pressure, the whole court is under political pressure."[101]

The new Chief Judge of the IST was announced as Saeed al-Hammash,[102] but he too was forced to step down because of pressure from Ali Faisal, the head of the de-Baathification Commission, a creation of the U.S.-led occupying powers meant to prevent individuals who supported the former government of Iraq from participating in public affairs in occupied Iraq.[103] Judge Saeed al-Hammash stepped down sometime between 24 and 29 January 2006.

On 23 January 2006, while the lawyers were in Baghdad they were informed by United States military Captain Mr. Philip Lynch that there had been two car bombs were reported to have gone off very in the near vicinity of their lodgings and that numerous people had been killed. For this reason, one of the lawyers who required emergency medical care was forced to wait several hours before he could go to the hospital.

The same day, 24 January 2006, it was reported that a new judge, Raouf Rasheed Abdel-Rahman, was brought in by the occupying powers controlling the IST.[104] This judge is from Halabja. This is one of the cities in which it is alleged that the President committed crimes against multiple victims. It can reasonably be assumed he is a relative or friend of some of the alleged victims. Moreover, as submitted below, this judge has displayed clear prejudice against the accused before he began his involvement in the trial.

While the lawyers were waiting for the hearing to begin on 24 January 2006, a clerk of the IST who identified himself as Mr. Riza Hasan attempted to return to the defense lawyers a lengthy written submission that had been made to the IST on 21 December 2005. He stated that the IST did "not want the arguments" and was refusing to rule on them.

At the courthouse, on 24 January 2006, defense counsel who had traveled from Sudan, Qatar, Bahrain, Jordan, Syria, and the United States were forced to wait in a room at the courthouse from which they neither could exit on their own free will nor communicate with the outside world. The defense lawyers were cut off from all outside contact despite the fact that this jeopardized the lives and well-being of their other clients who could not contact them. The IST did not communicate with the defense lawyers until 14:00 when a Captain in the United States military informed them that the hearing was cancelled in the wake of a declaration by Investigative Judge *and* Tribunal Spokesman, Raed Juhi, to the effect that "some of the witnesses had not yet returned from the HAJ. It should be noted that as of 24 January, 2006, the HAJ had ended *ten full days earlier*" (emphasis added).

On 26 January 2006, it was announced that Saeed al-Hammash was reinstalled as Chief Judge of the IST after the intervention of outside powers. In an interview with the Associated Press, one judge speaking for the IST declared that "[m]atters are not in our hands."[105]

The same day, 26 January 2006, it was also announced that Judge Rauf Rasheed Abdel-Rahman would indeed be the new Chief Judge despite the fact that he was born in Halabja and had allegedly been himself arrested and convicted under the regime of President Saddam Hussein for criminal offenses under the government headed by President Saddam Hussein.[106]

Without consultation with the defense lawyers, the IST set the next hearing date for 29 January 2006. Several lawyers, including the most senior defense lawyer, had prior obligations before courts in their own countries on 29 January 2006.

On 29 January 2006, only four defense lawyers were thus able to travel to Iraq. The most senior lawyer could not attend the IST session. Other defense lawyers were deterred by the deteriorating security situation.

At this session Dr. Curtis Doebbler and Mr. Sahal Armouty were admitted to appear before the IST after their original papers, which they had submitted in open court, were reviewed. A written request for a transcript of the prior proceedings was also made, but received no response.

On 1 February 2006, defense counsel submitted challenges to the impartiality of the Chief Judge and the prosecutor by arguing that they were biased. Both had made comments indicating that the guilt of the President was a foregone conclusion. This preliminary motion specifically requested the disqualification of Chief Judge Abdel-Rahman based on information that was widely reported and in the public domain.

On 19 February 2006, these submissions were supplemented by additional representations that were drafted on 8 February 2006, but could not be submitted to the IST until 19 February 2006 because of the inability to communication with the IST. These supplemental submissions again requested the disqualification of Chief Judge Abdel-Rahman on grounds of bias citing his pre-trial statement that the President should be summarily executed. This submission is supported by the affidavit of a Jordanian lawyer, Mr. Ziyad al-Nasjdawi who had witnessed the statement.

On 28 February and 1 March 2006, the IST refused to deal with the submissions regarding the lack of impartiality and the bias of Judge Abdel-Rahman, stating that it would not decide them. The IST did not disclose that the request for the disqualification of Chief Judge Abdel-Rahman had already been decided by the IST on 20 February 2006 in a decision whereby the IST's appellate body found that the motion should have been submitted before 19 October 2005, *almost four months before Chief Judge Abdel-Rahman and thus a practical impossibility.*

At the hearings on 12 and 13 March 2006, the IST stated that it had decided and rejected the motion for disqualification of Chief Judge Abdel-Rahman, but the IST refused to provide its decision in writing to the defense lawyers despite repeated requests.

The defense lawyers then requested a decision on their prior submissions concerning security, the illegality of the IST, and the conditions for a fair trial. Chief Judge Abdel-Rahman refused to consider this request or allow arguments to be presented. Instead he ordered one of the colleagues of the President and one defense lawyer from the courtroom for insisting that the IST at least implement previous oral decisions.

On 7 February 2006, chief Prosecutor Jaafar Al Mussawi told AFP and the Middle East Times that the lawyers of President Saddam Hussein "have no right to see the defendants."[107]

On 10 February 2006, Kurdish Media reported that another judge of the IST, 60-year-old Ali Hussein al-Shimmiri had died on 9 February 2006.[108] With this death four out of the five judges who were on the original IST panel were now removed.

On February 13 and 14, Chief Judge Abdel-Rahman presided over hearings of the IST where defendants had no counsel of their own choosing present to assist on their behalf. Moreover, evidence was read into the record on the basis of affidavits and without notice to defense counsel allowing them a reasonable opportunity to challenge the evidence.

On 28 February 2006, Judge Abdel-Rahman refused to respond to defense counsel's motions for his disqualification for bias and his inability to ensure basic human rights for defendants. Instead, further evidence was read into the record on the basis of affidavits of which defense counsel had no adequate prior notice, and therefore no opportunity to meaningfully question the witnesses allegedly making claims against their integrity and of criminal wrongdoing.

Between 29 January and 26 February defense counsel were denied access to their client despite repeated requests.

Only on 26 February 2006 was Mr. Kaleel al-Dolami allowed to meet with President Saddam Hussein after an oral assurance that such meeting could take place which was communicated from the United States authorities by United States military Captain Michael McCoy in an email dated 22 March 2006.

No other defense lawyer traveled to this meeting because of the short notice and uncertainty about whether the IST would allow the lawyers to meet with their client. In his email of 20 February 2006, Captain Michael McCoy had informed defense counsel that meetings had to be arranged solely through the IST. The IST finally issued a reply on 8 March 2006, well after the meeting was scheduled to take place.

On 28 February 2006, Chief Judge Abdel-Rahman held another session of the IST. Again defense counsel insisted on a written decision on the motion for disqualification. The IST refused to give a decision thereby forcing defense counsel to withdraw out of fear of prejudicing their client's rights. The Chief Judge continued the proceedings without defense counsel present after appointing new lawyers.

On 1 March 2006 only Mr. Khamis el-Obedi appeared for the defense. Nevertheless the IST denied all motions requesting a short delay. At the end of proceedings the trial was adjourned until 12 March 2006.

On 7 March 2006 the IST wrote to defense counsel informing them that five lawyers were entitled to meet with the President and enter the courtroom. Dr. Doebbler and Mr. Armouty were not among the five, although they had been previously admitted by the IST and allowed to attend meeting with President Saddam Hussein. Both Dr. Doebbler and Mr. Armouty possessed powers of attorney from the President and had previously been approved by the IST. No reason was give for the apparent decision to exclude them.

On 8 March 2006, subsequent to an enquiry from the defense lawyers, the IST stated in an email to Dr. Doebbler, in apparent contradiction with the event of 29 January 2006, that Dr. Doebbler was "not admitted to practice before the

IHT. The IST never accepted any paperwork from you on January 29, 2006 and has not recognized your right to represent Saddam Hussein or any other defendant." Dr. Doebbler is expert on international human rights law expert on the legal team.

On Monday and Tuesday, 12 and 13 March 2006, additional hearings were held in which some defense counsel were prevented from attending the hearings.

On 15 March 2006, the defense lawyers submitted to the IST in writing a 17-point request. The first point requested equality of arms between the parties. Among other points, the motion also requested the IST's prompt attention to the following: the defense request for a written response to their earlier submissions (points 2, 4 and 5); the defense request for timely notice and copies of all evidence submitted to the IST and all exculpating evidence in the possession of the prosecution (points 8, 11, 12, and 13); the defense request for timely notice of hearings (point 9); for transcripts (points 10 and 12); the defense request for private and confidential meetings with President (point 15); and the defense request for adequate time and facilities to prepare a defense (points 16 and 17). The IST accepted the filing but once again refused to rule on them to date despite the fact that some of them clearly go the very legitimacy of the proceedings.

On 3 April 2006, defense lawyers were granted another meeting with their clients. Like all previous meetings this one was not confidential. This time, Iraqi translators joined American soldiers in interfering with the meeting's confidentiality. Moreover, before some lawyers were allowed to enter the meeting, their private papers were searched and read despite their objections that such searches violated their lawyer-client privilege. Additionally, even legal papers already submitted to the IST had to be read by United States authorities before they could be provided to President Saddam Hussein.

