

IRAQ

# Judging Dujail

## The First Trial before the Iraqi High Tribunal

**HUMAN
RIGHTS
WATCH**

Dockets.Justia.com



NOVEMBER 2006

VOLUME 18, NO. 9 (E)

# Judging Dujail
## The First Trial before the Iraqi High Tribunal

Glossary ......................................................................................................... 1

I.    Introduction and Overview ....................................................................... 2

II.   Background ............................................................................................... 8

III.  Administrative Concerns ........................................................................ 12
      1.  Victims and Witnesses Protection ........................................... 14
      2.  Court Documentation ............................................................... 17
      3.  Security for Private Defense Counsel ....................................... 20
      4.  Outreach and Communications ............................................... 24
      5.  IHT Defense Office .................................................................... 28

IV.   Procedural Concerns in the Conduct of the Trial ................................... 36
      1.  Concerns Affecting the Independence and Impartiality of the
          IHT and the Presumption of Innocence ................................... 37
      2.  The Defendants' Right to be Informed of the Charges ............. 44
      3.  Equality of Arms and the Defendants' Right to Adequate
          Time and Facilities to Prepare a Defense ................................ 48
          a.  Continuous late or same-day disclosure of incriminating
              evidence and non-disclosure of some witness statements ........... 49
          b.  Non-disclosure of exculpatory evidence ......................... 52
          c.  Non-disclosure of trial session notes and late disclosure of
              defendants' statements made to the investigative judge .............. 53
          d.  Refusal to require information concerning chain of custody of
              documentation and refusal to permit defense to nominate
              own expert for document examination ......................................... 55

|   |   | e. | Ex parte scheduling of trial sessions and closing of the defense case .................................................................... 58 |
|---|---|---|---|
|   | 4. |   | The Defendants' Right to Confront and Examine Witnesses.................... 60 |
|   |   | a. | Reading of 29 witness statements into the court record................. 61 |
|   |   | b. | Constructive anonymity and blanket use of protective measures....................................................................... 62 |
|   | 5. |   | No Reasoned Written Decisions on Key Procedural Issues ..................... 63 |
|   | 6. |   | Judicial Turnover and Judicial Demeanor................................................. 64 |
|   |   | a. | Turnover of sitting judges............................................................. 64 |
|   |   | b. | Lapses in judicial demeanor by the presiding judge ...................... 65 |
|   | 7. |   | Conduct of Defense Counsel ................................................................ 69 |

| V. | | Substantive Concerns ......................................................................... **73** |
| | 1. | Relevant Legal Principles..................................................................... 75 |
| | 2. | Lack of 'Linkage' Evidence Relating to Knowledge and Intention ................................................................................................... 78 |

| VI. | The Role of International Advisors .................................................. **84** |

| VII. | Death Penalty .................................................................................... **87** |

| VIII. | Conclusion.......................................................................................... **88** |

| IX. | Recommendations ............................................................................ **90** |
| | To the Iraqi Government ..................................................................... 90 |
| | To the Iraqi Parliament and the IHT ................................................... 90 |
| | To the IHT............................................................................................... 91 |

| X. | Acknowledgments ............................................................................ **93** |

# Glossary

| | |
|---|---|
| Ba'th Party | The Ba'th Arab Socialist Party |
| CPA | Coalition Provisional Authority |
| ICTJ | International Center for Transitional Justice |
| ICTR | International Criminal Tribunal for Rwanda |
| ICTY | International Criminal Tribunal for the former Yugoslavia |
| IHT | Iraqi High Tribunal |
| IST | Iraqi Special Tribunal |
| NDBC | National De-Ba'thification Commission |
| RCLO | Regime Crimes Liaison Office (United States Embassy) |
| SCIRI | Supreme Council of the Islamic Revolution in Iraq (a Shi'a political party) |
| VWP | Victims and Witnesses Protection |

# I.   Introduction and Overview

On October 19, 2005, much of daily life in Iraq paused to watch an unprecedented event: the opening of the trial of former President Saddam Hussein, three other senior former government officials, and four lower-level Ba'th Party members,[1] all charged with crimes against humanity. The trial concerned events centered on Dujail, a town in Iraq's central Salahaddin governorate, between 1982 and 1985.

On July 8, 1982, there was an assassination attempt against then-President Saddam Hussein during a visit to Dujail. The prosecution at the trial of Saddam Hussein and his co-defendants claimed that, soon after the assassination attempt and in retaliation for it, Dujail was the object of a "widespread and systematic attack" in which nearly 800 men, women, and children were detained, of whom an unspecified number were tortured. After a year of detention in Baghdad, approximately 400 detainees were transferred to internal exile in a remote part of southern Iraq. Another 148 male detainees were referred to trial before the Revolutionary Court, are recorded as having been convicted and sentenced to death in 1984 after a summary trial (the number who actually stood trial is disputed[2]), and most of them were executed in 1985.[3] Large swathes of agricultural land and some homes in Dujail were confiscated by the government and bulldozed.

The Dujail trial was the first case brought before the Iraqi High Tribunal (IHT), the Iraqi court created to try persons responsible for grave human rights violations committed in Iraq between 1968 and 2003. Given the legacy of severe human rights

---

[1] The defendants in the Dujail case are: Saddam Hussein, former president of Iraq; Barzan al-Tikriti, head of the General Intelligence Directorate (*Mudiriyyat al-Mukhabarat al'Amma*) between 1979 and 1983; Taha Yassin Ramadan, former vice-president of Iraq; 'Awwad al-Bandar, chief judge of the Revolutionary Court between 1983 and 1990; 'Abdullah Kadhim Ruwayid Fandi al-Mashaikh, a farmer from Dujail and former Ba'th Party member; Mizher 'Abdullah Kadhim Ruwayid Fandi al-Mashaikh, a postal worker from Dujail and former Ba'th Party member (and son of 'Abdullah Kadhim); Muhammad 'Azzawi 'Ali al-Marsumi, a mechanic from Dujail and former Ba'th Party member; and 'Ali Dayeh 'Ali al-Zubaidi, a teacher and former Ba'th Party member from Dujail.

[2] See below, Section IV.6.b.

[3] Documents produced in court suggested that two persons listed for execution were mistakenly transferred to detention in southern Iraq, while another 10 listed for execution were not executed until 1989.

violations of the previous government,[4] the Dujail trial is likely to be one of several that eventually comes before the court. The scale of human rights violations in Iraq under the Ba'thist government was so serious that they reached the level of international crimes, such as genocide, crimes against humanity, and war crimes.

The significance of the trials before the IHT is difficult to overstate. For the first time since the post-Second World War Nuremberg trials, almost the entire senior leadership cadre of a long-lived repressive government faces trial for gross human rights violations committed during their tenure. At stake is not only justice for hundreds of thousands of victims, but, as at Nuremberg, the historical record itself. The trials represent the first opportunity to create a historical record concerning some of the worst cases of human rights violations, and to begin the process of a methodical accounting of the policies and decisions that gave rise to these events. Long shrouded in secrecy, the former government's "bureaucracy of repression"[5] could now potentially be examined in meticulous detail, evidence analyzed and tested, and individual criminal responsibility determined for human rights crimes.

In a political environment that has become even more intensely polarized since the Dujail trial commenced, the IHT must ensure that the legal and factual record it establishes through its proceedings and judgments is fair, credible, and withstands scrutiny. It should strive to make sure it is unimpeachable. Human Rights Watch believes that trials that meet international human rights standards of fairness will be more likely to ventilate and verify the historical facts at issue, contribute to the public recognition of the experiences of victims of different religious groups and ethnicities, and set a more stable foundation for democratic accountability after periods of conflict and/or repression.

The IHT as an institution has the heavy responsibility of being, up to now, the only mechanism for justice and accountability for these crimes in Iraq. But at the same

---

[4] See, for example, Middle East Watch (now Human Rights Watch/Middle East), *Genocide in Iraq: The Anfal Campaign Against the Kurds* (New York: Human Rights Watch, 1993); Middle East Watch, *Endless Torment: The 1991 Uprising in Iraq and its Aftermath* (New York: Human Rights Watch, 1992); Human Rights Watch/Middle East, *Iraq's Crime of Genocide: The Anfal Campaign Against the Kurds* (New Haven: Yale University Press, 1994); and Physicians for Human Rights, *Winds of Death: Iraq's Use of Poison Gas against Its Kurdish Population* (Boston: Physicians for Human Rights, 1989).

