> Judge: I don't do that, this is not a special court, I am not prosecuting you without fulfilling my conscience, I won't issue a sentence on 148 within one hour, I am not this type.[233]

(As noted in the Introduction to this report, whether the 148 men and boys charged over Dujail actually all stood trial is uncertain. The official record says 148 were tried and convicted, but a document dated July 5, 1987, and addressed by Saddam Hussein's son-in-law, Hussein Kamel, to Saddam Hussein states that 46 of the 148 accused had already died in detention by the time they were referred to trial. Another document produced in court in the Dujail trial was an extract of a court verdict from 1986 against an interrogator who had worked on the Dujail case and who had been convicted of misconduct. This document also stated that 46 persons died during interrogation, and that the interrogators sought to conceal the deaths for fear of reprimand.)

On May 15, 2006, the judge refused to allow defendants all to be present when defense witnesses gave evidence. For example, when a witness for defendant Ali Dayeh Ali gave evidence, the judge did not allow the other defendants to be present. This did not appear to be based on any misconduct by the other defendants, and no reasons were given. This continued for another trial day before the judge changed his mind, without explanation. Similarly, also on May 15, in a seemingly erratic manner, the judge refused to allow a defense lawyer to question his own witness, but later in the day permitted it without explanation. On May 24 the judge refused to allow defense lawyers to direct any questions to defense witness Tariq Aziz, exclaiming that "the defense team's aim is to insult the court,"[234] although defense lawyers had not yet had a chance to pose any questions to Aziz before the judge reached this view. After the lunch recess, the judge reversed himself and permitted Aziz to be recalled for questioning, but with no explanation as to why he had disallowed questioning in the first place.

---

[233] Human Rights Watch–ICTJ trial observation notes, June 5, 2006.

[234] Human Rights Watch–ICTJ trial observation notes, May 24, 2006.

Dockets.Justia.com

On June 12, 2006, the judge entered into an exchange of insults with defendant
Barzan al-Tikriti before ordering the latter's removal from the chamber. Al-Tikriti had
complained that witnesses for him were scared to come forward to testify:

> Judge: Afraid of Whom? Ghosts?

> Al-Tikriti: Afraid of the terrifying court.

> Judge: You're terrifying!

> Al-Tikriti: No, you're terrifying!

> Judge: Why do you always have to be the hero? Get him out of here.[235]

On June 13, 2006, the judge derided a member of Saddam Hussein's defense team
from the United States, Curtis Doebbler. When Doebbler rose to object to the closing
of the defense case, the judge was observed to sneer at him and said (in Arabic),
"We know his purpose. He comes here to hear his own voice and claim that he is an
international lawyer."[236] On July 24, during the closing statement for Barzan al-Tikriti,
the judge exclaimed to al-Tikriti, "Since you were a child, you were drowned in
blood."[237] On July 26 the judge stated to defendant Saddam Hussein (whose lawyers
were boycotting the closing sessions of the trial after the June assassination of their
colleague Khamis al-Obeidi—see Section III.3, above), "Where are your lawyers? They
incite violence, they took millions [of dinars] from Iraq and now they are outside Iraq.
They are not lawyers, they incite violence."[238] On July 27 the judge called 'Awwad al-
Bandar "stupid" as he ordered him to resume his seat, after al-Bandar tried to
interject in the reading of a defense statement on his behalf by a court-appointed
Defense Office lawyer.

---

[235] Human Rights Watch-ICTJ trial observation notes, June 12, 2006.

[236] Cited in "Judge Declares End to Hearing of Defense Witnesses in Saddam Trial," Associated Press, June 14, 2006.

[237] Human Rights Watch–ICTJ trial observation notes, July 24, 2006.

[238] Human Rights Watch–ICTJ trial observation notes, July 26, 2006.

While none of these statements compels the conclusion that the judge was in fact biased against the defendants, they do not reflect well on the court's appearance of impartiality. At the very least, these outbursts suggest that relations between the presiding judge and the defendants and their retained lawyers had become so poisoned that the judge had considerable difficulty detaching his own feelings towards some of them from the conduct of the case.[239]

## 7. Conduct of Defense Counsel

The observed performance of Iraqi defense counsel—whether privately retained or appointed by the Defense Office—was generally poor. The absence of any training or instruction in international criminal law was evident in the failure of defense counsel to raise or discuss any relevant international criminal law principles during the course of the trial.[240] As already noted, defense lawyers were not provided with international criminal law texts in Arabic until several months into the trial. Given that a trial of this kind was entirely outside the experience of Iraqi criminal lawyers, and in the absence of any attempt to build capacity through training, it is unsurprising that Iraqi defense counsel floundered. The observed level of preparation by private defense counsel and Defense Office counsel for questioning of witnesses was also poor, although this could in part be attributed to same-day disclosure of witness names and same-day notification of which witnesses would testify.

Some private defense counsel seemed more concerned to make political statements through their questioning of witnesses than to serve the interests of their clients by addressing the substance of the case against them. Combined with the tactic of boycotting proceedings (discussed below), the result was that it was difficult to discern any coherent defense case developed by private defense lawyers for each defendant, either factually or legally: no consistent and identifiable argument as to why the prosecution case was wrong or flawed was developed.

---

[239] See, for example, the discussion in *Kyprianou v. Cyprus* (App. 73797/01), Judgment of 15 December 2005, paras. 129-131, in which the European Court of Human Rights found that the "emphatic language" used by judges in response to a contemptuous remark by defense counsel in a criminal case contributed to the conclusion that the judges had become "personally embroiled" in the case.

[240] As noted above, the Defense Office lawyers did make substantive international criminal law arguments during the closing statements for the defendants, but these arguments were written on behalf of the Defense Office lawyers by the Defense Office's international advisor, and thus do not reflect the underlying capacity of the Defense Office counsel.

The use of boycotts became a common practice among some privately retained counsel.[241] Iraqi law requires that lawyers practicing in Iraqi courts must be respectful towards the court and not obstruct the course of justice or cause unreasonable delays.[242] The Iraqi code of legal professional ethics states that lawyers must appear in court on the set dates, should not try to delay the resolution of a case, and must facilitate the task of the judge.[243] In the Dujail case, the defendants' lawyers' statement that they would boycott the case unless certain demands were met (such as the resignation of the new presiding judge) would appear to contravene their professional obligations under Iraqi law. It is also difficult to envisage a situation in which it would advance the interests of the lawyers' clients. The repeated threat and use of the tactic created the strong impression that some counsel deliberately sought to delay or obstruct the course of the trial. This tactic in fact greatly diminished the ability of privately retained counsel to raise legitimate and serious procedural concerns that did persist in relation to the trial.

