in terms of institutional support, expertise and training, and infrastructure—is potentially considerable.[108] A robust and well resourced Defense Office, with international advisors, would be one way to redress this imbalance.

The Rules of Procedure provide for the creation of a Defense Office that could potentially play a role similar to those at the Special Court and the War Crimes Chamber.[109] However, the poor implementation of these provisions has meant that, in fact, the IHT Defense Office has not realized this potential, and functions essentially as a "legal aid" office for indigent accused. The picture is one of disarray in terms of recruitment and training, and fraught relations between private counsel and Defense Office lawyers, with the latter reluctant to provide any assistance or support to non-Defense Office defense lawyers.

A director for the Defense Office was not appointed until early September 2005[110]— six weeks prior to the start of the Dujail trial—and the Defense Office came into existence around the same time. Two other Iraqi lawyers were appointed to it shortly after that. These three lawyers participated in two training sessions in international criminal law in September 2005. One of the Defense Office lawyers was appointed to represent defendant Muhammad 'Azzawi in the Dujail proceedings, but did not meet with his client for at least a month after the opening of the trial.[111]

When private defense lawyers for the Dujail defendants threatened to boycott the trial after the assassinations of Sa'doun al-Janabi and Adel al-Zubeidi, an additional

---

[108] As noted above (see Section II), Saddam Hussein, Barzan al-Tikriti, and Taha Yassin Ramadan privately retained non-Iraqi defense counsel. However, apparently only one of Saddam's non-Iraqi lawyers, US attorney Ramsey Clark, has international criminal trial experience (he has defended individuals before the International Criminal Tribunal for Rwanda). The Dujail trial chamber did not provide legal-quality translation for non-Arabic-speaking lawyers such as Ramsey Clark, and was generally reluctant to allow him to speak in court. For example, on December 5, 2005, the court initially declined to hear Clark on the grounds that he did not speak Arabic, and then changed its mind. Overall, the poor quality of translation meant that his ability to follow proceedings was impeded. Under these conditions, non-Arabic-speaking, non-Iraqi lawyers with direct experience in defending international criminal cases are effectively precluded from directly participating in defending the accused. In the first days of the Anfal case, the court has ruled orally that non-Iraqi lawyers cannot have a speaking role in court.

[109] IHT Rules of Procedure and Evidence, rule 30. This provides that the director of administration shall establish a Defense Office and appoint a director for the office from among the lawyers working for the office. The director of the Defense Office serves at the pleasure of the director of administration, who may remove the Defense Office director "at any time." The Defense Office is mandated to provide legal counsel to accused persons who cannot afford counsel, to appoint a lawyer on a temporary basis to persons in detention who have not yet appointed a lawyer, and to provide "the required facilities to enable the lawyer in preparing his defense."

[110] Human Rights Watch interview with Defense Office lawyer, Baghdad, November 2005.

[111] Human Rights Watch interview with Defense Office lawyer, Baghdad, November 2005.

Dockets.Justia.com

five Iraqi defense lawyers were recruited by the Defense Office in October and November 2005. These lawyers were recruited to act as "stand-by counsel" in the event that the private defense lawyers failed to appear in court, and were given copies of the dossier of evidence. However, because they were recruited only a few weeks before the trial was to resume, they were not provided with any training in international criminal law. The threatened defense boycott of the court session of November 28, 2005, did not materialize, but in December six of the Defense Office lawyers resigned en bloc because their names had been inadvertently revealed to the media by a court official.[112] To replace them new lawyers were recruited, but these also did not have the opportunity to undergo training in international criminal law before a January 2006 boycott by the private defense lawyers led the trial court to appoint the new Defense Office lawyers as counsel for the defendants until their own counsel returned to court.[113] When Human Rights Watch interviewed the Defense Office lawyers again in March 2006, they stated that they had not yet received further training, and that they did not have access to international criminal law judgments in Arabic.[114]

Human Rights Watch's concerns about the in-court performance of Defense Office lawyers are detailed below (see Section IV.7), but it is clear that the Iraqi lawyers staffing the office have not had adequate training in substantive international criminal law, or in the relevant aspects of the fair trial procedure that should underpin any international criminal law prosecution. It appears that the Defense Office was eventually given a compact disc containing Arabic translations of key international criminal law judgments in May or June 2006. However, by their own admission, the Defense Office lawyers did not read these judgments. Indeed, it would be unrealistic to expect the lawyers to become conversant with judgments that are often hundreds of pages long, and which concern criminal laws not

---

[112] Human Rights Watch interview with Defense Office lawyers, Baghdad, February 2006.

[113] Human Rights Watch interview with Defense Office lawyers, Baghdad, February 2006. The Defense Office lawyers were imposed on the defendants against their will. For our concerns about the imposition of lawyers against the will of the accused, see Human Rights Watch, *The Iraqi High Tribunal and Representation of the Accused*, February 2006, http://hrw.org/backgrounder/mena/iraq0206/.

[114] Human Rights Watch interview with Defense Office lawyers, Baghdad, March 2006. The RCLO undertook the translation of over 12,000 pages of international criminal law judgments from English to Arabic. These were provided to judges of the court in December 2005.

previously contained in Iraqi law, in the absence of formal instruction and some guidance.

It is noteworthy that the closing statements for the defendants read by Defense Office lawyers in July 2006 (after another boycott by private defense lawyers) did contain extensive reference to and discussion of the relevant international criminal law principles. However, Human Rights Watch has determined that these statements were written not by the Defense Office lawyers but by international advisors to the IHT. The statements were drafted in English, translated into Arabic, and provided to the Defense Office lawyers to read aloud in court—indicating the underlying lack of capacity among the Defense Office lawyers themselves.[115]

The Defense Office has not hired any investigators to work on behalf of defendants in the Dujail trial or any other trial before the IHT.[116] The Defense Office also does not provide logistical, administrative, or other support to privately retained defense lawyers.[117] In interviews over several months, the director of the Defense Office reiterated his view that the Defense Office did not, and would not, have a role in supporting or assisting the private defense lawyers in the Dujail case.[118] Other Defense Office lawyers emphatically seconded this view, arguing that the role of the Defense Office is to assist court-appointed lawyers only. They also stated that they preferred to keep their distance from the private defense lawyers out of concern for their own security.[119]

---

[115] The advisor told Human Rights Watch that he had provided international criminal law references to the Defense Office lawyers as part of his assistance with the closing statements. However, Defense Office lawyers confirmed Human Rights Watch's conclusion that the advisor had written the text of the closing statements. Human Rights Watch interviews with Defense Office lawyers, Baghdad, July and September 2006.

[116] While the investigative judge is under an obligation to seek out exculpatory evidence, this does not necessarily mitigate the need for defense investigators in lengthy and complex criminal cases. For example, in the Dutch trial of two former Afghan military officers for torture committed in Afghanistan in the 1980s, the court authorized an investigator to travel to Afghanistan on behalf of the defense to collect evidence to present to the investigative judge. See Human Rights Watch, *Universal Jurisdiction in Europe: The State of the Art*, vol. 18, no. 5(D), June 2006, http://hrw.org/reports/2006/ij0606/, pp. 17–18. It is noteworthy that the Bosnian War Crimes Chamber's Criminal Defense Support Section, which functions in a civil law system, also facilitates the hiring of defense investigators.

[117] One exception to this was the attempt by an international advisor to the Defense Office to provide legal assistance to privately retained lawyers.

[118] Human Rights Watch interviews with Defense Office director, Baghdad, November 2005 and February–March 2006.

[119] Human Rights Watch interviews with Defense Office lawyers, Baghdad, November 2005 and March 2006.

Relations between Defense Office lawyers and private defense lawyers deteriorated further after January 2006 when the Defense Office lawyers were brought into court to replace the boycotting private lawyers. The private defense lawyers filed a complaint with the Iraqi Bar Association, arguing that the payment arrangements between Defense Office lawyers and the IHT amounted to a "salary," and this violated the Iraqi Law of the Legal Profession.[120] The Iraqi Bar Association demanded that the IHT disclose to it the identity of the Defense Office lawyers, but the court declined to do so.[121] These divisive developments have resulted in little or no professional interaction between the Defense Office lawyers and the privately retained lawyers.

The Defense Office premises are located in the same building as the IHT's administrative offices, and thus Defense Office lawyers do not have the difficulties in gaining access to the court administration encountered by private lawyers. However, when Human Rights Watch visited the premises of the Defense Office in November 2005, it found the accommodations to be very basic: one office with three desks and two computers with no internet connection, shared among seven lawyers. Defense Office lawyers complained consistently that the IHT had not allocated resources to improve the facilities available to them, and that they had no administrative or secretarial support. On subsequent visits to the Defense Office premises in July 2006 Human Rights Watch found no improvement in the conditions and indeed observed that the office no longer had computers.

No security arrangements were in place for Defense Office lawyers at the opening of the Dujail trial in October 2005. When Human Rights Watch interviewed the Defense Office lawyers in November 2005 and February and March 2006, they stated that they had been offered relocation into the International Zone after the killing of Sa'doun al-Janabi, but living accommodation had still not been made available. The Defense Office lawyers noted that while the court was in session they stayed in the International Zone, but when the court adjourned for a recess the lawyers left the International Zone without secure transportation.[122] Their homes also remained

---

[120] Human Rights Watch interview with Defense Office lawyers, Baghdad, March 2006.

[121] The Iraqi Bar Association itself was reportedly plagued with governance problems, and its governing officers were alleged by many lawyers to be corrupt and strongly supportive of the former Ba'thist government.

