# Briefing Paper

# DUJAIL: TRIAL AND ERROR?

November 2006



International Center for Transitional Justice
5 Hanover Square, 24th Floor
New York, NY 10004
Tel 917-637-3800
Fax 917-637-3900
www.ictj.org

# DUJAIL: TRIAL AND ERROR?

**Contents**

| | | |
|---|---|---|
| I. | SUMMARY | 1 |
| II. | BASIC FACTS | 2 |
| | The Dujail Trial | 2 |
| | The Iraqi High Tribunal | 3 |
| | The Role of the ICTJ in Relation to the Trial | 4 |
| III. | CONTEXT | 5 |
| | What Did Iraqis Want? | 5 |
| | What Can These Kinds of Trials Achieve? | 5 |
| IV. | EVALUATING THE DUJAIL TRIAL | 5 |
| | A. Has the Trial Improved Respect for the Rule of Law and Independence of the Judiciary? | 6 |
| | B. Has the Trial Succeeded in Exposing the Full Extent of the System Crimes? | 9 |
| | C. Was the Trial Fair? | 11 |
| | D. Did the Trial Restore the Dignity of Victims? | 13 |
| | E. Did the Trial Consolidate the IHT's Institutional Capacity? | 14 |
| V. | CONCLUSIONS AND RECOMMENDATIONS | 15 |

## I. SUMMARY[1]

On November 5, 2006, the Iraqi High Tribunal (IHT) passed an historic judgment against Saddam Hussein and seven others. What became known as the "the Dujail trial" was the first before the Tribunal; the second would be that of al-Anfal, which began in August 2006.

The Dujail verdict was delivered in a 40-minute session that gave little indication of the judgment's detail and reasoning. Former president Saddam Hussein and his former chief of intelligence, Barzan al-Tikriti, were found guilty of willful killing, forcible deportation and torture. They were both sentenced to death and to two terms of 10 years' imprisonment each.[2] The former president of the Revolutionary Court, Awwad Hamd al-Bandar, was found guilty of willful killing and sentenced to death. The former vice president and head of the popular army, Taha Yasin Ramadan, was found guilty of willful killing, deportation, torture, and other inhumane acts. He was sentenced to life imprisonment and to three other terms of imprisonment, ranging from seven to 10 years. Former Ba'ath party officials, Abd Allah al-Ruwaid and Ali Dayih Ali, were found guilty of willful killing and sentenced to 15 years' imprisonment each. Former Ba'ath party leader, Mizher al-Ruwaid, was sentenced to 15 years' imprisonment for willful killing and seven years' imprisonment for torture. All these defendants were found guilty of these crimes as crimes against humanity.[3] Charges against Muhammad Azzawi Ali, a former Ba'ath party member from Dujail, were dismissed for lack of evidence. Individuals sentenced to more than one penalty will serve only the most severe.[4] No defendants were found guilty of the crime of enforced disappearances.

The November 5 judgment is not the final step in judicial proceedings, however. The case will also go to cassation, a process similar to an appeal. The cassation chamber will have to issue its final judgment before any sentences can be carried out. Among its options will be to affirm, reverse, or revise a decision.[5] It can also refer a case back to the lower court for retrial, although there is a discrepancy between the statute and the Iraqi Code of Criminal Procedure in terms of the grounds on which it can do so.[6]

This briefing paper was written prior to the release of the written judgment. It cannot analyze the evidence or judgment in depth until the court makes public its own reasoning behind the judgment. Instead, this paper summarizes the basic facts about the Dujail trial and the IHT, and of the ICTJ's trial-related work, including its in-depth monitoring. The paper outlines the context and considers both what the Iraqis

---

[1] This briefing was written by Marieke Wierda and Miranda Sissons, both Senior Associates at the International Center for Transitional Justice. Bill van Esveld also contributed. Our thanks go to the ICTJ Iraq consultant, Anne Massagee, Ari Bassin, and Bill van Esveld, as well as to Nehal Bhuta and the Iraq Researcher of Human Rights Watch. We gratefully acknowledge the assistance of all officials involved in facilitating ICTJ's monitoring efforts at the Iraqi High Tribunal.
[2] Saddam Hussein was sentenced to a further term of seven years' imprisonment upon being found guilty of other inhumane acts. This was omitted in early reporting.
[3] Crimes against humanity are among the most serious crimes of concern to the international community. They are designed to reflect the fact that certain crimes are either committed on a massive scale or are systemic and committed pursuant to an official policy of either a state or organization. The Tribunal's definitions of crimes against humanity are contained in Article 12 of the Law of the Supreme Iraqi Criminal Tribunal (Law Number 10 of 2005) *Official Gazette of the Republic of Iraq* (October 18, 2005). This law is referred to hereafter as "the statute". An English translation of the statute is available online at:
http://www.ictj.org/static/MENA/Iraq/iraq.statute.engtrans.pdf
[4] Article 142, Iraqi Penal Code (Law No 111) of 1969)
[5] Article 25, IHT statute, supra note 3.
[6] Article 26 of the IHT statute requires an application from either party to show that new findings or facts have been discovered which could have been decisive in reaching the verdict but were unknown at the time of the proceedings. However, the Iraqi Code of Criminal Procedure (Law 23 of 1971) seems to allow a broader discretion in this respect, and simply states that it must explain the grounds for its decision, paragraph 259(a)(1)(8)(B). On the face of it, there is some confusion between relevant provisions of the statute, rules of evidence, and the criminal procedural code.

wanted out of the trial, and what such prosecutions can achieve. The substance of the briefing, however, is an assessment of the trial itself, evaluating whether it:

- assisted in affirming judicial independence;
- exposed the full extent of system crimes;
- adhered to minimum fair trial guarantees;
- contributed to restoring the victims' dignity, and
- consolidated the IHT's institutional capacity.

Finally, the ICTJ offers conclusions and recommendations relating to both the Dujail trial and the IHT generally.

If done effectively, trying the perpetrators of massive human rights crimes can result in some measure of accountability and dignity to the victims. It can also help build much-needed respect for human rights and rule of law. Such trials must be evaluated against the broader political context – but also according to internationally-recognized standards of fairness. These issues are detailed on page 5.

While recognizing the many difficulties faced by the Tribunal, it is the ICTJ's assessment that the trial phase of the Dujail case did not meet these standards. It also fell short in a number of other crucial areas. These include exposing the full extent of the crimes committed by Saddam Hussein's regime; providing adequate outreach to the Iraqi public, and developing badly-needed administrative structures for the IHT. These concerns are discussed in detail on pages 11-14.