On 4 April 2006, although a request had been made 24 hours in advance as required by the US occupying powers in charge of monitoring the movements of the lawyers in Iraq and without prior notice, cancelled meetings that defense counsel had indicated were extremely important to their defense. These meetings were with a potential witness and senior United Nations personnel. One of the witnesses with whom a meeting was to take place was killed shortly thereafter. This witness would have been exposed to both American and Iraqi officials who are frequently at the meeting site, the Al-Rasheed Hotel, and the checkpoints that were required to pass to get to the meeting site.

On 5 April 2006 a meeting took place with IST officials who announced that the review of the authenticity of documents and signatures would be

conducted by a person who worked for the Ministry of Interior. Objections by defense counsel claiming that the review should be done by an impartial expert were ignored.

At the hearing, defense counsel again repeated in writing their requests for written responses from the IST to their motions and they again asked for adequate time and facilities to prepare a defense. Defense counsel also asked to see some original defense documents together with their clients. While the IST apparently granted the last request in part, the Americans indicated to defense counsel that only the lawyers and not their clients could view the documents. In addition at the hearing at which only President Saddam Hussein was present, Judge Abdel-Rahman admitted receiving at least six motions, but he again refused to rule on them claming that he had no time to do so.

Also at the hearing on 5 April 2006, Judge Abdel-Rahman also ordered the only female defense counsel, Mrs. Bushra al-Kalili, forcibly removed from the courtroom by four male guards. The removal was the result of Mrs. Bushra al-Kalili's failing to respond to the judge's order to "sit down and shut up." Defense lawyer Mrs. Bushra al-Kalili had argued that prejudicial evidence presented by the prosecution without prior notice to defense should be ruled inadmissible. The prosecution had introduced a video tape without a date and where several sources had been combined in a collage from Al-Arabya, a television station created by the US occupying forces with a publicly acknowledged goal of providing propaganda against supporters of the former Iraqi government. As defense lawyer Mrs. Bushra Kalili demonstrated the harmful consequence of allowing any evidence into the trial, Judge Abdel-Rahman became extremely irate and ordered bailiffs to remove her using force. Such treatment of a respected female lawyer is not only prejudicial to the President's rights, but such action is also far removed from Arab and Islamic the values.

On 12 April 2006, the IST again reconvened without any defendants present. In addition because the defense lawyers had been given only four days notice of the session, the most experienced defense lawyers were prevented from attending. The hearing was ultimately adjourned after ten minutes with the Chief Judge claiming that the IST was not ready to hold the hearing because handwriting experts had failed to appear.

At the 15 April 2006 hearing the President claimed that Ministry of Interior officials were killing and torturing Iraqis. The President attempted to illustrate how such summary killings created a 'chilling effect' for all other witnesses. The IST not only failed to call for an investigation into the allegations of obstruction of justice, it also told the President that such allegations should not be raised before the IST.

On 17 April 2006, amid increasing violence, the hearings resumed.[109] At the hearing the Prosecution introduced a report by alleged experts who worked in the Iraqi Ministry of Interior. The report claimed that all the signatures and documents presented by the Prosecution were authentic.

In April 2006, it was also confirmed that Mr. William Wiley, who had worked for the United Nations from approximately mid-2005 to early 2006, had gone to work for the United States government's Regime Crimes Liaison Office, which is the office that defense counsel and observers have accused of controlling the IST. For months, Mr. Wiley had used his United Nations position to gain confidential information from defense counsel and had represented to defense counsel that they could trust him with their confidential information.

On 12 June 2006, the IST read out allegations against the defense lawyers that had been made by defense witnesses who had been beaten, arrested and held without access to counsel of their choice. These allegations were read in front of the lawyers' clients and in a public session of the IST trying these clients. The statements alleged that the defense witnesses had been bribed by the defense lawyers. The IST did not bring the defense witnesses into courtroom, although they had been in custody during the last IST session. The IST did not provide defense counsel printed copies of the allegations or the right to respond to them. And later—through a person who claimed to be an officer of the IST—defense lawyers were threatened with arrest if they challenged the allegations before the IST the next day.

On 13 June 2006, when the defense lawyers raised arguments concerning international human rights law, Chief Judge Abdel-Rahman repeatedly interrupted them with irrelevant criticisms, such as concerns their choice of attire,[110] and then cut off their arguments. When the defense lawyers raised the issue of serious and widespread human rights violations of the right to fair trial, the Chief Judge said these arguments "are irrelevant" and that "the court should not be lectured to about these rights."[111]

At the hearing, despite having agreed to hear more defense witnesses and after receiving a written note passed to him from American officials outside the courtroom, Chief Judge Abdel-Rahman suddenly the defense case closed and ordered both parties to make their closing statements. The Chief Judge stated that "You've presented twenty-six witnesses. If that is not enough to present your case, then 100 won't work." In fact, the defense had presented less than 20 witnesses, while the prosecution had presented more fifty.

The Chief Judge then set down 19 June 2006 for the prosecution's closing statement—eight months after the prosecution began its case—and 10 July 2006 for the defense—less than two months after the defense lawyers had

received the formal charges and were forced to start presenting a defense without any time to prepare it.

After the hearing on 13 June 2006 an American escorting the lawyers to the Al-Rasheed hotel for meetings told the lawyers that the courthouse had been hit by rockets and was on fire.

On 19 June 2006, the Prosecutor made a final argument restating the allegations against the defendants, but failing to consider with the alleged perjury by prosecution witnesses, the allegation that persons who had been claimed killed were still alive, and the allegations that attempts were made to bribe defense witnesses. The judge ordered the defense counsel to present their closing argument on 10 July 2006.

Two days later, on 21 June 2006, a third defense lawyer, Mr. Khamis Obedi, was killed. The defense lawyers again pointed out that they lacked adequate security and that the killing of three defense lawyers proves this. The United States officials responded stating that they were already providing adequate security and could not improve upon it. Consequently the defense lawyers stated that they could not appear before the IST until better security was provided.

On 10, 11, 24, 26 and 27 July 2006, the IST convened despite the defense lawyers' objections and no further action to improve security. The IST appointed defense lawyers over the express objections of the defendants and their chosen defense lawyers. The IST also required some defendants to attend some of the hearings by force.

These hearing were mainly devoted to the statements of the IST-appointed lawyers. The IST-appointed lawyers read out statements that were prepared, according to one of the lawyers, by an advisor to the IST named Mr. William Wiley. The defense counsel chosen by defendants had earlier complained to the IST about Mr. Wiley's interference in the case and had asked the IST to issue an injunction against his contacting defense witnesses or any person connected to the defense. All the defense counsel had signed this submission that was made to the IST on 13 July 2006. In keeping with the practice that had been consistent through out the proceedings, no transcript or copy of the statements made by the IST-appointed lawyers was ever provide to the defense counsel or their clients.

At the final session of the trial court on 5 November 2006, Judge Abdel criticized the defense lawyers for making these legal arguments. Even on the day that the IST issued its verdict the chief judge Raouf Rasheed Abdel-Rahman refused to consider arguments about the illegality and unfairness of the court. Instead judge Abdel Rahman criticized the defense lawyers for

making these legal arguments and without ordered Mr. Ramsey Clark, a lawyer for President Saddam Hussein and a former Attorney-General of the United States, removed from the courtroom by force when the defense lawyers tried to submit arguments concerning the illegality and unfairness of the IST.

After public condemning the President to death on 5 November 2006, the IST failed to provide a written and reasoned judgment to defendants until 23 November 2006, severely curtailing the opportunity for appeal by defense counsel. Moreover, defense lawyers have never been provided a record of the proceedings upon which they can base their appeal. The written judgment that was provided to the defense lawyers on 23 November 2006 merely stated that the court would not consider arguments concerning it illegality and it lack of fairness. Annex L: 23 November 2006 Judgment of the IST.

Instead, of correcting the litany of mistakes that it has made, the IST continues to perpetuate and compound its mistakes.

*The Failure to Fix the Problems*

More than two years after his initial detention and after legal proceedings have begun and the prosecution has presented its case, President Saddam Hussein was still not able to have a single private and confidential meeting with his legal counsel that provides him the opportunity to begin to be able to prepare his defense.

There has also been no written and reasoned decision by the IST on any of the motions submitted by defense counsel, namely:

h.  19 October 2005: A motion indicating that notice of evidence and witnesses was not provided to defense counsel in a timely manner.
i.  19 October 2005: A motion calling for the proceedings to be suspended due to insecurity.
j.  8 December 2005: A preliminary motion challenging the legality of the IST and its failure to ensure respect for human rights.
k.  21 December 2005: A supplementary motion challenging the legality of the IST.
l.  1 February 2006: A preliminary motion requesting the disqualification of Chief Judge Abdel-Rahman on grounds of bias.[112]
m.  20 February 2006: A supplementary motion requesting the disqualification of Chief Judge Abdel-Rahman on grounds of bias.[113]
n.  15 March 2006: the seventeen point request, including respect for some basic human rights of fair trial.
o.  13 June 2006: a request to prevent Mr. William Wiley who alleged to work for the IST from interfering with defense witnesses and from contact with defense lawyers who he was threatening.

Moreover, the IST has shown that it cannot even ensure the safety of defense counsel by failing to address numerous requests for security, despite one of its own Judge's commitment to remedying the problems.