[5] Middle East Watch (now Human Rights Watch/Middle East), *Bureaucracy of Repression: The Iraqi Government in Its Own Words* (New York: Human Rights Watch, 1994).

time, the court is a newly created institution in a recently reconstituted legal system, in which lawyers and judges were previously isolated from developments in international criminal law and had no experience in investigating and trying complex international crimes. The United States-led Coalition Provisional Authority (CPA)[6] insisted on an "Iraqi-led" process,[7] and the US government strongly opposed an international tribunal or mixed Iraqi-international court under United Nations (UN) management, so significant international involvement in the creation of the court was largely foreclosed.[8] There was also a strong demand among many Iraqis for "Iraqi control" of any court.[9] The IHT Statute requires that the judges, prosecutors, and staff of the court, and the principal defense lawyer for the accused, be Iraqi nationals.[10]

Based on its long-standing commitment to ensuring justice and accountability for grave international crimes committed during the Ba'th Party's three-decade rule in Iraq, Human Rights Watch has closely followed the development of the IHT since before and through its creation in 2003 under a CPA order.[11] Human Rights Watch strongly urged over many years the investigation and prosecution of leaders of the now-deposed Ba'thist regime.

---

[6] The CPA was the occupying power in Iraq between April 2003 and June 30, 2004.

[7] See comments of then-US Ambassador-at-Large for War Crimes Pierre Prosper in April 2003, quoted in Peter Landesman, "Who vs. Saddam?" *New York Times*, July 11, 2004.

[8] See the background to the creation of the court, and the reasons for the lack of international participation, in Human Rights Watch, *The Former Iraqi Government on Trial: A Human Rights Watch Briefing Paper,* October 2005, http://hrw.org/backgrounder/mena/iraq1005/iraq1005.pdf, pp. 2–3.

[9] See International Center for Transitional Justice and Human Rights Center, University of California at Berkeley, *Iraqi Voices: Iraqi Attitudes Towards Transitional Justice and Social Reconstruction,* May 2004, http://www.hrcberkeley.org/download/Iraqi_voices.pdf (accessed October 20, 2006).

[10] Law of the Iraqi High Tribunal (IHT Statute), Official Gazette of the Republic of Iraq, No. 4006, October 18, 2005, English translation by the International Center for Transitional Justice, http://www.ictj.org/static/MENA/Iraq/iraq.statute.engtrans.pdf, art. 28 (judges, prosecutors, and staff), art. 19.4(B) (principal defense lawyer).

[11] See, for example, Human Rights Watch, *Justice for Iraq: A Human Rights Watch Policy Paper,* December 2002, http://www.hrw.org/backgrounder/mena/iraq1217bg.htm; *Iraq – The Mass Graves of Al-Mahawil: The Truth Uncovered,* vol. 15, no. 5(E), May 2003, http://www.hrw.org/reports/2003/iraq0503/; *Iraq: State of the Evidence,* vol. 16, no. 7(E), November 2004, http://www.hrw.org/reports/2004/iraq1104/; *Memorandum to the Iraqi Governing Council on 'The Statute of the Iraqi Special Tribunal,'* December 2003, http://www.hrw.org/backgrounder/mena/iraq121703.htm; *Briefing Paper: The Iraqi Special Tribunal – Rules of Procedure and Evidence Missing Key Protections,* April 2005, http://hrw.org/english/docs/2005/04/22/iraq10533.htm; and *The Former Iraqi Government on Trial,* October 2005.

The evolution of the IHT over the past three years has given rise to serious concerns
about its capacity to fairly and effectively try these massive crimes in a manner that
is consistent with international criminal law and fair trial standards.[12] Underlying
many of the concerns was the reality that, at the time the court was created, Iraq
"lack[ed] the professional and technical investigative and judicial expertise to
[prosecute crimes against humanity and war crimes] on its own."[13] At the same time,
US advisors to the court insisted that sufficient training and advice could make up
for this lack of capacity. The first trial would thus be a critical test of the functioning
of the court, and an opportunity to carefully and objectively evaluate the
proceedings—both from the point of view of their procedural fairness, and in terms
of whether the court and its personnel had developed sufficient expertise to
competently investigate and try complex international crimes.

From the beginning of the Dujail trial, Human Rights Watch engaged in intensive
monitoring of the proceedings before the first trial chamber of the IHT. Human Rights
Watch and the International Center for Transitional Justice (ICTJ) were the only
international human rights organizations to consistently observe the trial and
investigate the functioning of the court. Working collaboratively, the monitoring
presences fielded by the two organizations achieved almost complete coverage of all
trial sessions.[14] In addition, Human Rights Watch conducted over three dozen
interviews over the course of the trial with key actors in the tribunal, including
prosecutors, judges, defense lawyers, and administrators. Human Rights Watch
researchers also reviewed the dossier of evidence submitted by the investigative
judge to the trial court, and examined the statements given by the defendants to the
investigative judge. While much of the media and public attention on the trial
concerned the behavior of key defendants such as Saddam Hussein, and the often-

---

[12] For further discussion of the development of the IHT, and Human Rights Watch's concerns about its statute, see Human Rights Watch, *The Former Iraqi Government on Trial.*

[13] US Department of State, *Quarterly Update to Congress: Section 2207 Report on Iraq Relief and Reconstruction* (January 2004), http://www.whitehouse.gov/omb/legislative/20040105-sec2207_main_report.pdf (accessed October 20, 2006), p. 43. The weaknesses of the post-conflict Iraqi legal system were also documented in the CPA's "Report of the Iraq Judicial Assessment Team," June 2003, and World Bank and United Nations Development Group, *Legal Needs Assessment Mission to Iraq*, August 2003.

[14] For Human Rights Watch, trial monitoring was conducted principally by a Middle East-based researcher, who was joined for part of the trial by a researcher from the Human Rights Watch office in New York. Human Rights Watch and ICTJ shared all information obtained through their respective trial monitoring presences, and often jointly conducted interviews with tribunal personnel and defense lawyers.

tumultuous courtroom proceedings, Human Rights Watch's focus was on the fairness of the proceedings and the capacity of the court to prosecute and adjudicate the crimes charged, in a manner consistent with international law.[35]

The picture that emerges from this research is of an institution struggling with all aspects of conducting these legally and factually complicated trials, and also beset by external problems: misunderstanding and hostility in public opinion and from political leaders; grave and increasing security threats to all participants; a bitterly divided legal profession; and a deepening reluctance by other international actors to assist the process. Cumulatively, these limitations have meant that, in the Dujail trial, the court has not met essential fair trial standards and that the credibility of the trial process is doubtful. Human Rights Watch has documented serious administrative, procedural, and substantive legal defects in the trial.

Taken together, these problems point strongly to the conclusion that the level of legal and practical expertise of the key Iraqi actors in the court—trial judges, administrators, prosecutors, and defense lawyers—is not sufficient to fairly and effectively try crimes of this magnitude. In addition, while non-Iraqi advisors provided by the US Embassy have been indispensable to the day-to-day functioning of the court, they have proved a poor substitute for the direct participation of international judges, counsel, and managers in the court. In the last instance, it appears that "advisors" can advise, but cannot actively participate to ensure that essential international standards are met.

In this report, Human Rights Watch sets out the principal concerns arising out of its observation of the Dujail trial and its research into the court. These concerns are divided into three categories: administrative difficulties that have significantly hampered the smooth functioning of the trial and also impacted on its fairness; procedural problems arising in the course of the trial; and substantive problems with the case presented by the prosecution and investigative judges, indicating a lack of

---

[35] Crimes such as genocide and crimes against humanity achieved recognition as crimes through international law; the legitimacy of trying them is thus inextricably linked to whether the trial meets international fair trial standards and correctly applies substantive international criminal law.

sufficient understanding of the elements of proof required to establish individual criminal responsibility under international criminal law.

Because of severe security threats to all persons involved in the court process, and the desire of interviewees to be able to speak candidly about their concerns, persons quoted in this report are not referred to by name, but according to their role (for example "judge," "Defense Office lawyer," etc.).

* * *

On August 21, 2006, the second trial before the IHT commenced. The trial concerns a series of large-scale attacks mounted by the Iraqi army against the Kurdish populations of northern Iraq during 1988 and known as the "Anfal" campaign. The campaign involved the repeated use of chemical weapons, and resulted in the deaths of between 50,000 and 100,000 Kurdish civilians. Saddam Hussein is a defendant in that trial also (charged with genocide, war crimes, and crimes against humanity), along with six others.[16] At this writing the trial is ongoing.