During the course of the defense case, private defense lawyers for Saddam Hussein were accused of procuring the perjury of four defense witnesses.[244] The witnesses had testified on May 30 and 31, 2006. Two had claimed that the chief prosecutor in the Dujail case had tried to bribe them into giving false testimony against Saddam Hussein. Another claimed that some of the individuals alleged by the prosecution to have been executed were in fact alive and living in Dujail, while the fourth witness claimed that a person whom he believed to be the chief prosecutor had attended a celebration in Dujail marking the anniversary of the assassination attempt against Saddam Hussein and that some attendees at that anniversary celebration had taken responsibility for the assassination attempt. The witnesses were detained after the end of the court hearing on May 31 on suspicion of perjury, and were interrogated by an investigative judge in the presence of court-appointed counsel. They are alleged to have confessed to having knowingly fabricated their testimony due to threats and inducements by one of Saddam Hussein's defense counsel, who allegedly had

---

[241] Privately retained counsel for Ali Dayeh Ali and for 'Abdullah Kadhim Ruwayid and Mizher 'Abdullah Kadhim Ruwayid did not participate in the boycotts to the same extent.

[242] Law of the Legal Profession, No. 173 of 1965, art. 50.

[243] Lawyer's Professional Code of Conduct, June 16, 1987 (annexed to the Law of the Legal Profession), art. 9.

[244] "Four witnesses in Saddam trial held," Associated Press, June 1, 2006.

coached them on what to say.[245] Defense lawyers for Saddam Hussein claimed that the witnesses had been assaulted and detained incommunicado and that their confessions to perjury were coerced.[246] The witnesses' confessions were read in court in the Dujail trial on June 5. Human Rights Watch has been unable to independently investigate the allegation that the detained witnesses were coerced into confessing perjury, but the confessions raise grave concerns about serious professional misconduct on the part of the implicated defense counsel.

The Defense Office lawyer appointed to represent Dujail defendant Muhammad 'Azzawi in September 2005 did not meet with his client before the opening of the trial, nor for a month after it opened.[247] The court-appointed Defense Office lawyer failed to appear, without prior notice, on at least two occasions,[248] and in all the sessions observed between October 2005 and January 29, 2006, the court-appointed Defense Office lawyer asked no questions. The role of Defense Office lawyers was dramatically enlarged upon the first boycott of the privately retained defense lawyers, which commenced on January 29, 2006, and lasted for three sessions (February 1, 13 and 14).[249] On the first day that Defense Office lawyers were brought in to replace boycotting private counsel, the lawyers asked no questions of any of the three witnesses who testified for the prosecution. In the next three sessions, the Defense Office lawyers became more active, and did ask relevant questions, but generally showed little evidence of preparation. For example, when the former head of the Office of the President, Ahmed Hussein Samarra'i, gave evidence concerning the workings of that office—a critical issue in terms of identifying reporting lines of information and establishing what defendant Saddam Hussein knew about the abuses committed against residents of Dujail—the Defense Office lawyers did not ask a single question of the witness.[250] On the same day, the

---

[245] Paul Schemm, "Key Saddam Witnesses Say They Were Bribed, Coerced," Agence France-Presse, June 12, 2006. The perjury cases against the four witnesses appear to have been referred to ordinary Iraqi criminal courts for prosecution, and Human Rights Watch is unaware of the status of these cases.

[246] Sinan Salaheddin, "Saddam Defense Protests Witnesses' Arrests," Associated Press, June 5, 2006.

[247] Human Rights Watch interview with Defense Office lawyers, November 2005.

[248] November 28, 2005, and March 13, 2006.

[249] For a discussion of the relevant legal principles governing circumstances in which the court can impose lawyers against the will of defendants, see Human Rights Watch, *The Iraqi High Tribunal and Representation of the Accused*, February 2006.

[250] Human Rights Watch–ICTJ trial observation notes, February 13, 2006.

court read the 23 witness statements into the court record without notice (mentioned above). No objection was raised by any Defense Office lawyer, although some of the witness statements pertained to the acts of individual defendants. When asked by Human Rights Watch why they did not object to the reading of the statements, a Defense Office lawyer responded that they did not wish to risk a reprimand from the judge.[251]

---

[251] Human Rights Watch-ICTJ trial observation notes, February 13, 2006. The fear of antagonizing the court was underlined by another Defense Office lawyer interviewed by Human Rights Watch in October 2006: The lawyer noted that the Defense Office lawyers were dependent on the court for their security, and were for that reason reluctant to do anything that might incur the hostility or ire of the court. Human Rights Watch interview with Defense Office lawyer, Baghdad, October 2006.

## V.  Substantive Concerns

The brutality of the former Ba'thist government in Iraq was notorious, but the internal functioning of the "bureaucracy of repression" has not been systematically examined and documented. One of the significant incidental outcomes of attempting to establish individual criminal responsibility for systematic human rights violations is that, in order to link an accused individual with the crime, it is usually necessary to carefully reconstruct the functioning of the "criminal system" in which the individual acted.

The scale of criminal conduct implied in crimes such as crimes against humanity usually means that the "underlying acts" of the crime—mass killing, forced displacement, mass arrests—will be difficult to deny. However, attributing individual criminal responsibility for these acts further up the chain of political and military responsibility can be complicated by the fact that "system crimes ... are generally characterized by a division of labour between planners and executants, as well as arrangements in structure and execution that tend to make connections between these two levels difficult to establish."[252]

The challenge of successfully prosecuting individuals who are alleged to be "planners" is that describing the events of the crime ("crime-base") will generally not be enough: it will be necessary to "elucidate the elements of the operation of the machinery"[253] by showing how political and security institutions regularly functioned, to whom information flowed as a matter of course, and what was known or reasonably knowable to those higher up in the system. Unless the orders or instructions given were patently criminal on their face,[254] this kind of evidence is essential to showing that an accused person knew and intended that the criminal acts would be committed by persons under his or her control or acting in conjunction with him or her. Proving knowledge and intent is necessary to prove that an accused person is individually liable for a criminal act.

---

[252] Office of the High Commissioner for Human Rights, *Rule-of-Law Tools for Post-Conflict States: Prosecution Initiatives* (United Nations, New York and Geneva, 2006), p. 12.

[253] Ibid.

[254] An example of such an order would be "torture all detainees," or "kill all men and boys."