[122] Human Rights Watch interviews with Defense Office lawyers, Baghdad, February–March 2006.

unprotected. Like the private defense lawyers, Defense Office lawyers were also given the option of being licensed to carry a handgun, and handguns were issued to them in mid-February 2006.[123] Also, like the private defense lawyers, the Defense Office lawyers were given the option of nominating three guards, to be approved by the Ministry of Interior and paid for by the Iraqi government. According to the Defense Office lawyers, some of them had one or two nominated guards approved by the Ministry of Interior, but none of the approved guards' salaries had been paid.[124]

The Defense Office lawyers complained that, despite repeated requests to the court's administration to improve their security arrangements, the court was not responsive and the Defense Office lawyers asked the RCLO to intercede.[125] The RCLO responded by taking up the issue directly with the Prime Minister's Office, which has responsibility for allocating secure apartments within the International Zone. Representatives of the RCLO noted that the waiting list for accommodation within the International Zone runs to 1,500 families but they continued to press the issue with the Prime Minister's Office.[126] When Human Rights Watch again interviewed Defense Office lawyers in July 2006 they stated that apartment accommodation had recently become available in the International Zone and that some had been able to relocate to these apartments with their families.[127]

Rule 30(6)(a) and (b) of the IHT's Rules of Procedure and Evidence permit the director of administration to appoint an international advisor to the Defense Office. The advisor is required to have experience and expertise in "international war crimes trials."[128] An international advisor was not appointed to the Defense Office until mid-April 2006. The advisor appointed had considerable experience as an investigator with international criminal tribunals, but was not a lawyer. He appears to have made a good faith effort to offer assistance to the private defense lawyers during the Dujail trial, but over some time private defense lawyers became reluctant to accept his

---

[123] Human Rights Watch interviews with Defense Office lawyers, Baghdad, February 2006.

[124] Human Rights Watch interviews with Defense Office lawyers, Baghdad, July 2006.

[125] Human Rights Watch interviews with Defense Office lawyers, Baghdad, March 2006.

[126] Human Rights Watch interview with RCLO representatives, Baghdad, July 2006.

[127] Human Rights Watch interview with Defense Office lawyers, Baghdad, July 2006.

[128] IHT Rules of Procedure and Evidence, rule 30(6)(b).

assistance on the grounds that the international advisor was regarded as serving the interests of the RCLO (which played a role in his recruitment).[129] Private defense lawyers accused the advisor of talking to defense witnesses *ex parte* and without the permission of the defense lawyers.

---

[129] Human Rights Watch interview with private defense lawyers, Baghdad, September 2006.

## IV.  Procedural Concerns in the Conduct of the Trial

Based on its extensive monitoring of trial sessions, and its interviews with key actors in the trial process, Human Rights Watch has identified a number of serious procedural concerns that, cumulatively, significantly diminished the fairness of the Dujail trial.

The Republic of Iraq ratified the International Covenant on Civil and Political Rights (ICCPR) in 1976, and all successor governments remain bound by it. Article 14 of the ICCPR provides that any person charged with a criminal offense is entitled to "a fair and public hearing by a competent, independent and impartial tribunal established by law."[130] A "fair trial" under the ICCPR means that a person being tried for a criminal offense must be guaranteed, at a minimum, the following rights:[131]

- To be presumed innocent until proved guilty according to law;[132]
- To be informed of the charges against her/him in detail and promptly, in a language she/he understands;
- To have adequate time and facilities for the preparation of a defense and communication with counsel of her/his own choosing;
- To be tried without undue delay; to be tried in her/his own presence, and to defend her/himself in person or through legal counsel of her/his own choosing;
- To examine witnesses against her/him and be able to obtain the attendance and examination of witnesses on her/his behalf, under the same conditions as the prosecution;
- Not to be compelled to confess guilt or incriminate her/himself;
- To be able to appeal to a higher tribunal against conviction and sentence.[133]

---

[130] International Covenant on Civil and Political Rights (ICCPR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force March 23, 1976, art. 14(1).

[131] Ibid., art. 14(3)(a)-(g).

[132] Ibid., art. 14(2).

[133] Ibid., art. 14(5).

These basic fair trial guarantees apply irrespective of whether the legal system of the country conforms to an adversarial model (such as in the United States or the United Kingdom) or an inquisitorial model (such as in Iraq). They are the minimum requirements for a trial to be considered "fair" in international law.

The procedural flaws identified by Human Rights Watch over the course of the Dujail trial undermine several of these fair trial guarantees, including: the right to an independent and impartial tribunal; the right to be presumed innocent; the right to be promptly informed of charges against the accused; the right to adequate time and facilities to prepare a defense; and the right to examine witnesses against the accused.

## 1. Concerns Affecting the Independence and Impartiality of the IHT and the Presumption of Innocence

A basic element of a fair trial is that the court conducting the proceedings be independent from interference by litigants, the political branches of government, or any other source. Critical determinants of the independence of a court are the laws and procedures governing the appointment of judges, the conditions governing the transfer and cessation of their functions, and the "actual independence of the judiciary from the executive branch and the legislative."[134] The UN Basic Principles on Independence of the Judiciary require that procedures for the suspension, removal or disciplining of a judge be determined in accordance with established standards of judicial conduct and be subject to independent review.[135]

The IHT Statute declares the "complete independence"[136] of the court, and the statute and rules contain judicial procedures governing the disciplining of a judge for misconduct,[137] and concerning the recusal of a judge where there is an allegation of

---

[134] UN Human Rights Committee, General Comment 13, Article 14 (Twenty-first session, 1984), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, UN Doc. HRI\GEN\1\Rev.1 (1994), para. 3. The Human Rights Committee monitors the implementation of the ICCPR.

[135] Basic Principles on the Independence of the Judiciary, adopted by the Seventh United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Milan, 26 August to 6 September 1985, U.N. Doc. A/CONF.121/22/Rev.1 at 59 (1985).

[136] IHT Statute, art. 1(1).

[137] IHT Statute, arts. 4–6.

bias.[138] The Iraqi constitution also guarantees the independence of judges in the exercise of their functions.[139]

However, the IHT Statute contains two provisions—articles 4(4) and 33—that are open to abuse, and have in fact been abused to seriously undermine the independence of the court by the transfer or suspension of judges in the midst of ongoing trials.

Despite specific provisions governing the suspension and dismissal of judges for misconduct,[140] article 4(4) of the IHT Statute allows the Council of Ministers (the Prime Minister and Cabinet) to transfer a judge from the IHT to the Higher Judicial Council "for any reason." While a judge so transferred does not lose his status as a judge, he is removed from any role in adjudicating cases before the IHT and may also lose certain privileges associated with being an IHT judge, such as secure accommodation in the International Zone.

Article 33 of the IHT prohibits any person who belonged to the Ba'th Party from holding any position within the court. However, it does not specify any procedures for investigating whether a court employee was a member of the Ba'th Party, or which governmental institution is responsible for enforcing this provision. A de facto "pause" in the applicability of article 33 meant that former Ba'th members were in fact appointed to the IHT, although they remain vulnerable to dismissal should the article be enforced. Membership of the Ba'th Party was a prerequisite for admission to judicial training under the former government, and does not necessarily imply that the member was a supporter of the Ba'th Party or the government of Saddam Hussein, so former membership of the Ba'th Party, without regard to rank or extent of participation, is unlikely of itself to be sufficient to render a person unfit for office with the IHT.

The susceptibility of judicial personnel to dismissal at any time is a threat to the independence of the IHT. It creates the possibility that judges who belonged to the Ba'th Party may be selectively dismissed or threatened with dismissal. Any

---

[138] IHT Rules of Procedure and Evidence , rules 7–8.

[139] Constitution of Iraq (as adopted by referendum on October 15, 2005), art. 88.

[140] IHT Statute, arts. 5–6.

procedure for the dismissal of judges must preserve the independence of judicial personnel, for example by considering their performance on an individual basis, and with avenues for review against a dismissal decision. Article 33 is also at variance with the general rules for de-Ba'thification applied by the National De-Ba'thification Commission (NDBC), which render persons holding any of the top four levels of Party membership potentially ineligible for government employment.[141]

In July 2005 the NDBC relied on article 33 to seek the dismissal of over 20 personnel from Iraqi courts, including judges. On that occasion the dismissals were avoided only due to the direct intervention of Iraqi President Jalal Talabani and then-Prime Minister Ibrahim al-Ja'fari. But in January 2006 the NDBC intervened again, this time in relation to a judge sitting on the Dujail case. After the resignation of the first presiding judge in the Dujail case (discussed below), the next most senior judge on the trial chamber, Judge Saeed al-Hammashi, was to take over as presiding judge. However, before Judge al-Hammashi could continue hearing the case in January, the NDBC demanded his removal on the grounds that he was previously a Ba'th Party member. Judge al-Hammashi denied the charge, and in November 2006 the NDBC notified Judge al-Hammashi that the case against him had been dropped. Nevertheless, due to the NDBC's invocation of article 33, Judge al-Hammashi was removed from the Dujail trial. The NDBC's intervention forced the IHT to negotiate with the Prime Minister's Office in order to forestall Judge al-Hammashi's dismissal from the IHT altogether; he remains a judge of the IHT but has not been reassigned to any case.

Article 33 has thus become a "sword at the necks"[142] of sitting IHT judges, and has been used by the NDBC to exercise considerable power in terms of having sitting judges suspended from their duties. In October 2006, a further four trial judges—including one judge sitting on the ongoing Anfal trial—received letters stating that they were being transferred from the IHT to the Higher Judicial Council. According to one of the judges, those transferred were made to understand that if they protested the transfer they would become subject to investigation by the NDBC.[143]

---

[141] Coalition Provisional Authority, Order Number 1, De-Ba'thification of Iraqi Society, CPA/ORD/16 May 2003/01, paras. 2–3.

[142] Human Rights Watch interview with IHT judges, Baghdad, October 2006.

[143] Human Rights Watch interview with IHT judges, Baghdad, October 2006.

Article 4(4) of the IHT Statute was used by the Council of Ministers to remove the presiding judge in the Anfal trial, 'Abdullah al-Amiri, on September 19, 2006. Five days earlier, Judge al-Amiri had had an exchange with defendant Saddam Hussein in which the judge stated, "I will answer you: you are not a dictator. Not a dictator. You were not a dictator. The people or those who are around the official make him a dictator, and it is not just you. This is the case all over the world."[144] These comments were interpreted as showing leniency or bias towards Saddam Hussein, and were the subject of intense public criticism. Members of parliament demanded the removal of Judge al-Amiri,[145] and a representative of the prime minister was also dispatched to the president of the IHT to demand the judge's transfer off the case.[146] The IHT president then wrote to the Council of Ministers, requesting the transfer of Judge al-Amiri from the IHT to the Higher Judicial Council under article 4(4) of the IHT Statute, and the Council of Ministers authorized the transfer. A spokesperson for the prime minister confirmed that the Cabinet acted to remove Judge al-Amiri because of its view that he was biased in favor of Saddam Hussein, and because of popular anger over al-Amiri's comments.[147] The executive's intervention to transfer Judge al-Amiri— despite the existence of judicial procedures to resolve allegations of bias[148]— seriously undermined the IHT's independence and reflected a disturbing readiness to intervene in a judicial matter in response to public opinion. When challenged about the propriety of transferring a judge for such reasons, a Cabinet advisor responded that Iraqi law gives the government the right to "hire, fire and transfer judges. We are responsible and the Iraqi government does pay the salaries of these judges. The only thing is, we have no influence over the verdict and what goes on in court because it's an independent system."[149] This statement suggests a failure to grasp fully the principle of independence of the judiciary.