The Dujail trial was a significant but flawed step in the search for Iraqi justice. Tribunal judges courageously attempted to deliver justice at a new and ambitious standard for Iraq. But the trial was troubled by challenges such as political interference, gaps in evidence, and breaches of fair trial standards. Based on its in-depth monitoring of the Dujail proceedings, the ICTJ believes a robust appeals process is essential. Substantive and procedural flaws in the trial phase should be addressed. The Tribunal's Cassation (appeals) Chamber should consider referring the Dujail case for retrial to ensure justice is realized. These and other recommendations can be found on pages 15-17.

Three defendants in the Dujail case face the death penalty. The ICTJ opposes the application of the death penalty, and even more so in the light of the flaws of this trial. The terrible crimes of the Ba'ath regime deserve justice and punishment; the ICTJ is articulating its concerns because it believes Iraqi victims and the Iraqi people deserve a fair, strong verdict that will stand the test of time.

## II.    BASIC FACTS

**The Dujail Trial**

The alleged facts of this trial deal with a retributive attack against the population of Dujail, a small village about 60 kilometers north of Baghdad. It was here that local residents allegedly mounted an assassination attempt on then president Saddam Hussein on July 8, 1982. The attack took place when his presidential motorcade visited the town. On the day, several residents of Dujail were killed in the town. In the days that followed, hundreds of others were detained and tortured. The Revolutionary Court passed the death sentence on nearly 100 male detainees, who were then executed. Up to 46 others included in the Revolutionary Court judgment had already died under torture. Hundreds of their relatives, including elderly men, as well as women and children, were banished to a camp in the desert.[7] While in internal

---

[7] The Liya camp, in the al-Samawah desert, is located close to the Saudi border.

exile, their houses were confiscated, their orchards in the area of Dujail razed and their property destroyed.

The IHT tried eight accused in the Dujail trial, ranging in seniority from the highest to low-ranking Ba'ath officials. The high-ranking defendants included Saddam Hussein; his half-brother and former chief of the intelligence service (the *mukhabarat*), Barzan Ibrahim al-Hassan al-Tikriti; the former deputy prime minister and later vice-president and head of the army, Taha Yasin Ramadan; and the president of the Revolutionary Court, Awwad Hamd al-Bandar. At the other end of the spectrum were medium- to low-ranking local Ba'ath party members. These included Abd Allah Kathim al-Ruwaid and Mazhar Abd Allah Kathim al-Ruwaid, senior Ba'ath party officials in Dujail, and Ali Dayih Ali and Mohammed Azawi Ali, both party officials in Dujail. The defendants were charged with crimes against humanity, including willful killing, deportation, imprisonment, torture, disappearances and "other inhumane acts."[8] Under Article 406 of Iraq's penal code, the crime of murder is punishable by death.

Crimes against humanity are amongst the most serious crimes of concern to the international community. While the underlying offences of murder, torture and so on are important measures of individual criminal acts, they do not on their own convey the full nature and extent of the crimes. Crimes against humanity are derived from international criminal law and designed to reflect the fact that certain crimes are committed on a massive scale or systemically, often following an official policy of a state or organization. The crimes must have been committed as part of a widespread or systematic attack against a civilian population. Furthermore, it must be shown that the accused knew that the crime in question formed part of such an attack.

**The Iraqi High Tribunal**

In essence, the IHT is a domestic court that has been inserted into the Iraqi legal system. Its jurisdiction, however, applies international law provisions that were first developed after World War II, but had never been formally included in Iraqi law.

A more complete history of the Tribunal's establishment is documented in detail elsewhere.[9] Briefly, US officials stated their intention to establish an Iraqi-led tribunal prior to the fall of the Ba'athist regime. The IHT, originally titled the "Iraqi Special Tribunal," was established by order of the Coalition Provisional Authority in December 2003. In the following year, it was re-established in Iraqi national law and renamed. IHT proceedings are regulated by a statute promulgated on October 18, 2005.[10]

Under the statute, the IHT has jurisdiction over certain international crimes, including genocide, crimes against humanity and war crimes, if committed between July 17, 1968 and May 1, 2003.[11] It also has jurisdiction over certain crimes under Iraqi national law.[12] While separate rules of procedure and

---

[8] Awwad Hamd al-Bandar was charged initially with murder as a crime against humanity. The crimes of disappearances and other inhumane acts were added on May 15 2006, at the close of the prosecution case.
[9] See ICTJ, *Creation and First Trials of the Supreme Iraqi Criminal Tribunal*, October 2005 at http://www.ictj.org/images/content/1/2/123.pdf.
[10] See Law of Supreme Iraqi Criminal Tribunal, supra note 3.
[11] Iraq ratified the 1949 Geneva Conventions on February 14, 1956, and acceded to the Convention on the Prevention and Punishment of the Crime of Genocide on January 20, 1959 (as mentioned in the statute, Article 11(1)). Genocide, war crimes and crimes against humanity had not been incorporated into domestic law before the Tribunal's statute was promulgated.
[12] Article 14 (1-3) of the IHT statute includes undefined crimes from a law of 1958: interference in the affairs of the judiciary; the wastage and squandering of natural resources, and the abuse of position and pursuit of policies that may lead to the threat of war or the use of Iraqi armed forces against an Arab country. Article 14 (4) of the statute, inserted in October 2005, allows the tribunal to hear cases of crimes which may lack the elements required for crimes against humanity, war crimes, or genocide if they constitute crimes under the Iraqi Penal Code.

evidence were promulgated for the IHT,[13] the basic procedural framework of the Dujail trial was taken from Iraqi law, specifically the Iraqi Code of Criminal Procedure of 1971 and the Iraqi Penal Code of 1969.

The Iraqi legal system follows the civil law tradition, not the Anglo-Saxon system of common law. The trial, therefore, followed a standard civil law format, where the presiding judge plays a leading role. He is required to guide proceedings through various phases of evidence, including the complainants' phase and witness testimony, documentary evidence and the statements of defendants themselves. This is followed by a charging process, witnesses for the defense and concluding statements. As in any civil law system, the defendants were given the opportunity to represent their own views and to be represented by legal counsel of their choice.[14]

The IHT received international advice primarily via the Regime Crimes Liaison Office (RCLO), a unit operating out of the US Embassy. The RCLO is staffed largely by individuals seconded from the US Department of Justice, and also provides investigative and logistical support. An experienced British lawyer who is not an RCLO employee advised the judges of the first trial chamber. Another expert was appointed to assist the defense office some six months after the Dujail trial began.

**The Role of the ICTJ in Relation to the Trial**

The ICTJ is one of only two organizations (with Human Rights Watch)[15] to formally observe the trial throughout. Prior to the trial, ICTJ commented on the statute and the rules of procedure and evidence. The organization's Arabic-speaking observers were present from the trial's opening, and attended 85 percent of the hearings. The ICTJ has engaged in many conversations and interviews with key participants in a series of four visits,[16] one including international expert Robin Vincent, formerly Registrar of the Special Court for Sierra Leone.