Instead, the IST continues to make matters worse for itself. It continues to desecrate the rule of law and the Arab and Islamic principles of Iraq by pushing forward with a clearly unfair and unjust trial. This unfair trial has already caused further divisiveness in Iraq contributing to the instability created by the state of war.

*Lack of Security and Murders of Defense Participants*

Even before the trial began in October 2005, defense counsel and other prominent observers warned about the lack of security for such a trial.

For example, on 19 September 2005, in a letter to the United Nations Secretary-General, Mr. Kofi Annan, Mr. Ahmed Ben Bella, former President of Algeria; Tun Dr. Mohammed Mahathir, former Prime Minister of Malaysia, Mr. Roland Dumas, former Minister of Foreign Affairs of France, and Mr. Ramsey Clark, former Attorney-General of the United States, publicly expressed their concern for the safety of all participants in the trial. Annex E. In this letter these four prominent statesmen drew attention to the atmosphere of violence in which the United States and Iraqi authorities were considering conducting a trial.

The lawyers themselves also provide the IST with detailed requests for security. For example, on 28 November 2005, Mr. Ramsey Clark presented these requests both in writing and in oral argument to the judges of the IST. Annex D. And on 26 January 2006 Mr. Kaleel al-Dolami repeated these requests in writing, but was denied the opportunity to make oral argument to the judges of the IST. Annex F. These requests for adequate security were always either denied or ignored.

Unfortunately, the fears of these prominent statesmen were proven well-founded when on 20 October 2005, just one day after the first hearing, defense lawyer Mr. Sadoon al-Janabi was gunned down by individuals claiming to be from the Iraqi Interim Ministry of Interior. The next day, 21 October 2005, eyewitnesses told Al Arabiya TV that "Mr. Janabi's abductors, dressed in suits and ties, identified themselves as officials of the Interior Ministry" and on 22 October the *New York Times* reported that eyewitnesses identified the men abducting the victim as claiming to be from the Iraqi interim administration's Ministry of Interior.[114] This killing was never been investigated by the Iraqi or United States authorities, and, despite renewed request for the security by

defense counsel, no adequate security was put in place for the remaining lawyers.

No adequate security measures were put in place after this killing and the IST deferred any response to requests made by the defense lawyers for adequate security arrangements to be made.

On 8 November 2005, another defense lawyer, Mr. Adil Mohammad Abbas al-Zubeidi, was killed and a colleague seriously injured, again with alleged involvement of the Iraqi interim government and the occupying United States forces, according to independent news reports.[115] These allegations of Iraqi government involvement in the assassination of private individuals have been repeatedly reported by the media in Iraq.[116]

The defense lawyers again pleaded for adequate security to be provided. In addition the United Nations Secretary-General Mr. Kofi Annan issued a public statement condemning the killings and stating that "it is vitally important that the security of all involved with the Tribunal should be equally assured to ensure a trial free from intimidation and coercion ... [and that the Secretary-General] ... hopes that the Tribunal will uphold the international standards of justice necessary to ensure its legitimacy, fairness and independence."[117] No adequate action was taken by either the Iraqi or United States authorities.

On 28 November 2005, when proceedings resumed despite not adequate security arrangements having been made, another request for security was submitted to the IST and the United States authorities. This time Mr. Ramsey Clark, on behalf of the defense counsel, made an oral plea in the courtroom and submitted a written request seeking specific measures of security for defense counsel. (See annex D) The Chief Judge asked that oral argument be held "later".

On Monday, 5 December 2005, the IST proceeded without the defense counsel present because no steps had been taken to provide adequate security. The IST had also refused to allow the defense counsel to address the preliminary issues of lack of security and the illegality of the IST. Chief Judge Rizgar Amin appointed defense lawyers who had been waiting outside the courtroom and without any preparation and over the express protests of President Saddam Hussein the lawyers entered the courtroom. The IST-appointed lawyers made no challenges to any prosecution witness.

On Tuesday, 6 December 2005, the IST proceeded with more witnesses and again denied defense lawyers request to make preliminary arguments on issue of security and legality.

On Wednesday, 7 December 2005, the IST proceeded with more witnesses and again denied defense lawyers request to make preliminary arguments on issue of security and legality. Protesting the unfairness of the IST he defendants refused to be present. After the public hearing was adjourned defense lawyer Mr. Ramsey Clark was allowed to make a 10 minute oral argument in which he reiterated the call for security to be provided to all participants in the trial. He also provided this request in writing in Arabic and English to the IST. Defense lawyer Mr. Najeeb al-Nuaimi was also allowed to make a 15 minute oral argument on the issue of legality.

On 8 December 2005, Chief Judge Rizgar Amin orally indicated to the defense lawyers that he agreed with their security concerns and had referred the request to the President of the IST for action. No adequate action was ever taken.

During the early December 2005 hearings the prosecution's lead witness testified that no attack had taken place against President Saddam Hussein in Dujail in 1982. This statement is later proven to have contradicted an earlier statement by the same witness and to have shown that this witnesses' testimony is not credible. Furthermore, none of the witnesses directly implicated President Saddam Hussein in any alleged criminal acts, but instead described vaguely treatment they had received at the hands of individual security agents. And in addition most of the witnesses were anonymous and nothing was known about their identity or background by the defense lawyers.

In a letter dated 20 December 2005, the same Chief Judge of the IST indicated that "[t]he Court agrees with the defense point of view about the importance of providing security" (IST Doc. Ref. 1/2005). Again no adequate action was ever taken.

The United States and the Iraqi authorities failed to take any adequate security measure to protect the defense lawyers, especially the Iraqi lawyers. Instead, of providing the security measures requested by defense counsel, the United States authorities agreed to pay for two guards for each defense lawyer. This money was never paid to defense lawyers, as was admitted by Mr. William Wiley in a meeting with defense counsel on behalf of the IST in Amman, Jordan on 7 May 2006. In this meeting Mr. Wiley admitted that the money was not paid and said he would look into the matter. Even if this *de minimus* security arrangement had been provided it would not have been adequate to protect the lawyers from attacks that were carried out by heavily armed perpetrators who claimed to be government authorities and who acted with impunity and perhaps in concert with both Iraqi and United States authorities.

On 21 June 2006, a third defense lawyer, Mr. Khamis al-Obedi, was killed, again under circumstances in which both Iraqi and United States authorities appeared to be involved.[118] The attackers, who abducted the defense attorney, identified themselves as being form the Iraqi Ministry of Interior, and they both arrived at the lawyer's home as well as fled without being pursued by United States authorities that were in the nearby vicinity.

A United States government spokesperson said that they noted that "the Iraqi Government and the international community offer every form of protection and assistance to those involved in the trial … [and that] … unfortunately in this case and this individual, he refused those protections and refused those offers."[119] This is statement was untrue and the United States government knew it to be untrue. Indeed, the *New York Times* had already reported months earlier that the defense lawyers had repeatedly sought adequate security and that "Mr. Obeidi had been one of the most vocal members of Mr. Hussein's team in calling for better security or for the boycotting of the trial after the assassinations of two other defense lawyers in October and November last year."[120]

On 27 June 2006, Mr. Ramsey Clark and Dr. Curtis Doebbler, two of the surviving lawyers on the defense team provided public documentary evidence of the requests made by Mr. Obeidi and the other defense lawyers for adequate security dating back to November 2005 at a press conference at the National Press Club in Washington D.C. in the United States. These two lawyers also indicated that despite the IST's agreement with these requests, these requests had never been honored.

Even as the defense lawyers are trying to prepare final arguments after the defense case was stopped by the chief judge, threats continue against the lawyers. The Iraqi government has threatened the lawyers by claiming to pursue family members of the President for arrest.[121] The timing of this unfounded action by the Iraqi authorities was clearly intended as further attempt to intimidate the lawyers and prevent the defense from being able to proceed.

Furthermore, in public on 27 July 2006, Chief Judge Abdel-Rahman falsely accused the defense lawyers of taking large sums of money from their clients and of not representing their clients.[122] He did this despite knowing that the defense lawyers have worked *pro bono* and have constantly complained that they have no money or other resources available to them to enable them to adequately prepare a defense.[123]

*Lack of Respect for Due Process during Investigations*

There has been constant and extensive interference in the investigative process by members of the Iraqi executive branch of government and by the foreign occupying powers.

The United States has interfered by providing the prosecuting office more than two hundred thousand dollars of support, plus logistic support and constant encouragement to push the trial forward as fast as possible without due respect for the human rights of the accused to a fair trial. There are also countless American lawyers working for the prosecution, but not identified to the defense lawyers.

No exculpatory evidence was shared with defense counsel before or during the proceedings before the IST. Even the proceedings concerning Dujail court in 1982, which were central to the alleged charges relating to events in Dujail, were never provided the defense lawyers despite the admissions that they existed.[124]

United States President George W. Bush, Iraqi President Jalal Talabani, the Chief Prosecutor of the IST, and, allegedly, the Chief Judge before the trial have all said that the death penalty will or should be implemented. Other officials spoke out stating their desired out in favor of their desired outcome of a guilty verdict and/or an execution. Examples of the numerous public statements are recounted in the next section on the lack of independence of the IST.