---

[16] The other defendants in the Anfal trial are Ali Hassan al-Majid al-Tikriti (charged with genocide, war crimes, and crimes against humanity), Tahir Tawfiq al-'Ani (charged with crimes against humanity), Sabr Abdul-Aziz al-Douri (charged with war crimes and crimes against humanity), Farhan Mutlak al-Juburi (charged with war crimes and crimes against humanity), Sultan Hashem Ahmed al-Ta'i(charged with war crimes and crimes against humanity), and Hussein Rashid al-Tikriti (charged with war crimes and crimes against humanity).

## II.  Background[17]

Between December 2003 and October 2005 the Iraqi High Tribunal was known as the Iraqi Special Tribunal (IST). The IST Statute was promulgated as an Order of the CPA on December 10, 2003.[18] In early August 2005 the IST Statute was revoked by Iraq's Transitional National Assembly, and replaced by an amended statute that renamed the Special Tribunal as the High Tribunal. The August enactment proved legally defective due to a failure to follow the proper legislative process,[19] and was therefore re-debated and re-enacted in September 2005. The new law, Law No. 10 of 2005,[20] was promulgated in the Official Gazette on October 18, only one day before the commencement of the Dujail trial.[21]

The IHT has jurisdiction over Iraqis, and non-Iraqis residing in Iraq, accused of committing genocide, crimes against humanity, and war crimes between July 1968 and May 2003.[22] The IHT Statute adopts the definitions of these crimes from the Rome Statute of the International Criminal Court. However, the IHT Statute also includes crimes from a 1958 Iraqi law that are of a breadth and vagueness that makes them susceptible to politicized interpretation and application, and therefore could be regarded as political offenses.[23] For example, the IHT Statute allows individuals to be

---

[17] This section draws on Human Rights Watch's previous analysis of the IHT in *The Former Iraqi Government on Trial*.

[18] *Coalition Provisional Authority Order Number 48: Delegation of Authority Regarding an Iraqi Tribunal*, CPA/ORD/9 Dec 2003/48 (2003) (IST Statute).

[19] Draft legislation should normally be referred by the relevant ministry or the Council of Ministers to the State Consultative Council (*Majlis Shura al-Dawla*) for review before being debated in parliament. In this instance, the Council of Ministers sent the draft statute to the State Consultative Council and the Transitional National Assembly simultaneously. Consequently, in August 2005 parliament debated and adopted a draft law that had not been reviewed by the State Consultative Council. When the error was discovered, the adopted law was sent to the State Consultative Council for review, then re-debated and re-enacted with further amendments in September 2005.

[20] The Rules of Procedure and Evidence were also revised at this time, and were promulgated as an annex to Law No. 10 of 2005 on the same day. Rules of Procedure and Gathering of Evidence With Regard to the Iraqi High Tribunal (IHT Rules of Procedure and Evidence), Official Gazette of the Republic of Iraq, No. 4006, October 18, 2005, English translation by the International Center for Transitional Justice, http://www.ictj.org/static/MENA/Iraq/IraqTribRules.eng.pdf.

[21] IHT Statute, Official Gazette of the Republic of Iraq, October 18, 2005.

[22] IHT Statute, art. 1(2).

[23] Ibid., art. 14. Two of the crimes listed in article 14 appear to have their origins in the military tribunal that was constituted to try leaders of the monarchical government after the 1958 revolution led by 'Abdel Karim Qassim. This tribunal, known as the Mahdawi Court, conducted overtly political trials more concerned with discrediting the monarchy than with establishing the

charged with "the wastage of natural resources and the squandering of public assets," and "the abuse of position and the pursuit of policies that may lead to the threat of war or the use of the armed forces of Iraq against an Arab country." These offenses are not defined, either in the IHT Statute or in the 1958 Law from which they are drawn.

Investigations and trials before the IHT are regulated primarily by the Iraqi Code of Criminal Procedure.[24] This is based on the civil law system of criminal procedure as used in countries such as France in the 1950s.[25] It concentrates powers of fact-finding and investigation in the hands of an investigative judge. The investigative judge plays the role of an inquisitor whose objective is to ascertain the truth,[26] and has broad powers to compel testimony, seek out experts, and collect and preserve evidence.[27] He or she must seek out both exculpatory and inculpatory evidence in order to assess whether there is sufficient evidence for trial. All evidence collected and testimony taken are compiled in a written dossier. During the investigative phase, the accused and the accused's lawyer can seek to be present while the investigative judge collects evidence and questions witnesses,[28] and may only question a witness through the investigative judge and with the latter's permission.[29] However, the investigative judge has an unfettered discretion to exclude the accused and his or her lawyer from investigative hearings.[30] The accused can submit comments on witnesses' testimony, to be included in the dossier.[31]

---

guilt or innocence of the accused. It is troubling that these offenses have been included in the substantive jurisdiction of the IHT.

[24] IHT Statute, art. 16. The principal law is the Code of Criminal Procedure, No. 23 of 1971, as amended.

[25] In 1993 and 2000, French criminal procedure law was amended in order to expand the rights of defendants, which were considered insufficiently protected under the earlier laws. See Stewart Field and Andrew West, "Dialogue and the Inquisitorial Tradition: French Defense Lawyers in the Pre-Trial Criminal Process," *Criminal Law Forum*, vol. 14, no. 3 (2003), pp. 261–316.

[26] Christoph J.M. Safferling, *Towards an International Criminal Procedure* (Oxford, UK: Oxford University Press, 2001), p. 217.

[27] Iraqi Code of Criminal Procedure, Law No. 23 of 1971, arts. 51-129.

[28] Ibid., art. 57.

[29] Ibid., art. 64.

[30] Ibid., art. 57. Under the IHT Statute, the accused is guaranteed the right for counsel to be present when the accused himself or herself is being questioned as part of the investigative process.

[31] Iraqi Code of Criminal Procedure, art. 63.

If the case is referred to trial, everything contained in the dossier constitutes evidence, and the trial court is entitled to treat all witness testimony in the investigative dossier as having been given at trial.[32]

The Rules of Procedure and Evidence (IHT Rules) provide that the IHT will establish a Defense Office, headed by a director and supported by the Administration of the IHT, to ensure adequate facilities for counsel in the preparation of defense cases.[33]

Each trial chamber of the IHT consists of five judges.[34] The conduct of a trial is controlled by the judges, who decide which witnesses shall be called and what questions are put to the witnesses and the defendant. Lawyers for the prosecution and the defense may address questions to witnesses only through the judges.[35] Proceedings at the trial stage can be expected generally to entail a review of the evidence contained in the dossier, followed by statements by the lawyers for the prosecution and defense. Where the judges are satisfied of the guilt of the defendant, they issue a verdict and sentence in a written opinion. Convictions may be appealed to the Appeals Chamber of the IHT, which is constituted by nine appeals judges including the president of the IHT.[36] A conviction and sentence may be reversed, revised, or set aside and the case sent back for re-trial.

The IHT applies the penalties that are available in Iraqi law.[37] Where the defendant is convicted of a crime that would also amount to murder or rape under domestic Iraqi law, the penalties for those offenses will apply.[38] The death penalty is widely prescribed in the Iraqi Penal Code, including for the murder of more than one

---

[32] Defense counsel in the Dujail case were not invited to participate in the investigative judge's taking of witness statements, and thus could not question or submit comments on witness testimony during the investigative phase. See Human Rights Watch, *The Former Iraqi Government on Trial*, p. 11, and also below, Section IV.4.a.

[33] IHT Rules of Procedure and Evidence, rule 30(3)(c).

[34] IHT Statute, art. 3(4)(B).

[35] Iraqi Code of Criminal Procedure, art. 168(B). Article 16 of the IHT Statute makes the Code of Criminal Procedure the governing procedure for the trials, supplemented by the Rules of Procedure and Evidence.

[36] IHT Statute, art. 3.4(A).

[37] Ibid., art. 24.

[38] Ibid., art. 24(4).

person.[39] Consequently, most offenses over which the IHT has jurisdiction may incur the death penalty.