Based on our review of the dossier of evidence in the Dujail case, and our observation of proceedings, Human Rights Watch is concerned that neither the investigative judge nor the prosecution in the Dujail case paid sufficient attention to gathering evidence that would prove the required kinds of knowledge and intention on the part of the defendants in the Dujail case to commit the crimes alleged. In particular, the case against the senior defendants was marred by a striking lack of "linkage evidence." That is, an almost total lack of evidence establishing:

- the legal and practical authority of the numerous security organizations and political institutions implicated in the events at Dujail;
- structures of command and internal organization of these security organizations and political institutions;[255]
- the internal reporting lines and flows of information within these organizations, and how information could be expected to flow to individual defendants;
- the general context of human rights practices (such as the systematic use of torture) and violence by security organizations; and
- the nature of the historical relationship between the political institutions (such as the Office of the President and the Revolutionary Command Council) and the legal institution (the Revolutionary Court) implicated in the crime.

The absence of these kinds of evidence diminishes the persuasiveness of the prosecution case, because it makes it harder to establish that the high-level defendants knew or had reason to know that crimes would be committed as a result of orders that might have been legal on their face, or in the absence of explicit orders at all. These kinds of evidence are generally essential to reconstruct the political context

---

[255] The doctrine of judicial notice has been applied by international criminal courts to permit judges to take notice of certain laws and public documents as "facts of common knowledge." It might have been permissible for the IHT trial chamber to take judicial notice of Iraqi laws establishing the legal authority and structure of some political institutions and security organizations implicated in the events at Dujail. However, the practical functioning and exercise of authority by these organizations and institutions would still have to be established by evidence. Moreover, the court would still have to inform the prosecution and defense teams in respect of what exactly it intends to take judicial notice, so that both sides have an opportunity to comment or object. Judicial notice cannot be taken of a fact that would amount to an essential element of a crime, such as the intent and knowledge (*mens rea*) of the accused. The prosecution did not invite the court to take judicial notice of any facts not in evidence. See *Prosecutor v. Semanza*, Case No. ICTR-97-20, Decision on the Prosecutor's Motion for Judicial Notice and Presumptions of Facts Pursuant to Rules 94 and 54, Nov. 3, 2000; *Prosecutor v. Karemera*, Case No. ICTR-97-24, Decision on Prosecutor's Interlocutory Appeal of Decision on Judicial Notice, June 16, 2006, para. 47; *Semanza v. Prosecutor*, Judgment (Appeals Chamber), para. 192; *Prosecutor v. Fofana*, SCSL, Decision on Appeal Against "Decision on Prosecution's Motion for Judicial Notice and Admission of Evidence", May 16, 2005, paras. 28-31 and separate concurring opinion of Justice Robertson, para. 16.

in which the crimes took place, thus allowing the credible inference that senior political figures authorized, or had an unspoken agreement approving, the crimes.

## 1. Relevant Legal Principles

The defendants were charged uniformly with committing murder, torture, forced displacement, and unlawful imprisonment as a crime against humanity under article 12 of the IHT Statute.[256] A crime against humanity is defined in the IHT Statute as "any of the following acts [in this case, murder, torture, forced displacement, and unlawful imprisonment] when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack." A person has the necessary intention to commit a crime against humanity when he or she has the intention to commit the underlying act[257] (for example, murder), and when he or she knows that there is an attack on the civilian population and that his or her acts form part of that attack.[258]

---

[256] As noted in Section IV.2, above, these charges were expanded without notice to include enforced disappearance and other inhumane acts intentionally causing great suffering, after the close of the prosecution case. For the purposes of this discussion, the original charges will be considered.

[257] The elements of each underlying offense must also be proved. Thus, a person charged with murder as a crime against humanity must have had the necessary intention and engaged in the necessary acts constituting the offense of murder, namely: an act or omission by the accused (or person for whom the accused has criminal responsibility) causing the death of the victim, and done with the intention to kill or cause serious injury. *Prosecutor v. Blagojevic and Jokic*, ICTY, Case No. IT-02-60, Judgment (Trial Chamber), January 17, 2005, para. 556; *Prosecutor v. Brdjanin*, ICTY, Case No. IT-99-36, Judgment (Trial Chamber), September 1, 2004, paras. 381–382.

A person charged with torture as a crime against humanity must have had the intention to commit torture, and know that his or her act forms part of an attack on a civilian population. Torture occurs under international criminal law when there is the intentional infliction, by act or omission, of severe pain or suffering, whether physical or mental. The act or omission must aim at obtaining information or a confession, or at punishing, intimidating or coercing the victim or a third person, or at discriminating, on any ground, against the victim or a third person. *Prosecutor v. Kunarac et al.*, ICTY, Case No. IT-96-23&23/1, Judgment (Appeals Chamber), June 12, 2002, para. 142.

Forcible displacement of a population occurs under international criminal law when there is an intentional relocation or removal of persons from the territory in which they lawfully reside, involuntarily and without grounds permitted under international law. Relocation or removal is involuntary if it is the result of threat of force or coercion. *Prosecutor v. Simic et al.*, ICTY, Case No. IT-95-9, Judgment (Trial Chamber), October 17, 2003, para. 125.

Unlawful imprisonment occurs under international criminal law where an individual is deprived of his or her liberty without legal basis and with the intention by the accused (or persons for whom the accused bears criminal responsibility) of arbitrarily depriving the person of his or her liberty, or in the reasonable knowledge that his or her act or omission is likely to cause the arbitrary deprivation of physical liberty. *Simic*, para. 64.

[258] See *Kordic and Cerkez*, Judgment (Appeals Chamber), para. 99.

Because of the vagueness of the notice of charges (as discussed above, Section IV.2), it is unclear what "mode of responsibility" is alleged against each of the defendants.[259] However, based on the prosecution's in-court statements, it seems to be that the four senior defendants (Saddam Hussein, Barzan al-Tikriti, Taha Yassin Ramadan, and 'Awwad al-Bandar) were accused of having committed a crime against humanity by participation in a "joint criminal enterprise." The four lower-level defendants ('Abdullah Kadhim Ruwayid, Mizher 'Abdullah Kadhim Ruwayid, 'Ali Dayeh 'Ali, and Muhammad 'Azzawi[260]) appear to have been accused of "aiding and abetting" a crime against humanity by naming suspected Da'wa Party members to the then-minister of interior on July 8, 1982, and allegedly leading security forces to the homes of some individuals, who were then arrested, and some of them later executed.