---

[144] Paul von Zielbauer, "Judge Tells Hussein, 'You are Not a Dictator,'" *New York Times*, September 15, 2006.

[145] Richard Oppel, "After Remark, Judge in Trial of Hussein Loses His Post," *New York Times*, September 20, 2006.

[146] Brian Bennett, "Behind the Saddam Judge's Ouster", *Time Magazine*, September 20, 2006. This was confirmed by Human Rights Watch interviews with IHT judges, including a judge in the Anfal trial, Baghdad, October 2006.

[147] See comments by spokesman for Nouri al-Maliki, Ali Dabbagh, reported in "Saddam Hussein ejected from Trial," CNN, September 20, 2006, http://edition.cnn.com/2006/WORLD/meast/09/20/iraq.saddam/index.html (accessed November 3, 2006). See also Liz Sly, "Hussein Trial Judge Removed," *Chicago Tribune*, September 20, 2006.

[148] IHT Rules of Procedure and Evidence, rules 7 and 8.

[149] Bassam Ridha, quoted in Sly, "Hussein Trial Judge Removed," *Chicago Tribune*.

The IHT's independence and its appearance of impartiality have also been undermined by fierce public criticism of the court and its judges by senior government officials. This has occurred regularly since the beginning of the Dujail trial. The uncertain and faltering start to the trial, and the difficulties in controlling the behavior of the defendants encountered by former presiding judge Rizgar Amin, gave rise to vituperative attacks from members of parliament and the then-minister of justice. Members of parliament denounced the court and Judge Amin as "weak" and excessively lenient with the defendants, and demanded his resignation.[150] During one trial session at which Human Rights Watch was in attendance, a prominent parliamentarian in the public gallery was heard to declare that "this Kurdish judge must go."[151] The then-minister of justice also denounced Judge Amin as weak and demanded his resignation on more than one occasion in the press.[152] Then-Prime Minister Ibrahim al-Ja'fari during a press conference also criticized the conduct of the trial by the presiding judge.[153] The Iraqi government did nothing to defend the court from these attacks, and did not warn ministers or other public officials against making such statements. In January 2006 Judge Amin resigned. Judges interviewed by Human Rights Watch stated that the resignation was principally caused by the severity and intensity of official criticism of his conduct of the trial.[154] Judges observed that the attacks by government figures created an enormous sense of pressure upon them, and that there was in fact little understanding within the government about the IHT and its procedures.[155] One judge explained,

> The attitude of the cabinet towards the court and the trial is one of a
> consumer who pays money for a product: they give money, and they
> demand results. The government treats the court like a factory.[156]

---

[150] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch.

[151] Human Rights Watch-ICTJ trial observation notes, November 28, 2005. In a similar vein, Shi'a parliamentarian and Da'wa Party member Ali al-Adeeb stated to the press, "The chief judge should be changed and replaced by someone who is strict and courageous." See Hamza Hendawi, "Saddam Lashes out at US as Trial Resumes," Associated Press, November 28, 2005.

[152] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch.

[153] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch.

[154] Human Rights Watch interviews with IHT judges, February, March and October 2006.

[155] Human Rights Watch interviews with IHT judges, November 2005 and March 2006.

[156] Human Rights Watch interview with IHT judge, March 2006.

The pressure was compounded by impatience and a lack of understanding in the wider Iraqi public, and the failure of the IHT to develop an effective outreach and communications strategy (discussed in Section III.4, above). This public impatience was intensified by statements from government officials demanding a rapid trial and speedy execution of Saddam Hussein.[157]

Through comments prejudging the guilt of the defendants, senior government officials and political figures have also run the risk of appearing to or actually seeking to influence the outcome of the trial. State officials and political figures must not prejudice the accused's fair trial rights or undermine the perceived impartiality of the tribunal by prejudging the assessment of the facts by the competent judicial authority.[158] From well before the beginning of the Dujail trial, senior Iraqi government officials and political figures made statements declaring Saddam Hussein guilty and deserving of execution.[159] These statements continued throughout the Dujail trial: On November 28, 2005, Abdul Aziz al-Hakim, leader of the powerful Shi'a political party the Supreme Council of the Islamic Revolution in Iraq (SCIRI), stated that "the government wants to see Saddam dead, it wants him to face the death penalty because that is the will of the people."[160] Another prominent SCIRI

---

[157] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch. See also statement by a leader of SCIRI, Adel Abdul Mahdi, that Saddam Hussein should have been "put to death without trial" quoted in Ali Rifat, "Saddam trial is bad for us, says top Iraqi," *Sunday Times* (London), January 8, 2006. See also Ellen Knickmeyer, "Iraq's Premier Urges a Speedy Trial for Hussein," *Washington Post*, October 18, 2005; and "Maliki: Saddam's Execution is Imminent," United Press International, July 5, 2006.

[158] UN Human Rights Committee (HRC), General Comment 13, para. 7; HRC, Decision: Gridin v. Russian Federation, CCPR/C/69/D/770/1997, July 18, 2000, para. 8.3; European Court of Human Rights (ECtHR), *Allenet de Ribemont v. France*, Judgment of 10 February 1995; (1995) 20 EHRR 557, para.35; African Commission on Human and Peoples' Rights (ACHPR), *International Pen and Others (on behalf of Ken Saro-Wiwa Jr. and Civil Liberties Organization) v. Nigeria*, Communication Nos. 137/94, 139/94, 154/96, and 161/97, decision adopted on October 31, 1998, paras. 94-96.

[159] On May 9, 2005, Iraqi President Jalal Talabani stated that Saddam Hussein "will not escape punishment for his terrible crimes" (as quoted in "Iraqi president on national unity, government, terrorism, foreign presence" (in Arabic), *Al-Ra'y* (Amman), May 9, 2005, p. 6, reproduced in English translation by BBC Monitoring Middle East – Political), and on May 31 Talabani stated that "Saddam Hussein is a war criminal" (as quoted in "Talabani: Saddam Likely to Face Trial Soon," Associated Press, May 31, 2005). In an interview with Iraq's state-funded broadcaster Al-Iraqiya on September 6, 2005, President Talabani stated, "I received the investigating magistrate who is in charge of questioning Saddam [Hussein]. I encouraged him to continue his interrogation. He told me good news, saying that he was able to extract important confessions from Saddam Hussein." Talabani added that "Saddam signed these confessions," and that "Saddam Hussein is a war criminal and he deserves to be executed 20 times a day for his crimes against humanity." See "Iraq's Talabani says Saddam 'confessed' and deserves to die" (in Arabic), Al-Iraqiya TV (Baghdad), September 6, 2005, 17:35 GMT, reproduced in English translation by BBC Worldwide Monitoring, September 7, 2005. On June 24, 2005, SCIRI head Abdul Aziz Hakim stated in an interview with Reuters that "there is no doubt that Saddam deserves more than just execution... I am among those who are going to file a complaint for killing 64 members of my family. For these crimes alone he deserves 64 executions." See Mariam Karouny, "Iraqi Shiite Leader Wants Insurgents Wiped Out," Reuters, June 24, 2005.

[160] Muhammad Shakeel, "Trial of Saddam Set to Resume, Former PM warns against Rising Abuse in Iraq," *World Markets Analysis*, November 28, 2005.

figure (and currently one of Iraq's two vice-presidents), Adel Abdul Mahdi, stated in January 2006 that Saddam "deserves to be put to death without trial" and that "the continuing [trial process] is unnecessary and will only hurt the Iraqi people."[161] On February 20, 2006, Shi'a cleric Muqtada al-Sadr stated that Saddam deserved the death penalty because he was responsible, directly or indirectly, for all those killed in Iraq while he was president.[162] In an interview published on July 12, 2006, Muqtada al-Sadr—whose faction now formed part of the Iraqi government—asserted that "Saddam needs no trial and he must be treated as he treated the Iraqi people ... I demand his execution immediately."[163] On July 5, Prime Minister Nouri al-Maliki stated of Saddam Hussein, "his execution for the crimes he committed will come soon, just after the court ruling."[164]

The statements of officials indicate that the Iraqi government has not only failed to promote a climate of public opinion conducive to a fair trial, but has actively encouraged the prejudgment of the outcome of the case. While the trial of someone as notorious as Saddam Hussein will inevitably be accompanied by strong opinions and public discussion as to his guilt or otherwise, public authorities and in particular leading political figures are not relieved of their obligation to refrain from prejudging the outcome of the trial. In creating an environment in which judges feel intense pressure to be seen as dealing severely with the accused, such behavior undermines the guarantee of presumption of innocence at trial.

---

[161] Rifat, "Saddam trial is bad for us, says top Iraqi," *Sunday Times*.

[162] Iraqi press summaries, December 2005–March 2006, on file with Human Rights Watch.

[163] "Iraqi Shi'i cleric Al-Sadr denies Al-Mahdi Army's involvement in recent killings" (in Arabic), Al-Iraqiya TV (Baghdad), July 12, 2006, 1710 GMT, reproduced in English translation by BBC Monitoring International Reports, July 14, 2006.

[164] "Maliki: Saddam's Execution is Imminent," United Press International. While in Baghdad in December 2005, Human Rights Watch also observed that, during the breaks in the telecast of the trial on the government-funded Al-Iraqiya television channel, material was broadcast that strongly suggested the guilt of the defendant Saddam Hussein. This is also described by journalist Jonathon Steele in "This faltering trial has put Saddam back in charge," *Guardian* (London), December 9, 2005: "Whenever the courtroom had a break, the screen was filled with a propaganda commercial showing Saddam's face. Blood slowly pours across it. Pictures of the former President bringing his hand down firmly to make a point are intercut with archive footage of a prisoner lying on the ground while a man uses a baseball bat to smash his wrists. In the style of Shi'a religious mourning, a voice wails a poem that taunts Saddam with God's judgment: 'Where will you hide from all your crimes?'"