In addition to maintaining a consistent presence on the ground, the ICTJ organized a pre-trial dialogue on international standards in London – aimed at prosecutors and judges. It also evaluated the trial dossiers, kept an informal transcript, and corresponded with the Tribunal. The organization has also provided extensive media commentary throughout the trial. The ICTJ also worked in Iraq prior to the trial and, together with the University of California, Berkeley, conducted a country-wide survey on Iraqis' expectations of transitional justice in 2003.[17]

---

[13] Rules of Procedure and Gathering of Evidence with Regard to the Supreme Iraqi Criminal Tribunal, *Official Gazette of the Republic of Iraq* (October 18, 2005), available at http://www.ictj.org/static/MENA/Iraq/IraqTribRules.eng.pdf

[14] On the frequent occasions that counsel of their choice were absent, the IHT made an effort to ensure that the accused were represented by members of the court's own defense office.

[15] In this regard, our thanks in particular go to Nehal Bhuta and the Iraq researcher from Human Rights Watch for an extensive collaboration on covering the IHT and the trials. Most of our missions were joint missions and we are very grateful for the opportunity for consulted and shared impressions.

[16] October 2005; November – December, 2005; February - March 2006; and July 2006.

[17] In extensive interviews and focus group discussions, 395 people, representing a broad cross-section of the Iraqi population, were polled through 38 interviews and 49 focus groups, conducted in July and August, 2003. ICTJ / Human Rights Center, University of California (Berkeley), *Iraqi Voices: Attitudes Toward Transitional Justice and Social Reconstruction*, (2004), p.60. Generally, interviewees expressed widespread support both for material and symbolic compensation and rehabilitation as ways of rebuilding lives, restoring dignity and moving beyond the legacy of the old regime. Many responses further indicated a desire for national reconciliation through education, media, and community programs. The three most pressing issues in social reconstruction were securing basic needs, maintaining security and stability, and improving economic conditions. *Iraqi Voices*, pp. i-iii.

## III. CONTEXT

**What Did Iraqis Want?**

When surveyed shortly after the fall of the Ba'ath regime by the ICTJ and University of California, Berkeley, Iraqis strongly supported fair and public trials for the regime's massive human rights violations[18] – namely, the trials of Saddam Hussein, his family, and his closest supporters.[19] Those surveyed said they viewed public trials as a way to ensure the public airing of the regime's crimes.[20] Because victims and their families desired retribution, respondents felt that the punishment should fit the crime.[21]

The survey also made clear that Iraqis' belief in the legitimacy of a trial process would be built gradually. Attitudes revealed conflicting feelings: a desire for fair trials, but also for swift and vengeful justice; a strong demand for an Iraqi-controlled accountability process, and a lack of confidence in the fairness of the Iraqi legal system and mixed feelings about judges and lawyers from the old regime; recognition of the need for international assistance, but mistrust of the US for its earlier support of Saddam Hussein and its role as an occupying power. They also expressed anger against the international community for years of sanctions and decades of inaction against Saddam Hussein.[22] The trial should be evaluated against this background of expectations.

**What Can These Kinds of Trials Achieve?**

If handled effectively, trials dealing with massive human rights violations can strongly reaffirm the rule of law. They can bring a measure of accountability for terrible crimes, and restore dignity to victims. They can demonstrate a new commitment to an independent and effective judiciary, strengthen the capacity of criminal justice institutions, and demonstrate the meaning and importance of fairness. However, holding such trials in post-conflict (and conflict) environments poses great challenges. These may include continued insecurity, political upheaval and potential politicization; as well as lack of capacity, and/or lack of independence or impartiality by the judges. All these factors should be taken into account when evaluating any trial process. However, one should never lose sight of the fundamental questions. Was the trial fair? Did it meet recognized international standards? And will it merit respect in years to come? This document seeks to answer these questions in regard to the Dujail trial.

## IV. EVALUATING THE DUJAIL TRIAL

The Dujail trial is the first step of a very ambitious exercise. It is rare for countries to attempt to try their own leaders for massive human rights violations in the immediate aftermath of their overthrow. Hence, the very fact that Iraq decided to hold trials must be seen as significant. Unlike during the post World War II trials at Nuremberg, the violence in Iraq continues, and the Tribunal is working in an extremely challenging environment.

---

[18] Respondents tended to define a fair legal process as the antithesis of what they had experienced in the past. Other criteria included, inter alia, open and public trials, judgments in accordance with the law, and non-corrupt judges. *Iraqi Voices*, p. 48.
[19] Ali Hassan al-Majid (Chemical Ali), Izzat Ibrahim al-Douri (vice-chair of the Revolutionary Command Council), and Uday and Qusay Hussein were among those specifically named. *Iraqi Voices*, p. 49. Respondents stressed the need to differentiate between Ba'ath party leadership and mere members. Id., pp. 27-28.
[20] Some of those interviewed criticized the killings of Uday and Qusay Hussein because they would not be confronted with their crimes in court. Id, p. 48.
[21] Id., p. 26.
[22] Id., pp. i-ii.

It would not be fair to say that the Dujail trial has been a sham; the judges have clearly intended to set a new standard for Iraqi judicial processes – one that is procedurally and substantially fairer than any previously held by the special courts that dominated the criminal justice regime during the era of Saddam Hussein in Iraq. Some of those involved in the Dujail trial – judges, prosecutors, complainants, witnesses, and lawyers - are individuals of enormous courage, and their participation has required considerable personal sacrifice. Judges at investigative and trial levels, as well as other Tribunal participants, are attempting to deliver justice to a certain standard.

Their efforts are complicated by the fact they are working from an extremely low base. Under Ba'athist rule, the Iraqi criminal justice system was a travesty. It would be unrealistic to expect the trials to conform fully to international standards without additional international assistance. Even trials conducted under the auspices of the UN have not always met international standards of fairness.[23]

The ICTJ considers that the Dujail trial should be evaluated according to the following criteria – i.e., did it contribute towards:

- Improving respect for the independence and impartiality of the judiciary (as a way of building the rule of law);
- Uncovering the full extent of the system crimes, and thereby contributing to accountability for these crimes;
- Demonstrating and preserving standards of fairness, even for defendants who may be despised;
- Restoring the dignity of victims, including thorough acknowledgement of the crimes committed against them and the extent of their suffering;
- Building the effectiveness and institutional capacity of the IHT.

Ultimately, it is for Iraqis to decide the form of justice that they wish to pursue, provided it adheres fully to human rights standards. While recognizing the difficult circumstances in which it took place, the ICTJ considers that the Dujail trial fell short of international standards – and also of the Tribunal's own statute and rules. By drawing attention to these shortcomings, the ICTJ hopes that mistakes will be recognized and corrected, and that, ultimately, the quality of justice delivered in the Dujail case – and in future cases – will stand the test of time.