On 20 June 2004, Mr. Salem Chalabi, the first director of the IST, sum up the proceedings before the IST as nothing more than a "show trial" which would end in the execution of the President.[125]

Notwithstanding these public statements, the President was not formally charged for almost two years while he remained in detention not allowed legal representation of their own choosing, not allowed or able to approach a court of law to determine the legality of their arrest, and not allowed adequate facilities to prepare a defense.

During this time he was repeatedly interrogated without a lawyers present and in a manner which he constituted torture. Allegations of torture were made in the courtroom before the IST, but never investigated.

On 1 July 2004, the President was forced to appear before an investigative judge in a spectacle that was televised around the world. The President had not seen his lawyers and had no lawyer with him. He was not provided detailed charges but subjected to vague allegations by a junior judge. The process was

clearly intended as an attempt to humiliate him. Nevertheless, the President maintained his composure and objected the hearing and the IST as illegal. He also asked to see his lawyers, as request that was not granted for almost another six months.

Between 1 July 2004 and 19 October 2005, the President repeatedly appeared before investigative judges with no prior notice and without a lawyer. Some of these judges even bragged falsely that the President had confessed.[126]

*Incompetence of the IST*

Every court or tribunal must be created in accordance with pre-existing law.[127] The violations of this obligation have been established above in the section on the illegality of the IST. Nevertheless, it is relevant to reiterate that when a court is not created in accordance with pre-existing law it is incompetent and illegal.

The IST was not created in accordance with law. It was created in violation of international law and Iraqi law to serve the interests of the occupying powers.

When the United States invaded and occupied Iraq in March 2003 is dissolved the regular courts and created new courts including special courts such as the IST. The IST was created by Order No. 48 which contained its Statute. Order No. 48 was signed into law by CPA Administrator L. Paul Bremer acting for the occupying power on 10 December 2003.

Iraq already had courts existing under Iraqi law. Iraqi Law No. 160 on Judicial Organization established the basis for the creation and functioning of the courts. This law must have remained in force throughout the occupation as this is required by article 64 of the Fourth Geneva Convention, which unequivocally states that "penal laws of the occupied territory shall remain in force ... [and] ... the tribunals of the occupied territory shall continue to function in respect of all offenses covered by the said laws." The existing laws were ignored when the IST was established in late 2003

The IST was thus created outside the established Iraqi legal system. Although an attempt was made to ratify it *ex post facto* by the TAL adopted on 8 March 2004, this instrument was created and adopted while Iraq was under occupation. This is recognized by U.N. Security Council Resolution 1511 that recognizes both the TAL *and* the fact that Iraq is an occupied country.[128]

Another attempt was made to re-create the IST with minor adaptations in August 2005 by Iraqi Law No. 10, which was promulgated by the United States chosen Iraqi Council in October 2005 just a week before the start of the proceedings concerning Dujail. At the time that the proceedings began the

defense could not even obtain a copy of the new version of the Statue of the IST.

The exceptional nature of the IST is also recognized in the manner in which it was referred to in the originally authoritative English language text; as the "Iraqi Special Tribunal" (see article 1 of the old Statute). The new statute also refers to the "Iraqi Higher Criminal Court" as a "specialized" court (see article 1 of the new Statute). Both the Transitional Law of 8 March 2004 and the later adopted Constitution recognize the exceptional nature of the IST by attempting to make special provisions for its existence despite articles in both instruments that prohibit special courts.

Article 48 of the TAL—which in contradiction to articles 3, 12, 15(I) and 43 of the same law—states that the IST is a 'special' tribunal. Article 15(I) of the TAL unequivocally states that "special or exceptional courts may not be established." This provision is expressly violated by the establishment and continued functioning of the IST. The more recently adopted Constitution article 130 also contradicts article 92 in the same way just described.

The violation of the prohibition of special courts cannot be remedied by reference to an exceptional article authorizing the special courts that is promulgated after the courts have been created. The violation of this prohibition, which exists under general customary international law, has already occurred.

In Iraqi law, this has been expressed as the principle of legality[129] and in international human rights law as the principle of due process, which is well-established in human rights treaties including article 14(1) of the International Covenant of Civil and Political Rights as well as article XXVI of the American Declaration of the Rights and Duties of Man, article 7 of the European Convention on Human Rights,[130] article 9 of the American Convention on Human Rights,[131] and article 7 of the African Convention on Human Rights.[132]

Article 14 of the International Covenant of Civil and Political Rights requires that courts be established by preexisting law. This provision is intended to ensure that courts are not established to adjudicate specific cases based on political or other biases.

This article is further explained by Principle 5 of the Basic Principles on the Independence of the Judiciary which states that:

> [e]veryone shall have the right to be tried by ordinary courts or tribunals using established legal procedures. Tribunals that do not use the duly established procedures of the legal process shall not be created

to displace the jurisdiction belonging to the ordinary courts or judicial tribunals.[133]

Principle 5 has, as such, been interpreted as expressly prohibiting the use of special tribunals. The United Nations Working Group has stated that "one of the most serious causes of arbitrary detention is the existence of special tribunals."[134] Annex A. The Inter-American Court has stated that it is violation of human rights when states use "[t]ribunals that do not use the duly established procedures of the legal process [...] to displace the jurisdiction belonging to the ordinary courts or judicial tribunals."[135]

In this case there can be no doubt the IST was created in violation of international law and Iraqi law. It flawed creation also contributes to its lack of independence.

*The Lack of Independence*

The independence of the judiciary is essential to any democratic state respecting the rule of law.

In 2004, the American-appointed Ahmed Chalabi appointed his relative Salem Chalabi as the first Chief Administrative judge. Salem Chalabi is a United States educated nephew of Ahmad Chalabi, a long time exile from Iraq, an individual who has proudly acknowledged close ties to the U.S. government, its Defense Department, other agencies and individual leaders, and an avowed enemy of President Saddam Hussein.

A few months later, Salem Chalabi was removed from the IST by Iyad Allawi, a "favorite of the CIA," after his appointment by the United States as an interim Prime Minister, and the selection of Amir Bakri, a member of Allawi's own party.

Amir Bakri then dismissed Judge Naim al-Egaili, the President of the IST, in what was branded as a wrestling of 'political control' from Chalabi's faction to that headed by Allawi.

A further attempt to change the IST was forced through the Iraqi assembly in August 2005. This attempt was to revise the whole statute, not by improving its substance, but by repeating its mistakes and shortcomings with the stamp of the Iraqi Governing Council (IGC). The IGC, however, was a creation of the occupying powers and merely acting on their behalf. It was certainly not an independent body. In any event, the new IST Statute was not published until 11 October 2005, just eight days before the first hearings began.

Despite the binding nature of the universal requirement of fair trial there have been repeated acknowledgments by persons involved in this trial—from person in the Iraqi government as well as in the United States government that is occupying Iraq—indicating that the IST is not independent.

Statements made by officials of the IST, officials of the executive branch installed by the occupying power, as well as the occupying powers, indicate that the IST is subject to the control of both the occupying power as well as the executive branch it has installed. Members of Iraq's executive and legislative branches have repeatedly exerted pressure on the IST.

In January 2006, IST Chief Judge Rizgar Amin was forced to resign by external pressure from those such Ali al-Adeeb, a senior Shiite official in Prime Minister Ibrahim al-Jaafari's party and member of the Interim legislature, who declared that "[t]he Chief Judge should be changed and replaced by someone who is strict and courageous."[136] After Judge Rizgar Amin resigned he was then pressured to rescind his resignation, according to "sources close to the Chief Judge" who told Reuters that the Chief Judge "…tendered his resignation to the court a few days ago, but the court rejected it. Now talks are under way to convince him to go back on his decision … He's under a lot of pressure, the whole court is under political pressure."[137]

Immediately after the new after Judge Saeed Al-Hameesh was publicly nominated to replace Judge Amin Rizgar,[138] pressure was asserted by Mr. Ali Faisal, the head of the United States-created de-Baathification Commission, to force his resignation.[139] These overt public acts of interference in the make-up of the IST on overtly political grounds and by political actors are strong evidence of both the apparent and *de facto* lack of independence of the IST.

The above actions are all executive interferences in the functioning of the IST.

This pressure has ranged from statements assuming guilt even before a trial begins to conclusions about what sentences should be passed.

Iraqi Interim President Jalal Talibani stated on 5 October 2005, before any trial had commenced, to Radio Free Europe that the President "is a war criminal. He committed crimes against the Iraqi people, against our neighbours, against Iranians, against Kuwaitis. For that I think he will deserve to be presented to the court as a war criminal" and that the President should be executed twenty times.[140]

On 19 January 2006, United States George W. Bush was quoted as saying that the trial was on track and that he was sure that the President would be executed at the end.[141]

More recently on 6 July 2006 the Arab Times reported Iraqi Prime Minister Nouri Al-Maliki said that "[t]he trial of the deposed Iraqi President Saddam Hussein would not take long and his execution for crimes against humanity would come soon after the court's verdict ... if President Jalal Talabani refused to sign the death sentence, a presidential council would carry out the mission."[142]

Also before any trial commenced, American television outlet CNN reported that President Talabani "had spoken to one of the Iraqi Special Tribunal judges involved in the investigation who had said that "he was able to take important confessions from Saddam Hussein and he has signed these confessions and there is video and audio for these confessions."[143]

The leader of Iraq's most powerful Shiite political party, Abdul Aziz Hakim, also declared that the Iraqi Interim government "wants to see Saddam dead, it wants him to face the death penalty, because that is the will of the people"[144] just days after the trial began.