The IST Statute as originally promulgated permitted the appointment of non-Iraqi judges with expertise in international criminal proceedings to the trial chamber. The amended version that is the IHT Statute provides that non-Iraqi judges may be appointed only if a foreign state is a party to proceedings before the IHT.[40] To date, no non-Iraqi judges have been appointed to any chamber of the IHT. Non-Iraqi lawyers with experience in international criminal law may be appointed, at the discretion of the court's president, as "advisors" to judges and prosecutors in order to provide "assistance in the field of international law" (the exact role of advisors, to whom they are accountable, and how they exercise an "assistance" function are unspecified, however).[41] Non-Iraqi defense lawyers are permitted to assist the principal lawyer, but non-Iraqis cannot register as representing the accused unless they present proof of accreditation with the legal professional association in their country, and are then approved by the Iraqi Ministry of Justice.[42]

Almost the only source of non-Iraqi advisors and assistance has thus far been the US Embassy's Regime Crimes Liaison Office (RCLO), established in March 2004 by the US Department of Justice and funded by the US Congress.[43] Non-Iraqi defense lawyers were privately retained in the Dujail trial by Saddam Hussein, Barzan al-Tikriti, and Taha Yassin Ramadan (see also Section III.5, below).

---

[39] Iraqi Penal Code, Law No. 111 of 1969, art. 406 (1). The CPA suspended the application of the death penalty by means of Order No. 7 of June 10, 2003, section 3(1): *CPA Order Number 7: Penal Code*, CPA/ORD/9 June 2003/07, http://www.iraqcoalition.org/regulations/20030610_CPAORD_7_Penal_Code.pdf (accessed November 3, 2006). The Iraqi Interim Government reintroduced capital punishment for a range of offenses by means of Order No. 3 of August 8, 2004. The offenses for which the death penalty was reintroduced include premeditated murder. All the defendants in the Dujail case were charged with murder as a crime against humanity.

[40] IHT Statute, art. 3(5).

[41] Ibid., arts. 7(2), 8(9), 9(7).

[42] Ibid., art. 19(4)(D).

[43] See the discussion in Human Rights Watch, *The Former Iraqi Government on Trial*, pp. 17–18. Further discussion of the role of the RCLO is found below, in Section VI. According to the Foreign and Commonwealth Office website, the United Kingdom has provided 1.2 million UK pounds in training-related assistance to the IHT (this is less than 2 percent of the amount contributed to the IHT by the United States, which allocated US 128 million dollars to supporting the IHT between 2003 and 2006). See http://www.fco.gov.uk/servlet/Front?pagename=OpenMarket/Xcelerate/ShowPage&c=Page&cid=1024313967149 (accessed September 22, 2006). As discussed further below, two non-RCLO international advisors have been appointed, one to the first trial chamber shortly before the opening of the Dujail trial, and the second to the Defense Office in late April 2006, six months after the commencement of the Dujail trial.

## III.  Administrative Concerns

Competent administration is essential for any court to run effectively, but in the case of courts adjudicating multi-defendant trials concerning large-scale crimes, court administration is the fulcrum on which the trial pivots. For example, the administrative organ of the ad hoc international criminal tribunals for the former Yugoslavia and for Rwanda (ICTY, ICTR), usually known as the Registry, is independent of the judiciary and prosecution, and undertakes multifaceted tasks indispensable to both the efficiency and fairness of the trials. These tasks include servicing the judiciary's administrative and personnel needs, managing vast amounts of documentation, liaising between prosecution and defense, ensuring defense access to clients, supervising witness protection, supervising conditions of the accused's detention, and managing outreach and communications for the court.

Prior to its amendment in September 2005, the IHT (then-IST) Statute provided for an Administrative Department, [44] headed by an administrative director.[45] In its original form, the department was charged with addressing the administrative needs of judges and prosecutors, but not defense lawyers, and in addition was responsible for Victims and Witnesses Protection (VWP), detention conditions of the accused, communication with parties,[46] outreach and communications,[47] and the creation of the Defense Office.[48] In the 2005 revisions of the IHT Statute, the appointment of the administrative director and tribunal spokesperson was brought under the control of the president of the IHT, making the president ultimately responsible for the overall administration of the court.[49]

The first administrative director was Salem Chalabi, who assumed a prominent role in the drafting of the IST Statute up to December 2003, and in nominating judges and

---

[44] IST Statute (revoked), art. 3(c).

[45] Ibid., art. 9(a).

[46] IHT Rules of Procedure and Evidence, rules 13–15.

[47] IST Statute (revoked), art. 9(e).

[48] IHT Rules of Procedure and Evidence, rule 30.

[49] IHT Statute, art. 7(1).

other key personnel during the court's start-up phase in mid-2004. However, Chalabi was dismissed as administrative director in September 2004,[50] and his dismissal was followed by efforts to have "Chalabi loyalists" removed from the IST and replaced by personnel selected by officials in the government headed by then-interim Prime Minister Ayad Allawi. In the subsequent months the position of administrative director was filled by two other IST personnel on a temporary basis, during which time the administrative affairs of the court fell into disarray.[51] In September 2005 an Iraqi-American was nominated as administrative director, but his nomination was not accepted by the IST president, and a judge of the Appeals Chamber assumed the role temporarily. The 2005 amendments to the court's statute, which took effect in October and concentrated administrative powers in the hands of the IHT's president,[52] meant that the position of administrative director was effectively downgraded. As far as Human Rights Watch has been able to determine, the position has not been permanently filled since, and its functions were disaggregated and exercised by different officials within the court on an as-needed basis.

Although the IHT Rules continued to stipulate that the Administrative Department was responsible for VWP, detention conditions, communication with the parties,[53] and the creation of a Defense Office, in practice these essential functions have been taken over by other officials within the IHT. VWP is managed by the chief investigative judge,[54] who also functions as the court's spokesperson and media liaison. The defendants in all cases before the IHT are detained by the US military, and thus the US military is responsible for their detention conditions. At the court, it is unclear who is responsible for the court's supervision of the defendants' detention.

---

[50] Nancy Youssef, "Salem Chalabi Reportedly Removed from Post Overseeing Saddam Trial", *Knight Ridder News Service*, September 8, 2004. Charges were brought against Chalabi in an unrelated criminal case and referred to the Central Criminal Court of Iraq.

[51] John Burns, "Hussein Tribunal Shaken by Chalabi's Bid to Replace Staff," *New York Times*, July 20, 2005; John Burns, "Ignoring U.S., Chalabi Pursues Attempt to Fire Hussein Judge," *New York Times*, July 27, 2005; Edward Wong, "Iraqi Leader Vows to Block Purges on Hussein Tribunal," *New York Times*, July 29, 2005; Kathleen Ridolfo, "Iraq: Debaathification Commission Backs Away from Tribunal Purge," Agence France-Presse, July 29, 2005.

[52] IHT Statute, art. 7(1)(D).

[53] IHT Rules of Procedure and Evidence, rules 13–15.

[54] Human Rights Watch interview with chief investigative judge, Baghdad, February 2006; Human Rights Watch interview with non-Iraqi diplomatic official observing the court, Baghdad, November 2005.

The lack of administrative direction in the management of the IHT was a common theme among court personnel and lawyers interviewed by Human Rights Watch. Court administrative staff themselves complained that they received no training or instruction in administrative procedures relevant to trials of this kind,[55] while several judges asserted that the administration of the documentation and records of court proceedings was so poor that they could not easily determine what motions and documents had been received.[56] Judges also consistently stated that the then-president of the court was unresponsive to proposals to improve aspects of court administration.[57] As one judge commented,

> It pains me to say this, but there is a lack of discipline in the administration of the court. The president is aged—he has my respect, I like him and he is a humane person, but ... [he] is a judge, not an administrator.[58]

Overarching administrative problems have had a serious impact on the functionality of the court, and its capacity to perform tasks essential for a fair and effective trial, including witness protection, document management, security arrangements, the Defense Office, and outreach and communications.

## 1. Victims and Witnesses Protection

Witnesses (who may also be direct victims) in trials for genocide, war crimes, or crimes against humanity face serious risks. They may confront direct threats to the safety of their families and themselves—before or after testifying in court—and may also be in need of ongoing psychosocial support in the aftermath of testifying about deeply traumatic events. In circumstances where a conflict is ongoing, such as Iraq, the risks to all witnesses, whether for the prosecution or the defense, can be expected to be very grave, and a comprehensive program of protection and support is thus indispensable to ensuring both an effective prosecution and an effective

---

[55] Human Rights Watch interview with court administrative staff, Baghdad, March 2006.