A "joint criminal enterprise" is a means of committing[261] the crime alleged, namely, a crime against humanity. It is a "theory of liability" that, if its elements are proved, means that an accused is individually responsible for the underlying crime (the elements of which must also be proved). There are three kinds of joint criminal enterprise in international criminal law:[262] "basic," "systemic," and "extended." Only the "basic" and "extended" forms are relevant to the events concerning Dujail.[263]

A "basic" joint criminal enterprise exists where all co-perpetrators, acting pursuant to a common criminal purpose, possess the same criminal intention.[264] For example, participants in a joint criminal enterprise formulate a common plan to kill and each of them has the intent to kill, although each may carry out a different role. An "extended" joint criminal enterprise entails a situation where there is a common

---

[259] Article 15(2) of the IHT Statute sets six modes of responsibility: direct commission; ordering, soliciting or inducing; facilitation, assistance or aiding and abetting; joint criminal enterprise; incitement (for genocide only); and attempting.

[260] In its closing statement, the prosecution recommended the acquittal of 'Azzawi.

[261] *Prosecutor v. Kvocka et al.*, ICTY, Case No. IT-98-30/1, Judgment (Appeals Chamber), February 28, 2005, para. 91.

[262] *Prosecutor v. Vasiljevic*, ICTY, Case No. IT-98-32, Judgment (Appeals Chamber), February 25, 2004, para. 96; *Kvocka*, Judgment (Appeals Chamber), para. 82.

[263] "Systemic" joint criminal enterprise is applied to "an organized system of ill-treatment. An example is extermination or concentration camps, in which the prisoners are killed or mistreated pursuant to the joint criminal enterprise [of running the camp]." *Vasiljevic*, Judgment (Appeals Chamber), para. 98.

[264] *Vasiljevic*, Judgment (Appeals Chamber), para. 97

criminal purpose, but additional crimes outside the common criminal purpose are a natural and foreseeable consequence of carrying out the common purpose.[265]

The *criminal intent* that must be shown to prove guilt as a member of a "basic" joint criminal enterprise is the individual's intention to perpetrate a certain crime (for example, murder, torture, or displacement), with this intent being shared by all other co-perpetrators.[266] The criminal intent that must be shown to prove guilt as a member of an "extended" joint criminal enterprise is an intention to participate and further the common criminal purpose of a group. Responsibility for a crime other than one that was part of the common design arises if it was foreseeable that such a crime might be perpetrated by another member of the group, and the accused willingly took that risk.[267] The intention of the accused can be determined either by manifest evidence, or by inference, where the inference of the accused's intention is the *only reasonable inference* from the evidence.[268] The fact that an accused holds a command role does not give rise to the presumption that he or she knew about the criminal acts of subordinates.[269]

The *acts* that must be established to prove guilt as a member of a joint criminal enterprise are the same irrespective of whether it is a "basic" or "extended" joint criminal enterprise. It must be proved that: a plurality of persons were involved; there was a common design or purpose involving the commission of a prosecutable crime; and the accused actually participated in this common design or purpose.[270] The "common design or purpose" to commit the crime (in this case, a crime against humanity) need not be express, but can be an unspoken understanding inferred from the fact that a plurality of persons *acted in unison* to effect the criminal purpose.[271] However, an unspoken understanding among the members of the joint criminal enterprise should only be inferred if it is the *only reasonable inference* from the

[265] *Kvocka*, Judgment (Appeals Chamber), para. 83.

[266] *Vasiljevic*, Judgment (Appeals Chamber), para. 101.

[267] Ibid.

[268] Ibid., paras. 129–132.

[269] *Blaskic*, Judgment (Appeals Chamber), para. 62.

[270] *Kvocka*, Judgment (Appeals Chamber), para. 96.

[271] *Vasiljevic*, Judgment (Appeals Chamber), paras. 108–9.

evidence.[272] "Participation" in the common plan or purpose does not require physical perpetration of any of the underlying acts of the crime (such as murder or torture), but may take the form of assistance or contribution.[273]

## 2. Lack of 'Linkage' Evidence Relating to Knowledge and Intention

The documentary evidence collected by the investigative judge clearly establishes the parameters of the "underlying acts" constituting a crime against humanity: large-scale and prolonged arbitrary detention of a civilian population; torture and harsh conditions in detention leading to numerous deaths; and a summary trial followed by execution of over 100 individuals. Where the documentary evidence is largely silent is in respect of proving either an explicit or unspoken common purpose among senior defendants to commit these crimes, and that each defendant knowingly committed acts in furtherance of the common criminal purpose of committing a crime against humanity. It is here that expert and other evidence concerning the structure, internal organization, and past practice of the Ba'thist government security and political apparatuses was necessary to fill in the gaps and show the links between the "crime-base" and the leadership. "Linkage" evidence can be provided by experts in the politics, history, or military affairs of the country concerned, who can provide detailed contextual information to show how the individual accused fits into a chain of command, how his or her authority was exercised, and what level of knowledge he or she may be expected to have in the circumstances. In the Dujail case, no such expert evidence was presented.

The importance of compiling evidence that addresses the state of knowledge and intent of the defendants can be illustrated by considering the key documents relied upon by the prosecution to make its case against Saddam Hussein. The evidence collected by the investigative judge established that, in the immediate aftermath of the assassination attempt, Saddam Hussein ordered an investigation. The precise parameters of the order were never established by the evidence. On October 14, 1982, the Revolutionary Command Council issued an order, signed by Saddam Hussein, authorizing the expropriation of lands in Dujail for the purposes of an "agricultural

[272] *Brdjanin*, Judgment (Trial Chamber), para. 353.

[273] *Prosecutor v. Krnojelac*, ICTY, Case No. IT-97-25, Judgment (Appeals Chamber), September 17, 2003, para. 31; *Kvocka*, Judgment (Appeals Chamber), para. 263.

redevelopment" project and requiring compensation to be paid to the expropriated (except for certain persons detained in relation to the assassination attempt).[274] On May 27, 1984, Saddam Hussein signed a document referring the cases of 148 individuals accused of involvement in the assassination attempt[275] to trial before the Revolutionary Court;[276] the referral was based upon the recommendation of legal advisors who reviewed a 361-page dossier of evidence compiled against the 148 individuals. The decision of the Revolutionary Court, convicting all 148 individuals and sentencing them to death by hanging, was issued on June 14, 1984, and on June 16, 1984, Saddam Hussein signed an order ratifying the death sentences.[277] The death sentences appear to have been implemented in March 1985. The haste with which the accused persons were tried and convicted, and with which the death sentences were ratified, clearly raises real suspicions that the process was no more than part of a de facto plan to carry out extrajudicial executions.