## 2. The Defendants' Right to be Informed of the Charges

Article 14(3)(a) of the ICCPR provides that the defendant has the right to be informed "promptly and in detail ... of the nature and cause of the charge against him."[165] A basic prerequisite for the fairness of a trial is that a defendant has sufficient information about what is alleged against him or her, so that he or she can adequately defend him or herself against the charge.[166] At minimum, a defendant must be provided with information that identifies the material facts alleged against him or her that are at the basis of the accusation, and the legal characterization of these material facts.[167] The level of detail that is necessary will depend on the nature of the case, and needs to be considered in terms of what would amount to sufficient information to prepare an adequate defense to the charges.[168]

In international criminal law cases, the crimes alleged will likely have been committed by numerous individuals, playing distinct roles over an extended period of time. International criminal law contains several different theories of individual criminal liability that could be used to connect the defendant in court to the large-scale crime that occurred. Individuals brought before a court may bear different kinds of responsibility, from a commander to a participant to an aider-and-abettor. Each of these forms of liability will require specific kinds of criminal intention (*mens rea*) and criminal act (*actus reus*) to be proved in order to convict the individual defendant. Thus, in cases involving accusations of international crimes (such as crimes against humanity), international tribunals have consistently held that sufficient detail about the nature and cause of the charge must be provided to the defendant, so that a defendant can properly understand *in what capacity* he or she is alleged to be responsible for the crime. International courts have held that, at minimum, the *particular nature* of the defendant's responsibility (for example, as a planner, commander, instigator, or aider of the crime) must be clearly identified, *and*

---

[165] This guarantee appears in almost identical form in article 6(3)(a) of the European Convention on Human Rights. The holdings of the European Court of Human Rights are therefore relevant to the interpretation of this fair trial guarantee, particularly because the European Court frequently interprets fair trial guarantees in the context of inquisitorial or civil law systems.

[166] European Court of Human Rights, *Mattoccia v. Italy* (App. 23969/94), Judgment of 25 July 2000, para. 59.

[167] Ibid.

[168] European Court of Human Rights, *Sadak and Others v. Turkey* (App. 29900/96, 29901/96, 29902/96 and 29903/96), Judgment of 17 July 2001, para. 50.

the defendant must be given *a concise statement of the material facts* that will be used to establish the defendant's specific mode of responsibility.[169] The kinds of facts that may be material for someone alleged to have planned or directed a crime will be quite distinct from those facts that are material for someone accused of aiding a crime.

Thus, in order to effectively prepare a defense, the defendant must be able to determine the "theory of liability" to be applied against him or her, and what facts will be proved in order to sustain that theory. For example, the international courts have held that if a defendant is accused of having "command responsibility" for the crime, he or she must be given notice of the following material facts that will be proved against him or her:[170]

  (a) what command position he or she is alleged to have held;
  (b) the identities of the subordinates over whom he or she exercised effective control and for whose acts he or she is alleged to be responsible;
  (c) the conduct of the defendant that shows that he or she knew that a crime was being committed, or was about to be committed, by those identified subordinates and;
  (d) the conduct of the defendant that shows that he or she failed to take the necessary and reasonable measures to prevent such acts or to punish the persons who committed them.

If someone is alleged to have personally participated in the crime, material facts such as the identity of the victim, the time and place of the event, and the means by which the criminal acts were committed have to be notified to the defendant.[171] The facts that will be proved to show the defendant's mental state, and his or her criminal intent, also should be stipulated.[172]

---

[169] *Prosecutor v. Kupreskic et al.*, ICTY, Case No. IT-95-16, Judgment (Appeals Chamber), October 23, 2001, para. 95; *Prosecutor v. Mejakic et al.*, ICTY, Case No. IT-02-65, Decision on Dusan Fustar's Preliminary Motion on the Form of the Indictment, April 4, 2003; *Prosecutor v. Sesay*, Special Court for Sierra Leone (SCSL), Decision and Order on Defence Preliminary Motion for Defects in the Form of the Indictment, October 13, 2003, para. 12.

[170] *Prosecutor v. Blaskic*, ICTY, Case No. IT-95-14, Judgment (Appeals Chamber), July 29, 2004, para. 218.

[171] *Kupreskic*, Judgment (Appeals Chamber), para. 90.

[172] *Blaskic*, Judgment (Appeals Chamber), para. 219.

Without this kind of specification of the defendant's alleged role in a large-scale, multiple-perpetrator crime, and identification of what facts will be established to prove that role, the defendant is essentially left to guess at the "nature and cause" of the case against him or her.

The charge sheet in the Dujail case was in the form of a "referral decision" from the IHT's chief investigative judge, and was provided to defendants along with the dossier of evidence on August 10, 2005. The referral decision and dossier were identical for all eight defendants, even though the defendants ranged from the former President of the Republic through to minor Ba'th Party officials from Dujail. The referral decision was the only notice of charges provided to the defendants before the trial commenced. The referral decision contained no information whatsoever about each defendant's alleged role in the crime, or what theory of liability was to be used against each defendant. No material facts to be proved against each defendant were described. Indeed, no material facts were stipulated at all; the referral decision simply stated that each defendant was charged with "[c]rimes against humanity against a number of citizens in the town of Dujail in Salahuddin Governorate on July 8, 1982. This is in accordance with Clauses A, D, E and F of Paragraph 'First' of article 12 of the court law. It consists of:
A. Premeditated murder.
D. Removal of population or forcible removal of population.
E. Imprisonment or arbitrary deprivation of physical freedom contrary to the basic rules of international law.
F. Torture."

The referral decision does not constitute adequate notice of the cause and nature of the charge. The disclosure of the dossier of evidence does not amount to adequate notice, because the dossier was not tailored to each defendant, and thus does not inform a defendant of the material facts related to his role that will be proved at trial.[173]

Under Iraqi law, no "indictment" or similar document is produced before the beginning of the prosecution case. However, a more detailed "charging document" is

---

[173] *Prosecutor v. Naletilic and Martinovic*, ICTY, Case No. IT-98-34, Judgment (Appeals Chamber), May 3, 2006, para. 27; *Prosecutor v. Jean Mpambara*, ICTR, Case No. ICTR-01-65-T, Judgment (Trial Chamber), September 11, 2006, para. 30.

drafted after the close of the prosecution case and before the commencement of the defense case.[174] In the Dujail case, this more detailed charging document was read out in court on May 15, 2006, eight months after the beginning of the trial. The charging document did contain more details concerning the specific role that each defendant was alleged to have played in the events at Dujail. However, because it was formulated only after the close of the prosecution case, the defendants cannot be considered to have had adequate notice of the charges against them during the presentation of prosecution witnesses and documentary evidence. The defendants' ability to prepare challenges to this evidence was thus circumscribed.

In addition, the May 15 charging documents added two new charges against seven out of the eight defendants: in addition to murder, forcible displacement, arbitrary detention, and torture, the charges of enforced disappearance and "other inhumane acts" were added against Saddam Hussein, Taha Yassin Ramadan, Barzan al-Tikriti, 'Abdullah Kadhim Ruwayid, Mizher 'Abdullah Kadhim Ruwayid, 'Ali Dayeh 'Ali al-Zubaidi, and Muhammad 'Azzawi 'Ali al-Marsumi. The defendants had no notice during the prosecution case that these charges would be added, and thus could not effectively address prosecution evidence that may have been relevant to proving disappearance or "other inhumane acts." The court required the defendants to open their defense case on the same day that the charging document was read out in court, effectively denying them any opportunity to revise or amend their defense in accordance with the more detailed notice and in light of the new charges.

It is also questionable whether even the May 15 charging document constituted adequate notice of the charges against each defendant. The charging document does include more specific allegations concerning the acts of each defendant, but

---

[174] Iraqi Code of Criminal Procedure, art. 181(C), (D). This provides:

"C – If it appears to the court, after the aforementioned steps have been taken, that the evidence indicates that the defendant has committed the offense being considered, then he is charged as appropriate, the charge is read to him and clarified and he is asked to enter a plea.

"D – If the defendant confesses to the charge against him and the court is satisfied of the truth of the confession and that he understands its implications, then it listens to his defense and issues a judgment in the case without any requirement for further evidence. If he denies the charge or does not offer a defense, if he requests a trial or if the court considers that his confession is confused, or that he does not understand the consequences or if the offense is punishable by death then the case goes to trial, defense witnesses are heard and the remaining evidence in his defense is heard, unless the court finds it to be an unjustified attempt to impede the investigation or mislead the court. When this has been completed the commentary of the other parties, the public prosecutor and the defense of the defendant are heard. The end of the trial is then announced and the court issues its verdict in the same session or in another session held soon afterwards."

does not stipulate material facts such as the facts showing the effective authority of defendants charged in a "command responsibility" role, the facts proving the mental state of the defendants, or the facts showing that a defendant knew that crimes were being committed by a subordinate. Moreover, the charging document does not clarify which theory of liability is being applied to each defendant—participation, instigation or joint criminal enterprise—or whether any high-level defendant is also accused of a "failure to prevent or punish" subordinates.

### 3. Equality of Arms and the Defendants' Right to Adequate Time and Facilities to Prepare a Defense

As noted above (see Section III.5), a fundamental element of a fair trial is that every party must be afforded a reasonable opportunity to present his or her case under conditions that do not place the party at a substantial disadvantage vis-a-vis the opponent.[175] Implicit in the notion of equality of arms,[176] and explicit in article 14(3)(b) of the ICCPR, is that a defendant has a right to adequate time to prepare his or her case. The meaning of "adequate" will depend on the size and complexity of the case against the defendant.[177]

Human Rights Watch has concluded that a number of aspects of the conduct of proceedings in the Dujail trial violated the principle of equality of arms, and deprived the defendants of adequate time and facilities to prepare their defense. In addition, Human Rights Watch observed a troubling indifference on the part of the court when these procedural concerns were raised by the defense. The court never engaged in a public or reasoned process of evaluating these concerns in light of fair trial principles, despite the seriousness of some of the concerns, as outlined below.