## A. Has the Trial Improved Respect for the Rule of Law and Independence of the Judiciary?

Several issues impacted directly on the Tribunal's ability to demonstrate the centrality of the rule of law and the independence of the judiciary in post-2003 Iraq. Some of these factors were within the Tribunal's control; others were not.

Much has been made in the media and elsewhere of the dramatics in the courtroom, particularly the exchanges between the judges and the accused. But these are, to some extent, common to such trials. High-ranking politicians are almost always capable of better showmanship than judges. Rather, other factors have seriously undermined the trial's ability to re-affirm the rule of law.

The first and most serious issue is that of political attacks on the independence of the judiciary. Iraqi political leaders have continually made remarks and exerted pressure, creating an atmosphere that is not

---

[23] See Caitlin Reiger and Marieke Wierda, *The Serious Crimes Process in Timor-Leste: In Retrospect* (ICTJ, 2006), pp. 2-3, 40-41. See also David Cohen, *Indifference and Accountability: The United Nations and the Politics of International Justice in East Timor* (East-West Center, June 2006).

conducive to the exercise of the presumption of innocence or to fair trials. Judge Rizgar Amin, who initially presided over the Dujail trial, resigned in January 2006, following criticism of his courtroom demeanor by senior political figures and the public.[24] In the same month, the ICTJ was told that members of the executive reportedly threatened to cut judicial allowances, following unfavorable media coverage of the IHT. Judge Abdullah al-Amiri, who was presiding over the second trial chamber, was removed on September 19, 2006, following an outcry from the prime minister's office, parliamentarians, and the public at his comment that Saddam Hussein was "not a dictator."[25]

Such direct and indirect forms of interference are intended to have a chilling effect on the behavior of the remaining judges.[26] The political message is clear: if judges are seen as too lenient in their courtroom demeanor or judgments, they will be removed. Internal judicial processes for evaluating the conduct and possible bias of judges, and resulting in their disqualification, have been completely ignored. Other remarks by political leaders have eroded the presumption of innocence and given the impression that the trials are a foregone conclusion. It is difficult to think of a more blatant attack on the independence of the judiciary.[27]

A second vital issue concerns the repeated interventions in judicial selection by the Higher National De-Ba'athification Commission.[28] The IHT has undergone several rounds of de-Ba'athification, a politicized process which has ignored the high threshold required by international standards before judges can be removed from ongoing cases.[29]

De-Ba'athification has not been confined to the Tribunal. However, the standard imposed is unusually stringent, and it has remained a looming threat throughout the proceedings.[30] The first round of removals was in the summer of 2005, when a number of the IHT's staff was dismissed. But when Judge Sa'id al-Hammashi was due to replace former presiding judge Rizgar Amin as the next most senior judge, the De-Ba'athification Commission prompted his removal from the trial chamber (although he was not ultimately removed from the IHT). In October 2006, a further four judges received letters to indicate that they were under investigation and were suspended from their duties. It is unknown what future damage de-Ba'athification may cause to the process.

---

[24] The Minister of Justice, Abd al-Hussein Shandal, directly attacked Judge Rizgar in December 2005; his attacks were subsequently directed at the newly-appointed presiding judge, Rauf Abd al-Rahman. *Al-Hayat*, February 5, 2006.

[25] See Peter Beaumont, "Judge in Saddam Trial Axed in Neutrality Row," *The Guardian*, September 20, 2006.

[26] Article 4(4) of the IHT statute allows the Council of Ministers (made up of the Prime Minister and the cabinet) to transfer a judge from the IHT to the Higher Judicial Council "for any reason."

[27] See the UN Basic Principles on the Independence of the Judiciary, available online at http://www.unhchr.ch/html/menu3/b/h_comp50.htm

[28] According to Article 33 of the Tribunal's Statute, "No person belonging to the Ba'ath Party may be appointed as a Judge, Investigative Judge, Prosecutor, employee or any of the Tribunal's staff." Coalition Provisional Authority (CPA) Order No. 7 gave ex post ratification to the first and second decisions of the Higher National De-Ba'athification Commission and authorized the Iraqi Governing Council to further delegate powers to the Commission. CPA Order No. 6: Delegation of Authority Under De-Baathification Order No. 1 (CPA/MEM/4 November 2003/7), Sections 1(1), and 2(1). Further, CPA Order 15, "*Noting* that the Iraqi justice system has been subjected to political interference and corruption over the years of Iraqi Ba'ath Party rule," created a Committee to "investigate and gather information on the suitability of Judges and Prosecutors to hold office," with the power to remove them or confirm them in office, appoint replacements, and resolve claims of improper removal. CPA Order 15, Establishment of the Judicial Review Committee (CPA/ORD/-- Jun 2003/--), June 23, 2003, Section 4(1).

[29] In this regard, the ICTJ notified then Iraqi Prime Minister Ibrahim al-Jafaari of the UN Basic Principles on the Independence of the Judiciary in a letter of February 14, 2006.

[30] In other fields, it is high-ranking Ba'ath party members who are subjected to de-Ba'athification, but Article 33 of the Tribunal statute states that any person who was a member of the Ba'ath party cannot be employed by the court.

The Dujail case had a substantial turnover. During the course of the trial, there were at least four changes of personnel in the five-judge panel (due to resignation, recusal, de-Ba'athification, and illness). It is reasonable to conclude that the judges' ability to assess the facts was affected and fairness was damaged.

Comparative experience shows that respect for the independence of the judiciary is vital to the success of domestic prosecutions for grave human rights abuses.[31] Unless Iraqi government officials, the De-Ba'athification Commission and others halt their interference with these trials, their legacy will be tainted and they will be perceived as having been politicized for years to come.

A number of other factors have contributed to the politicization of the Dujail trial and its inability fully to affirm the centrality of the rule of law in the Iraqi context:

- *Perceptions regarding legitimacy.* The promulgation of the Tribunal's statute may have ensured its legitimacy as a matter of formal law. However, there is still a difficulty in terms of *perception* of the legitimacy of the Tribunal, because of the US role in its creation and its provision of ongoing support, mainly through the RCLO. This has been readily seized upon by defendants and defense counsel. It has also impaired the trial's impact in the Middle East and North Africa regions.

- *Security.* The security environment in which the IHT operates has deteriorated sharply since 2003, affecting almost every aspect of its work. At least five IHT employees have been murdered since 2004, and three defense lawyers were murdered during the Dujail trial. These deaths have led to ongoing controversy over the propriety of the trial's timing and location. The killing of the defense lawyers, in particular, gave rise to the perception that the IHT and RCLO had not taken sufficient steps to protect them from the outset of the Dujail trial. While certain arrangements may have been offered to defense counsel, too little appears to have been offered too late.[32] Members of the Tribunal's defense office have also had difficulty in making adequate security arrangements. As a result, defendants faced difficulties in retaining not only private counsel, but even court-appointed attorneys.[33] The deaths of the defense counsel are also likely to have had an enormous impact on the defense's ability to conduct independent investigations.