On 26 November 2005, followers of Shiite cleric Muqtada al-Sadr, who controls a fraction of at least thirty members of the Iraqi Parliament that had been created under the United States-led occupation, demonstrated in Baghdad calling for the summary execution of President Saddam Hussein. And he has said that "I call for the execution of Saddam ... [he] should not [even] be tried."[145] On that same day, the Associated Press reported that "the leader of the biggest Shiite party, Abdul-Aziz al-Hakim, accused the IST of "weakness" for not having sentenced Hussein to death already" and that an attempt had been made on the life of one of the judges.[146]

Ali Dabagh, a Shi'ite member of the Transitional National Assembly appeared to acknowledge interference with the functioning of the IST when he declared that "[t]he judge is giving too much leeway to Saddam. He should respect the Iraqis and the victims' feelings."[147]

And Hoshyar Zebari, the Iraqi Foreign Minister, pressured the IST to act more quickly declaring derogatorily that "[t]here are Baathist thugs in the country who still believe Saddam is coming back. I believe that if he had been tried before we would have better control of security now."[148]

Statements indicating interference have also been directed towards possible penalties that the IST could impose before any judgment has even been pronounced.

Iraqi Interim Prime Minister, Ibrahim Al-Jafari pressured the IST to impose the death penalty when he surmised that finding persons twilling to carry out the execution was "not a problem, many people already volunteered. Many

people would love to do the job. This is a man who does not deserve any mercy."[149]

Political leaders have made repeated statements interfering with the independence of the IST.

In October 2005, a senior American advisor to the IST who has worked for the United States Department in the past has stated that "[t]he United States will be involved in the trial but from behind the scenes, more like a puppet master role. In fact, the tribunal statute requires that both the judges and the prosecutors receive assistance from U.S. authorities."[150]

This was confirmed by the statement of Ridha Jwad Taqi, head of the political office of SCIRI, another Shi'ite party in the government who declared that "[t]he Americans have attempted to Americanize the IST so it appeals to their public..."[151]

The investigative judges, sitting judges, and prosecutors of the IST are named by the Iraqi Governing Council (IGC), a temporary executive authority that itself is created by the occupying powers.[152]

Although a Judicial Council has been established, it does not have power to remove the judges. The judicial appointments were instead made by the Iraqi Prime Minister a member of the executive branch of government. The IGC no longer exists. It has been disbanded in January 2005. As a consequence, no legitimate entity which existed under Iraqi law remains in order to name judges to the Iraqi IST.

Moreover, during the existence of the IGC, judges were named by the Prime Minister in consultation with unknown individuals. The secretiveness of the process under a military occupation that is being unyieldingly resisted by patriotic Iraqis, alone raises serious doubts about the appointment of independent judges.

The process by which the IST judges are selected is in direct contradiction with the United Nations' Principles on the Independence of the Judiciary. The Principles unequivocally advise against the nomination of judicial authorities by political authorities.[153] Article 6(b) of the old Statute of the IST also requires the President of the IST "to appoint non-Iraqi nationals to act in advisory capacities or as observers to the Trial Chambers."

The article further states that the role of these observers is to "provide assistance to the judges" and to "monitor" the functioning of the IST. Other articles also call for observation of the IST's functioning by foreign observers.[154] Such functions are *prima facie violation* of judicial independence

in that they impinge upon the independent decision making prerogatives of the IST by subjecting the latter's internal deliberations to the scrutiny of observers beholden to the occupying power.

The independent functioning of the IST is further impugned by the fact that no standards of professional qualification are established for prosecutors, although such standards are required by Iraqi law.[155] These actions severally and jointly violate the requirement of judicial independence and deprive the IST of its legality.

Evidence of the lack of independence in practice has been provided by the manner in which the IST makes decisions. At the hearing on 28 November 2005, the IST agreed that defense counsel should be given at least three months to meet with their clients and begin to prepare their defense cases. After consultations in which American military personal and other foreigners who were apparently advisors to the IST met with IST officials the decision was reversed and the time significantly limited. Again on 13 June 2006 after having agreed to allow more defense witnesses, the Chief Judge suddenly changed his mind in the courtroom after receiving a note passed to him by Americans outside the courtroom. Finally, an another example of the United States control of the proceedings was the 21 December 2005, denial of the right to enter the courtroom to Dr. Curtis F.J. Doebbler, who possess three powers of representation from the Iraqi President Saddam Hussein. According to US military Captain Philip Lynch this documentation was accepted by the IST, but the decision was reversed by Canadian judge Howard Davidson, who apparently acts as an advisor to the IST. These clear examples of United States control of the proceedings call into serious question the independent functioning of the IST.

The requirement of independence of the judiciary is has been confirmed by numerous states in their domestic constitutions[156] as well as in numerous international instruments,[157] particularly article 14 of the International Covenant of Civil and Political Rights and article 10 of the Universal Declaration of Human Rights, which reflects a rule of customary international law. It is also found in articles 8(1) and 27(2) of the American Convention on Human Rights, article XXVI of the American Declaration on the Rights and Duties of Man that reflects customary international law, article 6(1) of the European Convention on Human Rights, and articles 7(1) and 26 of the African Charter of Human and Peoples' Rights. It "is an absolute right that may suffer no exception."[158]

This right is violated when the independence of judges are repeatedly interfered with by Iraqi and foreign authorities as has been the case with the judges of the IST.

*The Lack of Impartiality*

Impartiality is an essential condition of the right to fair trial that requires that judges carry their judicial duties free from any bias. Judges must be impartial in fact as well as appear to be impartial.[159]

An example of the requirements of impartiality is illustrated by Judge Dara Nureddin an Iraqi who was nominated to sit on the appellate division of the IST, but who recused the nomination because "he had previously been imprisoned by the Saddam regime."[160]

Anonymous judges—those whose identity and qualification are not known—are *prima facie* violations of impartiality as has been recognized by the United States government itself. When commenting on the practice of "anonymous judges in Colombia, it recognized that "[h]uman rights groups continued to charge that this system violated basic legal norms and procedural rights."[161]

Furthermore, although the qualifications and names of the judge have not been made known, it is known that the judges have been vetted for their political opinions. Vetting judges on the basis of their political opinions is a *prima facie* violation of the principle of impartiality.

The occupying powers are violating this principle by selecting only judges who have been vetted for their political opinion for the IST.

In addition to preventing the existing judiciary from continuing to function or selecting new judges on the basis of their legal competence, the occupying power announced a program of de-Ba'athification.[162] This process sought to vet judges based on their support for an occupation regime that had been installed by an unlawful use of force.

Judges who were allowed to remain on the bench were implicitly those who supported the illegal use of force against their own country and opposed, in violation of their own domestic law, the legitimate government of the country. As avowed enemies of the previous government, these judges cannot be expected to adjudicate in a fair and unbiased manner. Moreover, the government has announced that the judges' names will be kept secret in order to ensure their personal safety; this procedure is an additional *prima facie* showing of the lack of impartiality.

Judges of the tribunal stated that the Iraqi President who was then about to go on trial before them had "persecuted the Kurds. He killed them, wiped many of them out. He also used chemical weapons with the aim of committing genocide against this race, against this people, to eradicate them as a nation.

He also went after the Shiites due to their religious beliefs."[163] Another judge stated that the President is "one of the worst tyrants in history."[164]

The lack of impartiality of the judges, which must be assumed because the majority are 'faceless'/anonymous and neither their identity nor their credentials have been disclosed to defense counsel, must result in the disqualification of all the judges of the IST.

One judge, whose identity is known, is Chief Judge Abdel-Rahman, who as indicated above became Chief Judge only after significant interference in the functioning of the IST by both United States and Iraqi political officials. Moreover, Judge Abdel-Rahman was a Kurdish judge of junior level who did not even received the two weeks training that other judges on the IST had allegedly received. His statements in the courtroom irrationally lashing out at defense counsel are strong evidence that he was seriously biased against Iraqi President Saddam Hussein.

Despite strict secrecy surrounding information about Judge Abdel-Rahman and the inability of defense counsel to investigate his background through sources in Iraq because of the insecurity, there is ample information in the public domain to indicate that he is biased or must reasonably be perceived as biased.

This information included the following:

   a. The media has widely reported that Judge "Raouf Abdul Rahman, the judge who has taken over at the trial of former Iraqi leader Saddam Hussein, was born in the Iraqi Kurdish town of Halabja."[165]

   b. The British Broadcasting Company (BBC) has also stated that "Judge Rahman lost some of his relatives in the attack, although not immediate family members." [166] The American media has furthermore stated that "[s]ome relatives of Abdel-Rahman were among the dead, according to his family."[167]

   c. It has also been reported that Judge "Abdel Rahman set up organisations to help his hometown of Halabja recover from a gas attack attributed to Saddam's forces in 1988, which killed 5,000 people, including his relatives."[168] And that Judge "Abdel Rahman has taken a personal interest in helping Halabja heal, forming committees to help its distraught residents recover. Some observers wonder if a Kurdish judge can show impartiality."[169]

   d. It has furthermore been reported that "[t]he Chief Judge [Abdel Rahman] was imprisoned and allegedly tortured for membership in a

- 61 -

Kurdish nationalist movement in the early 1970s, when Iraq was
already ruled by the Baath Party regime"[170] and that Judge Abdel
Rahman "was also reportedly tried *in absentia* in 1977 and sentenced
to life in prison."[171]

Each of these media reports are corroborated and consistent with the defense
lawyers' own very limited knowledge of judge Abdel-Rahman's background.
None of the allegations have been substantively challenged, even in the final
judgment of the IST on 5 November 2006. Moreover, judge Abdel-Rahman
has frequently expressed his hatred for the defendants saying before the trial
that for Saddam Hussein "a trial is not necessary, just a hanging" and during
the trial, of the defendants, that they "had blood on their hands since
childhood."[172]

None of these allegations been denied when they were alleged in formal
motions made to the IST. These motions called for the disqualification of
judge Abdel-Rahman because of his perceived bias which is evidenced by his
statements. These statements indicate that he is unable to ensure the
presumption of innocence to which every defendant is entitled.