[56] Human Rights Watch interviews with IHT judges, Baghdad, November 2005, February 2006 and March 2006.

[57] Human Rights Watch interviews with IHT judges, Baghdad, February and March 2006.

[58] Human Rights Watch interview with IHT judge, Baghdad, March 2006.

defense. At minimum, a witness protection program in such circumstances would be expected to include pre-trial and post-trial risk assessments for each witness; in-court protective measures (based on the risk assessment and duly authorized by the court on a witness-by-witness basis);[59] safe transportation to and from the court and safe accommodation during court attendance; post-trial follow up and threat monitoring; and relocation arrangements, including international relocation agreements, for the most at-risk witnesses.[60]

The IHT Rules envisage the creation of a "Victims and Witnesses Unit."[61] However, concrete planning for the operationalization of such a unit does not appear to have commenced in earnest before July-August 2005, when a consultant expert in witness protection was funded by the United Kingdom (UK) Foreign and Commonwealth Office to develop a plan for the court. The consultant's report was submitted to the court in September 2005, but in interviews with Human Rights Watch in November 2005, non-Iraqi diplomatic personnel familiar with the court's workings stated that the Victims and Witnesses Unit existed only on paper.[62] Another diplomat familiar with the issue stated that there were "100 witness protection staff on the books, but they don't do anything."[63] Instead of someone with direct experience in creating and managing a victims and witnesses protection program being appointed to lead the unit, the chief investigative judge assumed responsibility for the program, in addition to his judicial duties and his role as the court's spokesperson.

In practice, the RCLO and the US military assumed complete responsibility for the safe transport of witnesses to and from the courtroom, and for accommodating them in Baghdad's International Zone during their time at the court. Defense witnesses within Iraq but outside Baghdad who wanted to testify were transported by helicopter from the US Forward Operating Base (FOB) nearest their home town, and

---

[59] For concerns about the court's approach to in-court protective measures see below, Section IV.4.b.

[60] See, for example, discussion in Eric Stover, *The Witnesses: War Crimes and the Promise of Justice in The Hague* (Philadelphia: University of Pennsylvania Press, 2005), pp. 41–43, See also Human Rights Watch, *Justice in Motion: The Trial Phase of the Special Court for Sierra Leone*, vol. 17, no. 14(A), October 2005, http://hrw.org/reports/2005/sierraleone1105/, pp. 20-27.

[61] IHT Rules of Procedure and Evidence, rule 15.

[62] Human Rights Watch interview with non-Iraqi diplomatic personnel, Baghdad, November 2005.

[63] Human Rights Watch interview with non-Iraqi diplomatic personnel, Baghdad, November 2005.

were returned there after the completion of their testimony (it was incumbent upon
the defense lawyer seeking to have the witness come forward to arrange for the
witness to report to the FOB at an arranged time, in order to be transported to the
International Zone). A number of witnesses for Saddam Hussein were first relocated
out of Iraq, because the defense lawyers insisted that this was the only way to
ensure the witnesses' safety.[64] When they were due to testify, the witnesses were
flown back into Baghdad International Airport, and the RCLO provided secure
transportation between the airport and the International Zone.

No systematic post-testimony mechanism of threat assessment or individual
protection was available for either prosecution or defense witnesses. However, the
town of Dujail did benefit during trial days from some additional deployments of Iraqi
military personnel and increased vigilance by US military forces stationed nearby.

The RCLO also assumed responsibility for arrangements to relocate the most
seriously at-risk witnesses. But no coherent and integrated program was operational
by the beginning of the Dujail trial, and relocation arrangements appear to be largely
ad hoc and dependent on the RCLO.

According to a Dujail-based witness ("Witness A") who testified before the court in the
Dujail trial,[65] prosecution witnesses and complainants[66] were frightened to attend the
first session of the trial on October 19, 2005, because no arrangements for their
protection had been made, and threats had been received from the families of certain
defendants. In early February 2006, lawyers for the victims complained in court that
witnesses and complainants had received kidnap threats, and asked the court to
"activate" its witness protection mechanisms.[67] According to Witness A, no risk

---

[64] Human Rights Watch interview with private defense lawyers, Amman, September 2006; Human Rights Watch interview with
RCLO representatives, Baghdad, October 2006. The defense lawyers claimed that there was an agreement with the RCLO that
the costs of transporting the witnesses for Saddam Hussein out of Iraq and accommodating them in a neighboring country
would be reimbursed by the RCLO to the defense lawyers, and that the RCLO reneged on this agreement. The RCLO confirmed
that they were willing to meet some costs, but that the defense lawyers concerned demanded a lump-sum of cash up front.
This was unacceptable to the RCLO, particularly without guaranteed proper accounting of expenditures, and no
reimbursement agreement was ultimately reached.

[65] Human Rights Watch interview with Witness A, March 2006.

[66] Under Iraqi law, a complainant is someone who alleges that they suffered injury as a result of the crime, and who has a
right to file suit for compensation with the criminal court trying the case. Iraqi Code of Criminal Procedure, arts. 9, 25.

[67] Human Rights Watch–ICTJ trial observation notes, February 13, 2006.

assessments were undertaken for him or his family, and he arranged his own protection for his family (who remained in Dujail when he traveled to Baghdad to testify) through "local groups." After completing his testimony, Witness A was offered the option of relocating to the Kurdistan region, but he chose to return to Dujail in the belief that the court's witness protection program was now activated. However, sectarian conflict and threats intensified in Dujail, and Witness A returned to Baghdad on his own initiative to seek help. With the assistance of a Cabinet advisor, the witness was able to move into the International Zone and his family traveled to join him there. Witness A was subsequently contacted by an RCLO official, who offered to make arrangements for international relocation for Witness A and his family.

These arrangements were the result of the witness's own initiatives and the intercession of an Iraqi government advisor. They were not the product of a coordinated response by the Victims and Witnesses Unit. Witness A stated,

> The government is weak. The witnesses cannot leave Dujail. They protect themselves. They cannot go to Baghdad without being killed ... There is no counseling or support for female witnesses. I don't think the court takes witness protection seriously. I am confused.[68]

## 2. Court Documentation

Based both on in-court observation and on interviews with key actors in the trial process, it became evident that during the Dujail trial the court encountered significant difficulties in the management of trial-related documents. These difficulties were concentrated along two axes: private defense lawyers' problems in receipt and transmission of documents, and problems with the internal management of documents received by the court, such as motions and powers of attorney.

In pre-trial interviews with privately retained defense lawyers (including lawyers representing accused who were not defendants in the Dujail trial), Human Rights Watch received consistent complaints that the court failed to process powers of attorney submitted by defense lawyers, and was unresponsive to written

---

[68] Human Rights Watch interview with Witness A, March 2006.

communications.[69] A court official denied this claim, and attributed problems in certifying powers of attorney to a lack of due diligence on the part of defense lawyers. However, it was apparent during trial proceedings that the court regularly could not find powers of attorney that defense lawyers claimed to have submitted, and the court lacked a system for verifying and tracking the receipt of documents.[70]

The same problem arose in relation to motions claimed to have been submitted to the court,[71] and more than one judge admitted that he was unable to determine exactly how many motions had been submitted.[72] Court officials contradicted each other about whether a comprehensive list of submitted motions was maintained by the court, and despite repeated requests by Human Rights Watch to inspect such a list one was never made available. While Human Rights Watch was unable to substantiate each claim of document mishandling, it became clear in the course of observing proceedings that the only way for a lawyer to ensure that a legal document reached the trial judges was to submit it in person during a court session.

Private defense lawyers complained that part of the problem of submitting documents to the court, outside of court sessions, was that the court's administrative offices within the International Zone were difficult and very time-consuming to access.[73] These lawyers also expressed reservations about the security risk posed by regularly entering

---

[69] See Human Rights Watch, *The Former Iraqi Government on Trial*, p. 12. Human Rights Watch interview with private defense lawyer for a non-Dujail accused, October 2005.

[70] Human Rights Watch–ICTJ trial observation notes, October 19 and December 5, 2005; April 19 and July 11, 2006.

[71] For example, on April 19, 2005, lawyers for the victims asked about a motion they had submitted to the court, and the court could find no record of it. Human Rights Watch–ICTJ trial observation notes, April 19, 2006.

[72] Human Rights Watch interviews with IHT judges Baghdad, February and March 2006.