However, no evidence was presented from which the intent and state of knowledge of Saddam Hussein could be discerned or inferred in relation to these actions. The critical issue to be resolved in deciding whether this amounted to committing a crime against humanity is whether Saddam Hussein knew and intended that referring 148 persons to the Revolutionary Court would result in their conviction and execution. In the absence of direct incriminating evidence that Saddam Hussein and Revolutionary Court judge 'Awwad al-Bandar expressly colluded with each other, evidence establishing that Saddam Hussein had knowledge about the way in which the Revolutionary Court functioned or that he directly controlled its proceedings would be needed. One would expect this evidence to set out the structure and actual functioning of the Revolutionary Court, its legal and practical relationship with the Office of the President, its legal and practical non-independence from the policies and will of the president, and its historical treatment of persons alleged to be a

---

[274] The order refers to a list of names of these individuals appended to the order, but the list was not attached to the order produced in court.

[275] The accused persons referred to the Revolutionary Court were charged under articles 156 and 175(2) of the Iraqi Penal Code of 1969, which criminalize intentional attempts to violate the independence, unity or security of Iraq.

[276] The power of the then-president of Iraq to refer to the Revolutionary Court cases concerning threats to the internal or external security of the state was provided for in Revolutionary Command Council Decision No. 1016 of August 1, 1978, promulgated in *Al-Waqa'i al-Iraqiya* No. 1096 of August 14, 1978.

[277] For the evident contradiction between the official record of 148 accused having been tried and sentenced, and reports that up to 46 had already died in custody prior to the trial, see Section IV,6.b, above.

"security threat" against the state. As a corollary, to prove that former Revolutionary Court judge 'Awwad al-Bandar was guilty of participating in a joint criminal enterprise to murder persons from Dujail, evidence establishing that he knowingly acted in furtherance of the then-president's criminal plan or policy must be shown. One way of showing this would be to demonstrate that the Revolutionary Court (along with other exceptional courts in Iraq under the former Ba'thist government) regularly acted as an extension of state policy and its judges were not independent of the then-president. Thus, in the famous *Altstotter Case* before the Nuremberg Tribunal, certain judges who worked in Nazi Germany's legal system were held criminally responsible for certain judicial decisions implementing National Socialist laws because the judges were proved to have knowingly and deliberately contributed towards the effectuation of a criminal plan of racial persecution directed by the Nazi Party and the state. As part of proving its case, the prosecution in *Altstotter* traced the degeneration of the German legal system under Nazism and the corrosion of judicial independence, and showed how the defendant judges had a history of taking instructions from the Nazi leadership in regard to specific cases.[278]

Neither the investigative judge nor the prosecution gathered any evidence concerning these issues. The laws creating the jurisdiction of the Revolutionary Court, its procedures, the methods of appointing its judges, and other relevant information were never put before the IHT trial chamber. The history of the use of special and exceptional courts by the former Ba'thist government to effect state policy, which was extensive, was also not the subject of evidence. These absences suggest that neither the investigative judge nor the prosecution had an adequate grasp of what international criminal law requires to be proved in order to convict a person accused of a crime against humanity, in the context of these actions.

In a similar vein, no evidence was presented concerning the structure and internal organization of the several governmental institutions and security apparatuses that

---

[278] *The Trial of Josef Altstotter and Others*, United States Military Tribunal at Nuremberg, 17 February to 4 December 1947, reported in *Law Reports of Trials of War Criminals* (Buffalo, NY: W.S. Hein & Co., 1997), Vol. VI, pp. 1-110. The investigative judge and the prosecution in the Dujail case focused on the unfairness of the trial before the Revolutionary Court, and the evidence indeed suggests that the trial was summary and highly unfair. However, subjecting a person to an unfair trial is not listed as one of the underlying acts that can amount to a crime against humanity under article 12 of the IHT Statute. As the court in *Altstotter* pointed out, showing arbitrary behavior by the judge in the courtroom is not sufficient; rather it must be proved that the arbitrary behavior amounted to participation in a criminal policy or plan. Ibid., p. 81.

played a role in the events concerning Dujail, and what the leaders of these various institutions knew or could have been expected to know concerning the actions of their subordinates. For example, the Ba'th Party's "Popular Army" militia was alleged to have played a role in the response to the assassination attempt against Saddam Hussein, by arresting suspects and delivering them to the custody of the General Intelligence Directorate and the General Security Directorate (*Mudiriyyat al-Amn al-'Amm*) and in subsequently razing orchards in Dujail.[279] Taha Yassin Ramadan was the national commander of the Popular Army, and appears to have been accused of having command responsibility[280] for the acts of the Popular Army in Dujail. Yet no evidence was ever presented concerning the command structure of the Popular Army, the actual and legal authority of Ramadan as commander, who were his subordinates or who had actual command of the Popular Army in Dujail, and what the reporting lines were between Ramadan and his subordinates. Ramadan was also alleged to have been a member of an ad hoc committee comprising representatives of security agencies that was responsible for coordinating the response to the assassination attempt at Dujail, but the powers, membership, and structure of this committee were never the subject of any evidence.

Important political organs such as the Revolutionary Command Council, the National Security Council, and the Office of the President all appear to have played a role in the response to the assassination attempt at Dujail. However, the membership, powers, and internal organization of these political organs was not the subject of any evidence, making it impossible to determine whether, for example, a report submitted to the National Security Council concerning the fact that nearly 800 persons from Dujail had been detained[281] would have come to the attention of Saddam Hussein, Taha Yassin Ramadan, or Barzan al-Tikriti. The paths through which information flowed from the security apparatus to the political leadership, and

---

[279] The wanton destruction of property is not one of the underlying crimes that can form part of a crime against humanity under article 12 of the IHT Statute. Hence, it is puzzling that the prosecution focused mostly on Ramadan's alleged role in supervising the razing of the orchards in Dujail, as even if this was proved, it would not amount to a crime against humanity unless it was proved to be part of the crime of persecution—something with which Ramadan was never charged.

[280] Due to the vagueness of the charges, it is unclear whether Ramadan was in fact alleged to have had command responsibility for the acts of the Popular Army, or whether he was primarily accused of being a participant in the joint criminal enterprise of the leadership group.