---

[175] European Commission of Human Rights, *Kaufman v. Belgium* (App. 10938/84); (1986) 50 DR 98, p. 115; European Court of Human Rights, *Foucher v. France* (App. 22209/93), judgment of 18 March 1997; (1998) 25 EHRR 234, para. 34; UN Human Rights Committee, Decision: Morael v. France, Comm. No. 207/1986, UN Doc. Supp. No. 40 (A/44/40) at 210 (1989), para. 9.3 ("... the concept of a fair hearing in the context of article 14(1) should be interpreted as requiring a number of conditions, such as equality of arms ...").

[176] *Prosecutor v. Kordic and Cerkez*, ICTY, Case No. IT-95-14/2, Judgment (Appeals Chamber), December 17, 2004, para. 175.

[177] UN Human Rights Committee, General Comment 13, para. 9.

### a. Continuous late or same-day disclosure of incriminating evidence and non-disclosure of some witness statements

Timely disclosure of prosecution evidence is essential for defendants to adequately prepare their defense. The IHT Rules provide that prosecution evidence must be disclosed 45 days before the start of the trial.[178] Approximately 900 pages of the trial dossier were disclosed in accordance with this rule, on August 10, 2005, seven weeks before the opening of the Dujail trial. The bulk of the 900 pages consisted of photocopies of official documents. On January 22, 2006—three months after the commencement of the trial—a further several hundred pages of documentation were provided to the defense, but with no explanation (and no explanation was requested by the court) as to why the material had not been made available in accordance with the Rules.[179]

Of more serious concern was a tendency by the prosecution to engage in "trial by ambush,"[180] in which incriminating documents were not disclosed to the defense until the day that the document was used in court by the prosecution. Human Rights Watch documented a number of instances in which critical, incriminating documents were disclosed to the defense only on the day that they were used in court, and in some cases well after the close of the prosecution case.

On February 13, 2006, the court read the statements of 23 prosecution witnesses into the court record, without making these witnesses available for questioning by the defense.[181] Of those 23 witness statements, 13 were not in the dossier and were not subsequently disclosed to the defendants during the trial. During the prosecution's presentation of its documentary evidence on March 1, 2006, over 40 previously undisclosed documents were presented to the court, including the most important incriminating evidence against three of the "low-level" defendants: three letters addressed to former Minister of Interior Sa'doun Shaker naming suspected

---

[178] IHT Rules of Procedure and Evidence, rule 40.

[179] Human Rights Watch examined the documents disclosed on January 22, 2006, and found that some were copies of documents previously disclosed but the majority were new documents, not previously disclosed.

[180] This term is used by Judge Richard May and Marieke Wierda in *International Criminal Evidence* (Ardsley, New York: Transnational Publishers, Inc.), p. 70.

[181] See below, Section IV.4 (on the right to confront and examine witnesses) for discussion of other concerns raised by this aspect of proceedings.

Da'wa Party members in Dujail in the aftermath of the 1982 assassination attempt, and allegedly written by 'Ali Dayeh 'Ali, 'Abdullah Kadhim Ruwayid and Mizher 'Abdullah Kadhim Ruwayid. Also presented on that day, but previously undisclosed to the defense, was a compact disc containing a recording of a conversation allegedly between Saddam Hussein and former Ba'th Party Regional Command member Abdel Ghani al-Ghafour, in which the latter refers approvingly to the destruction of orchards in Dujail. The date of the recording was not disclosed, nor its source or means of interception.

The prosecution case effectively closed on March 1, 2006. On March 15, during the taking of statements from the defendants, the prosecutor confronted defendant Taha Yassin Ramadan with a previously undisclosed document concerning the detention of individuals from Dujail, which Ramadan allegedly had signed. As far as Human Rights Watch can ascertain, this document was never actually disclosed in full to Ramadan's defense lawyers, even after it was displayed in court. Further new documents were introduced on April 6 concerning the age of some of those convicted by the Revolutionary Court in connection with the Dujail incident.

On April 24, 2006, the prosecution introduced another compact disc recording, this time purporting to be a conversation between Saddam Hussein and Taha Yassin Ramadan concerning the fate of properties in Dujail. On June 13, 2006—the last day of the *defense* case—the prosecution produced in court a further three undisclosed documents allegedly signed by Taha Yassin Ramadan concerning land seizures in Dujail, and another compact disc recording of a conversation alleged to be between Taha Yassin Ramadan and Saddam Hussein.[182]

The court always retains discretion to permit evidence that has not been disclosed in a timely manner to the defense, where the evidence is clearly probative. However, the exercise of this discretion requires a reasoned process of weighing the value of the evidence against the potential prejudice to the defendant due to late disclosure, and consideration of steps that might mitigate that prejudice (such as granting an

---

[182] The conversation appeared to refer to a town by a code name, although identification of this town as Dujail was never established by evidence.

adjournment or a delay to permit review of the new evidence).[183] Moreover, international tribunals have emphasized that the prosecution bears the burden of explaining why the evidence was not disclosed earlier or could not reasonably have been made available in time[184]—in part to ensure that the prosecution does not reap the benefit of failing to comply with court rules.

However, as best Human Rights Watch could determine, the IHT trial chamber did not consider these issues and permitted the prosecution to introduce new evidence as and when it wished. It also did not seek an explanation from the prosecution as to why disclosure was not made earlier, and never undertook a reasoned examination of whether permitting the evidence would be prejudicial to the defendants or how ensuing prejudice could have been remedied. The court appears to have been essentially indifferent to the potential threat to the defendants' fair trial rights flowing from consistent late disclosure or non-disclosure. The court also appears to have applied a different standard to defense late disclosure than to the prosecution: on May 30, 2006, the defense sought to have shown in court a compact disc of television footage suggesting that a complainant was not speaking truthfully during some of his in-court statements.[185] Whereas the presiding judge always permitted the prosecution to play its newly introduced recordings in court without consulting the defense, on this occasion he refused to allow the footage to be played until the defense obtained the permission of the prosecution. The judge insisted that all such material must be given in advance to the prosecution before it could be used in court. The prosecution examined the compact disc overnight and gave its consent the next

---

[183] See, for example, *Prosecutor v. Bagosora*, Case No. ICTR-96-7-T, Decision on the Motion by the Defense Counsel for Disclosure, November 27, 1997; *Prosecutor v. Brima et al.*, Case No. SCSL-04-16-PT, Decision on Application for Leave to File an Interlocutory Appeal Against Decision on Motions for Exclusion of Prosecution Witness Statements and Stay on Filing of Prosecution Statements, February 4, 2005.

[184] *Prosecutor v. Delalic et al.*, ICTY, Case No. IT-96-21, Judgment (Appeals Chamber), February 20, 2001, para. 279.

[185] The complainant, Ali al-Haydari, had stated in court that the incident at Dujail on July 8, 1982, was "not an assassination attempt" against Saddam Hussein. The footage, shown on Al-Arabiya television channel on May 30, 2005, shows al-Haydari addressing a commemoration ceremony in Dujail in August 2004. Al-Haydari states, "Heroes from the sons of the *mujahid* and heroic city of al-Dujail turned the day of the tyrant Saddam's visit to that city into a historic day in the life of that city, when they tried to kill the most vicious tyrant of modern history, and even the most vicious tyrant known by mankind." See "Al-Arabiya airs video of Saddam prosecution witness contradicting his testimony," BBC Monitoring Middle East – Political, May 30, 2006, 0705 GMT.

day, and the footage was shown on May 31. Treating the two parties unequally in this manner raises concerns that the principle of equality of arms has been violated.[186]

### b. Non-disclosure of exculpatory evidence

Rule 42 of the IHT Rules requires the prosecution to disclose, on a continuing basis, any evidence that mitigates the guilt of the accused. The obligation to disclose exculpatory evidence that is within the prosecutor's custody and control is considered as "important as the obligation to prosecute."[187] International tribunals have held that the equivalent obligation in their own rules is "fundamental to the fairness of proceedings before the Tribunal."[188]

The prosecution does not appear to have exercised due diligence in complying with its obligation under the IHT Rules to disclose exculpatory evidence. On May 29, 2006, while questioning a defense witness, the prosecution showed in court documents apparently issued by a "compensation committee" formed to compensate Dujail residents whose lands had been seized by the government. One of the contentions of the defense case for Saddam Hussein and Taha Yassin Ramadan was that the razing of orchards in Dujail was unrelated to the assassination attempt against Saddam Hussein, but was undertaken pursuant to an agricultural redevelopment program in which compensation was paid to expropriated landowners. Documents suggesting the existence of a "compensation committee" for Dujail clearly tend towards supporting this aspect of the defense case, but were never disclosed to the defendants.

The defendant 'Awwad al-Bandar, the former chief judge of the Revolutionary Court who presided over the 1984 trial and sentencing of men and boys from Dujail, repeatedly claimed that the soundness of the legal procedures he employed could be verified by having regard to the full file of the Revolutionary Court proceedings. Documents in the Dujail trial dossier clearly indicated that the Revolutionary Court file

---

[186] See, for example, *Frank Robinson v. Jamaica*, Comm. No. 223/1987, U.N. Doc. CCPR/C/35/D/223/1987 (1989), para. 10.4, in which the Human Rights Committee commented, "The refusal of the trial judge to order an adjournment to allow the author to have legal representation, when several adjournments had already been ordered when the prosecution's witnesses were unavailable or unready, raises issues of fairness and equality before the courts. The Committee is of the view that there has been a violation of article 14, paragraph 1, due to inequality of arms between the parties."

[187] *Blaskic*, Judgment (Appeals Chamber), para. 264.

[188] *Prosecutor v. Krstic*, ICTY, Case No. IT-98-33, Judgment (Appeals Chamber), April 19, 2004, para. 180.

consisted of 361 pages, but only four of these pages were extracted in the Dujail trial dossier. Lawyers for al-Bandar repeatedly demanded that the court or the prosecution produce the entire Revolutionary Court file, but the court declined to order the prosecution to do so. Indeed, at one point the court suggested that the defendant al-Bandar should have kept a copy for himself when he left the Revolutionary Court in 1989, and that any failure to find the file was al-Bandar's responsibility.[189]

It appears that the prosecution also took no steps to review documents in its custody and control in order to determine whether the Revolutionary Court file was in its possession. The investigative judge responsible for compiling the Dujail trial dossier, who has an express legal obligation to search out exculpatory evidence,[190] also does not appear to have sought to locate the file among the millions of pages of documents to which the court has access.[191] The file was, in fact, among those documents within the control of the court, as it was located by a representative of the RCLO shortly before the end of the trial.[192] The file was never produced in open court, and no explanation was proffered by the prosecution—or sought by the court—as to why it could not have been located earlier.