- *Failure to apply legal rules during the proceedings.* The Dujail trial also suffered from an absence of regularized procedures, which contributed to a sometimes chaotic appearance. Judges' lack of prior experience in conducting complex criminal cases was apparent at times, in spite of the efforts made to run an orderly court.

- *Judicial demeanor and impact on impartiality.* The exchanges between the judges and the posturing of defendants in the courtroom led to several lapses in judicial demeanor. Some of these may have been harmless, unlike statements such as that by judge Rauf to Awwad al-Bandar directly alluding to facts under dispute: "This is not a special court, I am not prosecuting you without fulfilling my conscience, I won't issue a sentence on 148 defendants within one hour, I am not this type."[34]

---

[31] Steven R. Ratner and Jason S. Abrams, *Accounting for Human Rights Atrocities in International Law: Beyond the Nuremberg Legacy* (Oxford University Press, 2001), pp. 182-183.
[32] After the killing of Sadun al-Janabi in October 2006, defense counsel demanded that they be given a choice of protective personnel (rather than have guards provided by the Ministry of Interior); that they be issued weapons and appropriate licenses, and that an impartial investigation be conducted into the killing of al-Janabi. In March 2006, there were delays in paying the guards assigned to them by the Ministry of the Interior, and there was reportedly still no offer to relocate outside of Iraq.
[33] Ali Dayih Ali claimed that, after two privately hired lawyers withdrew from his case, his two court-appointed attorneys either withdrew or simply failed to appear. IHT session, February 1, 2006.
[34] IHT session, June 5, 2006.

- *Role of defendants.* Defendants were more concerned with the trial as a political platform than with their own legal defense. There can be no doubt that the fact that the proceedings were televised provided the accused with additional opportunities in this regard.

- *Role of defense counsel.* Many defense counsel contributed directly to the trial's politicization through tactics both in and out of the courtroom. These included staging walk-outs and other political gestures such as boycotts.[35] This kind of behavior was not in the interests of their clients, who were left to fend for themselves. The IHT had insufficient disciplinary tools to tackle this problem.

### B. Has the Trial Succeeded in Exposing the Full Extent of the System Crimes?

Investigative techniques for "system" crimes, such as those committed by Saddam Hussein's regime, differ from those relating to ordinary crimes. The work of the investigative judge or prosecutor in investigating and presenting most ordinary crimes is sometimes likened to that of a film director in terms of "depicting" or reenacting an event, such as a murder. On the other hand, the investigation of system crimes requires an approach closer to that of an engineer. If an investigation were to demonstrate the responsibility of members of a criminal regime, the task would to expose clearly how the various parts of the 'machinery' functioned to culminate in crimes such as murder on a massive scale.[36]

System crime investigation – whether in relation to one or a series of criminal acts – requires a detailed exploration of the system itself, and not merely its results. The results are manifested in the underlying offenses that constitute what is called the "crime base" (e.g., murder, torture, rape, deportation, etc.). In the Dujail case, the testimony of the complainants and the documentary evidence succeeded in establishing the crime base.

However, the more difficult task is to show that high-level accused such as Saddam Hussein himself were responsible for the crimes committed by his subordinates. This requires evidence that links them to the crimes. Such evidence may establish their direct participation (for instance, though oral or written orders). It may also establish their superior or command responsibility (in terms of showing that they had effective control over their subordinates and failed to act or punish them, even though they knew or should have known about the crimes.) In short, the prosecution case, as compiled by the investigative judge, was *much weaker* in terms of linkage evidence.

This analysis was written prior to the release of the trial chamber's written judgment. The ICTJ will analyze the judgment in depth at a later stage. Based on extensive monitoring and observer notes, however, the ICTJ has identified the following weaknesses in the case presented against the defendants:

- *Lack of clarity on the forms of participation alleged.* The prosecutor never clearly laid out *how* each of the accused participated in the crimes. While he seemed to allege that there was something akin to a joint criminal enterprise to carry them out, no evidence was brought to that

---

[35] After Barzan al-Tikriti had been ordered removed from the court, a Jordanian defense lawyer stood up and began shouting at the presiding judge until he was removed as well. The judge observed that this counselor was inciting his clients. IHT session, January 29, 2006. Hussein's private defense attorneys were still boycotting the trial when Hussein re-appeared in court on July 26 to critique it, and to listen to two other lawyers as they delivered his closing defense arguments. IHT session, July 26, 2006; BBC Monitoring Middle East (transcription of al-Jazeera television broadcast), July 23, 2006.
[36] See Office of the UN High Commissioner for Human Rights, *Rule of Law Tools for Post-Conflict States: Prosecution Initiatives* (UN, New York and Geneva: 2006)

effect, nor were other types of co-perpetration specified.[37] This leaves open the possibility that the violations committed in the course of investigating the assassination attempt were the result of acts by overzealous individuals. Moreover, none of the charging documents specified the particular roles played by the individuals accused of the crimes.

- *No clarity on the respective responsibilities of the different organs of Saddam Hussein's regime.* In the trials at Nuremberg, or at the Yugoslav Tribunal, it has been common to call expert witnesses to give an overview of how a particular system operated. This helps produce clear descriptions of chains of command and the respective responsibilities of various parts of the "machine." In the Dujail trial, *no such witness was called*, and the respective competences of the institutions with which individual accused were affiliated were never clearly defined (for example, the *mukhabarat*, the Revolutionary Court, the Popular Army, the Ba'ath party, or the President's Office). The result is that the evidence related more clearly to the facts of the crimes themselves, than to who orchestrated them.

- *Absence of patterns.* The presentation of evidence seemed constrained by the sequence stipulated in Iraqi law, where it is common to start with complainants, followed by witnesses, and then present the documentary evidence. This process did not easily allow for the presentation of patterns of evidence, which would have allowed the prosecution to argue that the judges should draw inferences. For instance, if it had been shown that torture was widespread in the *mukhabarat*, it would have been easier to argue that Saddam Hussein knew, or should have known, that such torture was occurring in the aftermath of the Dujail attack. Nor did the judges exercise their right to call additional evidence on such issues.

- *Lack of evidence on knowledge or intent.* There was insufficient evidence to show that some of the accused were aware of, or should have known about, the crimes. For instance, documentation from the Revolutionary Court in relation to the cases before it – including a verdict from June 14, 1984 and ratified on June 16 – shows that Saddam Hussein was aware that 148 individuals were ordered executed for events in Dujail. However, this in itself is not enough to constitute the requisite intent for crimes against humanity. What was required was evidence showing that the Revolutionary Court sentenced people to death without any trial, and that Saddam Hussein was aware of that. This is merely one of several such examples.