The IST has refused to provide a reasoned reply to the motion challenging
Judge Abdel Rahman's lack of impartiality. Instead the Appellate division of
the IST held that it could not consider the motion because it should have been
presented before the proceedings on the merits commenced. This was, of
course, impossible as pointed out above, Judge Abdel Rahman was not a
member of the IST when proceedings commenced in October 2005, nor was
he even known to the defense lawyers. The IST's failure to provide a reasoned
opinion on motion challenging Judge Abdel-Rahman's lack of impartiality is
itself a violation of the obligation of impartiality.

Both for reasons related to obscuring of the judges' identities as well as to the
strong evidence suggesting overt displayed bias by the Chief Judge the IST
violates the obligation of impartiality.

The manipulation of the IST already described in the previous section on lack
of independence also indicates that the IST lacks impartiality. This is both
because its judges have failed to defend the IST from attempts to politically
control it and because the judges have created an appearance of colluding with
political authorities.

The judges' lack of impartiality has also been repeatedly made apparent. In a
film by Jean-Pierre Krief for Arte France and KS Visions that was shown in
France in 2005 a judge of the tribunal states that the Iraqi President who was
then about to go on trial before them had "persecuted the Kurds. He killed
them, wiped many of them out. He also used chemical weapons with the aim

of committing genocide against this race, against this people, to eradicate them as a nation. He also went after the Shiites due to their religious beliefs." Another judge states that the President is "one of the worst tyrants in history."[173] (See Annex J "Arte France and KS Visions DVD"). These are not the statements of impartial judges, who in the inquisitorial system of justice such as that of the IST, is both the evaluator of law and fact. These are the statements of persons who have been put in place by an illegal occupying power to serve its ends and not those of justice.

On 12 June 2006, the IST evidence its bias when the Chief Judge allowed a judge to read out allegations against the defense lawyers that had been made by defense witnesses who had been beaten, arrested, and held without access to counsel of their choice. These allegations read in front of their clients and in a public session of the IST that is trying these clients, alleged that the defense witnesses had been bribed by the defense lawyers. The IST did not bring the defense witnesses into IST, although it had had them in custody during the last session; it did not provide defense counsel copies of the allegations or the right to respond to them; and it later—through a person who claimed to be an officer of the IST—threatened the defense lawyers with arrest. This act alone is irrefutable evidence that the IST is biased, the trial is unfair, and that a mistrial must be declared.

This right is found in article 20(d)(1) of the original Statute of the IST, article 19(Fourth)(A) of the new Statute, article 14(1) of the International Covenant of Civil and Political Rights as well as under customary international law as reflected in article 10 of the Universal Declaration of Human Rights, article 6(1) of the European Convention on Human Rights, article 8(1) of the American Convention of Human Rights, and article 7(1) of the African Charter on Human and Peoples' Rights.

The Human Rights Committee has stated that impartiality "implies that judges must not harbour preconceptions about the matter put before them, and that they must not act in ways that promote the interests of one of the parties."[174]

The requirement of impartiality is violated because the judges have expressly shown bias by their statements and actions _and_ have created an appearance of bias through their actions and inactions.

*Other Issues of Impartiality*

In April 2006 it was confirmed that Mr. William Wiley, who had worked from the United Nations from approximately mid-2005 to early 2006, had gone to work for the United States government's Regime Crimes Liaison Office, which is the office that defense counsel and observers have accused of controlling the IST. For months Mr. Wiley used his United Nations position to

gain confidential information from defense counsel and had represented to defense counsel that they could trust him with confidential information.

This conflict of interest represents not only a serious breach of integrity of the United Nations human rights operation in Iraq and undermines public confidence in this work, but it also constitutes a serious breach of legal ethics that undermines the impartiality of the IST.

Furthermore, Mr. Wiley also approached defense witnesses in an attempt to influence their testimony after he had been asked not to do so by the defense lawyers and he approached defense lawyers, prompting them to petition the IST on 13 June 2006 to have him prohibited from contacting either witnesses or the defense lawyers, according to Mr. Kaleel al-Dolami.[175] Immediately after this motion was made, the Chief Judge of the IST prematurely ended the defense and disallowed the defense from calling anymore of the many witnesses it wished to call.

*Failure to Provide Timely Charges*

The right to be informed of charges in a timely manner has been violated by the fact that the President was not informed in any detail about the charges leveled against him in a timely or adequate manner.

The specific charges against the President were not provided to the defense until 15 May 2006, approximately two and half years after the President had been arrested, and approximately seven months into the trial and after the prosecution had presented its case, including all its witnesses and evidence. The extraordinary delay in providing the President the charges against him precluded him from preparing a defense or even questioning the witnesses or evidence against him.

This is especially egregious because the Statute of the Tribunal contains numerous charges that overlap or are very similar and contains new offenses which did not exist under neither Iraqi or international law at the time they are alleged to have been committed.

This right to a prompt hearing is enshrined in article 20(d)(1) of the original Statute of the IST and article 19(Fourth)(A) of the new Statute that entered to force on 11 October 2005 as well as under customary international law that is reflected in article 14(3)(a) of the International Covenant of Civil and Political Rights and is reiterated article 67(1)(a) of the Statute of the International Criminal Court, article 8(2)(b) of the American Convention on Human Rights, and article 6(3)(a) of the European Convention on Human Rights.

Interpreting the meaning of 'promptness' the Inter-American Court of Human Rights has held that it is violated when the accused was found to have been held incommunicado for 36 days without charges. The Court noted that "the principle of *"reasonable time"* is to prevent accused persons from remaining in that situation for a protracted period and to ensure that the charge is promptly disposed of."[176]

*No Adequate Facilities or Time to Prepare a Defense*

The right to adequate facilities and time to prepare one's own defense requires that the President and his legal counsel be allowed to freely and confidentially consult with each other in advance of a trial and during a trial. This right has been seriously violated in numerous ways.

The only meetings that took place between the President and his IST-appointed lawyers were not private and took place with constant surveillance from several United States soldiers.

There were no meetings between the President and his lawyer for more than a year including no face-to-face meeting during the whole of the defense case during May and June 2006.

When the President was able to meet a lawyer, he was only able to meet one who had been agreed to by the IST. This lawyer Mr. Kaleel al-Dolami, although extremely courageous, has no experience in prominent criminal cases, no experience or training in international criminal law, and had never met the President in person in his life. He was appointed by the IST from a list of several lawyers prepared by the IST from which the President was forced to choose. The ACHRP held that the assignment of lawyers to accused persons "is capable of exposing the victims to a situation of not being able to communicate, in confidence, with counsel of their choice."[177] In this case, the President's Iraqi lawyers were all either IST-appointed or IST approved before they could meet the President. In addition lawyers none of them have significant expertise in international criminal law from which all the charges against the President are drawn. Such expertise is central to the proceedings according to the Statute of the IST. At the same time, lawyers with expertise in international law were consistently prevented from participating in the defense either by the IST-appointed lawyers, the United States government officials or those acting on their behalf, or Iraqi officials.

Repeated requests by the President himself to consult experts in international law were ignored by both the IST and the occupying powers. The ECHR reaffirmed that "art 6(1) might sometimes compel the state to provide for the assistance of a lawyer when such assistance proved indispensable for effective

- 65 -

access to a court, either because legal representation was rendered compulsory, or by reason of the complexity of the procedure or of the case."[178]

Moreover, all the meetings that took place between the President and his IST-appointed lawyers were not private and took place with constant surveillance of several soldiers from the occupying powers.

The IST did not allow the President to know the charges against him until 15 May 2006, almost two and half years after he was detained and had been held with very limited access to legal counsel. After he was provided the charges the defense was given a matter of minutes to begin to present its case, no time was allowed to prepare a defense or to evaluate the prosecution's case.

Moreover, because the charges were provided only after the prosecution had presented its case there was not even the possibility for the defense lawyers to cross examine witnesses or review documentary evidence after knowing the charges.