[73] Because the renovation of the building housing the courtroom is ongoing, the court's administrative offices (for prosecutors, investigative judges, trial judges, and appeal judges) have been provisionally located on one floor of a multi-storey building in the heart of the International Zone (this office building also accommodates numerous other Iraqi government agencies, such as the National De-Ba'thification Commission). Privately retained defense lawyers are not provided with badges that would allow them direct access to the building. Instead, they must place a phone call 24 to 48 hours ahead of the desired visit, and arrange to have their names listed at the entrance to the building. On the day they seek to visit, the lawyers must enter the International Zone on foot through the pedestrian checkpoint ("Checkpoint 3") and then traverse two other checkpoints over approximately 500 meters, before reaching the court administrative building. Once they arrive at the building, there is no guarantee that their names have in fact been communicated to the security desk at the entrance. If the name has not, the lawyer will be unable to enter; if the name is at the entrance, the lawyer may still have to wait for an hour or more before gaining access to the building. Once they enter the building, they are not permitted to go beyond the lobby area, and must wait for a court employee to meet them to either hand over documents or receive them. Private defense lawyers indicated that because the process is both time-consuming and fraught with uncertainty they rarely try to gain access to the administrative offices of the court.

and exiting the International Zone on foot. [74] The court did not provide badges that could have facilitated private defense lawyers' entry into the International Zone.

Among court officials there was confusion about how a private defense lawyer could effectively submit documents to the court if unable to reach the court offices. Some officials claimed that there was an arrangement with the Iraqi Bar Association, whereby lawyers could submit documents to the Bar Association and the court would send an employee to collect them;[75] private defense lawyers expressed support for this as an idea, but claimed that the procedure was not in fact in place, and documents were only collected from the Bar Association on an irregular basis.[76] By contrast, a trial judge firmly denied that any documents were received, or could be submitted, through the Bar Association.[77] Email submission of documents to the court was possible, and the court did receive motions from defense lawyers by email.[78] However, the court never instituted a practice of acknowledging the receipt of documents via email, leaving defense lawyers uncertain as to whether the documents had been received by the court.[79] As of March 2006 no standard protocol or procedure governing the modalities of submitting documents to the court had been established, and no court official had been appointed to liaise with private defense lawyers concerning the transmission of documents. Human Rights Watch has not been able to establish whether this situation has since changed.

The dossier of evidence in the Dujail case—containing witness statements and documentation collected by the investigative judge—was made available to defense counsel on August 10, 2005. On the first trial day, defense counsel complained that large portions of the dossier were illegible.[80] Human Rights Watch reviewed copies of

---

[74] Human Rights Watch's experience was that entry via Checkpoint 3 was possible if the entrant had two forms of legible photo identification. However, what amounted to acceptable identification could vary, and thus entrants can occasionally be refused. The pedestrian checkpoint has also been the subject of several suicide attacks in the past 12 months.

[75] Human Rights Watch interview with IHT judge, Baghdad, March 2006; and Human Rights Watch interview with prosecutor, Baghdad, February 2006.

[76] Human Rights Watch interview with private defense lawyers, Baghdad, March 2006.

[77] Human Rights Watch interview with IHT judge, Baghdad, March 2006.

[78] Human Rights Watch interview with IHT judge, Baghdad, February 2006.

[79] Human Rights Watch interview with private defense lawyer, New York, April 2006.

[80] Human Rights Watch–ICTJ trial observation notes, October 19, 2005.

the dossier disclosed on August 10, 2005, and found approximately 30 percent of its pages to be unreadable.[81] The dossier was also poorly assembled and organized, with inconsistent pagination and some documents presented out of sequence or with missing pages. The dossier contained multiple copies of the same documents for no apparent reason, as well as documents that had no apparent connection with the Dujail case. Given that the dossier constitutes the principal basis for the conduct of the case, and for a defendant to understand the case against him, such haphazard collation of the material is problematic. As far as Human Rights Watch can determine, some defense counsel received more legible copies by late November 2005.

### 3. Security for Private Defense Counsel

Since the creation of the IHT (then-IST) in December 2003, the security situation in Iraq has declined steadily, with a dramatic deterioration from late 2004. In such an environment, and with trials concerning individuals and events that provoke very powerful emotions and polarized political views, all persons involved with the trials are at grave risk. At least five persons working for the court, including an investigative judge and the chief of security, were killed before the opening of the Dujail trial.[82] Over the course of 2005, apartments inside the International Zone were renovated for use by prosecutors and judges, and as an interim measure some judges and prosecutors, and their families, were provided temporary hotel accommodation inside the International Zone. The RCLO played the primary role in devising security arrangements for court personnel, and for securing the court building in the start-up phase of the court.

However, a similar level of advanced planning for the security of defense counsel does not appear to have been undertaken. The ability of defense counsel to vigorously represent their clients without fear of reprisal or retaliation is essential for a fair trial. In Iraq's deteriorating security environment, the high level of risk to defense counsel for senior figures of the former regime such as Saddam Hussein, 'Awwad al-Bandar, Taha Yassin Ramadan, and Barzan al-Tikriti, was foreseeable.

---

[81] The original dossier contained approximately 900 pages. It was supplemented by further material disclosed by the prosecutor in late January and early March 2006. For concerns about the practice of disclosure during the trial see below, Section IV.3.a–c.

[82] Human Rights Watch interview with IHT judge, Baghdad, October 2005.

Whereas from among the prosecutors and the five-member bench only the faces of the chief prosecutor and the presiding judge were broadcast on the first day of the Dujail trial, the faces of all defense lawyers were visible. Defense lawyers stated that they gave their permission to be televised, but that they were consulted only a few minutes before the trial opened.[83] The following day (October 20, 2005), Sa'doun al-Janabi, lawyer for defendant 'Awwad al-Bandar, was kidnapped from his offices and murdered. Three weeks later, Adel al-Zubeidi and Thamer al-Khuza'i, defense counsel for defendants Taha Yassin Ramadan and Barzan al-Tikriti, were attacked by gunmen. Al-Zubeidi was killed, and al-Khuza'i was injured and fled Iraq. On June 21, 2006, Khamis al-Obeidi, defense counsel for Saddam Hussein, was abducted from his home in Baghdad and shot dead.

Up until the assassination of al-Janabi, neither the court administration nor the RCLO appears to have developed specific proposals to ensure the security of defense counsel. Defense Office lawyers, who are retained by the court, also complained that no security measures for them were planned or implemented before the beginning of the trial.[84] After al-Janabi's killing, a representative of the RCLO contacted private defense lawyers in the Dujail case and offered to relocate them and their families into the International Zone.[85] As an alternative, the Iraqi government offered security guards from the Ministry of Interior.

The private defense lawyers rejected security guards provided by the Interior Ministry, as they regarded it as hostile to them and their clients.[86] They also rejected the offer

---

[83] Human Rights Watch interview with private defense lawyer, Baghdad, October 2005.

[84] Human Rights Watch interview with Defense Office lawyers, Baghdad, November 2005. See Section III.5, below, for further discussion concerning the Defense Office.

[85] Human Rights Watch interviews with private defense lawyers, Baghdad, October–November 2005. According to representatives of the RCLO, the RCLO was able to secure one apartment in the International Zone in November 2005 that could have been made immediately available. Human Rights Watch interview with RCLO representatives Baghdad, July 2006. Under the security conditions prevailing in Iraq, the RCLO was unable to safeguard defense lawyers living outside the International Zone, and they made this clear to the defense lawyers when the latter made their choices.