[281] Report from then-Minister of Interior Sa'doun Shaker to the National Security Council, dated December 28, 1982, stating that 393 men over age 19 and 394 women and children from Balad and Dujail were in detention.

the kinds of information that could be expected to reach the political leadership about the security apparatuses' response to Dujail, were not part of the evidence compiled by the investigative judge.

The systematic use of torture in interrogation in Iraq, and the history of disproportionate violence on the part of the former Ba'thist government's security forces, was also never the subject of any evidence. If the use of torture and excessive force can be shown to be a common practice by security forces, and has been previously brought to the attention of the political leadership (for example, by reports submitted by human rights nongovernmental organizations or through the human rights organs of the United Nations), it becomes harder for senior government officials to claim that they did not know that torture would occur under interrogation by personnel of the intelligence and security agencies.

In respect of the four lower-level defendants, charged with "aiding and abetting" crimes against humanity in Dujail, no evidence was presented concerning their state of knowledge and their intent when allegedly participating in the arrest operations. In order to be found guilty of "aiding and abetting," an accused must be proved to: know that the acts he or she is committing will assist in the commission of the specific crime by the principal;[282] be aware of the essential elements of the crime including the principal's intention to commit the crime;[283] and be aware that one of a number of crimes will probably be committed, and one of those crimes is in fact committed.[284] Thus, the lower-level defendants in the Dujail case (who were charged with aiding and abetting murder, torture, forced displacement, and unlawful imprisonment as a crime against humanity) must be shown to have known that their acts would assist in the commission of murder, torture, forced displacement, and unlawful imprisonment; have been aware of the principals' intention to commit these crimes; and have been aware that one of the crimes will probably be committed. Neither the investigative judge nor the prosecution produced evidence relevant to proving these issues: for example, no evidence addressing the question of whether the lower-level defendants knew or reasonably would have known that

---

[282] *Blaskic*, Judgment (Appeals Chamber), para. 45.

[283] *Prosecutor v. Aleksovski*, ICTY, Case No. IT-95-14/1, Judgment (Appeals Chamber), March 24, 2000, para. 162.

[284] *Blaskic*, Judgment (Appeals Chamber), para. 50.

their acts would assist in the commission of murder or torture or other crimes was ever introduced. Indeed, during their interrogation by the investigative judge, the defendants were not even questioned about what they knew or believed would happen to those individuals who were arrested during the aftermath of the assassination attempt in Dujail.[285]

Overall, the case prepared by the investigative judge in relation to the events in Dujail in 1982 suffered from important gaps in terms of the kinds of evidence necessary to prove intent, knowledge, and criminal responsibility on the part of the defendants. When preparing the case, it appears that neither the prosecution nor the investigative judge paid sufficient attention to the requirements of what must be proved under international criminal law in order to establish specific, individual criminal responsibility of each defendant for the abuses that were committed against the people of Dujail.

Some of the evidentiary gaps may also be explained by the intense pressure placed on the IHT by the Iraqi government to move forward with a trial of Saddam Hussein as early as possible.[286] According to a judge with knowledge of internal deliberations of the IHT trial chamber, when the Dujail case was first referred to trial in July 2005, the trial chamber judges found the dossier of evidence to be insufficient to move forward with a trial and remitted it to the investigative judge for further investigation.[287] The investigative judge appealed, and the Appeals Chamber, under what the judge described as "intense political pressure,"[288] ruled that the trial should proceed.

---

[285] Statement of 'Abdullah Kadhim Ruwayid Fandi al-Mashaikh, February 21 and 28, 2005; Statement of Ali Dayeh Ali al-Zubeidi, May 5, 2005; Statement of Mohammad 'Azzawi 'Ali al-Marsumi, April 27 and June 1, 2005; Statement of Mizhir 'Abdullah Kadhim Ruwayid Fandi al-Mashaikh, February 21 and 28, 2005.

[286] Over the course of 2004 and 2005, senior figures in the Iraqi government made numerous statements demanding that the trial of Saddam Hussein start quickly, or promising that the trial was imminent. See "Talabani: Saddam to Stand Trial within Two Months", *Al-Sabah al-Jadeed*, June 1, 2005, as reported in Institute for War and Peace Reporting, *Iraqi Press Monitor*, No. 253, October 1, 2005; "Barzani Calls for Speedy Trial for Saddam," *Al-Mutamar*, June 8, 2005, as reported in Institute for War and Peace Reporting, *Iraqi Press Monitor*, No. 258, October 1, 2005; "Speed Up Saddam's Trial, Allawi Tells Court," Reuters, August 16, 2004; "Former Saddam Henchmen to Face Trial from Next Week: PM," Agence France-Presse, December 15, 2004; "Iraqi FM Hopes for Saddam Trial by Year's End," Agence France-Presse, June 21, 2005; "Iraqi leader says judges wasting time on Saddam case," *AFX News Ltd*, June 24, 2005; and "Talabani: Saddam likely to face trial soon," Associated Press, May 31, 2005.

[287] Human Rights Watch Interview with IHT judge, Baghdad, March 2006.

[288] Ibid.

## VI. The Role of International Advisors

The institutional design of the IHT makes the non-binding advice of international advisors the principal mechanism to address the underlying lack of capacity of the Iraqi legal system in respect of trying international crimes. The IHT Statute envisages advisors in each of the branches of the court—judicial, prosecutorial, and defense[289] (but not the administration)—as an alternative to direct participation of international personnel. In reality, the RCLO has been the only source of international advisors to the investigative judges and the prosecution, and the RCLO has frequently been forced to step in and resolve gaps left by the poor administration of the court (such as witness protection and defense counsel security). As a result, the already significant role of the RCLO[290] expanded to the oversight of key logistical and administrative requirements for the conduct of the Dujail trial. As one IHT judge put it, the RCLO functioned at times as the "executive authority" of the IHT.[291]

Apart from RCLO personnel, only two other individuals have been appointed as advisors to the court: one to the IHT trial chamber during the Dujail trial, and the other to the IHT Defense Office from April 2006. Both of these individuals have very significant experience and expertise in international criminal law and procedure, and do appear to have had some impact in preventing even more serious defects in the trial than those documented in this report. Ultimately, however, advisors have not been able to correct or prevent the significant fair trial concerns that arose over the course of the trial.[292]

A further concern with relying on advisors as the only mechanism for international expertise is the lack of transparency concerning the extent of the advisors' role. As previously noted, the closing statements for the Defense Office lawyers in the Dujail trial (the privately retained defense lawyers then staging a boycott) were substantially

---

[289] See above, Section II, "Background."