### c. Non-disclosure of trial session notes and late disclosure of defendants' statements made to the investigative judge

The Dujail trial was conducted without a verbatim written transcript being taken.[193] Although the trial was relatively short compared to other major international criminal trials, it nevertheless ran for 40 trial days, with approximately 70 witnesses and over 1,000 pages of documentation. The absence of a transcript makes it exceptionally difficult to determine exactly what a witness or defendant said, and also makes the task of preparing and adjudicating an appeal both imprecise and cumbersome. The court did maintain a video recording of all sessions, but using video footage to

---

[189] Human Rights Watch-ICTJ trial observation notes, April 6, 2006. The judge made a similar statement on June 5, 2006.

[190] IHT Rules of Procedure and Evidence, rule 23.

[191] The court maintains a "Secure Evidence Unit" overseen by the RCLO, which is responsible for reviewing and cataloging documents seized by investigators. The documents include some of those seized by the US military after the fall of the former government, which were initially transported to Qatar for review as part of the search for weapons of mass destruction.

[192] Human Rights Watch interview with RCLO representative, Baghdad, October 2006.

[193] Ordinary Iraqi criminal courts do not as a matter of practice maintain a verbatim transcript for court proceedings. Rather, the presiding judge dictates the court record to the clerk.

pinpoint witness testimony or trial events is significantly more time-consuming than using a verbatim transcript.

In place of a verbatim written transcript, the court maintained a "court record" of trial session notes, written in longhand by court clerks. The trial session notes are essentially a summary of what was said in court (although Human Rights Watch observers frequently noted that the court clerks were writing little or nothing at all as testimony was given). These trial session notes were not made available to private defense counsel, despite repeated in-court requests. When Human Rights Watch raised the issue with an IHT prosecutor, he stated that "Iraqi law" did not require the sharing of trial session notes with defense lawyers.[194] The court itself never made such a ruling, but it failed to respond to requests by the private defense lawyers that copies of the notes be made available to them. In the absence of either a transcript or the trial session notes, the ability of private defense counsel to review evidence and other statements given in court is severely circumscribed, and constrains their opportunity to prepare an adequate defense.

The court did not make available to the defendants copies of their statements given before the investigative judge, until the morning of the trial session at which defendants were to be questioned by the trial chamber concerning those statements.[195] The dossier of evidence handed over in August 2005 did not include these statements,[196] and the statements were also not included in additional documents disclosed by the prosecution in January and early March 2006. When Human Rights Watch raised this with two IHT prosecutors, they both stated (in separate interviews) that "Iraqi law" does not require that copies of defendants' statements be provided to defendants or their counsel.[197] The court did not rule on in-court demands by private defense counsel that copies of the statements be provided. Only shortly before the opening of the trial session of March 12, 2006 (in

---

[194] Human Rights Watch interview with IHT prosecutor, Baghdad, July 2006.

[195] Human Rights Watch–ICTJ trial observation notes, March 12, 2006.

[196] Human Rights Watch reviewed a copy of the dossier.

[197] Human Rights Watch interview with IHT prosecutor, Baghdad, March 2006; Human Rights Watch interview with IHT prosecutor, Baghdad, July 2006. Human Rights Watch's review of the Iraqi Code of Criminal Procedure has not identified any express provisions stating that providing copies of the defendants' statements is not obligatory, so this assertion appears to be based instead on common practice in the Iraqi legal system.

which defendants would be questioned by the trial chamber concerning their statements), were copies given to private defense counsel. The late provision of these documents made it effectively impossible for private defense counsel to prepare with their clients for questioning by the trial chamber. It also made it impossible for defense counsel to know exactly what their clients were alleged to have said to the investigative judge. This information must be disclosed prior to trial because it is highly material to the preparation of a defense and in particular if counsel wishes to challenge whether any of what is recorded in the statement was in fact uttered by their client.

The charging documents read in court on May 15, 2006, were also not provided in a timely manner to the defendants. The court did not provide a written copy to private defense counsel on May 15, stating that printed copies were still being prepared. This was despite the fact that the court required the defense to commence their case on May 15, just subsequent to the reading of the charges. Private defense counsel repeated their requests for written copies every day for the next three trial sessions, to no avail, and a copy was only provided after one privately retained lawyer, who was considered more cooperative by the court, intervened informally with the trial chamber and repeated the request. As best Human Rights Watch can determine, a written copy of the charging document for each defendant was not provided to private defense counsel and the defendants until one week after the charging documents were read in court.

### d. Refusal to require information concerning chain of custody of documentation and refusal to permit defense to nominate own expert for document examination

The most significant evidence in the Dujail trial came from documents compiled in the trial dossier by the investigative judge and presented by the prosecution at trial. The dossier contains no indication that the investigative judge took any steps to verify any of the documents, or sought out information that would be relevant to determining the authenticity of the documents. The investigative judge also did not indicate how the documents were obtained, from which files or series of files they were extracted, and whether the documents constituted partial or complete extracts from a larger file.

Information concerning the source and chain of custody of a document is essential to assess how much weight should be placed on the document.[198] Similarly, it is important to know whether the document constitutes an extract from a larger file (which may well contain documents that cast doubt on the information in the document tendered), in order to assess its weight and in order to enable the other party to demand to inspect the complete file.[199] In the Nuremberg trials, the prosecution provided detailed information concerning how the tendered documents were captured, analyzed, registered, translated, and safeguarded.[200] In the *Hostages Case*, the Nuremberg tribunal went so far as to state that failure to produce the remainder of a document on the part of the prosecution would cause the court to infer that the evidence contained therein was unfavorable to the prosecution.[201]

No information concerning the source and chain of custody of any document in the dossier was ever introduced during the Dujail trial, and the court was indifferent to defense requests that the prosecution produce information concerning the provenance of the documents. Indeed, when on April 5, 2006, private defense counsel demanded information about how the prosecution had obtained the documents in the dossier, the prosecution refused to answer.[202] The court did not react to the prosecution's refusal. When, on April 4, private defense lawyers alleged that the documents were obtained through the Association of Free Prisoners,[203] the presiding judge denied the claim but offered no further information on the source of the documents.[204] In fact, numerous photocopied documents in the dossier bear the stamp of the Association of Free Prisoners. As discussed above, requests by the

---

[198] *Prosecutor v. Halilovic*, ICTY, Case No. IT-01-48, Judgment (Trial Chamber), November 16, 2005, para. 21; *Prosecutor v. Delalic*, ICTY, Case No. IT-96-21, Decision on the Motion of the Prosecution for the Admissibility of Evidence, January 19, 1998, para. 20.

[199] May and Wierda, *International Criminal Evidence*, p. 244.

[200] *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 (1946-1949)* (Washington, DC: U.S. Govt Printing Office, 1949-53), vol. 15, pp. 632–72 ("Contemporaneous and Captured Documents").

[201] Ibid., vol. 15, pp. 94–96.

[202] Human Rights Watch–ICTJ trial observation notes, April 5, 2006.

[203] The Association of Free Prisoners comprises a group of former political detainees, Shi'as in the main, who announced their establishment as a nongovernmental organization on April 11, 2003, the day after Baghdad fell to coalition forces. According to its founders, the decision for establishing the Association of Free Prisoners and laying down their plan of action, including for the seizure of Iraqi state documents, was taken soon after the war against Iraq became imminent. Human Rights Watch interview with Ibrahim Ra'uf al-Idrisi, head of the Association of Free Prisoners, Baghdad, July 2003.

[204] Human Rights Watch–ICTJ trial observation notes, April 4, 2006.

defense to produce the full Revolutionary Court file, from which four pages were extracted, were also denied. Overall, the court failed to avail itself of the opportunity to obtain evidence that would be vital to assessing the weight to be given to the documents. It also seemed unaware of the relevant international principles that might guide its approach to this issue.

The only step taken to attempt to verify any of the documents submitted in the court was the retention of "handwriting experts" from the Ministry of Interior to inspect approximately 11 of the several hundred documents in the dossier. The mandate of the handwriting experts—whose identities and qualifications were never disclosed, and who were never made available for questioning—was to evaluate whether signatures on certain documents corresponded with signature samples taken from the defendants Saddam Hussein,[205] Barzan al-Tikriti,[206] 'Abdullah Kadhim Ruwayid,[207] Mizher 'Abdullah Kadhim Ruwayid,[208] and 'Ali Dayeh 'Ali.[209] In addition, a report said to have been authored by Saddam's late son-in-law Hussein Kamel, and dated July 1987, was sent for verification. Two panels (one composed of three experts and the other composed of five experts) examined these documents in March–April 2006. According to the summary of the reports read in court on April 19 and April 24, the panels were able to verify the signatures and handwriting on seven out of the 11 documents, but could not authenticate the documents because they were unable to assess the documents' age.[210] In the summary report read in court, it was stated that

---

[205] The documents submitted for signature verification in relation to Saddam Hussein were: Presidential Decree No. 778 of June 16, 1984 (authorizing the carrying out of the death sentences imposed by the Revolutionary Court); Revolutionary Command Council Resolution 1283 of October 14, 1982 (authorizing the expropriation of lands in Dujail for an "agricultural development" project); and Revolutionary Command Council Resolution 982 of July 31, 1982 (awarding promotions to several General Intelligence Directorate Officers for their role in responding to the incident at Dujail).

[206] The documents submitted for signature verification in relation to Barzan al-Tikriti were: General Intelligence Directorate letter addressed to the Revolutionary Command Council regarding honors/awards of General Intelligence Directorate Officers, No. 220 of 21 July 1982; General Intelligence Directorate document No. 5782 of 23 September 1982 regarding Dujail farms; General Intelligence Directorate document No. 6282 of 25 October 1982 regarding Dujail farms, with a list of farm owners attached; and Memo addressed to the Revolutionary Command Council from the head of the General Intelligence Directorate, 13 July 1982, No. 9, concerning progress in the investigation into events at Dujail.

[207] The document submitted for signature verification in relation to 'Abdullah Kadhim Ruwayid was the Ba'th Party report allegedly written by him to then-Minister of Interior Sa'doun Shaker, naming Da'wa Party supporters in Dujail, undated.