The difficulties in defining the case against the accused allowed issues to emerge which were not central to the case, but which occupied much time and attention in the courtroom. Examples include whether the Revolutionary Court had followed Iraqi law in its proceedings, or whether any juveniles had been executed. The result was that *no clear narrative* emerged from the proceedings.

Although there was much media attention on the documentary phase of the trial, the ICTJ's assessment is that the documents in this case did not succeed in providing a "roadmap" to the system crimes. ICTJ had an opportunity to examine the dossier and found that it did not seem to be compiled in a logical or strategic manner, and that it contained many pieces of evidence of doubtful probative value. In many cases, the chain of custody of documents could not be discerned.[38]

---

[37] A joint criminal enterprise would ordinarily require evidence that several persons having a *common purpose* embark on criminal activity that is then carried out either jointly or by some members of this plurality of persons (although joint criminal enterprise is not usually used in civil law systems, which tend to rely on various levels of co-perpetration).

[38] Rule 26 of the Rules of Procedure and Evidence provide that the investigative judge, public prosecutor or investigator must send a copy of any information or material evidence gathered before the trial – to the Tribunal's Information unit, which must "preserve this material" ( rule 26(1-2)). An ICTJ observer mission to the Tribunal, from February 27 to March 3, 2006, raised concerns that such a unit had, in fact, transparently ensured the origin and handling of the evidence in the Dujail trial.

Documentary evidence provided snippets of insight into the functioning of Saddam Hussein's regime over the years. However, with the exception of the role of the department of *mukhabarat*, the documents did not contain evidence on many facets of the prosecutor's case.

Some commentators have overemphasized the value of "admissions" made by the accused in the courtroom or to the investigative judge. These unsworn statements, an ordinary feature of the civil law trial, are not necessarily evidence and in this case are of doubtful evidentiary value. For instance, at one point during the trial Saddam said that "Everything I signed I am responsible for,"[39] but this will not constitute conclusive evidence if the documents do not decisively establish his guilt.

Finally, the evidence on the role of the lower-level Ba'ath party officials was scant. It did not seek to demonstrate how their individual actions may have been carried out in the knowledge that they were part of a widespread or systematic attack.

### C. Was the Trial Fair?

In terms of procedural fairness, the standards by which the Dujail trial should be evaluated were acknowledged by the Tribunal itself. The language of Article 19 of the statute incorporates almost exactly that of Article 14 of the International Covenant on Civil and Political Rights.[40] This article was read out at the outset of the trial.

In addition to concerns about the independence of the IHT and the presumption of innocence discussed in section A, the ICTJ has a number of other serious fairness concerns. Many of these were brought to the attention of the IHT in a letter to its president, dated May 13, 2006.

- *Specificity in charging.* The IHT's charging process followed that of Iraqi domestic criminal law; however, in the ICTJ's opinion, it was insufficiently specific in terms of what should be required for a case of crimes against humanity. The first charges contained in a "referral decision" by the investigative judge simply stated that the accused were charged with crimes against humanity. These charges were not detailed in the dossier, nor did the prosecutor provide much additional information in his opening statement. The charges were similarly weak in that they constituted only a brief factual account, with no differentiation between the accused individuals. This was attached to the charging document presented in May 2006 at the end of the case for the prosecution (an occasion on which charges of disappearances and other inhumane acts were added). This violates an accused's right to be informed promptly and in detail of the charges against him, making the case very difficult to defend. Crimes against humanity, being of a widespread nature, often rule out defenses that exist in domestic law (for example, that of alibi.) Most defenses by those accused in such trials deal with the fact that, although the crimes may have occurred, they themselves did not participate. By failing to specify the mode of participation, the prosecutor deprived the defendants of such possible avenues of defense and/or meant that they had to prepare for every possible alleged scenario.

- *Right to confront witnesses.* The ICTJ believes that the investigative stage – and potentially the trial stage – may have violated the right of the accused to examine, or to have examined, the witnesses against him. It is the ICTJ's understanding that neither the accused nor their

---

[39] BBC Monitoring Middle East, July 26, 2006.
[40] This article includes the accused's presumed innocence (19(2)), entitlement to a public hearing (19(3)), and such minimum guarantees of a fair impartial trial (19(4)) as: being promptly informed of the content, nature and cause of the charge against him (4a); having adequate time and facilities to prepare his defense and to communicate freely with counsel of his own choosing (4b); being tried in his own presence (4d).

defense counsel were present during the questioning of complainants in the investigative stage,[41] so that there was no confrontation of witnesses at that time. While about half of complainants (28) subsequently appeared in court, another 28 were deemed "unavailable" and their statements were read in court, but without offering them the opportunity of confronting the witnesses. Moreover, the identity of up to 23 of the complainants was disclosed only an hour in advance of their being called (the complainants were also not subsequently recalled), making it impossible for the defense to prepare adequately for cross-examination.

- *Lack of opportunity for lower-level defendants.* The inclusion in the case of both relatively minor and high-level defendants seriously hampered the quality of their defense, as the former were generally accorded less time and fewer resources than the latter. The unfairness is compounded by the severity of the sentencing.

- *Equality of arms.* The ICTJ also considers that the Dujail trial fundamentally breached the principle of equality of arms, whereby both the prosecution and defense are given the opportunity to present evidence under equal conditions. (A related right is the right to adequate time and facilities to prepare the defense case.) While inadequate institutional support has been a common problem in international and hybrid tribunals, IHT problems relating to equality of arms were more pronounced than elsewhere, and were also exacerbated by the security situation. Preserving this right in the face of public opinion to the contrary could have been one of the most significant contributions of the IHT process.

There is no indication that the investigative judge fulfilled his duties to find and disclose exculpatory evidence. On one occasion, a request by the court for assistance in locating the Revolutionary Court dossier on Dujail – claimed to be exculpatory – was explicitly turned down. The security situation made it difficult if not impossible for the defense to conduct its own investigations; nor were they able to go to Dujail.

Indeed, the court was consistently unresponsive to defense motions. Only rarely did it issue short oral rulings, and seldom gave reasons for decisions (thereby depriving the defendants of remedies). An absence of reasoning can also affect the defendant's ability to appeal.

Defendants were frequently represented by the defense office; however, this office lacked capacity for much of the trial. Until the trial's final stages, defense office lawyers were usually silent and passive in court.[42] It seems that the court did not always treat the defense as essential to the integrity of the proceedings: as an integral part of the trial, not a luxury. Instead, it appears that, on many occasions, the court simply substituted giving the accused an opportunity to speak with giving them a full opportunity to present a legally-based defense.

There were also other indications of a lack of even-handedness in procedural matters. For instance:

- the prosecutor was allowed to introduce into evidence a number of documents and other exhibits in court, without prior disclosure to the defense (amounting effectively to "trial by ambush")
- the chain of custody of documents was not always clear, and some sources with custody of the documents may not have been impartial, including certain victim organizations

---

[41] Other than in defendants' interviews with the investigative judge.
[42] The relationship between the defense office and private attorneys was fraught, and the latter did not always share documents with the defense office or inform them when filing motions.