Furthermore, only part of the evidence—and not all of the most important evidence—was handed over to the defense mere days before the proceedings were to begin in October 2005. By comparison, in *Ocalan*, the European Court of Human Rights frowned at the delay in providing legal counsel access to information, the likes of which it deemed the result of "the sheer number and volume of documents and the restriction imposed on the number and length of their (legal counsel) visits."[179]

Furthermore, the prosecution did not provide the defense lawyers any exculpatory evidence. This was the case even though the defense lawyers repeatedly asked for evidence such as the transcripts and papers form the Dujail investigation and trial that took place in 1982. While first denying and then admitting they had these papers, the prosecution never provided them to the defense lawyers. This state of affairs in Mr. Hussein's case stands in stark contrast with the ICTY Tribunal's decision to grant defense counsel access to confidential transcripts and documents from another legal proceeding.[180]

In *Avocats Sans Frontieres v. Burundi*, the African Commission on Human and Peoples' Rights found that

> the right to equal treatment by a jurisdiction, especially in criminal matters, means, in the first place, that both the defense and the public prosecutor shall have equal opportunity to prepare and present their pleas and indictment during the trial. Simply put, they should argue their cases before the jurisdiction on an equal footing. Secondly it entails the equal treatment of all accused persons by jurisdictions charged with trying them. This does not mean that identical treatment should be meted

to all accused. The idea here is the principle that when objective facts are alike, the response of the judiciary should also be similar. There is a breach of the principle of equality if judicial or administrative decisions are applied in a discriminatory manner. In the case under consideration, it is expected of the Commission to attend to the first aspect, that is, observation of the rule of equality of the means utilized by the defense and the prosecution.[181]

The right to adequate facilities and time to prepare one's own defense has been violated by the failure to provide the President adequate access to his lawyers.

The right to adequate time and facilities to prepare a defense is stated in article 20(d)(2) of the original Statute of the IST and article 19(Fourth)(B) of the new Statute that entered to force on 11 October 2005 as well as in article 14(3)(b) of the International Covenant of Civil and Political Rights and is reiterated in article 67(1)(d) of the Statute of the International Criminal Court, article 8(2)(c) of the American Convention on Human Rights, and article 6(3)(b) of the European Convention on Human Rights.

<em>Failure to Provide Public Trial</em>

The trial has not been public. Instead the United States government controls what parts of trial are allowed to be broadcast to the public and deletes whatever parts it does not wish to be broadcast.

The BBC's John Simpson has commented that "[t]he American company in charge of broadcasting the proceedings frequently blanks out the sound of what Saddam and the others say, and sometimes cuts the vision as well." He continues to the frustrating conclusion that "[t]he impression of control and censorship is very strong - and yet the things which cannot be broadcast are often trivial enough."

In addition, the Chief Judge has sometimes shut the courtroom from the public because he did not like what was being said by a witness or other participant in the trial without either providing an explanation or refer to a rational nexus as that latter may pertain with regards to the protection of other persons present in the courtroom or listening to the trial.

On 13 June 2006, for example, the Chief Judge suddenly ordered the IST closed to the press for several hours for no apparent reasons.

The right to public trial is stated in article 20(c) of the original Statute of the IST and article 19(Third) of the new Statute that entered to force on 11 October 2005 as well as in article 14(1) of the International Covenant of Civil and Political Rights.

*Lack of Privacy between Lawyer and Client*

The right to a lawyer of one's own choosing and to communicate with a lawyer of one's own choosing requires that a defendant be able to choose his own lawyer or lawyers after consultations.

In this case, the President had requested meetings with senior lawyers, including former United States Attorney General Mr. Ramsey Clark. These lawyers also themselves sought meetings with the President. No meeting with such senior lawyers was ever allowed to take place before the proceedings started in October 2005.

This right is violated whenever a defendant is refused the right to meet with a lawyer who wishes to meet with the defendant.

This right is enshrined in article 20(d)(2) of the original Statute of the IST and article 19(Fourth)(B) of the new Statute that entered to force on 11 October 2005 as well as in article 14(3)(d) of the International Covenant of Civil and Political Rights and in article 11(1) the Universal Declaration of Human Right, which reflects customary international law as is evidenced by the restatement of the rule in article 67(1)(d) of the Statute of the International Criminal Court, article 8(2)(d) of the American Convention on Human Rights, article 6(3)(c) of the European Convention on Human Rights, article 7(1)(c) of the African Charter of Human and Peoples' Rights.

This right is violated whenever a defendant is refused the right to meet with a lawyer who wishes to meet with the defendant. In *Ocalan,* the court noted that

> on the day after his arrest, his lawyer in Turkey, Mr Feridun Celik (who already possessed a valid authority), sought permission to visit him . . . but was prevented from traveling by members of the security forces. In addition, on 22 February 1999 sixteen lawyers who had been retained by the applicant's family sought permission from the State Security Court to visit the applicant, but their requests were turned down by the authorities."

The Court held that "to deny access to a lawyer for such a long period and in a situation where the rights of the defense might well be irretrievably prejudiced is detrimental to the rights of the defense to which the accused is entitled by virtue of art 6 . . ." [182]

*Lack of Effective Defense Counsel*

Every defendant has the right to be adequately represented by lawyer of his own choosing. This right was significantly violated by the requirement that defence counsel had to be approved by the IST and the occupying power, experience defense counsel were denied the right to meet with the President before the start of the trial, defense counsel have been continuously obstructed from being able to prepare a defense and participate in the trial, and several times—including for closing arguments—defence counsel were appointed who had previously declared the defendant guilty in front of other defense counsel.

From the time that the President was detained in late 2003 until August 2004, no defense counsel was allowed to meet the President despite requests that were made by experienced defense counsel who knew the President, such a Mr. Ramsey Clark on the time of his detention. These request received no response from the American or Iraqi authorities.

Only in December 2004 was one lawyer with no experience in international criminal law allowed to meet the President after being approved by the IST and the American occupying powers. This lawyer, Mr. Kaleel al-Dolami, had submitted his name with other Iraqi lawyers in early 2004 for approval. This lawyer was not know to the President, had not been requested by the President at the time, and admits that he is not an expert in international criminal law and has no experience in high profile trials.

Not until after the first trial started on 19 October 2005, was experienced counsel allowed to meet the President. This was almost two years after he had been detained and repeatedly investigated, interviewed and allegedly tortured. Even at that time and despite a specific authorization for foreign lawyers in the Statute of the IST,[183] the foreign lawyers with experience in prominent criminal cases and international law were not allowed to meet with the President.

Continuously during the trial experience defense counsel were harassed and denied access to their client. This was done through several different actions. Defence counsel were told they could not meet with their client because of security concerns, defense counsel were told it was not safe to come to Iraq or not provided security in Iraq, defense counsel were told that they would have to pay exorbitant fees for security, defense counsel were not allowed private meetings with the President, defense counsel were not allowed to pass legal documents to the President without their first being reviewed by the occupying authorities—often important legal documents were not authorized, hearing where scheduled with inadequate notice and without taking into account prior legal obligations of counsel—especially the most experienced lawyers, defense counsel were told they had to repeatedly submit documents concerning their standing as lawyers to the IST—often the IST did not respond

or claimed not to have received documents that had been provided to the IST in open court, documents were not provided on time and were often unreadable and never translated to English so that the experienced foreign defence counsel could read them.

Finally, in several hearing before the IST, including for the closing argument delivered on 10 July 2006, the IST appointed lawyers against the will of the defendants. On these occasions defense counsel chosen by the President did not appear because of threats to their personal security or because of the serious due process violations by the IST, for example, denying defense counsel the right to speak before the IST. On 10 July 2006, the President objected to the IST appointed lawyers who presented the closing argument in his defense. Lawyer Mr. Mazin Abdul Hammed Jabbar told a Jordanian lawyer at the courthouse that "the defendants in this case do not deserve being tried ... [and] they should be left in the streets for people to directly take their revenge on them. This is because the death penalty is a rather mild sentence when compared to the crimes they committed against the Iraqi people." Annex I from 26 March 2006 entitled "Affidavit by Jordanian Lawyer of Statements of Bias Against President Made By IST-Appointed Lawyer Who Made Closing Statement for Defense."

The right to be represented by competent lawyers of one's choosing is an indispensable part of a fair trial. This right is enshrined in article 20(d)(2) of the original Statute of the IST and article 19(Fourth)(B) of the new Statute that entered to force on 11 October 2005 as well as in article 14(3)(d) of the International Covenant of Civil and Political Rights. This right is further explained in principle 5 of the UN Basic Principles on the Role of Lawyers as the right of every defendant "to be assisted by a lawyer if their own choice upon arrest or detention" and to requiring that all defendants for lawyers are appointed by a court "be entitled to a lawyer of experience and competence commensurate with the nature of the offence assigned to them in order to provide effective legal assistance,"[184] which reflects customary international law as is evidenced by the restatement of the rule in article 67(1)(d) of the Statute of the International Criminal Court, article 8(2)(d) of the American Convention on Human Rights, article 6(3)(c) of the European Convention on Human Rights, and article 7(1)(c) of the African Charter on Human and Peoples' Rights.

*Intimidation of Defence Witnesses*

The right to call and examine witnesses is fundamental to the opportunity to a defense. Without this right a defendant and defense counsel are not able to conduct a defense. This right requires that witnesses must be protected by the court in which they appear and that the defense must have the ability to question witnesses.

In the current proceeding, witnesses—especially defense witnesses—cannot testify because they cannot be protected from the violence that is widespread Iraq by the authorities and defense lawyers cannot find witnesses because they are subjected to same violence without adequate protection. Defense lawyers are also impeded in compiling a list of its own witnesses, as they are constantly threatened and/or intimidated when they are attending the IST sessions. On 13 June 2006, the IST also expressly prevented the defense from calling more witnesses stating merely that it did not wish to hear anymore defense witnesses after agreeing to do the day before.