[86] The killings of al-Janabi and al-Zubeidi came at a time when militia activity was intensifying in Baghdad, and there were persistent rumors that "death squads" and secret detention facilities were being operated by the Ministry of Interior. The Ministry of Interior was frequently alleged to be dominated by the paramilitary forces of the Shi'a political party the Supreme Council of Islamic Revolution in Iraq (SCIRI). Subsequently, the Ministry of Interior was indeed found to be operating secret detention facilities, and there were continued reports of death squads operating from among the police force and the ministry. See, for example, "Widespread abuse of Iraqi prisoners and detainees by Iraqi police and commandos," in "All Things Considered," National Public Radio, July 12, 2005, 8:00 PM EST; John F. Burns, "If It's Civil War, Do We Know It?" *New York Times,* July 24, 2005; Peter Beaumont, "Revealed: Grim world of new Iraqi torture camps," *Observer* (London), July 3, 2005; Edward Wong and John F. Burns, "Iraqi Rift Grows As Secret Prison Enrages Sunnis," *New York Times,* November 17, 2005;

to relocate into the International Zone on the grounds that living there—the heart of the US presence in Iraq and the seat of the new government—compromised their perceived independence and their ability to defend their clients. For those lawyers who maintained a legal practice in Baghdad's ordinary courts, International Zone relocation also implied restrictions on their ability to continue their other legal work and an added risk of having to regularly enter and exit the International Zone. Defense lawyers further noted that, insofar as they feared violence from persons associated with the new government (such as Interior Ministry forces), living in the International Zone would not necessarily afford protection.[87]

After the November 2005 killing of al-Zubeidi, defense lawyers negotiated an arrangement with the Iraqi government and US advisors to the court under which defense lawyers would be provided weapons licenses to carry a sidearm themselves, and the Iraqi government would pay the salaries for three armed guards for each defense lawyer. The armed guards would be nominated by each defense lawyer and approved by the Ministry of Interior. However, in interviews with Human Rights Watch over several months, defense lawyers consistently complained that the salaries for the three armed guards were never provided by the Iraqi government. Some lawyers also experienced difficulties obtaining the weapons licenses, with delays in the processing of the paperwork. Because the armed guards went unpaid, those defense lawyers who did not have their own resources to keep up payments were forced to let the guards go, and rely instead on relatives to volunteer their time as guards. This appears to have been the case with Khamis al-Obeidi, whose relatives were unable to guard him 24 hours a day.

Human Rights Watch raised these concerns with US advisors to the court in March 2006, but the situation did not improve. No single official among the court staff or in the Iraqi government was given responsibility for ensuring that the security arrangement negotiated in November 2005 was properly implemented. Defense lawyers who raised the concern with the court were told to speak to the RCLO, but

Solomon Moore, "The Conflict in Iraq; Killings by Shiite Militias Detailed," *Los Angeles Times*, September 28, 2006; Ali Al-Fadhily and Dahr Jamail, "Government Death Squads Ravaging Baghdad," IPS News, October 19, 2006. See also "Iraq: End Interior Ministry Death Squads, Police Must be Held Accountable for Killings," Human Rights Watch news release, October 29, 2006, http://www.hrw.org/english/docs/2006/10/29/iraq14473.htm.

[87] Human Rights Watch interview with private defense lawyers, October 2005.

the RCLO was in no position to ensure that the Iraqi government met its commitment to pay the guards. As a result, and in light of the other serious administrative difficulties faced by the court, no effective follow up seems to have occurred.

RCLO officials did expend considerable effort to be able to give the private defense lawyers an undertaking that the deaths of al-Janabi and al-Zubeidi would be independently investigated by US investigators. However, due to the continuing deterioration of security conditions the investigation did not progress, and the murders of all three lawyers remain unsolved.[88]

After al-Zubeidi's killing, several Iraqi defense lawyers responded to the security risks by choosing to leave Iraq whenever the IHT was not in session. US advisors to the court facilitated this choice by providing secure transportation to and from Baghdad International Airport for those lawyers leaving Iraq between court sessions and returning for hearings. This transportation has so far been provided free of charge. Those defense lawyers who felt that they could not leave the country between court sessions—because they felt that they could not leave their homes unattended for fear of theft, or because they could not afford to take their families with them outside the country—were essentially left to make whatever security arrangements they could on their own.

On December 7, 2005, defense lawyers for all defendants submitted to the IHT trial chamber in open court a detailed, seven-page motion concerning security. The motion included a proposal for security arrangements that defense lawyers believed would adequately protect them and ensure their ability to fully participate in the trial. According to correspondence seen by Human Rights Watch, the presiding judge of the trial chamber referred the motion to the IHT president,[89] but no response was forthcoming. In failing to accept, reject, or rule on it in any way, the court effectively ignored this motion and the attached proposal.

A durable solution to the problem of security for private defense lawyers was not developed by the court over the course of the Dujail case. Insofar as the private defense

---

[88] Human Rights Watch interview with RCLO representatives, Baghdad, March 2006.

[89] Letter from Judge Rizgar Amin, dated December 7, 2005, viewed by Human Rights Watch on December 9, 2005.

lawyers for high-profile defendants in the Dujail case regarded relocation to the International Zone as unsafe and unacceptable, they were effectively left with one option: to relocate their families outside Iraq at their own cost, and return to Iraq for trial sessions. Such circumstances impose considerable practical constraints on the capacity of retained lawyers to conduct an effective defense, and are also an enormous disincentive for private Iraqi criminal lawyers to accept a high-profile defendant as a client. If the court fails to act decisively to develop security arrangements that regain the confidence of defense counsel in the court's capacity to protect them and all persons involved in the trial process, it is difficult to envisage how the court can ensure effective defense participation in current and future cases before the court.

Human Rights Watch has been informed that several lawyers who had accepted clients accused in the on-going Anfal trial withdrew from the case, on the grounds of personal security.

## 4. Outreach and Communications

Trials of a deposed political leadership for international crimes, applying international fair trial standards and international criminal law, are unprecedented in Iraqi history. All previous regime changes resulted in show trials for political crimes (such as the 1958-60 Mahdawi trials of leaders of the monarchical government), or summary executions and exile (1958, 1963, 1968). A countrywide qualitative interview study of Iraqi attitudes towards justice for the Ba'thist government revealed, on the one hand, some support for the idea of legal trials, and on the other, almost no knowledge about how trials under international criminal law, and applying international fair trial guarantees would work.[90] Understandably, among many sectors of the Iraqi population directly affected by human rights violations under the Ba'thist government, the desire for vengeance also ran high.[91]

Moreover, the ordinary legal system in Iraq deteriorated over three decades of authoritarian rule, when special or political courts were used to marginalize civilian courts. Fair trial guarantees found in the Iraqi Code of Criminal Procedure were

---

[90] See International Center for Transitional Justice and Human Rights Center, University of California at Berkeley, *Iraqi Voices.*
[91] Ibid, pp. 26–27.

regularly violated in practice. Even after the end of the Ba'thist government, and despite investment in judicial training and capacity building, felony trials in ordinary criminal courts monitored by Human Rights Watch are essentially summary in nature.[92]

In such an environment—and faced with defendants who are notorious and widely detested—public understanding of, and tolerance for, the need to uphold defendants' fair trial guarantees is likely to be low. In addition, the IHT is an entirely new institution within Iraq, with a unique set of procedures that mix Iraqi and international law. Understanding of the IHT Statute and IHT Rules is minimal beyond those individuals directly involved with the court. Indeed, after the commencement of the Dujail trial, there was intense public criticism of the court and the trial judges for not being sufficiently harsh with the defendants. Steps aimed at ensuring basic fair trial guarantees—such as postponing a hearing to ensure that a defendant's lawyer could be accredited—were vociferously condemned as excessive leniency in favor of defendants.[93] Even prior to the opening of the trial, a climate of hostile public opinion and a number of highly prejudicial comments made by political figures (see below, Section IV.1) threatened both the defendants' right to be presumed innocent and the ability of the court to preserve its appearance of impartiality.

Under such conditions, an effective outreach and communications strategy for the court is imperative. Outreach and communications are also essential if the trials are to have a "demonstration effect" in terms of educating the broader public about the content of a fair trial, and in order to enhance public comprehension of why the court behaves in the way it does. This comprehension may in turn help ameliorate an understandable frustration and impatience with the legal process.

In other national or national-international courts trying international crimes, such as the Special Court for Sierra Leone (the Special Court),[94] specific Outreach Units have

---

[92] As part of its research on torture in detention, Human Rights Watch conducted regular observation of felony trial proceedings at the Central Criminal Court of Iraq, Baghdad, during 2004–05.

[93] Human Rights Watch–ICTJ observer notes on Arabic-language press coverage in Baghdad, Iraq, December 2005 and February–March 2006. See below, Section IV.1., for further discussion of prejudicial comments made by public and political figures throughout the course of the Dujail trial.