[290] See Human Rights Watch, *The Former Iraqi Government on Trial,* p. 17.

[291] Human Rights Watch interview with IHT judge, Baghdad, November 2005.

[292] The advisor to the trial chamber has left the court and no replacement for him has yet been found, leaving the trial chamber in the Anfal trial currently without a non-RCLO international advisor.

written by the Defense Office international advisor. When some defendants made this claim in court, the presiding judge flatly denied it. The court's false denial creates the unfortunate impression that the court is trying to hide or conceal the advisor's role, and encourages the perception that the advisors "stage manage" the proceedings.

A direct and significant role by international personnel is to be welcomed and encouraged, but must be transparent. Advisors have proven a poor substitute for direct international involvement as co-counsel, judges, and administrators, such as occurs in the War Crimes Chamber for Bosnia-Herzegovina.[293]

The lack of other non-RCLO advisors can be attributed to several factors. The cost of maintaining an advisor (who stays at either the UK or US Embassy) runs between US$20,000 and $70,000 per month, and European governments other than the UK have not provided significant financial assistance to the IHT because of the likelihood that the court will apply the death penalty in its sentencing (all EU donor countries are abolitionist). Another factor appears to be the reluctance to be involved in what is perceived as a US-dominated process. Any international personnel directly assisting the IHT will be heavily dependent on the RCLO and the US military to facilitate their entry and exit from Iraq, and to provide logistical support (and potentially accommodation) while in Iraq. No entity with an arms-length relationship from both the US and Iraqi government currently serves as the practical vehicle for channeling, managing, and supporting potential international assistance to the IHT.[294] Given the serious problems in the administration of the court, the IHT administration has no capacity to directly manage and support international advisors.[295] Indeed, the then-president of the IHT generally declined to make written requests for further international advisors, even though as president he had primary

---

[293] International involvement in the War Crimes Chamber is subject to a planned phase-out over several years, to ensure both that sufficient expertise is available to conduct trials that meet international standards, *and* that local ownership is achieved over time. See Human Rights Watch, *Looking for Justice*, p. 7.

[294] The International Bar Association was the nongovernmental organization that provided some training support to the IHT judges and facilitated the recruitment of the non-RCLO trial chamber advisor. However, the advisor, once recruited, depends on the US and UK Embassies for day-to-day support in Iraq.

[295] This can be contrasted with the Registry of the War Crimes Chamber of Bosnia-Herzegovina, which is "internationalized" through the appointment of experienced international staff persons as registrar and in other key posts such as witness protection and head of the defense office. The Registry oversees the recruitment and management of international staff, and is also the recipient of donor funds for the court as a whole. The international personnel of the Registry are then gradually phased out once the institution is able to function effectively and has gained the confidence of donors.

responsibility for authorizing advisors to assist the court.[296] Finally, the grave and deteriorating security conditions in Baghdad over the course of 2005 and 2006 have deterred potential international advisors.

---

[296] IHT Statute, arts. 7(2), 8(9), 9(7).

## VII.  Death Penalty

Human Rights Watch opposes the death penalty as an inherently cruel and inhumane punishment. As noted above, the death penalty will be widely applicable for crimes tried before the IHT.[297] Human Rights Watch expresses its grave concern that article 27(2) of the IHT Statute makes the carrying out of death sentences handed down by the tribunal mandatory, by prohibiting the commutation of death sentences by any government official. The mandatory application of the death penalty, without any opportunity for clemency, directly violates Iraq's human rights obligations under the ICCPR. Article 6(4) of the ICCPR states that "anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases." The Iraqi constitution provides that the President of the Republic is required to ratify death sentences before they are implemented,[298] and thus the IHT Statute's prohibition on amnesty or commutation appears to infringe upon the constitutional authority of the president.

Article 27(2) also requires that a sentence be executed no later than 30 days after a final decision is handed down. This creates the possibility that a person charged in several cases can be tried, convicted, and executed for one of those cases before any other cases are subject to public trial, and as such is likely to deprive victims, witnesses, and the Iraqi people as a whole of the opportunity to conclusively establish which individuals were legally responsible for some of the worst human rights violations in Iraq's history. The execution of convicted individuals while other charges are pending against them means that there may never be a public accounting of the evidence for and against them in relation to these events.

---

[297] See note 39, above, concerning the history of the application of the death penalty in Iraq after 2003.

[298] Constitution of Iraq, art. 72(h).

# VIII. Conclusion

This report has documented serious procedural flaws in the IHT's conduct of the Dujail trial. These included:

- government actions that undermined the independence and perceived impartiality of the court;
- a failure to ensure adequately detailed notice of the charges against the defendants;
- numerous shortcomings in the timely disclosure of incriminating evidence, exculpatory evidence and important court documents;
- violations of the defendants' basic fair trial right to confront witnesses against them; and
- lapses of judicial demeanor that undermined the apparent impartiality of the presiding judge.

The court's conduct, as documented in this report, reflects a basic lack of understanding of fundamental fair trial principles, and how to uphold them in the conduct of a relatively complex trial. The result is a trial that did not meet key fair trial standards. Under such circumstances, the soundness of the verdict is questionable. In addition, the imposition of the death penalty—an inherently cruel and inhumane punishment—in the wake of an unfair trial is indefensible.

Apart from the conduct of the trial itself, this report has shown that the IHT as an institution has struggled to competently perform administrative functions that are essential to a fair and effective trial. The tribunal lacks a functioning outreach program, a competent witness protection program, and a Defense Office that could effectively ensure a vigorous defense for the accused. Some of these administrative failings have been exacerbated by the sharp deterioration in the security environment from 2004, but poor security conditions do not adequately explain the deficiencies in the functioning of the court. Rather, the facts gathered by Human Rights Watch point to a fundamental lack of capacity on the part of administrators, judges, prosecutors, and defense lawyers. Some of the failings of the court highlighted in this report, such as

the complete absence of an outreach and communications strategy, are now much harder to correct due to the security situation, but the court failed to take the opportunity to develop a program when security conditions were more permissive.

The concerns documented in this report point to the need for significant reforms in the structure and functioning of the IHT if it is to have a real chance of conducting subsequent trials that are fair and credible. The current design of the IHT is not conducive to effective international assistance in the conduct of the trial. The court's structure needs to be revised to ensure international participation at all levels, and the creation of an effective and independent court administration to oversee the integrity of the institution as a whole. In the absence of these reforms, the credibility of the IHT as an independent, fair, and effective judicial institution is fundamentally doubtful.