[208] The document submitted for signature verification in relation to Mizher 'Abdullah Kadhim Ruwayid was the Ba'th Party report allegedly written by him to then-Minister of Interior Sa'doun Shaker, naming Da'wa Party supporters in Dujail, undated.

[209] The document submitted for signature verification in relation to 'Ali Dayeh 'Ali was the Ba'th Party report allegedly written by him to then-Minister of Interior Sa'doun Shaker, naming Da'wa Party supporters in Dujail, dated July 8, 1982.

[210] Human Rights Watch–ICTJ trial observation notes, April 19 and 24, 2006.

both panels reached their conclusions by consensus. The defendants were denied
the opportunity to retain their own expert to inspect the documents and submit a
view concerning their authenticity. The defense objected to the use of experts from
the Ministry of Interior, arguing that the institution was implicated in the activities of
Shi'a "death squads" and was dominated by groups hostile to some of the senior
defendants. Their objections were rejected out of hand, as was their request for an
international document expert to be appointed by the court.

Because the credentials and identities of the experts were never disclosed, and none of
them was made available for questioning by the defense, the defense was unable to
effectively confront this evidence. Moreover, by denying the defendants the opportunity
to call their own expert to offer an opinion, the court does not appear to have considered
the requirements of equality of arms, insofar as one party should not be placed at a
disadvantage in terms of its opportunity to present evidence.[211] Human Rights Watch has
also learned that the second panel of experts did not, in fact, reach their conclusions by
consensus, but the differences in opinion between the experts do not appear to have
been disclosed to the defendants. This exculpatory evidence should have been
disclosed to the defense under rule 42 of the IHT Rules, as noted above, but the court
appears to have ignored the rule.

### e. Ex parte scheduling of trial sessions and closing of the defense case

The devising of a trial schedule, known in advance to both sides and created on the
basis of an objective evaluation of the preparation needs of both sides, is a basic
logistical prerequisite for ensuring that adequate time and facilities have been
accorded in long trials.[212] The IHT trial chamber engaged in no process of pre-trial
hearings, had no clear timetable for its sessions, and no procedural mechanisms
(such as "status conferences") by which it might create one: it simply issued the

---

[211] See, for example, European Court of Human Rights, *Mantovanelli v. France* (App. 21497/93), Judgment of 18 March 1997;
(1997) 24 EHRR 370, in which the ECtHR held that, where an expert report is commissioned by the court, the litigants must
have an opportunity to be "associated with the process of producing the report, as it consisted in interviewing witnesses and
examining documents." Making submissions on the content of the report after it was produced, and in the absence of
contributing to it, was not a real opportunity to comment effectively on it (paras. 35–36).

[212] For example, rule 73*bis* and rule 73*ter* of the ICTY's Rules of Evidence and Procedure require the trial chamber to hold
status conferences before the beginning of the trial, and after the end of the prosecution case, and issue written decisions
determining how many witnesses may be called by the prosecution and defense, and how many trial days are to be allocated
for each part. The scheduling order may be amended on the application of either party, in the interests of justice.

dossier and assumed that the defense would be ready within 45 days. Even once the trial had commenced, the court rarely consulted the defense in advance when scheduling sessions and would schedule on a session-by-session basis, creating great uncertainty as to when and for how long it would adjourn. The practice of the IHT trial chamber was to schedule sessions in informal consultation with the prosecution only. This poor trial management helps explain the "stop-start" nature of the proceedings.

The absence of a deliberative and reasoned process in which the court assesses the readiness of each side, and also sets deadlines for various intermediate procedural steps, diminishes the transparency of the trial, while increasing the risk that the court will appear indifferent to the right of the defendants to adequately prepare their defense. While the court did often adjourn for long periods of time, these adjournments were unscheduled and not necessarily related to any requests by the defense, or any reasoned evaluation by the court of the defense's requests for more time to prepare.

The presiding judge moved to close the defense case on June 13, 2006. He did so without issuing a reasoned written decision and with no explanation except that he had decided that he had heard enough witnesses. Courts have an inherent power to control proceedings and to impose limits on the length of time that a party has to present its case. However, the IHT trial chamber imposed its time limit in an essentially arbitrary manner, without previously setting a schedule for the defense and without giving the defense any prior ruling about how many days and court hours they would be permitted to take up. When the defense sought permission to bring additional witnesses, the presiding judge did not inquire into the relevance and materiality of each witness before refusing the request.

The court's power to control the proceedings and the need for expedition must be balanced with the defendant's right to a fair trial. As the ICTY Appeals Chamber noted in *Oric*,[213]

---

[213] *Prosecutor v. Oric*, ICTY, Case No. IT-03-68, Interlocutory Decision on Length of Defence Case, July 20, 2005.

> [T]he authority to limit the length of time and number of witnesses
> allocated to the defense case ... [is] always subject to the general
> requirement that the rights of the accused pursuant to Article 21 of the
> Statute of the International Tribunal[214] be respected. Thus, in addition
> to the question whether, relative to the time allocated to the
> Prosecution, the time given to the Accused is reasonably proportional,
> a Trial Chamber must also consider whether the amount of time is
> objectively adequate to permit the Accused to set forth his case in a
> manner consistent with his rights.

The IHT never engaged in the exercise of trying to determine what amount of time
would be objectively adequate to permit the defendants to set forth their case in a
manner consistent with their rights. It imposed the time limit in an ad hoc manner,
and failed to issue any kind of written decision that explained how the time limit was
consistent with the defendants' fair trial rights. The court acted in a way that
suggested it was indifferent to or ignorant of the relevant procedural principles.

## 4. The Defendants' Right to Confront and Examine Witnesses

The defendant's right to confront and examine witnesses against him or her is a
fundamental fair trial guarantee applicable to both common law and civil law
systems. It is essential to test the credibility of witnesses and their evidence. The
right requires that an accused should be given "adequate and proper opportunity to
challenge and question a witness against him, either at the time the witness makes
his statement or at some later stage in the proceedings."[215] This does not mean that
every witness must be heard and cross-examined, but a conviction cannot be based
substantially on the statements of witnesses whom the defense is unable to cross-
examine.[216]

---

[214] Article 21 of the ICTY Statute replicates the fair trial guarantees found in article 14 of the ICCPR.

[215] European Court of Human Rights, *Delta v. France* (App. 11444/85), Judgment of 19 December 1990; (1993) 16 EHRR 574, para. 36.

[216] European Court of Human Rights, *Kostovski v. The Netherlands* (App. 11454/85), Judgment of 20 November 1989; (1990) 12 EHRR 434; D.J. Harris, M. O'Boyle and C. Warbrick, *Law of the European Convention on Human Rights* (London: Butterworths, 1995), p. 212.

Two features of the Dujail trial violated the defendants' right to confront and examine witnesses against them: the reading of 29 prosecution witness statements into the court record without making any of them available for questioning by defense counsel, and the blanket use of protective measures that amounted to "constructive anonymity" for the overwhelming majority of prosecution witnesses who did testify.

### a.  Reading of 29 witness statements into the court record

On February 13, 2006, the trial chamber read 23 prosecution witness statements into the court record without any reasoned decision as to why the witnesses would not be required to attend in person to give their testimony. On March 1, a further six prosecution witness statements were read into the record without explanation. As noted above, of the 23 statements read on February 13, 13 had not been previously and were not subsequently disclosed to the defendants and their lawyers.

Many of the witness statements read into the record referred by name to individual defendants and purported to describe specific conduct by certain defendants. The right to question witnesses is often exercised at the investigative phase in civil law systems.[217] However, defense lawyers in the Dujail trial had not been invited to attend the investigative sessions at which witnesses were deposed, and thus had had no opportunity to question those witnesses. Hence, the witnesses whose statements were read into the record were never, at any stage of the proceedings, questioned on behalf of the defendants.

The Defense Office lawyers who were representing all the defendants at that time (due to a boycott by private defense counsel, described above in Section III.5) did not object to the court's conduct. When private defense counsel returned to court, they requested the recall of these witnesses to permit cross-examination.[218] The trial chamber essentially ignored the request, issuing no written decision as to why the witnesses would or would not be recalled and never explaining its decision to read the statements into the record.

---

[217] Caroline Buisman, Ben Gumpert and Martine Hallers, "Trial and Error – How Effective is Legal Representation in International Criminal Proceedings?" *International Criminal Law Review*, vol. 5, no. 1 (2005), pp. 1–82.

[218] Human Rights Watch–ICTJ trial observation notes, March 15, 2006.

The total number of prosecution witnesses and complainants who appeared before the IHT and gave *viva voce* evidence was 29. Thus, the 29 statements read represent half of all witnesses against the defendants. While some of the witness statements might have been of a kind which did not require cross-examination (because they were of a cumulative nature, or concerned background issues), a defendant *must* have the opportunity to question a witness whose statement concerns the defendant's acts and conduct.[219] By reading the statements into the record without differentiating between statements that concern individual defendants' acts and conduct, and those that do not, and by not providing any reasoned response to the private defense lawyers' request to have witnesses recalled, the trial chamber did not adequately safeguard the defendants' right to confront these witnesses.

### b. Constructive anonymity and blanket use of protective measures

In-court "protective measures"—in which a witness is permitted to conceal her or his identity from the public, and in some cases to be shielded from the sight of the defendants in court—are indispensable tools for war crimes prosecutions. They can be instrumental in convincing witnesses that they can be protected from intimidation and retaliation, inside and outside the courtroom. However, protective measures must also be balanced with the defendant's right to confront the witness and test the witness's evidence, and thus must be applied on a witness-by-witness basis.[220] Complete anonymity of witnesses, in which the defendant's lawyer can neither know the name of the witness beforehand nor has the practical possibility of observing the witness under questioning, is not consistent with the right to confront the witness.[221]

---

[219] See, for example, rule 92 *bis* (A) of the ICTY Rules of Procedure and Evidence, which permits proof of facts by a written witness statement, where the statement goes to proof of a matter other than the acts and conduct of the defendant. See also *Prosecutor v. Milosevic*, ICTY, Case No. IT-02-54, Decision on Prosecution's Request to have Written Statements Admitted under Rule 92 *bis*, March 21, 2002; *Prosecutor v. Galic*, ICTY, Case No. IT-98-29, Decision on Interlocutory Appeal Concerning Rule 92 *bis* (C), June 7, 2002.