- as far as the ICTJ can determine, the defense did not have access to their own statements to the investigative judge as part of the dossier.

The ICTJ raises these concerns in the full knowledge of the extreme security conditions in which the tribunal operates, but considers that these are not necessarily to blame for many of the shortcomings, including the fact that (1) the investigative judge did not seek or disclose exculpatory evidence; (2) the charging process was not sufficiently specific; (3) witness statements were read into the trial record without reservation; (4) the prosecutor did not properly disclose documents ahead of time. The ICTJ urges the IHT to urgently review its approach to the rights of the accused in current and future trials. ICTJ's recommendations for the Dujail case and other recommendations for future action that follow from this are detailed below

**D. Did the Trial Restore the Dignity of Victims?**

The ICTJ believes that the trial has played a role in restoring the dignity of those victims who participated as complainants, and who were represented by lawyers in the courtroom. People from Dujail often sat in the public gallery and seemed to take a measure of pride in the role of residents of Dujail in confronting, and testifying against, Saddam Hussein and the other defendants.

Some of the testimony given in the trial was both compelling and historic. For example, several witnesses testified to the torture they underwent while they were detained in the months and years following the assassination attempt. Female witnesses showed tremendous courage in testifying about their detention and torture.[43] One recalled how she was stripped naked, hung by her arms, and shocked by electrical wires attached to her fingers and toes.[44] Many victims withstood strong and often abusive questioning by defense counsel – and verbal outbreaks by the defendants themselves – as they told of the arrest, disappearance, or deaths of friends, brothers, fathers, uncles, sons, and nephews. While the testimonies were often horrific in content, the importance to the victims of recounting their experience in a courtroom in front of the former Iraqi leadership cannot be overstated.

The broader impact of the narrative created by this testimony was, however, hampered by the IHT's lack of outreach. Ideally, the Tribunal should have educated the public about the importance of this testimony and its process. To date, however, its failure to disseminate general information about court procedures, the laws being applied, and the role of the defense have seriously diminished its potential to show that justice was being done.

The IHT's location inside Baghdad's International Zone severely hampered access to the trial. For the average Iraqi, the tribunal's security arrangements and location might as well have been located outside Iraq. While the television coverage was presumed to be a substitute, sessions were edited and aired without any explanation, while for security reasons cameras could not depict the entire courtroom. Much of the focus was on the exchanges between the presiding judge and the accused.

Press conferences were held by the spokesperson, but ICTJ observers have raised with the IHT the appropriateness of using an investigative judge in this representative role.

---

[43] BBC Monitoring Middle East (transcription of Al-Sharqiya television broadcast), December 6, 2005 (Witness A recalling how she was tortured with electricity, beaten with hoses and prodded to confess); IHT session, February 1, 2006 (testifying that she was detained, tortured, subjected to mock hanging and the mock execution of her parents). The testimonies of women prompted indignant responses from Saddam Hussein, who repeatedly stated that no woman could have been subject to abuse under his regime.
[44] IHT session, February 1, 2006.

**E. Did the Trial Consolidate the IHT's Institutional Capacity?**

The recent experience of criminal tribunals shows that fair, efficient trials require effective administration. Like the "registries" of the International Criminal Tribunal for the former Yugoslavia (ICTY), the International Criminal Tribunal for Rwanda (ICTR) and the Special Court for Sierra Leone, the administrative department of the IHT is formally charged with crucial responsibilities both inside and outside the courthouse. These include handling the court's documentation (both in maintaining the trial record and in handling motions); assisting the chambers, prosecutors, and defense office, forming a victims and witnesses unit, overseeing the detention of defendants, as well as communicating with the media.[45]

In practice, however, the administrative structure outlined in the Tribunal's framing laws has failed to function. A critical issue has been a lack of leadership. Administrative directors have been purged and replaced, and the director's duties have been divided among other IHT officials on an ad hoc basis.[46] IHT judges – particularly the late president of the IHT – saw little need to remedy the absence of an experienced senior administrator and well-trained staff. Serious problems have resulted. These have included:

- *Delays, interruptions, and confusion in court sessions.* The presiding judge did not always know how many privately retained defense counsel were entitled to be in court, who they were, whom they represented, and whether they had power of attorney. Counsel occasionally arrived in court to find there were not enough seats. Scheduling appeared erratic and subject to judicial whim. There was no master schedule available that both parties could consult – a major issue given the logistical complexities of attendance. These problems contributed to a perception of chaotic courtroom proceedings.

- *Damage to fairness of proceedings.* The late disclosure of documents, and the unclear origin and chain of custody of evidence, raised concerns that went beyond inefficiency. Defense counsel complained repeatedly the very limited disclosure of witness identities (an hour before proceedings) damaged their ability to confront witnesses, and that they had received copies of prosecution documents or sound recordings. Procedures relating to the submission and receipt of motions were poorly managed, and several defense motions were reportedly lost altogether. No written transcript was available during the trial phase, which affected final statements and also limited public understanding of events. Unless an unedited transcript is subsequently produced, defendants will not have a court transcript on which to base appeals.[47]

- *Inadequate communication with and protection of victims and witnesses.* The IHT was not proactive in providing information to victims, and in managing their expectations. Crucially, and despite the robust victim and witness protection program set out in Tribunal documents,[48] the victim and witness unit was initiated only well into the trial process, and was placed in the hands of the Dujail trial's chief investigative judge. From the ICTJ's research, it appears that the program merely offered transport assistance and some limited services at the IHT itself.

---

[45] See article 15 of the Rules of Procedure. The goal of the unit is to protect anyone at risk, "on account of the testimony they give" at the Tribunal, and includes safety measures, short and long term plans for protection, and medical treatment, counseling and rehabilitative support.
[46] Salem Chalabi, the original Director, was replaced in August 2004; his replacement was removed in August 2005; the post has been vacant since. The tasks of media outreach and establishing a victims and witness protection unit were assigned to the chief investigative judge.
[47] Compare article 53 of the Rules of Procedure, mandating the preservation of trial records.
[48] Rule 15, Rules of Procedure.

No witness relocation program had been institutionalized by March 2006, although ad hoc arrangements had developed.

- *Lack of budgetary clarity.* The Iraqi portion of the IHT's budget is managed directly by the IHT. Responses by IHT staff indicated that information on budgetary allocations was closely guarded. If no coherent, transparent process for allocating the Iraqi portion of Tribunal funds, exists, then the Tribunal's management and administration will be significantly compromised and its accountability processes undermined.