Moreover, during these proceedings, defense has not been provided the copies of the statements of prosecution witnesses in violation of Rule 40(A) of the Rules of Procedure and Evidence of the IST. It also violates the human right of the defense to call and examine witnesses. Without the transcripts of the proceedings defense lawyers are not able to adequate participate in the questioning of either defense or prosecution witnesses.

Moreover, defense witness have been killed and intimidated, sometimes even by IST officials or with the apparent participation of the occupying powers.

In April 2006 after the United States authorities cancelled a meeting between a defense lawyer and a defense witness, the witness turned up dead. The United States officials had refused to allow the defense lawyer to travel to the meeting alone and had insisted they be told the time and place of the meeting in order to provide security. After being provided the exact time and place of the meeting the American cancelled it without prior notice and without the defense lawyer being able to contact the person he was to meet. A few days later this defense witness was killed.

On Wednesday 31 May 2006, after having testified that several prosecution witnesses were lying, three defense witnesses were beaten, arrested, and held without access to lawyers of their own choosing. The IST had issued the order for their arrest according to the police and United States force that came to arrest them. The IST later alleged that the defense witnesses were arrested because they had been lying when in their testimony they accused prosecution witnesses of lying and the prosecutor of bribing them. No effort was made to investigate the truth of these statements, but instead the arrests appear based merely on the prosecution's or United States government's allegation. During their detention, while being held with access legal representation of their own choosing, the IST alleged on 12 June 2006 that the defense witnesses had signed statements saying they had been bribed by defense lawyers. The IST gave no details of motive and read the charges into the record in the courtroom, but refused to allow defense lawyers to have a copy of the statements or to question the defense witnesses.

Furthermore, on 12 and 13 June 2006, Mr. William Wiley, who claimed to working for the IST, questioned and instructed defense witnesses what to say over the objection of the defense lawyers. He also indirectly—through his colleague—threatened one of the defense lawyers with arrest if they objected to his actions in open court.

These examples are evidence of interference with witnesses that was so intense as to violate the human right to call and examine witnesses of the defense.

This right to be able to confront witnesses is found in article 20(d)(5) of the original Statute of the IST and article 19(Fourth)(E) of the new Statute that entered to force on 11 October 2005 as well as in article 14(3) of the International Covenant of Civil and Political Rights and in customary international law as is evidenced by the restatement of the rule in article 67(1)(e) of the Statute of the International Criminal Court, article 8(2)(f) of the American Convention on Human Rights, article 6(3)(d) of the European Convention on Human Rights.

### Nulla Poena Sine Lege and Nullum Crimen Sine Lege

The right reflected in the maxims *nulla poena sine lege* and *nullum crimen sine lege* prohibits the punishment or prosecution of an individual for acts that were not deemed crimes under the laws of the country concerned at time of their commission. It also precludes the prosecution of individuals before special courts that were created to prosecute specific individuals for acts made crimes long after the acts constituting the alleged crimes were committed.

The IST did not exist under Iraqi law. It was created by the IST Statute attached to CPA Decree No. 1 on 10 December 2003. Not only was the IST created illegally as has been shown above, but it was created only to try the President and his colleagues for specific crimes. The creation of the IST long after the alleged crimes have been committed and when courts already existed in Iraq means that the President and his colleagues could not have reasonably believed that they would be subjected to the jurisdiction of such an extraordinary court when they alleged took action.

This IST Statute also contains crimes that that did not exist at the time that they were allegedly committed or there are serious questions as to their existence. For example, the Iraqi Penal Code[185] in force since 1969 does not include crimes against humanity in civilian armed conflicts. Although crimes against humanity were created by after World War II, it was not until very recently, with the development of the jurisprudence of the two ad hoc

tribunals, that war crimes and crimes against humanity became recognized as offenses in non-international armed conflicts.[186]

In the Dujail case the President is charged with crimes against humanity. Such crimes did not exist either under Iraq law or under international law at the time that the alleged events took place in July 1982. Iraqi law had not incorporated any concept of crimes against humanity and the concept that did exist under international law as applying to non-international armed conflicts as was made clear at the Nuremberg trials.[187]

The principles of maxims *nullum crimen nulla poena* or *nullum crimen sine lege* are enshrined in article 15(1) of the International Covenant of Civil and Political Rights and article 11(2) the Universal Declaration of Human Right, which reflects customary international law as is evidenced by the restatement of the rule in article 22 of the Statute of the International Criminal Court, article 9 of the American Convention on Human Rights, article 7 of the European Convention on Human Rights, and article 7(2) of the African Charter of Human and Peoples' Rights.

The ECHR has held that

> [a]ccording to the Court's case-law, Article 7 of the Convention is not confined to prohibiting the retrospective application of the criminal law to an accused's disadvantage: it also embodies, more generally, the principle that only the law can define a crime and prescribe a penalty (*nullum crimen, nulla poena sine lege*) and the principle that the criminal law must not be extensively construed to an accused's detriment. From these principles it follows that an offence must be clearly defined in the law. This requirement is satisfied where the individual can know from the wording of the relevant provision and, if need be, with the assistance of the courts' interpretation of it, what acts and omissions will make him criminally liable. [notes omitted][188]

These rights are non-derogable, according to article 4 of the International Covenant of Civil and Political Rights, and have been referred to by leading international legal experts as "cornerstone principles of criminal law" that "have become known in almost all of the world's legal systems."[189] Article 70 of the Fourth Geneva Convention also prohibits prosecutions based on retroactively applicable laws.

In this case, the principles of *nullum crimen nulla poena* and *nullum crimen sine lege* have been knowingly and intentionally violated by the United States and Iraqi authorities as part of their effort to conduct an unfair trial to ensure an execution that serves their political ends.

*No Presumption of Innocence*

The right to presumption of innocence requires that an individual not be prejudged.

This right requires that all public officials of the state prosecuting an individual must not make statements expressly stating or implying that guilt of a person who has not yet been convicted.[190] This principle has been interpreted as a fundamental principle, which protects everybody against being treated by public officials as if they were guilty of an offence even before such guilt is established by a competent court.[191]

The repeated statements by officials of the government of Iraq and the United States government violate this right. These statements have sometimes come from the judges of the IST as well.

A judge of the tribunal states that the Iraqi President who was then about to go on trial before them had "persecuted the Kurds. He killed them, wiped many of them out. He also used chemical weapons with the aim of committing genocide against this race, against this people, to eradicate them as a nation. He also went after the Shiites due to their religious beliefs"[192] In the same film another judge states that the President is "one of the worst tyrants in history."[193] Such statements are evidence of the bias of the judges of the IST and consequently the lack of impartially of the proceedings before the IST.

This right is well-established in article 20(b) of the original Statute of the IST and article 19(First) of the new Statute that entered to force on 11 October 2005 as well as article 14(2) of the International Covenant of Civil and Political Rights and in article 11 of the Universal Declaration of Human Right, which reflects customary international law as is evidenced by the restatement of the rule in principle 36(1) of the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment.[194]

*No Equality of Arms*

The principle of equality of arms is violated when the prosecuting party is able to spend millions of dollars on the prosecution of an offense while confiscating all assets of the President and forbidding him to gain access to lawyers willing to represent him.

In the present case, the United States, as one of the occupying powers, has stated that it has spent at least hundreds of millions of dollars while preparing the alleged case against the President[195] and provided at least "$138 million to build, over the course of a year, the state-of-the-art courthouse that sits at the heart of the fortified Green Zone" for the judges and prosecutors.[196] The

United States is also alleged to have sent teams of prosecutors, investigators and advisors to gather evidence and train prosecutors.[197] Even before the trial started it was reported that he United States was paying the IST's annual budget of $75 million for 2004-05"[198] and that "teams of Iraqi lawyers and judges are backed up by more than 75 foreign experts, many from the United States and Britain, and have been helping to prepare the evidence and organize the cases."[199]

At the same time, the occupying powers confiscated all monies and property belonging to the President, including an estimated US$700,000 taken from the President's person at the beginning of his detention. Such a taking is not only a violation of international humanitarian law,[200] but it also deprives the President of resources he could have used to prepare his defense.

As a consequence, defense counsel are working as volunteers and have no resources to investigate the scenes of the alleged crime, to search for witnesses, to review evidence—most of which they have not been given, or to even do the complex legal research that is required for such a trial.

Defense counsel are denied regular and meaningful visits with their client as request for meeting are routinely ignored and receive with such short notice as to make it often impossible to organize travel to the Iraqi capital at the specified day and time.

In an email of 1 December 2005, United States military Captain Michael McCoy attempted to extort between "between $2,000 and $3,000" for each trip to or from the airport from defense counsel, saying that "we will forward that bill onto the Saddam International Attorneys when we receive it" and threatening not to provide security if this sum was not paid.[201]

While the United States government has taken some steps towards meeting their responsibilities to provide security to the lawyers, these steps have been grossly inadequate—as the killing of two defense counsel, which have to date not been investigated, have indicated—and often the steps taken have done more to interfere with ability of the lawyers to do their work then to provide security.

For example, on 4 April 2006, claming security required he be prevented from leaving the housing compound, one of the lawyers was forced to miss meetings with potential witnesses. These meetings had been pre-arranged and the American officials had been notified more than 24-hours in advance with the exact time, length, and location of the meetings. Nevertheless, with no prior warning—indeed after assurances were made that these meetings would be held—and while the lawyers were prevented from having access to communications equipment such a their mobile telephones so the persons they