[94] Human Rights Watch, *Bringing Justice: The Special Court for Sierra Leone – Accomplishments, Shortcomings, and Needed Support*, vol. 16, no. 8(A), September 2004, http://hrw.org/reports/2004/sierraleone0904/, p.33; *Justice in Motion*, p. 28.

been created at the inception of the court to help maximize public understanding and impact. These units have developed a variety of innovative and potentially far-reaching initiatives to enhance comprehension—and combat misperception—about their respective courts. For example, the Outreach Unit of the Special Court based outreach staff in Sierra Leone's provinces, where they tapped into local social networks to disseminate information about the court through workshops, trainings, and screenings of specially prepared video materials. These materials covered such issues as the role of the judge, the prosecutor, and the defense lawyer in a fair trial, and simple explanations of complex legal issues such as jurisdiction and challenges to the court's legal foundation.[95] The Special Court's Outreach Unit also undertook workshops to educate the Sierra Leonean legal profession about the court and its rules, helping overcome misperceptions and confusion about the court in this important local constituency.

While some of these measures may not be feasible in Iraq due to the severe security risks facing court personnel, the IHT has failed to devise and implement any kind of outreach strategy, or create a specific outreach unit staffed with the relevant expertise. The IHT's communications strategy has thus far consisted of only two basic activities: media briefings provided by the chief investigative judge as the court's spokesperson, and the televising of court sessions on a "gavel-to-gavel" basis.[96] Neither of these activities can be considered adequate to ensure widespread knowledge and understanding of the court in Iraq. The mere provision of media briefings to Iraqi media is unlikely to be effective if the media personnel have not benefited from workshops or trainings to familiarize them with court procedures, relevant principles of international criminal law and fair trials, or other essential background knowledge. Indeed, a member of the Iraqi media pool covering the IHT stated to an international trial observer that most of the Iraqi media pool reporters could not easily follow the legal terminology used in the trial, and had a limited grasp of key principles such as the role of the defense.[97] Similarly, televising of proceedings without disseminating

---

[95] Human Rights Watch, *Justice in Motion*, p. 29.

[96] The court televises trial sessions with a 20-minute delay to allow for deletion of sensitive information, or to edit out remarks by defendants that the court deems inflammatory or prejudicial to national security. The exact criteria applied when redacting the televised sessions are not publicly available, and it is unclear whether they are consistently applied. Closed sessions are not televised.

[97] ICTJ trial observation consultant report, March 28, 2006, paras. 68–88.

simple, accessible, and neutral explanations of the workings of the court and its laws may spread confusion as much as comprehension. Over the course of 2005 the IHT website was only intermittently updated and for much of 2006 the website did not function at all.

Furthermore, under the Iraqi legal system key documents such as indictments and records of court proceedings are not publicly posted.[98]

The role of the chief investigative judge as the court's spokesperson is also a matter of concern.[99] The IHT Statute requires that the spokesperson for the court be a judge or a prosecutor,[100] but casting either of these court personnel in such a role raises the risk that the perceived impartiality of the court will be diminished. A court spokesperson will be required not only to explain the actions of the court, but also at times to defend the court's decisions from criticism by defense lawyers, among others. Having a judge play this function is potentially in conflict with the need for judges to maintain the appearance of impartiality in their dealings with parties to a case. Similarly, appointing a prosecutor as spokesperson can create the impression that the judiciary and prosecution "speak with one voice." Several trial judges interviewed by Human Rights Watch stated their discomfort with the fact that a judge was acting as the court's spokesperson, on the grounds that judges should not make out-of-court statements to the media.[101]

The spokesperson's role was not consistently respected. Former presiding judge in the Dujail case Rizgar Amin gave an interview to the press while he was still a sitting judge in the case,[102] and an IHT judge complained to Human Rights Watch that some judges had taken to speaking directly to the media because the court lacked

[98] The IHT does not maintain verbatim transcripts of any session. For further discussion, see below, Section IV.3.c.

[99] A court spokesperson, who was not the chief investigative judge, was in fact appointed initially, but his tenure was short-lived. Because of concerns about his security, the spokesperson could not reveal his name and this proved unacceptable to journalists. The chief investigative judge, whose identity was already publicly known, then stepped into the gap. After the amendment of the statute of the court in September 2005, it became a requirement that the spokesperson be a judge or prosecutor.

[100] IHT Statute, art. 7(1)(f).

[101] Human Rights Watch interviews with IHT judges, Baghdad, November 2005 and February–March 2006.

[102] Interview by the Arabic-language *Al-Hayat* newspaper (London) with Judge Rizgar Amin, December 21, 2005 (summary on file with Human Rights Watch).

sufficient communications expertise.[103] The chief prosecutor regularly spoke to the media concerning such matters as the scheduling of trial sessions.

In a meeting with the then-president of the IHT in March 2006,[104] Human Rights Watch raised its concerns about both the lack of any outreach strategy, and about the role of the chief investigative judge as court spokesperson. The president of the IHT stated his view that the IHT's efforts at communicating information about the court and the trial were more than sufficient, arguing that the Iraqi people were sufficiently knowledgeable about legal matters to comprehend the working of the court. He also saw no difficulties in respect of having the chief investigative judge as court spokesperson. According to a representative of the RCLO, the position of an outreach coordinator has been advertised but had not been filled as of October 2006.[105]

## 5. IHT Defense Office

A fundamental component of a fair trial is "equality of arms." Equality of arms refers to the principle that every party must be afforded a reasonable opportunity to present his or her case under conditions that do not place the party at a substantial disadvantage vis-a-vis the opponent.[106] This includes not only equality in presenting arguments, but also equality in being able to present evidence. In international or mixed national-international courts the prosecution typically has the benefit of considerable international assistance and expertise, including forensic analysts, military analysts, international legal experts, and experienced investigators and prosecutors. While such a level of prosecution resources is necessary if the prosecution is to meet its burden of proving guilt for massive crimes, it has been increasingly recognized that an effective defense of such cases also requires significant institutional, logistical, investigative, and legal support. One mechanism by which this support can be provided is through the creation of a Defense Office, which is an independent office within the court that endeavors to strengthen defense

---

[103] Human Rights Watch interview with IHT judge, Baghdad, March 2006.

[104] Human Rights Watch interview with IHT president, Baghdad, March 2006. The president of the court died in June 2006 while undergoing surgery, and has been replaced by another Appeals Chamber judge.

[105] Human Rights Watch interview with RCLO representative, Baghdad, October 2006.

[106] European Commission of Human Rights, *Kaufman v. Belgium* (App. 10938/84); (1986) 50 DR 98, p. 115; European Court of Human Rights, *Foucher v. France* (App. 22209/93), Judgment of 18 March 1997; (1998) 25 EHRR 234, para. 34.

capacity in various ways. For example, the Defense Office of the Special Court for Sierra Leone maintains a list of qualified counsel to represent accused who cannot afford legal assistance; advocates with the court administration and judges to ensure that defense lawyers (both privately retained and court-funded) have the necessary resources to prepare a defense; hires defense investigators to inquire into factual issues relevant to an accused's defense; and participates in regular discussions with court management concerning the needs of defense counsel.[107]

Bosnia's War Crimes Chamber has a Criminal Defense Support Section (known by its Bosnian acronym OKO), headed by an experienced international defense lawyer, which forms part of the administrative and management structure of the War Crimes Chamber's Registry. As well as providing logistical and administrative support to all defense counsel, the OKO also engages in intensive training and capacity-building for Bosnian lawyers participating in trials before the War Crimes Chamber. The OKO manages the accreditation of lawyers seeking to appear before the War Crimes Chamber, in part to ensure that the lawyers have the necessary training and expertise. It also maintains five regionally-based teams that provide assistance to individual Bosnian lawyers defending persons indicted by the chamber. The assistance provided includes helping with the preparation and presentation of legal arguments, and the hiring of expert consultants if necessary.

There is a profound need for a Defense Office fulfilling these kinds of functions at the IHT. As previously noted, the Iraqi legal system has never before undertaken trials of this scope or complexity, and Iraqi lawyers have been isolated from the rapid development of international criminal law over the last 15 years. Yet contesting cases under the IHT's substantive jurisdiction requires a deep knowledge of international criminal law and international law more generally, as well as knowledge of modern investigative techniques and methods. The RCLO sought to build this capacity among IHT prosecutors and judges, including tens of millions of dollars worth of investigative assistance and substantial training programs. However, private Iraqi defense lawyers were not incorporated into these training programs, and no expert legal or investigative assistance was made available in the lead-up to the Dujail trial. Hence, the degree of inequality of arms between the prosecution and the defense—

---

[107] Human Rights Watch, *Bringing Justice*, pp. 21–28; *Justice in Motion*, pp. 15–17; *Looking for Justice*, pp. 22–23.