## IX.   Recommendations

### To the Iraqi Government

- Desist from using article 4(4) of the IHT Statute to remove or relocate sitting trial judges. All questions of bias must be left to the Appeals Chamber of the IHT pursuant to its rules.
- Discourage statements by government officials and political figures concerning the guilt or innocence of defendants before the IHT, concerning the courtroom conduct of judges, or concerning the substance of any ongoing trial.
- Discourage statements by government officials that could in any way be seen as attempts to bring public pressure on the IHT and its judicial decision making.
- Uphold security arrangements agreed upon by government officials with the IHT and private defense lawyers, regarding the provision of salaries for armed guards for defense lawyers.

### To the Iraqi Parliament and the IHT

- Revise the IHT Statute to permit individuals with experience in international criminal trials to participate directly in the trial process as judges, co-prosecutors and co-defense counsel, alongside Iraqi personnel.
- Revise the IHT Statute to create the Administrative Department as an independent entity, led by an individual experienced in managing complex criminal trials and judicial institutions, and tasked with servicing the requirements of the defense as well as the prosecution and judiciary.
- Revise the IHT Statute to reduce the administrative role of the president of the court.
- Revise the IHT Statute to delete article 4(4) of the IHT Statute and to amend article 33 concerning former membership of the Ba'th Party. Dismissal of judges on the grounds of former membership of the Ba'th Party should only occur after an individualized assessment of the past conduct of the judge, that assessment to be undertaken by the disciplinary procedures established under the IHT Statute.

- Revise the IHT Statute to remove the requirement that a judge or prosecutor be a spokesperson for the court.
- Abolish the death penalty.

## To the IHT

- Immediately institute an outreach program administered by a person with expertise in communications.
- Establish a protocol for communications with private defense counsel, and devise methods of verifying delivery of documents and motions, while taking into account difficulties faced by counsel in reaching the court offices out of court sessions.
- Develop training programs for administrative staff.
- Recruit an experienced professional in witness protection to develop and manage a comprehensive witness protection program.
- Institute a protocol for due diligence in the review of evidence and documents held by the court, to ensure thorough and complete disclosure of exculpatory evidence under the IHT Rules.
- Supervise disclosure of evidence by the prosecution to minimize or avoid late or same-day disclosure of incriminating evidence.
- Ensure timely disclosure of witness identities to the defense.
- Develop a reasoned approach to the application of in-court protective measures.
- Appoint an official, with necessary support staff, responsible for ensuring security arrangements for defense counsel. Develop and implement a comprehensive and well supervised security plan for defense counsel.
- Respond to motions concerning fundamental procedural issues in a timely manner and with reasons.
- Institute a practice of maintaining a verbatim written transcript of court proceedings, to be disclosed on a regular basis to all parties to the case.
- Develop a practice of regularly scheduling status conferences well before the beginning of the trial to objectively assess the readiness of both sides for trial, and issue scheduling orders setting out a timetable for hearing.
- Ensure the proper legibility and adequate organization of the dossier of evidence when provided to the defense, and ensure disclosure of defendants' interrogation statements to the defense.

- Institute intensive and ongoing training for Defense Office lawyers in international criminal law and procedure. Appoint an experienced international criminal lawyer as an advisor to the head of the Defense Office.
- Ensure the provision of logistical and other administrative support to private defense lawyers, through the Defense Office.

## X.  Acknowledgments

This report was written by Nehal Bhuta, Arthur Helton fellow with the International
Justice Program at Human Rights Watch. The report was researched by staff of the
Middle East and North Africa Division of Human Rights Watch, and Nehal Bhuta.
Legal research was provided by Daniel Ulmer, a consultant to the International
Justice Program. Hugh Sandler, an intern with the International Justice Program,
provided additional legal research. The report was edited by Richard Dicker, director
of the International Justice Program, and Ian Gorvin, consultant in the Program Office.
Legal review was conducted by Aisling Reidy, senior legal advisor. Daniel Ulmer,
Hannah Gaertner, associate in the International Justice Program and Andrea Holley,
director of publications, prepared the report for publication.

Human Rights Watch sincerely appreciates the cooperation afforded to its
researchers by judges and officials of the IHT, prosecutors, Defense Office lawyers
and private defense lawyers. Human Rights Watch also thanks advisors to the IHT
and staff of the Regime Crimes Liaison Office for their cooperation.

A deep debt is owed to Miranda Sissons and Marieke Wierda, senior associates with
the International Center for Transitional Justice, New York, and a consultant for ICTJ,
for extensive sharing of information and research.

HUMAN RIGHTS WATCH
350 Fifth Avenue, 34ᵗʰ Floor
New York, NY 10118-3299

www.hrw.org

# HUMAN RIGHTS WATCH

# Judging Dujail

## The First Trial before the Iraqi High Tribunal

The Iraqi High Tribunal (IHT) has the daunting task of bringing to justice those responsible for grave human rights violations committed in Iraq under the Ba'thist Government. But at the same time, the court is a newly-created institution in a recently-reconstituted legal system, in which lawyers and judges were isolated from developments in international criminal law and had no experience in investigating and trying complex international crimes. The capacity of the IHT to fairly and effectively prosecute international crimes has been questioned since its creation under the U.S.-led occupation.

Based on 12 months research and observation, and dozens of interviews with judges, prosecutors, defence lawyers and other key actors, Human Rights Watch's report provides the most comprehensive analysis of the first trial conducted by the IHT, for crimes against humanity committed against the Iraqi town of Dujail in 1982. The report documents serious administrative, procedural and substantive legal defects in the conduct of the case.

The picture that emerges from this report is of an institution struggling with all aspects of conducting these legally and factually complicated trials, and also beset by external problems: misunderstanding and hostility in public opinion, and from political leaders; grave and increasing security threats to all participants; a bitterly divided legal profession; and, a deepening reluctance by other international actors to assist the process. These limitations have meant that, in the Dujail trial, the court has not met essential fair trial standards and the credibility of the trial process is doubtful. The report proposes root-and-branch reforms to the IHT to enable it to meet the challenge of delivering justice for massive human rights violations.



*Abdullah Kadhim al-Ruwayid, a defendant in the Dujail trial, addresses the first trial chamber of the Iraqi High Tribunal as Chief Judge Ra'uf Abdel Rahman gestures in the foreground, while former Iraqi president Saddam Hussein looks on: February 13, 2006 in Baghdad, Iraq.*

© 2006 Getty Images