[220] *Prosecutor v. Thomas Lubanga Dyilo*, Case No. ICC-01/04-01/06, Decision Establishing General Principles Governing Applications to Restrict Disclosure pursuant to Rule 81(2) and (4) of the Rules of Procedure and Evidence, May 19, 2006, paras. 31–32; *Prosecutor v. Brdjanin and Talic*, ICTY, Case No. IT-99-36, Decision on Motion by Prosecution for Protective Measures, July 3, 2000, para. 13.

[221] European Court of Human Rights, *Van Mechelen v. Netherlands* (App. 21363/93, 21364/93, 21427/93, 22056/93), Judgment of 23 April 1997; (1998) 25 EHRR 647; ECtHR, *P.S. v. Germany* (App. 33900/96), Judgment of 20 December 2001. International tribunals have permitted complete anonymity in only one instance, the notorious "Witness L" case in *Prosecutor v. Tadic* (ICTY). "Witness L" lost his protective measures after it was discovered that he was not the person he claimed to be. *Prosecutor v. Tadic*, Case No. IT-94-1, Decision on Prosecution Motion to Withdraw Protective Measures for Witness L, December 5, 1996. Since that episode, international tribunals have refrained from granting anonymity. See May and Wierda, *International Criminal Evidence*, p. 283.

Of the 29 prosecution witnesses and complainants testifying against the defendants at trial, at least 23 were "constructively anonymous." That is, their names were deleted from the dossier before it was handed to the defense (indeed, all witness names were deleted) and they testified out of sight of the prosecution, the defense lawyers and the defendants, in a curtained witness box. Defense lawyers would be provided with the names of the witnesses to testify on the morning of the trial session at which the witness would speak. But the design of the courtroom and witness box was such that not all defense lawyers could observe the demeanor of the witness under questioning if the witness testified with the curtains of the witness box drawn.

The purpose of disclosing witness names in advance of the trial is to provide the defense with the opportunity to investigate witnesses in order to properly test their truthfulness and credibility.[222] Disclosing witness names one hour before testimony does not satisfy this purpose as it renders such investigation impossible. The IHT Rules require that the names of prosecution witnesses be disclosed to the defense 45 days before trial.[223] Rule 48 provides that the court may order protective measures, which include non-disclosure of witness names to the public and the media, but the rule does not refer to withholding of witness names from the defense.

The Dujail trial chamber never issued a single ruling or order setting out the parameters of protective measures for a witness and explaining why the measures were justified. Instead, protective measures amounting to anonymity were applied in a blanket manner. The measures were also sometimes applied in a way that was nonsensical and self-defeating, indicating a lack of understanding of how to use protective measures effectively. For example, on February 13 and 14, 2006, five witnesses were permitted to testify while concealed by the drawn curtains of the witness box, even though their names had been read out in open court.

### 5. No Reasoned Written Decisions on Key Procedural Issues

The transparency of the Dujail trial was greatly diminished by the consistent failure of the court to publicly issue written decisions on key procedural issues, such as on

---

[222] *Lubanga*, para. 30; *Brdjanin and Talic*, para. 36.

[223] IHT Rules of Procedure and Evidence, rule 41(1)(a).

its decision to close the defense case, its decision to read 29 witness statements into the record, or in response to defense motions accusing the presiding judge of bias. During sessions observed by Human Rights Watch, at least six written motions—addressing issues such as the time needed for the defense to prepare, security for defense counsel, recall of witnesses, scheduling of trial sessions, and the legality of the court—were submitted by private defense lawyers. No public written response on these issues was provided by the court. While some of the motions, such as the motion concerning the legality of the IHT, could be addressed in a final judgment, most of the motions concerned procedural concerns with bearing on the defendants' fair trial rights. Ignoring them over the course of the trial runs the serious risk that the defendants' rights will be irreversibly prejudiced because of the lack of a timely response by the court. Indeed, the failure of the court to respond with reasoned written opinions reinforces the impression that it was essentially indifferent to or unaware of the fair trial principles discussed above.

## 6. Judicial Turnover and Judicial Demeanor

### a. Turnover of sitting judges

The IHT's first trial chamber, which is responsible for adjudicating all questions of fact and law in the trial, consists of five judges.[224] During the course of the Dujail trial, three members of the trial chamber as originally constituted permanently left the bench: Judge Rizgar Amin and Judge Saeed al-Hammashi (both mentioned above, see Section IV,1), and a third judge who recused himself after November 28, 2005. During the course of the trial, a fourth judge was frequently absent due to illness, and was replaced by an alternate. The IHT assigns alternate judges to each trial chamber, who follow proceedings via video from another room in the court building. It is unclear how many alternates are assigned to each trial chamber.

Substitution of judges is not an unknown occurrence when there is a long-running trial.[225] The Rules of Evidence and Procedure of the ICTY and ICTR explicitly allow the

---

[224] IHT Statute, article 3(4)(B).

[225] See, for example, *Prosecutor v. Krajisnik*, ICTY, Case No. IT-00-39 & 40, Decision Pursuant to Rule 15 *bis*(D), December 16, 2004; *Prosecutor v. Milosevic*, ICTY, Case No. IT-02-54, Order Pursuant to Rule 15*bis*(D), March 29, 2004; Order Replacing a Judge in a Case Before a Trial Chamber (President of the ICTY), June 10, 2004; *Prosecutor v. Nyiramasuhuko et al.*, ICTR, Case No. ICTR-97-21-T, Decision in the Matter of Proceedings Under Rule 15*bis*(D) (Trial Chamber II), July 15, 2003; *affirmed by* Decision in the Matter of Proceedings Under Rule 15*bis*(D) (Appeals Chamber), September 24, 2003.

substitution of one judge, even if the defendant objects, in order to avoid unnecessary interruption or repetition of proceedings. [226] In deciding whether to continue with the proceedings where one judge leaves the bench, the international tribunals have applied an "interests of justice" test, taking into account a variety of factors including the ability to assess the demeanor and credibility of witnesses from the trial record; the interests of victims and witnesses; the progress of the case; and the financial costs of restarting the trial.[227]

On the other hand, the rules of the international tribunals envisage a one-off substitution, and certainly not a situation in which 80 percent of the trial chamber effectively turns over in the course of the trial. Where the trial chamber is the primary trier of fact, first-hand evaluation by judges of the demeanor of witnesses is of vital importance.[228] While the video-recording of proceedings can be regarded as an acceptable "second-best" in conjunction with transcripts,[229] in the Dujail case the overwhelming majority of prosecution witnesses testified behind a drawn curtain and thus their demeanor may not be observable by means of the video record of the trial. It is questionable whether a review of video-recorded trial proceedings can, in any event, be considered adequate where not one but four judges were permanently or temporarily replaced over the course of the trial. The turnover of judges in the Dujail trial undermined the integrity of fact-finding by the trial chamber.

### b. Lapses in judicial demeanor by the presiding judge

The presiding judge was the public face of the Dujail trial. He was the only judge whose face was regularly broadcast on television, and had primary responsibility for the conduct of proceedings in court. Presiding judge Ra'uf Abdel Rahman, who replaced Judge Rizgar Amin in January 2006, faced aggressive and unruly defendants, and defense lawyers who engaged in tactics that would sorely try the patience of any

---

[226] ICTY Rules of Procedure and Evidence, rule 15 *bis*; ICTR Rules of Procedure and Evidence, rule 15 *bis*.

[227] See, for example, *Prosecutor v. Krajisnik*, Decision Pursuant to Rule 15 *bis*(D), para. 10.

[228] *Prosecutor v. Karemera*, ICTR, Case No. ICTR-98-44, "Reasons for Decision on Interlocutory Appeals Regarding the Continuation of Proceedings with a Substitute Judge and on Nzirorera's Motion for Leave to Consider New Material," October 22, 2004, paras. 55–61; *Nyiramasuhuko*, Decision in the Matter of Proceedings Under Rule 15 *bis*(D) (Trial Chamber II), July 15, 2003, para. 33(e) (allowing substitution of one judge but noting that "the need for every judge to assess demeanor is certainly a very important one...").

[229] See, for example, *Prosecutor v. Krajisnik*, Decision Pursuant to Rule 15 *bis*(D), para. 14.

court.[230] These strained circumstances led to deterioration in relations between the presiding judge and the privately retained defense lawyers over the course of the trial, for which the defendants and their lawyers bear heavy responsibility. At the same time, a judge remains bound by the obligation to maintain his impartiality, and the appearance of impartiality, throughout the proceedings.[231]

Human Rights Watch is concerned that, during the course of the trial, the presiding judge committed a number of lapses of judicial demeanor that undermined his appearance of impartiality. He appears to have lost his temper numerous times, leading to exchanges of insults with the defendants, or erratic and often unexplained decisions limiting the rights of defense counsel to question witnesses.

During his questioning of defendant 'Awwad al-Bandar on March 13, 2006, when al-Bandar was making his statement as a defendant, the presiding judge adopted a hostile tone, frequently interrupting the defendant and ultimately refusing to allow him to finish his statement, although it was clearly related to the case against him.[232] On June 5, the presiding judge made a statement to al-Bandar that suggested that the judge had closed his mind to a key fact in issue, namely, the duration of proceedings before the Revolutionary Court. The prosecution had alleged that al-Bandar had conducted the trial of the 148 accused men and boys from Dujail in less than an hour, while al-Bandar maintained that he had conducted the trial over 16 days:

> Judge: Asking for dossiers [of the Revolutionary Court's file] is the work of the defense but don't ask us to do it.
>
> Al-Bandar: The Americans have seized all the documents of the Iraqi government, and the court can ask them to bring it, but if you want to litigate me without knowing the truth ...

---

[230] The conduct of private defense counsel is discussed further below.

[231] See, for example, IHT Rules of Procedure and Evidence, rule 7(4), which requires a judge to withdraw from a case if his independence or impartiality "might reasonably be in doubt." It is an established principle of most legal systems that impartiality implies not only actual freedom from bias, but also the appearance of freedom from bias. See, for example, *Prosecutor v. Furundzija*, ICTY, Case No. IT-95-17/1, Judgment (Appeals Chamber), July 21, 2000, paras. 189-190; European Court of Human Rights, *Piersack v. Belgium* (App. 8692/79), Judgment of 1 October 1982; (1983) 5 EHRR 169, para. 30.

[232] Human Rights Watch–ICTJ trial observation notes, March 13, 2006.