Finally, as far as long-term capacity building is concerned, the Tribunal's legacy to Iraq's legal profession will be non-existent unless the security and credibility of the IHT improve. If judges, lawyers and victims are not respected, or cannot stay safely in Iraq after participating in the IHT, its lasting contribution to Iraq's legal system will be minimal. Moreover, if the Tribunal's administrative problems are not addressed, they may well be exacerbated in the al-Anfal case, which involves far higher numbers of witnesses and a greater volume of evidence than Dujail.

## V. CONCLUSIONS AND RECOMMENDATIONS

In the light of the observations above, it is the ICTJ's conclusion that, despite the tribunal's significant efforts the Dujail trial has fallen short of its desired goals – not just in terms of guaranteeing fair trial standards, but in a number of other areas as well. The concern of the ICTJ is that, if the mistakes made in the Dujail trial are not rectified, they will fundamentally undermine the contribution of the trial of Saddam Hussein and his associates to the transition in Iraq. Instead of arriving at a conclusive historical record, the proceedings are in danger of being questioned on their factual determination and fairness for years to come.

The fact that this trial did not perform better is particularly surprising in the light of the role played by the RCLO. The United States has significant experience in conducting trials for international crimes, and much of the "how to" in terms of investigating and prosecuting system crimes was developed by Americans at Nuremberg and subsequently used at the ICTY, ICTR, and the Special Court for Sierra Leone. Seen from this perspective, it may be puzzling that the case left so much to be desired. Individuals employed by the RCLO have seemed committed to the process and have often worked under difficult conditions. The reason for failings often given by RCLO officials is that their advice went unheeded. At the same time, the RCLO continued to play a significant, though often hidden, role in terms of supporting the trials (including legal, financial and logistical support).

In the ICTJ's view, many of these problems could have been avoided by inserting more varied external expertise into the process. The role of the RCLO had a chilling effect both on the Iraqi desire to seek other external advice, and on the willingness of other international experts to participate (as did the application of the death penalty).

As a matter of principle, the ICTJ would greatly prefer a process that includes greater external expertise, although it recognizes there may be some practical limitations. Nonetheless, the ICTJ urges the Tribunal to explore additional options for retaining external experts through means other than the RCLO: for instance, through an elaboration of the current arrangements for the independent judicial advisor. External experts have made largely positive contributions to issues of legal substance and fairness. External experts should be made available by governments beyond that of the United States, subject to constraints of the European Convention of Human Rights and other international human rights instruments in respect of cooperation with courts that apply the death penalty,

The IHT should not necessarily be judged on a single trial. But it should not allow even a single verdict to remain in place which is based on an unsatisfactory or sub-standard process. For these reasons, the ICTJ

urgently recommends that the Tribunal take steps to rectify the errors of the Dujail trial, and to make structural adjustments that will benefit future trials. This is in recognition of the fact that there is still a willingness and desire on behalf of the IHT to deliver justice to a standard that will be internationally recognized as sufficient.

**Recommendations – the Dujail Case**

The ICTJ believes a robust appeals process is essential. The substantive and procedural shortcomings in the investigative and trial phase should be addressed. The Tribunal's cassation chamber should consider referring the Dujail case back to the trial chamber for retrial to ensure justice is realized. A retrial may be the most desirable remedy in this situation as it would allow the Chamber to seek to correct the procedural flaws as well as the evidentiary gaps-the trial's two major deficiencies.

Three defendants in the Dujail case face the death penalty. The ICTJ opposes the application of the death penalty, and its opposition is strengthened in the light of the flaws in this trial. The death penalty would render irreversible all mistakes made during this trial, and would negate the access to justice for victims of other crimes.

**Recommendations - Going Forward**

**To Iraqi political leaders and parliamentarians:**

- The political leadership of Iraq should immediately put an end to all forms of political interference with the IHT, be this in the form of statements intended to influence the proceedings, administrative pressure, or the removal of judges. The political leadership of Iraq has a strict duty to promote an environment that is conducive to the holding of fair trials by an independent judiciary.

- Amend the language of Article 4(4) of the IHT statute to conform to UN Basic Principles on the Independence of the Judiciary and remove the inappropriate power of the executive to order the transfer of judges "for any reason."

- Delete Article 33 of the IHT statute. Any allegations of bias, disciplinary or other complaints against sitting judges should be dealt with by existing internal tribunal procedures or disciplinary mechanisms.

**To the Higher National De-Ba'athification Commission:**

- The Higher National De-Ba'athification Commission should cease issuing De-Ba'athification orders against existing Tribunal staff. Any allegations of bias, disciplinary or other complaints against sitting judges should be dealt with by existing internal tribunal procedures or disciplinary mechanisms.

**To the Iraqi High Tribunal:**

The IHT should seek to address the flaws in the prosecution case in Dujail, and thereby avoid similar problems in the Anfal case. This includes concentrating on adequate charging, on the elements of the crimes, and linking high-level accused with the crimes described by the complainants. Consider increased use of expert evidence for essential background.

- Urgently retain more external experts, with skills similar to the international judicial and defense office advisers. International assistance could include former judges, lawyers, or administrators

from international or hybrid tribunals, and others with substantial experience in trials of crimes against humanity or war crimes.

- Provide as a matter of priority additional training on international law for the prosecution, judges, and defense (including both private lawyers and the defense office). This should include training on elements of the crimes and modes of participation.

- Review security arrangements for the defense and all other trial participants. Effective witness and victim protection programs should be institutionalized. Greater efforts should be made to address the specific concerns of defense counsel and defense office employees.

- Respect and enforce the rights of the accused more rigorously. If in doubt, judges should err on the side of caution in allowing defense requests. In particular, judges should:
    - Ensure that the charges in pending cases are more specific;
    - Refrain from admitting any evidence that is not properly confronted by the accused at the investigative or trial stages, or only admitted with an express recognition that it will not result in a conviction.
    - Make certain that adequate time and facilities are accorded to the defense, including:
        - Dealing promptly with defense motions, giving a reasoned decision in each case;
        - Assisting the accused and defense counsel with locating exculpatory evidence;
        - Providing security and logistical support for defense investigations;
        - Strengthening the defense office, and improving its relationship with private counsel;
        - Ensuring the equality of arms more broadly, including in simple matters such as access to Tribunal offices and scheduling of session times;
        - Improving disclosure practices that comply with the IHT's own rules, including that concerning the identity of protected witnesses;
        - Improving facilities for the defense office.

- Consolidate judges' control of the courtroom by conducting consistent criminal proceedings regulated by the rules, and establishing appropriate disciplinary mechanisms.

- Appoint a senior administrator (national or international), and strengthen IHT administration.

- Develop a comprehensive outreach strategy as a matter of urgency.

**To other governments:**

- Make external experts available to the Iraqi High Tribunal, subject to the constraints of the European Convention of Human Rights and other international human rights instruments in respect of cooperation with courts that apply the death penalty.