**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TAHA YASSIN RAMADAN, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0297 (PLF) |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**RESPONDENTS' OPPOSITION TO
<u>PETITION FOR A WRIT OF HABEAS CORPUS</u>**

PETER D. KEISLER
Assistant Attorney General

JEFFERY A. TAYLOR
United States Attorney

JOSEPH H. HUNT (D.C. Bar No. 431134)
Branch Director

VINCENT M. GARVEY (D.C. Bar No. 127191)
Deputy Branch Director

MICHAEL P. ABATE (IL Bar No. 6285597)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
<u>Mailing Address</u>
P.O. Box 883
Washington, D.C. 20044
<u>Delivery Address</u>
20 Massachusetts Ave., N.W., Room 7302
Washington, D.C. 20001
Telephone:    (202) 616-8209
Facsimile:    (202) 616-8470

<u>Attorneys for Respondents</u>

# **TABLE OF CONTENTS**

**PAGE(S)**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.      The Multi National Force – Iraq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.     The Iraqi High Tribunal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

         A.     The Structure of the Iraqi High Tribunal . . . . . . . . . . . . . . . . . . . . . . . . . 6

         B.     Petitioner's Conviction and Sentence by the Iraqi
                 High Tribunal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.      Federal Courts Lack Jurisdiction to Consider Habeas Petitions
          from Non-Citizens, Detained Overseas by a Multinational
          Force During Ongoing Hostilities, Convicted by a Foreign Court
          for Violations of Foreign Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    II.     Neither the Constitution Nor Federal Law Permits a Collateral
          Attack on a Foreign Conviction in a Federal Court . . . . . . . . . . . . . . . . . . . . . . 19

    III.    Exercising Jurisdiction Over the Petition Would Contravene the
          Separation of Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    IV.    Article III Prohibits the Relief Petitioner Requests . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## <u>TABLE OF AUTHORITIES</u>

32 County Sovereignty Comm'n v. Dep't of State,
    292 F.3d 797 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ahmad v. Wigen, 910 F.2d 1063 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

* Al-Bandar v. Bush, et al.,
    No. 06-2209 (D.D.C. Dec. 28, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Al-Bandar v. Bush, No. 06-5425 (D.C. Cir. Jan. 3, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Al-Bandar v. Bush, 127 S. Ct. 854 (Jan. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Am. Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Bancoult v. McNamara, 445 F.3d 427 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Bishop v. Reno, 210 F.3d 1295 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

* Boumediene, et al. v Bush, et al.,
    No. 05-5062 (D.C. Cir. Feb. 20, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 22

Dep't of the Navy v. Egan, 414 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fiallo v. Bell, 430 U.S. 787 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

* Flick v. Johnson, 174 F.2d 983 (D.C. Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Garza v. Lappin, 253 F.3d 918 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Hamdi v. Rumsfeld, 542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

* Hirota v. General of the Army MacArthur,
    338 U.S. 197 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

* Holmes v. Laird, 459 F.2d 1211 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

* In re Hussein, __ F. Supp. 2d __,
    2006 WL 3832818 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Johnson v. Eisentrager, 339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

Lopez-Smith v. Hood, 121 F.3d 1322 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Mead Corp. v. United States, 490 F. Supp. 405 (D.D.C. 1980)  . . . . . . . . . . . . . . . . . . . . . .  19

* Mohammed v. Harvey, 456 F. Supp. 2d 115 (D.D.C. 2006)  . . . . . . . . . . . . . . . . . . . . .  15, 16

Ntakirutimana v. Reno, 184 F.3d 419 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Neely v. Henkel, 180 U.S. 109 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 21, 22

* Omar v.  Harvey, No. 06-5126 (D.C. Cir. Feb. 9, 2007)  . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Pauling v. McElroy, 278 F.2d 252 (D.C. Cir. 1960)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

People's Mojahedin Org. Of Iran v. U.S. Dep't of State,
    182 F.3d 17 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Preiser v. Rodriguez, 411 U.S. 475  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Qassim v. Bush, 407 F. Supp. 2d 198 (D.D.C. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Rasul v. Bush, 542 U.S. 466 (2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 17

Matter of Requested Extradition of Smyth,
    61 F.3d 711 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Schneider v. Kissinger, 412 F.3d 190 (D.C. Cir. 2005),
    cert. denied, 126 S. Ct. 1768 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

* Sea Containers Ltd. v. Stena AB, 890 F.2d 1205 (D.C. Cir. 1989)  . . . . . . . . . . . . . . . . . . .  23

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Spencer v. Kemna, 523 U.S. 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

United States v. Kin-Hong, 110 F.3d 103 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

United States v. Verdugo-Urquidez, 494 U.S.259 (199) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

W.S. Kirkpatrick  & Co., Inc. v. Envtl. Tectonics Corp.,
    493 U.S. 400 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Wilkinson v. Dotson, 544 U.S. 74 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 26

Wilson v. Girard, 354 U.S. 524 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Zadvydas v. Davis, 533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. Art. II, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

U.S. Const. Art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8 U.S.C. §1252(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

28 U.S.C. §§ 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Foreign Affairs Reform and Restructuring Act
    of 1998 Pub. L. No. 105-277, § 2242(d), 112 Stat. 2681 . . . . . . . . . . . . . . . . . . . . . . . . 22

Military Commissions Act of 2006, § 5(a), Pub. L. No. 109-366,
    120 Stat. 2600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## OTHER AUTHORITIES

U.N. Security Council Res. 1511 (Oct. 16, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

U.N. Security Council Res. 1546 (June 8, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 14

U.N. Security Council Res. 1637 (Nov. 11, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

U.N. Security Council Res. 1732 (Nov. 28, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

Iraqi National Assembly Law No. 10 of 2005 ("IHT Statute") . . . . . . . . . . . . . . . . . . . . . passim

Iraqi Criminal Procedure Code of 1971 ("1971 Code") . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

## INTRODUCTION

Petitioner Taha Yassin Ramadan ("petitioner"), the former Vice President of Iraq, was convicted by the Iraqi High Tribunal ("IHT") for committing crimes against humanity, including willful killing, torture, deportation or forcible transfer of the population, and imprisonment in violation of the norms of international law. At the request of the Government of Iraq, members of the Multi National Force–Iraq ("MNF-I") – an international military force with a United Nations Security Council mandate – are detaining petitioner in Iraq during the pendency of his ongoing IHT proceedings.

Petitioner seeks a writ of habeas corpus to prevent his release or transfer from MNF-I custody to the Government of Iraq. Because petitioner is a citizen of Iraq, being detained in that country by multinational forces pursuant to a conviction by an Iraqi court, Supreme Court and D.C. Circuit precedent require this Court to dismiss the petition for lack of jurisdiction. *See Hirota v. General of the Army MacArthur*, 338 U.S. 197 (1948); *Flick v. Johnson*, 174 F.2d 983 (D.C. Cir. 1949). This case presents a very straight-forward application of *Hirota* and *Flick*. To see why, this Court need look no further than the D.C. Circuit's recent opinion in *Omar v. Harvey*, No. 06-5126 (D.C. Cir. Feb. 9, 2007).[1] In that opinion, the D.C. Circuit identified four key "circumstances" present in *Hirota*: (1) "detention overseas"; (2) "the existence of a multinational force"; (3) "foreign citizenship"; and (4) a "criminal conviction." *See Omar*, slip.

---

[1] The *Omar* decision is binding on this Court and dictates the outcome of this case. The Government nevertheless believes that *Omar* was wrongly decided, and the Solicitor General has already decided to seek rehearing *en banc*. However, such reconsideration, even if granted, would not affect the outcome here. It remains clear that *Hirota* and *Flick* do apply to cases like Ramadan's, involving a petitioner who is not a citizen of the United States and who has been convicted by a foreign tribunal.

op. at 11 (D.C. Cir. Feb. 9, 2007).  This case is indisputably on all fours with *Hirota* because it contains the same four "circumstances": petitioner (1) is detained in Iraq; (2) by an international force (the MNF-I); (3) is a citizen of Iraq, and not the United States; and (4) was convicted by an Iraqi court for crimes against humanity.  According to the *Omar* court, this last circumstance – the conviction by the Iraqi High Tribunal – makes inescapable the conclusion that *Hirota* governs this case.  *See id.* at 12 ("[*Hirota*'s] language demonstrates the Court's primary concern was that the petitions represented a collateral attack on the final judgment of an international tribunal.").

There can be no doubt that this petition presents the kind of collateral attack upon a foreign judgment that is proscribed by *Hirota* and *Flick*.  Two other courts of this district, in considering *identical habeas petitions* brought by co-defendants at petitioner Ramadan's trial, recognized just that.  *See Al-Bandar v. Bush, et al.*, No. 06-2209, slip op. at 1 (D.D.C. Dec. 28, 2006) (amended order) (citing *Hirota* and *Flick* and dismissing petition for lack of jurisdiction);[2] *In re Hussein*, __ F. Supp. 2d __, 2006 WL 3832818, at *3 (D.D.C. 2006) (same).

Even if this Court were not compelled by controlling Supreme Court and D.C. Circuit precedent to dismiss the case for lack of jurisdiction, it nevertheless should refuse to issue the writ because principles of international comity prevent United States courts from adjudicating collateral attacks upon the decisions of foreign courts, like the Iraqi High Tribunal.  Moreover, exercising jurisdiction over the petition would threaten the separation of powers.  This Court's consideration of petitioner's plea would intrude into the President's control over military and

---

[2] Following this Court's dismissal of the petition for lack of jurisdiction, Al-Bandar sought an emergency injunction pending appeal from the D.C. Circuit and the Supreme Court.  Both courts rejected that request.  *See Al-Bandar v. Bush*, No. 06-5425, 2006 WL 3986241 (D.C. Cir. Jan. 3, 2007); *Al-Bandar v. Bush*, 127 S. Ct. 854 (Jan. 5, 2007).

foreign policy matters because it is the President, as Commander in Chief, who decided that U.S. forces should participate in the MNF-I. Entertaining this petition would also violate the principles underlying the longstanding rule of "non-inquiry" developed in the extradition context. That rule provides that if a determination is to be made about the fairness of a foreign judicial system or how it will treat a petitioner, that determination is to be made by the Executive Branch – in particular the Secretary of State – and not by federal courts.

Finally, the relief sought by petitioner – that MNF-I forces be enjoined from releasing him or transferring him to Iraqi custody – would violate Article III of the United States Constitution. That injunction would by its own terms prohibit the court from affording petitioner all the relief that he may obtain in a habeas proceeding – outright release or a shortening of his sentence – and would thereby artificially prolong his judicial proceedings without a justiciable case or controversy.

Petitioner's request essentially asks this Court to stand in judgment of a foreign tribunal's conviction of one of its citizens, and to prevent the nation of Iraq from carrying out the sentence pronounced by the Iraqi High Tribunal set up to prosecute the crimes committed in Iraq by the regime of Saddam Hussein. That request is inappropriate; it simply is not the role of the courts of the United States to adjudicate collateral attacks on the convictions of foreign citizens tried abroad in the courts of their own country for violations of foreign and/or international law. This Court should dismiss the petition.

## BACKGROUND

I.    THE MULTI NATIONAL FORCE – IRAQ

The Multi National Force–Iraq is an internationally organized entity consisting of forces

from over twenty-five nations, including the United States.[3]  The MNF–I operates in Iraq at the

request of the Government of Iraq and under a U.N. Security Council mandate authorizing MNF-

I "to take all necessary measures to contribute to the maintenance of security and stability in

Iraq."  U.N. Security Council Res. 1511, at 3 ¶ 13 (Oct. 16, 2003) (establishing MNF-I) (attached

as Exh. 1).  In resolution 1546, passed in 2004, the U.N. Security Council "[n]ote[d] that the

presence of the multinational force in Iraq is at the request of the incoming Interim Government

of Iraq, and therefore reaffirm[ed] the authorization of the multinational force under unified

command established under resolution 1511 (2003)."  U.N. Security Council Res. 1546, at 4 ¶ 9

(June 8, 2004) (attached as Exh. 2).

Resolution 1546 also referenced letters sent by the Prime Minister of Iraq, Dr. Ayad

Allawi, and the then U.S. Secretary of State, Colin Powell, to the President of the U.N. Security

Council.  *See id.* at 4 ¶ 10.  Those letters (annexed to the resolution) state that MNF-I's goal is to

---

[3] In addition to forces from the United States, military forces from the following countries participate in the MNF-I: Albania, Armenia, Australia, Azerbaijan, Bosnia and Herzegovina, Bulgaria, Czech Republic, Denmark, El Salvador, Estonia, Georgia, Italy, Japan, Kazakhstan, South Korea, Latvia, Lithuania, Macedonia, Mongolia, Netherlands, Norway, Poland, Romania, Slovakia, United Kingdom, and Ukraine.  Although the United States is a leading participant in the MNF–I, and the multinational force operates under the "unified command" of high-ranking U.S. military officers, the multinational force is legally distinct from the United States and includes high-ranking officers from other nations (for example, the second in command, Lt. Gen. G.C.M. Lamb, is a British officer,  *see*  http://www.mnf-iraq.com/index.php?option=com_content&task=view&id=22& Itemid=16 (last visited Feb. 19, 2007)).

"help the Iraqi people to complete the political transition" and "permit the United Nations and the international community to work to facilitate Iraq's reconstruction." *Id.* at 10. The letters also state that the MNF-I is prepared to "continue to contribute to the maintenance of security in Iraq, including by preventing and deterring terrorism and protecting the territory of Iraq." *Ibid.* MNF-I stood ready to "undertake a broad range of tasks to contribute to the maintenance of security and to ensure force protection," and to provide "civil affairs support, and relief and reconstruction assistance," as requested by the Government of Iraq. *Id. at 11.*

In addition, resolution 1546 created a mechanism that allows the Government of Iraq to seek a review of the MNF-I mandate at any time. The resolution provided that the "mandate for the multinational force shall be reviewed at the request of the Government of Iraq or twelve months from the date of this resolution." *Id.* at 4 ¶ 12. The Security Council also declared in that resolution that it "will terminate [MNF-I's] mandate earlier if requested by the Government of Iraq." *Ibid.* Since resolution 1546, the U.N. Security Council has twice extended MNF-I's mandate in Iraq for an additional twelve months, each time concluding (based on communications from Iraqi officials) that the Government of Iraq desired MNF-I's continued presence. *See* U.N. Security Council Res. 1637, at 3 ¶1 (Nov. 11, 2005); U.N. Security Council Res. 1723, at 3 ¶ 1 (Nov. 28, 2006).

Consistent with the U.N. Security Council mandate and at the request of the Government of Iraq, which convicted and sentenced petitioner for crimes against humanity, petitioner is currently in MNF-I custody. *See* Declaration of Lt. Col. Quentin K. Crank ¶ 3 ("Crank Decl.") (attached as Exh. 3). Petitioner will remain in MNF-I custody for the duration of his current legal proceedings before the Iraqi High Tribunal. *Id.* ¶ 4.

II.     **The Iraqi High Tribunal**

A.     **The Structure of the Iraqi High Tribunal**

The Government of Iraq established the Iraqi High Tribunal – sometimes called the Iraqi

High Criminal Court ("IHCC") – in Law No. 10 of 2005.  *See* The Statute of the Iraqi High

Tribunal ("IHT Statute"), art. 1 § First (Oct. 18, 2005) (attached as Ex. 4).  That law gave the

IHT jurisdiction "over every natural person, whether Iraqi or non-Iraqi resident of Iraq, accused"

of specific, enumerated crimes, including genocide, crimes against humanity, war crimes, or

violations of certain other Iraqi laws, committed between June 17, 1968 and May 1, 2003.  *Id.*

art. 1 § Second.

The court operates under a continental or inquisitorial model, rather than under the

Anglo-American adversarial model.  Thus, the Iraqi High Tribunal is divided into three bodies:

the Investigative Judges, the Trial Chamber, and the Appellate Chamber (sometimes called the

Court of Cassation).  *Id*. art. 3.  IHT proceedings begin with an investigative hearing in which the

Investigative Judges determine whether there is sufficient evidence to warrant a criminal trial.

*Id*. art. 18.  Investigative judges have the "power to question suspects, victims or their relatives,

and witnesses, to collect evidence and to conduct on-site investigations."  *Ibid*.  If the

Investigative Judge determines that there is sufficient evidence to proceed, he prepares an

indictment and refers the case to the Trial Chamber.  *Ibid.*

At trial, the accused is presumed innocent until proven guilty.  *Id*. art. 19.  In addition,

every defendant is guaranteed certain rights, including the right to be informed promptly of the

charges against him; the right to appointed counsel or counsel of choice; the right to a trial

without undue delay; the right to present evidence and witnesses and to examine witnesses

against him; and the right not to testify against himself. *Ibid.* The IHT statute also incorporated into IHT proceedings the Iraqi Criminal Procedure Law of 1971 ("1971 Code") and a special set of IHT Rules of Procedure and Evidence enacted by the National Assembly. *Id.* art 16.

If the defendant is convicted, the Trial Chamber is required to impose a sentence in accordance with Iraqi law. *Id*. art. 24. The Appeals Chamber hears the appeals of defendants convicted by the Trial Chamber. *Id*. art. 25. The Appeals Chamber can affirm, reverse, or revise the decision of the Trial Chamber. *Ibid*.

### B.    Petitioner's Conviction and Sentence by the Iraqi High Tribunal

Petitioner and his co-defendants were tried before the IHT. Their trial, known as the "Dujail Trial," investigated events occurring after an alleged assassination attempt on Saddam Hussein in Dujail on July 8, 1982. *See generally Dujail Judgment*.[4] The IHT determined that, after 10 to 12 gunshots were fired from behind a garden wall in Dujail as Hussein's presidential procession passed by, the Hussein regime embarked on a massive and coordinated retaliation campaign that included: (1) the arrest, interrogation, torture, and detention of nearly 400 persons, many of whom died while in detention; (2) the widespread destruction of homes, autos, and water pumps and canals used to irrigate land with water from the Tigris River; (3) the destruction of the town's gardens and orchards, and seizure of arable land; and (4) a staged trial in which 148 men were wrongly convicted and executed. *Id.* Pt. 1, at 9; 18-22. In total, the IHT concluded, some 543 people were imprisoned, killed, or displaced. *Id.* Pt. 1, at 17.

---

[4] There is no official English translation of the IHT Trial Chamber judgment. An unofficial English translation of the Dujail Judgment (in six separate parts due to the opinion's length) may be obtained on a website hosted by the Case Western Reserve University School of Law, at http://law.case.edu/saddamtrial/Dujail/opinion.asp (last visited Feb. 19, 2007).

On May 15, 2006, the IHT Trial Chamber charged Petitioner – the former Vice President of Saddam Hussein's cabinet, commander of the Public Army, and high ranking Baath party official, *see id.* Pt. 1, at 10 – with crimes against humanity, including, *inter alia*: (1) willful killing; (2) deporting people or transferring them by force; (3) imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law; (4) torture; (5) enforced disappearance of persons; (6) and other inhumane acts of similar character causing great suffering, or serious injury to the body or the mental or physical health. *See id.*, Pt. 5, at 30.

Both prior to and after these formal charges issued, the IHT allowed petitioner to present his case. *See, e.g.*, *Dujail Judgment*, Pt.5, at 25-27 (summarizing petitioner's own statements to the court on May 14, 2006 – the day before he was charged – and the evidence offered through petitioner's attorney in the months following the issuance of the formal charges). Moreover, throughout the proceedings, the accused were permitted to meet with their attorneys when their attorneys were in Baghdad, and at the end of every judicial session. *Id.* Pt. 1, at 24.

At the close of the defense case, the Trial Chamber convicted petitioner on all counts except the charge of enforced disappearance (of which all co-defendants were acquitted). *See id.* Pt. 5, at 30-49; *id.* Pt. 6, at 1-6. On November 5, 2006, the Trial Chamber announced petitioner's conviction and sentence: life in prison pursuant to Art. 24 of the IHT Statute and Art. 406 of the Iraqi Penal Code, No. 111 of 1969. *See Dujail Judgment*, Pt. 6, at 6. The Trial Chamber issued its written Judgment on November 22, 2006.

Petitioner appealed to the Appellate Chamber, advancing many of the same arguments he presses in this petition.[5]  As permitted in the civil law system, the prosecutor and complaining victims also appealed, arguing that petitioner's sentence was too lenient. *See id.* at 4.  The Appellate Chamber rejected petitioner's challenges to the IHT's legality and procedures, and affirmed his conviction, but returned the case file to the Trial Chamber with a recommendation that the sentence against petitioner be increased.  *See id.* at 8-9, 14, 19-20.

On February 12, 2007, the Trial Chamber reconsidered the case and announced that petitioner was to be sentenced to death by hanging.  Pursuant to the IHT Statute and the 1971 Code, the Appellate Chamber will automatically review petitioner's death sentence.  The Trial Chamber must forward the case file to the Appellate Chamber, and petitioner has 30 days (starting the day after the decision was announced) to file papers in the Appellate Chamber contesting the new sentence.  *See* IHT Statute art. 25 (noting that appeals are governed by the 1971 Code); 1971 Code ¶ 224(D) ("If the court issues a death sentence, it must explain to the person given the sentence that his case papers will be sent automatically to the Court of Cassation for review.  He may also appeal against the ruling at the Court of Cassation within 30 days, starting from the day after the ruling has been issued.").[6]

---

[5] *See Dujail Appellate Judgment* at 5-6 (noting petitioner's arguments that the court was illegally constituted, that the trial contained procedural errors, was not sufficiently transparent, and was influenced by American personnel, and that, as Vice President, he was entitled to immunity). As with the Trial Chamber judgment, there is no official English translation of the Appellate Chamber judgment.  An unofficial translation may be obtained at http://law.case.edu/saddamtrial/content.asp?id=88 (last visited Feb. 19, 2007).

[6] An unofficial English translation of the 1971 Code can be found at http://law.case.edu/saddamtrial/documents/Iraqi_Criminal_Procedure_Code.pdf (last visited Feb. 19, 2007).

## ARGUMENT

Petitioner attempts to use this Court as a forum to collaterally attack his conviction and sentence before the Iraqi High Tribunal. This he cannot do. As precedents from the Supreme Court, D.C. Circuit, and courts in this jurisdiction make clear, federal courts in the United States lack jurisdiction to entertain habeas petitions from non-citizens held on foreign soil by multinational forces pursuant to convictions by foreign tribunals for violations of international and/or foreign law. Indeed, judges of this district have applied these precedents to dismiss for lack of jurisdiction two identical habeas challenges filed by co-defendants at petitioner's trial: Saddam Hussein and Awad Hamad Al-Bandar. The result in this case should be no different.

Even if this Court were to find, contrary to the legal principles underlying these precedents, that it had jurisdiction over the petition, it nevertheless should refuse to grant petitioner habeas relief because principles of international comity prevent this Court from entertaining an alien's collateral attack upon his conviction *by his own government*. Moreover, granting the writ would threaten the separation of powers and violate Article III.

## I.    FEDERAL COURTS LACK JURISDICTION TO CONSIDER HABEAS PETITIONS FROM NON-CITIZENS, DETAINED OVERSEAS BY A MULTINATIONAL FORCE DURING ONGOING HOSTILITIES, CONVICTED BY A FOREIGN COURT FOR VIOLATIONS OF FOREIGN LAW

Controlling authority confirms that the court lacks jurisdiction over petitioner's habeas plea. Under the Supreme Court's decision in *Hirota v. General of the Army MacArthur*, the D.C. Circuit's decision in *Flick v. Johnson*, and the decisions in *In re Hussein* and *Al-Bandar v. Bush*, habeas jurisdiction turns on whether the custodian holds the prisoner under the authority of the United States or, instead, pursuant to international authority.

In *Hirota v. General of the Army MacArthur*, 338 U.S. 197 (1948), the Supreme Court

-10-

considered a motion for leave to file a habeas petition on behalf of several Japanese citizens in the custody of U.S. military personnel in Japan, acting as part of the Allied Powers. *See Hirota*, 338 U.S. at 199 (Douglas, J., concurring). The prisoners had been convicted of war crimes and were in custody pending imposition of their sentences. They had been convicted by the International Military Tribunal for the Far East, a tribunal established by General MacArthur, acting "as an agent of the Allied powers." *Id.* at 198.

The Supreme Court held that "the courts of the United States have no power" to consider the prisoners' habeas petition. *Id.* at 198. Noting that the prisoners "are being held in custody pursuant to the judgments of a military tribunal in Japan," the Supreme Court explained that it had no authority to "review, to affirm, to set aside or annul the judgments and sentences imposed" because "the tribunal sentencing these petitioners is not a tribunal of the United States." *Ibid.* Thus, because the prisoners were not held pursuant to the laws of the United States, the Supreme Court held that the prisoners could not seek habeas relief in any U.S. court, even though the tribunal was established by General MacArthur, who was indisputably an officer in the U.S. Army subject to the direction of the President, and even though the petitioners were being detained by the U.S. Army. *Ibid.*

Shortly after *Hirota*, the D.C. Circuit reaffirmed that "no court of this country" has authority to exercise habeas jurisdiction over the claims of a petitioner held abroad under international authority, even if the petitioner is held by U.S. military personnel. *See Flick v. Johnson*, 174 F.2d 983, 984 (1949). In *Flick*, the D.C. Circuit affirmed a district court's dismissal, for lack of jurisdiction, of a German citizen's habeas petition. Flick was a German citizen, convicted of war crimes in Germany. *See id.* at 985. He was "serving a sentence of

-11-

imprisonment imposed by [a military tribunal] sitting in" the "American Zone of Occupation" in post-war Germany. *Id.* at 983. "American Army forces" were his jailers. *Ibid.* Because Flick was being held pursuant to a sentence imposed by the military tribunal, the D.C. Circuit explained, the determinative question was whether "the court which tried and sentenced Flick [was] a tribunal of the United States." *Id.* at 984 (citing *Hirota*). Accordingly, the Court "inquire[d] into the origin of the Flick tribunal and the source of its power and jurisdiction to determine whether it was a court of the United States." *Ibid.*

Even though that tribunal had been established by the American "Zone Commander," who appointed its members, and who was himself a General in the U.S. Army, the D.C. Circuit determined that the tribunal "was, in all essential respects, an international court"; the tribunal's "power and jurisdiction arose out of the joint sovereignty of the Four victorious Powers," and not U.S. law. *Id.* at 985. The Allied Powers established a "Control Council," which enacted a law "for the prosecution of war crimes." *Ibid.* That law "vested in the Commander for the American Zone the authority to determine and designate, for his zone, the tribunal by which accused persons should be tried." *Ibid.* Because the court that convicted Flick "was not a tribunal of the United States, its actions cannot be reviewed by any court of this country." *Ibid.* It made no difference that Flick was detained by members of the U.S. Army. The court of appeals explained that, because the tribunal had been established under international authority, "that ends the matter." *Ibid. See also Omar*, slip op. at 12 ("*Flick* thus holds that the critical factor in *Hirota* was the petitioners' convictions by an international tribunal, and for good reason . . . . [T]he Court's primary concern was that the petitions represented a collateral attack on the final judgment of an international tribunal." (internal citation omitted)).

-12-

As recognized by other judges in this district in dismissing two petitions brought by Ramadan's co-defendants in the Dujail trial, *Hirota* and *Flick* require dismissal of this petition for lack of jurisdiction. Addressing the petition filed by Ramadan's co-defendant Awad Al-Bandar, the former chief judge of the revolutionary court that sentenced 148 people to death in the wake of the Dujail incident, Judge Walton concluded that "[t]his court lacks *habeas corpus* jurisdiction over an Iraqi citizen, convicted by an Iraqi court for violations of Iraqi law, who is held pursuant to that conviction by members of the Multi-National Force–Iraq." *Al-Bandar v. Bush, et al.*, No. 06-2209, slip op. at 1 (D.D.C. Dec. 28, 2006) (amended order) (citing *Hirota* and *Flick*) . Similarly, in finding that the court had no jurisdiction over the habeas petition of Ramadan's co-defendant Saddam Hussein, Judge Kollar-Kotelly cited *Hiorta* and *Flick* for the proposition that "A United States Court has no 'power or authority to review, affirm, set aside, or annul the judgment and sentence imposed' by the court of a sovereign nation pursuant to their laws." *In re Hussein*, __ F. Supp. 2d __, 2006 WL 3832818, at *3 (D.D.C. 2006); *see also id.* (quoting Judge Walton's analysis in *Al-Bandar*).

These opinions are undoubtedly correct. As in *Hirota* and *Flick*, Hussein and Al-Bandar (like Ramadan) were in the custody of an international force (*i.e.*, MNF-I) stationed overseas. And, as in *Hirota* and *Flick*, Al-Bandar and Hussein (like Ramadan) were convicted in foreign (or international) courts. Finally, as in *Hirota* and *Flick*, Hussein and Al-Bandar (like Ramadan), were citizens of the foreign country in which they are detained by that multinational force pursuant to that foreign conviction. Therefore, those cases – like petitioner's – are on all fours with *Hirota* and *Flick*. In all of these cases it is clear that the petitioners were being held not under U.S. law, but under international and Iraqi authority. "[T]hat ends the matter." *Flick*, 179

-13-

F.2d at 985.

Despite the fact that judges of this Court have twice applied *Hirota* and *Flick* to dismiss habeas petitions brought by Ramadan's co-defendants, petitioner nevertheless urges that *Hirota* is distinguishable because in *Hirota* the United States had no authority over the Allied Powers, whereas here, the MNF-I is "subordinate in law and in fact to the United States." Pet. ¶ 20 (citing comments by Gen. Casey); *see also* Pet. ¶¶ 2-4, 16-17, 23, 36, 64, 68 (arguing that petitioner is in actual and physical custody of the United States). This argument is flawed. As noted above, the MNF-I is an international military force. The MNF-I derives authority from United Nations Security Council resolutions. *See* U.N. Security Council Res. 1511 (2003), 1546 (2004), 1637 (2005), 1723 (2006). The MNF-I is present in Iraq at the request of the Government of Iraq, which could at any time seek a review of its mandate by the U.N. Security Council. *See* U.N. Security Council Res. 1546, at 4 ¶ 12.

Indeed, three courts in this jurisdiction have explicitly considered the question and concluded that the MNF-I is a multinational, not American, force. In *Mohammed v. Harvey*, 456 F. Supp. 2d 115 (D.D.C. 2006), Judge Lamberth considered and rejected a claim that a petitioner in the custody of the MNF-I was within the custody of the United States military. He noted that the petitioner was "in the custody of coalition troops operating under the aegis of MNF-I, who derive their ultimate authority from the United Nations and the MNF-I member nations *acting jointly, not from the United States acting alone.*" *Id.* at 122 (emphasis added). Judge Lamberth went on to note:

> Petitioner is thus under the actual, physical custody of MNF-I, a multinational entity separate and distinct from the United States or its army. He is in the constructive custody of the Republic of Iraq, which is seized of jurisdiction in the

-14-

> criminal case against him, and which controls his ultimate disposition. Petitioner
> thus has two custodians, one actual and the other constructive: MNF-I and the
> government of Iraq. Petitioner has not shown that either custodian is the
> equivalent of the United States for the purposes of habeas corpus jurisdiction.

*Ibid.* (emphasis added); *see also id.* at 123 ("It does not change the outcome to point out that

Munaf is in the physical custody of U.S. troops in their capacity as participants in MNF-I. Where

a U.S. citizen is detained under the authority of a multinational military entity, he is not in

custody 'under or by color of the authority of the United States,' even if American military

personnel play a role in his detention as part of their participation in that multinational force.").

In finding that he had no jurisdiction over the habeas petition brought by Ramadan's co-

defendant, Al-Bandar, Judge Walton agreed with Judge Lamberth's analysis: "The Court does

not suggest that Respondents have custody of Petitioner. Rather, the Court agrees with Judge

Lamberth's analysis in *Mohammed v. Harvey* that Petitioner is either in the actual physical

custody of the Multi-National Force–Iraq or in the constructive custody of the Iraqi government."

*Al-Bandar v. Bush, et al.*, No. 06-2209, slip op. at 2 n.1 (D.D.C. Dec. 28, 2006) (amended order)

(citation omitted). Finally, in *In re Hussein*, __ F. Supp. 2d __, 2006 WL 3832818, at *3 (D.D.C.

2007), Judge Kollar-Kotelly also cited Judge Lamberth's analysis in concluding that Saddam

Hussein, because he was "held by members of the United States Military . . . pursuant to their

authority as members of the MNF-I," was "not in the custody of the United States."[7]

But, in any event, even if MNF-I were a United States military force, this Court would

still lack jurisdiction over the petition. As *Flick* makes clear – a case in which the petitioner was

unambiguously held by "American Army forces," *see* 174 F.2d at 983 – the fact that the

---

[7]   *Omar* did not hold to the contrary. It stated that one of the "circumstances" that was
"clearly the same" as in *Hirota* was the "existence of a multinational force." *Omar*, slip op. at 11.

petitioner is detained pursuant to a foreign conviction is sufficient, by itself, to deprive a United States court of jurisdiction over a habeas petition. "If the court was not a tribunal of the United States, its actions cannot be reviewed by any court of this country. If it was an international tribunal, that ends the matter." *Id.* at 985 (citations omitted); *see also Omar*, slip. op. at 13 ("The fact that Omar has never been convicted of criminal activity thus distinguishes this case from both *Hirota* and *Flick*.").

Petitioner also attempts to argue that *Rasul v. Bush*, 542 U.S. 466 (2004), and not *Hirota*, provides the proper framework to consider whether this Court has habeas jurisdiction. He alleges that under *Rasul*, a petitioner need only establish that the court has personal jurisdiction over the custodian and then allege that his detention violates the laws of the United States. *See* Pet. ¶ 16. Petitioner then implies that jurisdiction over his custodians exists so long as the respondents are within the territorial jurisdiction of the court. *See* Pet. ¶ 17 (arguing that "officials of the U.S. . . . are within the jurisdiction of this Court"). This argument puts the cart before the horse. *Hirota* and its progeny teach that jurisdiction over a custodian turns on whether the petitioner is being held pursuant to United States or international authority. Hence, the source of the authority for the detention is an *antecedent question* that must be answered before a court can conclude that it has jurisdiction over a custodian. *Rasul* did nothing to change that analytical framework. In *Rasul* there was simply no reason to address the antecedent question because those respondents are being held solely by U.S. forces under an assertion of U.S. authority. Here, by contrast, the petitioner is held by a multinational force, pursuant to authority granted to the MNF-I by United Nations Security Council resolutions, and at the request of the Government of Iraq after the Iraqi High Tribunal convicted petitioner of crimes against humanity. None of those factors were

-16-

present in *Rasul*, and, therefore, that opinion cannot be read to displace the analysis required by *Hirota* and *Flick*.[8]

Finally, in another attempt to make an end-run around *Hirota* and *Flick*, petitioner intimates that the Iraqi High Tribunal is not really a court of Iraq. *See, e.g.*, Pet. ¶¶ 7, 42-44. This contention is baseless. *Flick* makes clear that it is the source of the authority creating a court that determines whether that tribunal is a court of the United States or an international court. In *Flick*, even though the members of the court were selected by Gen. Clay, the American Military Governor and Zone Commander of the United States Zone of Occupation, the fact that he exercised that power at the directive of the Control Council of Allied Powers was sufficient to render the tribunal an international court whose sentences could not be reviewed in the courts of the United States. *See Flick*, 174 F.2d at 985-86.

Here, the court can only conclude that the IHT was established under the powers of a foreign sovereign – Iraq. As noted, the Iraqi National Assembly created the Iraqi High Tribunal in Law No. 10 of 2005.[9] The IHT has jurisdiction over, *inter alia*, crimes of genocide, crimes

---

[8] *Omar* does not support petitioner's argument that *Rasul* gives the Court jurisdiction over this case. The *Omar* court did not discuss the application of *Rasul* until after it concluded that the lack of a foreign conviction distinguished that case from *Hirota* and *Flick*. *See Omar*, slip op. at 14 ("With *Hirota* and the other cases the government cites thus distinguished . . . ."). Moreover, in *Omar* the D.C. Circuit explicitly recognized that *Rasul* did not overrule *Hirota*. *See id.* at 9 (noting that only the Supreme Court can overrule its prior opinions, and that *Rasul* did not purport to overturn *Hirota*).

[9] The Iraqi Special Tribunal, the predecessor to the Iraqi High Tribunal, was established in 2003 by the Governing Council of Iraq ("GCI"), which was part of the Coalition Provisional Authority ("CPA"). *See* CPA Order No. 48 ("IST Statute") (Dec. 10, 2003), *available at* http://www.iraqcoalition.org/regulations/20031210_CPAORD_48_IST_and_Appendix_A.pdf (last visited Feb. 19, 2007). Contrary to petitioner's suggestion, this fact does not mean that the IHT or the IST was "created by the United States." Pet. ¶ 7. The United Nations recognized the CPA (and the GCI) as the official governing body in Iraq pending the establishment of a permanent

-17-

against humanity, war crimes, and certain violations of Iraqi law. *See* IHT Statute art. 1. The court is governed by laws of procedure specially promulgated by the Iraqi General Assembly, as well as by the Iraqis' 1971 Code. *See id.* art. 16. The Iraqi Interim Government, the Iraqi Transitional Government, and the Government of Iraq all funded the court. *See Dujail Appellate Judgment* at 8-9. These facts amply demonstrate that the IHT is a court of a foreign sovereign – *as other judges of this Court have recognized. See In re Hussein*, 2006 WL 3832818, at *3 (referring to Hussein's sentence by the IHT as "the judgment of an Iraqi court"); *Al-Bandar*, slip. op. at 1 (noting that petitioner was "convicted by an Iraqi court for violations of Iraqi law").

This case is no different than *Hirota*, *Flick*, *In re Hussein*, or *Al-Bandar*. Because petitioner is an Iraqi citizen convicted by the Iraqi High Tribunal for crimes against humanity and Iraqi law committed in Iraq, and because he is in the custody of a multinational force in Iraq, this Court has no authority to consider the habeas petition. The court should dismiss petitioner's plea for lack of jurisdiction.[10]

---

government. *See* U.N. Security Council Res. 1511, at 2 ¶¶ 1, 4. In any event, even if it were true that the IST was created by the United States, the 2005 IHT Statute (passed by the Iraqi National Assembly) unequivocally abolished the IST. *See* IHT Statute art. 37. And the people of Iraq further ratified the court by providing in their Constitution (approved by 78% of Iraqis) that the IHT should continue its work in investigating crimes committed by the Hussein regime. *See* Const. of Iraq, art. 130, *available at* http://www.globalpolicy.org/security/issues/iraq/document/2005/1015text.htm (last visited Feb. 19, 2007).

[10] In addition to statutes authorizing actions for writs of habeas corpus, petitioner claims that this Court has jurisdiction over his petition under 28 U.S.C. § 1331 (the federal question jurisdiction statute) and 28 U.S.C. §§ 2201 *et seq.* (the Declaratory Judgment Act). *See* Pet. ¶ 15. This is not so. These statutes can form no basis of relief separate from his habeas claim, because they do not create any causes of action. *See, e.g.*, *Mead Corp. v. United States*, 490 F. Supp. 405 (D.D.C. 1980). Moreover, because petitioner is seeking to collaterally attack his conviction and sentence, that challenge *can only be brought* in a habeas proceeding. *See, e.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 500 (holding that habeas is sole remedy where prisoner "is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate

II.    NEITHER THE CONSTITUTION NOR FEDERAL LAW PERMITS A COLLATERAL ATTACK
       ON A FOREIGN CONVICTION IN A FEDERAL COURT

This habeas petition is nothing less than a collateral attack upon petitioner's conviction

and sentence by the Iraqi High Tribunal. *See* Pet. ¶¶ 6, 8, 44, 46-63, 68-89 (arguing that IHT

proceedings violated, *inter alia*, the Fifth, Sixth, and Eighth Amendments because it was a "show

trial" and denied petitioner "fundamental and basic rights of due process or fair trial"); Pet. ¶¶ 7,

42, 46, 63, 69 (arguing that the IHT was illegally constituted in violation of international law).

The Constitution provides no basis for such an attack, and it would be wholly unprecedented for

a U.S. court to sit in judgment of the decisions of a foreign, sovereign tribunal, especially where

that decision concerns a citizen of that foreign sovereign. Therefore, even if this Court

concluded that it had jurisdiction despite *Hirota Flick*, *Al-Bandar*, and *In re Hussein*, it should

conclude that principles of comity prevent it from issuing the writ.

As noted, the central claim of Ramadan's habeas petition is that the IHT proceedings

violated his rights under the United States Constitution, including the right to due process and a

fair trial. But the Supreme Court long ago held that the guarantees of the United States

Constitution "have no relation to crimes committed without the jurisdiction of the United States

against the laws of a foreign country." *Neely v. Henkel*, 180 U.S. 109, 122 (1901). For that

reason, courts of the United States will not permit an individual to collaterally attack in a U.S.

---

release or a speedier release from that imprisonment"); *see also Wilkinson v. Dotson*, 544 U.S. 74,
79 (2005) (suits attacking the fact or duration of confinement lie at "the core of habeas corpus").
    Finally, petitioner alleges that he may bring this habeas action directly under the Constitution
(as opposed to under the federal habeas statute). *See* Pet. ¶ 15 (citing suspension clause). This is
incorrect. The Constitution provides no habeas rights to aliens detained outside the United States.
*See Boumediene, et al. v Bush, et al.*, No. 05-5062, slip op. at 13-18 (D.C. Cir. Feb. 20, 2007); *In re
Hussein*, 2006 WL 3832818, at *3 n.2 (citing *Johnson v. Eisentrager*, 339 U.S. 763, 777-78 (1950)).

court his criminal conviction in a foreign court based on allegations that the foreign proceedings lacked the protections required by the United States Constitution, even when the petitioner is a U.S. citizen.  *See Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972) (refusing to enjoin U.S. Army from transferring U.S. citizens to Germany to serve sentence for criminal conviction in Germany despite claim that German trial was unfair and violated their rights under the United States Constitution); *Neely*, 180 U.S. at 123 ("When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people . . . ."); *see also Bishop v. Reno*, 210 F.3d 1295 (11th Cir. 2000) (finding court lacked jurisdiction to consider habeas petition of U.S. citizen serving sentence for conviction by a foreign court, even though he was serving his sentence in a United States prison).

In *Neely* and *Holmes* the courts rejected United States citizens' constitutionally based challenges to foreign criminal proceedings.  It is even clearer that the Constitution provides no protections for aliens, such as Ramadan, who are wholly outside the territory of the United States.  In *United States v. Verdugo-Urquidez*, the Supreme Court explained that it had "emphatic[ally]" rejected the idea that "aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." 494 U.S. 259, 269 (1990) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950)).  *See also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." (citing *Verdugo-Urquidez*, 494 U.S. at 269)).  Analyzing these Supreme Court precedents and its own cases, the D.C. Circuit recently reaffirmed that "the Constitution does not confer rights on aliens

-20-

without property or presence within the United States." *Boumediene, et al. v. Bush, et al.*, No.

05-5062, slip op. at 18 (D.C. Cir. Feb. 20, 2007). *See also 32 County Sovereignty Comm'n v.*

*Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) ("[a] foreign entity without property or

presence in this country has no constitutional rights, under the due process clause or otherwise"

(quoting *People's Mojahedin Org. Of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir.

1999)); *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) ("[N]on-resident aliens . . .

plainly cannot appeal to the protection of the Constitution or laws of the United States.").[11]

---

[11] Petitioner's citations to the numerous conventions on civil and political rights, *see* Pet. ¶ 15, are equally unavailing because those treaties do not create individually enforceable rights in the courts of the United States. *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ("[T]he United States ratified the [International Convention on Civil and Political Rights] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in federal courts."); *Garza v. Lappin*, 253 F.3d 918, 925 (7th Cir. 2001) (noting that the American Declaration on Human Rights and the American Declaration on the Rights and Duties of Man have not been ratified by the United States, and therefore do not create binding rights enforceable in habeas proceedings). Ramadan also relies on the International Covenant Against Torture, but that convention provides no rights cognizable in this habeas proceeding. In giving its advice and consent to ratification, the Senate declared that the Convention would not, itself, be privately enforceable. *See* 136 Cong. Rec. S 36,198 (Oct. 27, 1990). Congress then enacted implementing legislation expressly limited to the immigration context. *See* Foreign Affairs Reform and Restructuring Act of 1998 Pub. L. No. 105-277, § 2242(d), 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note). More recently, Congress eliminated habeas jurisdiction over claims asserted under the Convention. *See* 8 U.S.C. §1252(a)(4).

Finally, Ramadan claims (without any explanation) that the Geneva Conventions give this Court jurisdiction over his petition. This is not so. First, the Geneva Conventions do not give rise to individually enforceable rights. *See Boumediene*, slip op. at 13 (recognizing that Military Commissions Act of 2006, § 5(a), Pub. L. No. 109-366, 120 Stat. 2600, makes "unavoidable" the conclusion that no person may invoke the Geneva Conventions as a source of rights in any habeas corpus or other civil action to which U.S. or officer is a party); *see also Head Money Cases*, 112 U.S. 580, 597 (1884) (treaties are presumptively not judicially enforceable); *cf. Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (holding that the 1929 Geneva Convention is not judicially enforceable by the captured party). Moreover, even if those Conventions did create rights enforceable in United States courts, they still would not provide a basis for attacking petitioner's trial. The Geneva Conventions apply to treatment of prisoners of a foreign sovereign during conflicts between two or more of the Conventions' signatories; they have no application to a signatory's prosecution *of its own citizen* in a domestic court. And even if they did apply to petitioner's trial, those rights would

-21-

An injunction here would interfere with Iraq's criminal proceedings against one of its own nationals, convicted of committing a crime within Iraqi territory. "A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." *Wilson v. Girard*, 354 U.S. 524, 529 (1957). Here, an Iraqi court has convicted Ramadan of crimes against humanity. That foreign judicial determination is entitled to respect. *See Neely*, 180 U.S. at 123. Consequently, an exercise of habeas jurisdiction in this case would be inconsistent with "international comity [and the] respect for the sovereignty of foreign nations on their own territory." *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 404 (1990); *see also Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990) ("The interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced.").

Any relief that interferes with MNF–I's continued detention of Ramadan, or that would require U.S. troops to interfere with Iraq's ability to obtain physical custody of an Iraqi national, found by the Iraqi High Tribunal to have committed crimes in Iraq, and who is still physically in Iraq, would be unprecedented and an unjustified violation of international comity. Petitioner attempts to elide this fact by arguing that the relief he requests would run only against the United States, and not against the Iraqi court. *See* Pet. ¶ 10-11. But, "[t]he fact that the injunction operates only against the parties, and not directly against the foreign court, does not eliminate the need for due regard to principles of international comity because such an order *effectively*

---

not properly be invoked against *respondents*; it was the Iraqi High Tribunal, and not any American authority, that tried and convicted petitioner.

restricts the jurisdiction of the court of a foreign sovereign."  *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1213 (D.C. Cir. 1989) (emphasis added and citations omitted).  Indeed, as another judge of this Court has already concluded, preventing the transfer of petitioner's co-defendant Saddam Hussein from MNF-I custody to the government of Iraq would have been nothing less than a nullification of the Iraqi High Tribunal verdict.  "[P]revent[ing] the transfer of Petitioner Hussein to the custody of the Iraqi government . . . would effectively alter the judgment of an Iraqi court."  *In re Hussein*, 2006 WL 3832818, at *3.

## III.    EXERCISING JURISDICTION OVER THE PETITION WOULD CONTRAVENE THE SEPARATION OF POWERS

Even if this Court found that it had jurisdiction to consider the petition, and that doing so would not violate principles of international comity, it nevertheless should deny the writ out of respect for the separation of powers.  Article II of the Constitution "provides allocation of foreign relations and national security powers to the President, the unitary chief executive."  *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005), *cert. denied*, 126 S. Ct. 1768 (2006).  And the Supreme Court has repeatedly emphasized that, under our Constitution, the Executive Branch exercises the "vast share of responsibility for the conduct of our foreign relations."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003).  Moreover, because the President is the "Commander in Chief of the Army and Navy of the United States," U.S. Const. Art. II, § 2, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of the Navy v. Egan*, 414 U.S. 518, 530 (1988); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality opinion) ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those

-23-

who are best positioned and most politically accountable for making them.").

These considerations are particularly strong when they involve the Executive Branch's discretionary military and foreign policy decisions concerning persons and events wholly outside the United States, "on the far side of the world." *Bancoult v. McNamara*, 445 F.3d 427, 429 (D.C. Cir. 2006); *see id.* at 436. The Executive Branch determined that the U.S. military should participate in MNF–I "under unified command" by providing, among other things, "civil affairs support, and relief and reconstruction assistance," as requested by the Government of Iraq. U.N. Security Council Res. 1546, at 11. The Executive Branch's determination to permit U.S. military personnel to participate in the MNF–I and detain individuals such as Ramadan, at the request of the Government of Iraq, is a discretionary decision concerning how best to pursue the nation's military and foreign policy objectives. Similarly, whether, in the midst of daily violent attacks on the Iraqi people and their new democratic institutions, our Government should honor the Iraqi judiciary's judgment, and whether our Government should recognize Iraq's sovereign right to punish its own citizens for their criminal wrongs, are inherently foreign policy matters, entrusted solely to the Executive.

Moreover, in the context of extradition cases, respect for the separation of powers has led courts to apply a rule of "non-inquiry" that prevents courts from making their own judgments about the fairness of foreign judicial proceedings or the punishment to which a defendant is subject.[12] Where such judgments are to be made, they are the province of the Executive Branch –

---

[12] Because courts in extradition cases must ensure that "judicial inquiry does not unnecessarily impinge upon executive prerogative and expertise," they have repeatedly applied a "rule of non-inquiry." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997). Under that doctrine, "courts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated

and in particular the Secretary of State – and not federal courts.  Even though this is not an

extradition case, because the MNF–I (and not the United States) is holding Ramadan, and is

doing so in Iraq, the principles underlying these "non-inquiry" cases are nonetheless relevant to

whether this Court should exercise its discretion to grant a writ (even if it had the power to do

so).  These cases counsel that any decision on whether transferring petitioner to the Government

of Iraq to answer for crimes he committed in that country, and for which he was convicted in its

courts, might result in cruel and unusual punishment, *see, e.g.*, Pet. ¶¶ 5, 24, 45, 66, 68, should be

left to the Executive, and not the Judicial, Branch.  *Cf. Ntakirutimana v. Reno*, 184 F.3d 419, 430

(5th Cir. 1999) ("[I]t is the role of the Secretary of State, not the courts, to determine whether

extradition should be denied on humanitarian grounds or on account of the treatment that the

fugitive is likely to receive upon his return to the requesting state.").

IV.    **Article III Prohibits the Relief Petitioner Requests**

Finally, the relief petitioner requests is barred by Article III of the U.S. Constitution.

Ramadan seeks to *prevent* his release from MNF–I custody.  *See* Pet. at 26 ¶ 2 (asking court to

"[o]rder Respondents to prohibit the surrender, *or release* of Petitioner or to allow him to be

turned over to the Government of Iraq, or any of its Ministries, agents, the IST or designees or

---

humanely."  *Lopez-Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir. 1997).  Thus, for example, courts
will not consider evidence regarding the requesting country's "law enforcement procedures and its
treatment of prisoners"; such evidence is irrelevant and improper in a challenge to extradition in a
U.S. court.  *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990); *see also Matter of Requested*
*Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir. 1995) ("[C]ourts are ill-equipped as institutions and
ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and
pronouncements about the workings of foreign countries' justice systems.").

any other entity, or person without the prior approval of this Court" (emphasis added)).[13] But the "core" relief afforded by the writ of habeas corpus is "immediate release or a shorter period of confinement." *Wilkinson v. Dotson*, 544 U.S. at 79, 80 (quotation marks omitted); *id.* at 86 (Scalia, J., concurring) ("It is one thing to say that permissible habeas relief, as our cases interpret the statute, includes ordering a quantum change in the level of custody, such as release from incarceration to parole. It is quite another to say that the habeas statute authorizes federal courts to order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody." (quotation marks and citation omitted)).

As release is the only relief that petitioner could obtain in this habeas action, even if he had a right to any relief under the writ, his request that respondents be enjoined from releasing him must be rejected. *See Omar*, slip op. at 19 ("Omar did not seek an injunction barring his outright release, *nor could he have*." (emphasis added)). Because such an injunction would prevent respondents from affording him all the relief he could receive in habeas, it would offend Article III by artificially prolonging judicial proceedings in the absence of a legally cognizable case or controversy. *Cf. Spencer v. Kemna*, 523 U.S. 1, 7-8 (1998) (habeas challenge to parole violation moot once prisoner released).[14]

---

[13] Although it is unclear, petitioner appears to be seeking to bar *both* his outright release from MNF-I custody *and* his transfer to the Government of Iraq.

[14] Petitioner is not entitled to be brought before this Court, as he requests. *See* Pet. at 26 ¶ 5. As Judge Robertson recognized when considering a similar request by non-resident alien habeas petitioners detained at Guantanamo Bay, such relief is inappropriate – even in a habeas proceeding – because "the conditions of entry for every alien . . . have been recognized as matters . . . wholly outside the power of [courts] to control." *See Qassim v. Bush*, 407 F. Supp. 2d 198, 202-03 (D.D.C. 2005) (quoting *Fiallo v. Bell*, 430 U.S. 787, 796 (1977)).

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should dismiss the petition for a writ of habeas

corpus.

Dated: <u>February 23, 2007</u>                    Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        JEFFERY A. TAYLOR
                                        United States Attorney

                                        JOSEPH H. HUNT (D.C. Bar No. 431134)
                                        Branch Director

                                        VINCENT M. GARVEY (D.C. Bar No. 127191)
                                        Deputy Branch Director

                                        <u>**/s/ Michael P. Abate**    </u>
                                        MICHAEL P. ABATE (IL Bar No. 6285597)
                                        Trial Attorney, U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        <u>Mailing Address</u>
                                        P.O. Box 883
                                        Washington, D.C. 20044
                                        <u>Delivery Address</u>
                                        20 Massachusetts Ave., N.W., Room 7302
                                        Washington, D.C. 20001
                                        Telephone:    (202) 616-8209
                                        Facsimile:    (202) 616-8470

                                        <u>Attorneys for Respondents</u>

United Nations

$S$/RES/1511 (2003)



# Security Council

Distr.: General
16 October 2003

---

## Resolution 1511 (2003)

### Adopted by the Security Council at its 4844th meeting, on 16 October 2003

*The Security Council*,

*Reaffirming* its previous resolutions on Iraq, including resolution 1483 (2003) of 22 May 2003 and 1500 (2003) of 14 August 2003, and on threats to peace and security caused by terrorist acts, including resolution 1373 (2001) of 28 September 2001, and other relevant resolutions,

*Underscoring* that the sovereignty of Iraq resides in the State of Iraq, *reaffirming* the right of the Iraqi people freely to determine their own political future and control their own natural resources, *reiterating* its resolve that the day when Iraqis govern themselves must come quickly, and *recognizing* the importance of international support, particularly that of countries in the region, Iraq's neighbours, and regional organizations, in taking forward this process expeditiously,

*Recognizing* that international support for restoration of conditions of stability and security is essential to the well-being of the people of Iraq as well as to the ability of all concerned to carry out their work on behalf of the people of Iraq, and *welcoming* Member State contributions in this regard under resolution 1483 (2003),

*Welcoming* the decision of the Governing Council of Iraq to form a preparatory constitutional committee to prepare for a constitutional conference that will draft a constitution to embody the aspirations of the Iraqi people, and *urging* it to complete this process quickly,

*Affirming* that the terrorist bombings of the Embassy of Jordan on 7 August 2003, of the United Nations headquarters in Baghdad on 19 August 2003, of the Imam Ali Mosque in Najaf on 29 August 2003, and of the Embassy of Turkey on 14 October 2003, and the murder of a Spanish diplomat on 9 October 2003 are attacks on the people of Iraq, the United Nations, and the international community, and *deploring* the assassination of Dr. Akila al-Hashimi, who died on 25 September 2003, as an attack directed against the future of Iraq,

In that context, *recalling* and *reaffirming* the statement of its President of 20 August 2003 (S/PRST/2003/13) and resolution 1502 (2003) of 26 August 2003,

*Determining* that the situation in Iraq, although improved, continues to constitute a threat to international peace and security,

S/RES/1511 (2003)

*Acting* under Chapter VII of the Charter of the United Nations,

1.    *Reaffirms* the sovereignty and territorial integrity of Iraq, and *underscores*, in that context, the temporary nature of the exercise by the Coalition Provisional Authority (Authority) of the specific responsibilities, authorities, and obligations under applicable international law recognized and set forth in resolution 1483 (2003), which will cease when an internationally recognized, representative government established by the people of Iraq is sworn in and assumes the responsibilities of the Authority, inter alia through steps envisaged in paragraphs 4 through 7 and 10 below;

2.    *Welcomes* the positive response of the international community, in fora such as the Arab League, the Organization of the Islamic Conference, the United Nations General Assembly, and the United Nations Educational, Scientific and Cultural Organization, to the establishment of the broadly representative Governing Council as an important step towards an internationally recognized, representative government;

3.    *Supports* the Governing Council's efforts to mobilize the people of Iraq, including by the appointment of a cabinet of ministers and a preparatory constitutional committee to lead a process in which the Iraqi people will progressively take control of their own affairs;

4.    *Determines* that the Governing Council and its ministers are the principal bodies of the Iraqi interim administration, which, without prejudice to its further evolution, embodies the sovereignty of the State of Iraq during the transitional period until an internationally recognized, representative government is established and assumes the responsibilities of the Authority;

5.    *Affirms* that the administration of Iraq will be progressively undertaken by the evolving structures of the Iraqi interim administration;

6.    *Calls upon* the Authority, in this context, to return governing responsibilities and authorities to the people of Iraq as soon as practicable and *requests* the Authority, in cooperation as appropriate with the Governing Council and the Secretary-General, to report to the Council on the progress being made;

7.    *Invites* the Governing Council to provide to the Security Council, for its review, no later than 15 December 2003, in cooperation with the Authority and, as circumstances permit, the Special Representative of the Secretary-General, a timetable and a programme for the drafting of a new constitution for Iraq and for the holding of democratic elections under that constitution;

8.    *Resolves* that the United Nations, acting through the Secretary-General, his Special Representative, and the United Nations Assistance Mission in Iraq, should strengthen its vital role in Iraq, including by providing humanitarian relief, promoting the economic reconstruction of and conditions for sustainable development in Iraq, and advancing efforts to restore and establish national and local institutions for representative government;

9.    *Requests* that, as circumstances permit, the Secretary-General pursue the course of action outlined in paragraphs 98 and 99 of the report of the Secretary-General of 17 July 2003 (S/2003/715);

2

10.   *Takes note* of the intention of the Governing Council to hold a constitutional conference and, recognizing that the convening of the conference will be a milestone in the movement to the full exercise of sovereignty, *calls for*  its preparation through national dialogue and consensus-building as soon as practicable and *requests* the Special Representative of the Secretary-General, at the time of the convening of the conference or, as circumstances permit, to lend the unique expertise of the United Nations to the Iraqi people in this process of political transition, including the establishment of electoral processes;

11.   *Requests* the Secretary-General to ensure that the resources of the United Nations and associated organizations are available, if requested by the Iraqi Governing Council and, as circumstances permit, to assist in furtherance of the programme provided by the Governing Council in paragraph 7 above, and encourages other organizations with expertise in this area to support the Iraqi Governing Council, if requested;

12.   *Requests* the Secretary-General to report to the Security Council on his responsibilities under this resolution and the development and implementation of a timetable and programme under paragraph 7 above;

13.   *Determines* that the provision of security and stability is essential to the successful completion of the political process as outlined in paragraph 7 above and to the ability of the United Nations to contribute effectively to that process and the implementation of resolution 1483 (2003), and *authorizes* a multinational force under unified command to take all necessary measures to contribute to the maintenance of security and stability in Iraq, including for the purpose of ensuring necessary conditions for the implementation of the timetable and programme as well as to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure;

14.   *Urges* Member States to contribute assistance under this United Nations mandate, including military forces, to the multinational force referred to in paragraph 13 above;

15.   *Decides* that the Council shall review the requirements and mission of the multinational force referred to in paragraph 13 above not later than one year from the date of this resolution, and that in any case the mandate of the force shall expire upon the completion of the political process as described in paragraphs 4 through 7 and 10 above, and *expresses* readiness to consider on that occasion any future need for the continuation of the multinational force, taking into account the views of an internationally recognized, representative government of Iraq;

16.   *Emphasizes* the importance of establishing effective Iraqi police and security forces in maintaining law, order, and security and combating terrorism consistent with paragraph 4 of resolution 1483 (2003), and *calls upon* Member States and international and regional organizations to contribute to the training and equipping of Iraqi police and security forces;

17.   *Expresses* deep sympathy and condolences for the personal losses suffered by the Iraqi people and by the United Nations and the families of those United Nations personnel and other innocent victims who were killed or injured in these tragic attacks;

S/RES/1511 (2003)

18.    *Unequivocally condemns* the terrorist bombings of the Embassy of Jordan on 7 August 2003, of the United Nations headquarters in Baghdad on 19 August 2003, and of the Imam Ali Mosque in Najaf on 29 August 2003, and of the Embassy of Turkey on 14 October 2003, the murder of a Spanish diplomat on 9 October 2003, and the assassination of Dr. Akila al-Hashimi, who died on 25 September 2003, and *emphasizes* that those responsible must be brought to justice;

19.    *Calls upon* Member States to prevent the transit of terrorists to Iraq, arms for terrorists, and financing that would support terrorists, and *emphasizes* the importance of strengthening the cooperation of the countries of the region, particularly neighbours of Iraq, in this regard;

20.    *Appeals* to Member States and the international financial institutions to strengthen their efforts to assist the people of Iraq in the reconstruction and development of their economy, and *urges* those institutions to take immediate steps to provide their full range of loans and other financial assistance to Iraq, working with the Governing Council and appropriate Iraqi ministries;

21.    *Urges* Member States and international and regional organizations to support the Iraq reconstruction effort initiated at the 24 June 2003 United Nations Technical Consultations, including through substantial pledges at the 23-24 October 2003 International Donors Conference in Madrid;

22.    *Calls upon* Member States and concerned organizations to help meet the needs of the Iraqi people by providing resources necessary for the rehabilitation and reconstruction of Iraq's economic infrastructure;

23.    *Emphasizes* that the International Advisory and Monitoring Board (IAMB) referred to in paragraph 12 of resolution 1483 (2003) should be established as a priority, and *reiterates* that the Development Fund for Iraq shall be used in a transparent manner as set out in paragraph 14 of resolution 1483 (2003);

24.    *Reminds* all Member States of their obligations under paragraphs 19 and 23 of resolution 1483 (2003) in particular the obligation to immediately cause the transfer of funds, other financial assets and economic resources to the Development Fund for Iraq for the benefit of the Iraqi people;

25.    *Requests* that the United States, on behalf of the multinational force as outlined in paragraph 13 above, report to the Security Council on the efforts and progress of this force as appropriate and not less than every six months;

26.    *Decides* to remain seized of the matter.

———————

United Nations

$S$/RES/1546 (2004)



# Security Council

Distr.: General
8 June 2004

---

## Resolution 1546 (2004)

### Adopted by the Security Council at its 4987th meeting, on 8 June 2004

*The Security Council,*

*Welcoming* the beginning of a new phase in Iraq's transition to a democratically elected government, and *looking forward* to the end of the occupation and the assumption of full responsibility and authority by a fully sovereign and independent Interim Government of Iraq by 30 June 2004,

*Recalling* all of its previous relevant resolutions on Iraq,

*Reaffirming* the independence, sovereignty, unity, and territorial integrity of Iraq,

*Reaffirming also* the right of the Iraqi people freely to determine their own political future and control their own natural resources,

*Recognizing* the importance of international support, particularly that of countries in the region, Iraq's neighbours, and regional organizations, for the people of Iraq in their efforts to achieve security and prosperity, and *noting* that the successful implementation of this resolution will contribute to regional stability,

*Welcoming* the efforts of the Special Adviser to the Secretary-General to assist the people of Iraq in achieving the formation of the Interim Government of Iraq, as set out in the letter of the Secretary-General of 7 June 2004 (S/2004/461),

*Taking note* of the dissolution of the Governing Council of Iraq, and *welcoming* the progress made in implementing the arrangements for Iraq's political transition referred to in resolution 1511 (2003) of 16 October 2003,

*Welcoming* the commitment of the Interim Government of Iraq to work towards a federal, democratic, pluralist, and unified Iraq, in which there is full respect for political and human rights,

*Stressing* the need for all parties to respect and protect Iraq's archaeological, historical, cultural, and religious heritage,

*Affirming* the importance of the rule of law, national reconciliation, respect for human rights including the rights of women, fundamental freedoms, and democracy including free and fair elections,

04-38116 (E)

*0438116*

*Recalling* the establishment of the United Nations Assistance Mission for Iraq (UNAMI) on 14 August 2003, and *affirming* that the United Nations should play a leading role in assisting the Iraqi people and government in the formation of institutions for representative government,

*Recognizing* that international support for restoration of stability and security is essential to the well-being of the people of Iraq as well as to the ability of all concerned to carry out their work on behalf of the people of Iraq, and *welcoming* Member State contributions in this regard under resolution 1483 (2003) of 22 May 2003 and resolution 1511 (2003),

*Recalling* the report provided by the United States to the Security Council on 16 April 2004 on the efforts and progress made by the multinational force,

*Recognizing* the request conveyed in the letter of 5 June 2004 from the Prime Minister of the Interim Government of Iraq to the President of the Council, which is annexed to this resolution, to retain the presence of the multinational force,

*Recognizing also* the importance of the consent of the sovereign Government of Iraq for the presence of the multinational force and of close coordination between the multinational force and that government,

*Welcoming* the willingness of the multinational force to continue efforts to contribute to the maintenance of security and stability in Iraq in support of the political transition, especially for upcoming elections, and to provide security for the United Nations presence in Iraq, as described in the letter of 5 June 2004 from the United States Secretary of State to the President of the Council, which is annexed to this resolution,

*Noting* the commitment of all forces promoting the maintenance of security and stability in Iraq to act in accordance with international law, including obligations under international humanitarian law, and to cooperate with relevant international organizations,

*Affirming* the importance of international assistance in reconstruction and development of the Iraqi economy,

*Recognizing* the benefits to Iraq of the immunities and privileges enjoyed by Iraqi oil revenues and by the Development Fund for Iraq, and *noting* the importance of providing for continued disbursements of this fund by the Interim Government of Iraq and its successors upon dissolution of the Coalition Provisional Authority,

*Determining* that the situation in Iraq continues to constitute a threat to international peace and security,

*Acting* under Chapter VII of the Charter of the United Nations,

1.    *Endorses* the formation of a sovereign Interim Government of Iraq, as presented on 1 June 2004, which will assume full responsibility and authority by 30 June 2004 for governing Iraq while refraining from taking any actions affecting Iraq's destiny beyond the limited interim period until an elected Transitional Government of Iraq assumes office as envisaged in paragraph four below;

2.    *Welcomes* that, also by 30 June 2004, the occupation will end and the Coalition Provisional Authority will cease to exist, and that Iraq will reassert its full sovereignty;

3.    *Reaffirms* the right of the Iraqi people freely to determine their own political future and to exercise full authority and control over their financial and natural resources;

4.    *Endorses* the proposed timetable for Iraq's political transition to democratic government including:

(a)    formation of the sovereign Interim Government of Iraq that will assume governing responsibility and authority by 30 June 2004;

(b)    convening of a national conference reflecting the diversity of Iraqi society; and

(c)    holding of direct democratic elections by 31 December 2004 if possible, and in no case later than 31 January 2005, to a Transitional National Assembly, which will, inter alia, have responsibility for forming a Transitional Government of Iraq and drafting a permanent constitution for Iraq leading to a constitutionally elected government by 31 December 2005;

5.    *Invites* the Government of Iraq to consider how the convening of an international meeting could support the above process, and *notes* that it would welcome such a meeting to support the Iraqi political transition and Iraqi recovery, to the benefit of the Iraqi people and in the interest of stability in the region;

6.    *Calls on* all Iraqis to implement these arrangements peaceably and in full, and on all States and relevant organizations to support such implementation;

7.    *Decides* that in implementing, as circumstances permit, their mandate to assist the Iraqi people and government, the Special Representative of the Secretary-General and the United Nations Assistance Mission for Iraq (UNAMI), as requested by the Government of Iraq, shall:

(a)    play a leading role to:

(i)    assist in the convening, during the month of July 2004, of a national conference to select a Consultative Council;

(ii)    advise and support the Independent Electoral Commission of Iraq, as well as the Interim Government of Iraq and the Transitional National Assembly, on the process for holding elections;

(iii)    promote national dialogue and consensus-building on the drafting of a national constitution by the people of Iraq;

(b)    and also:

(i)    advise the Government of Iraq in the development of effective civil and social services;

(ii)    contribute to the coordination and delivery of reconstruction, development, and humanitarian assistance;

(iii)    promote the protection of human rights, national reconciliation, and judicial and legal reform in order to strengthen the rule of law in Iraq; and

(iv)    advise and assist the Government of Iraq on initial planning for the eventual conduct of a comprehensive census;

8.    *Welcomes* ongoing efforts by the incoming Interim Government of Iraq to develop Iraqi security forces including the Iraqi armed forces (hereinafter referred to as "Iraqi security forces"), operating under the authority of the Interim Government of Iraq and its successors, which will progressively play a greater role and ultimately assume full responsibility for the maintenance of security and stability in Iraq;

9.    *Notes* that the presence of the multinational force in Iraq is at the request of the incoming Interim Government of Iraq and therefore *reaffirms* the authorization for the multinational force under unified command established under resolution 1511 (2003), having regard to the letters annexed to this resolution;

10.    *Decides* that the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the letters annexed to this resolution expressing, inter alia, the Iraqi request for the continued presence of the multinational force and setting out its tasks, including by preventing and deterring terrorism, so that, inter alia, the United Nations can fulfil its role in assisting the Iraqi people as outlined in paragraph seven above and the Iraqi people can implement freely and without intimidation the timetable and programme for the political process and benefit from reconstruction and rehabilitation activities;

11.    *Welcomes,* in this regard, the letters annexed to this resolution stating, inter alia, that arrangements are being put in place to establish a security partnership between the sovereign Government of Iraq and the multinational force and to ensure coordination between the two, and *notes also* in this regard that Iraqi security forces are responsible to appropriate Iraqi ministers, that the Government of Iraq has authority to commit Iraqi security forces to the multinational force to engage in operations with it, and that the security structures described in the letters will serve as the fora for the Government of Iraq and the multinational force to reach agreement on the full range of fundamental security and policy issues, including policy on sensitive offensive operations, and will ensure full partnership between Iraqi security forces and the multinational force, through close coordination and consultation;

12.    *Decides further* that the mandate for the multinational force shall be reviewed at the request of the Government of Iraq or twelve months from the date of this resolution, and that this mandate shall expire upon the completion of the political process set out in paragraph four above, and *declares* that it will terminate this mandate earlier if requested by the Government of Iraq;

13.    *Notes* the intention, set out in the annexed letter from the United States Secretary of State, to create a distinct entity under unified command of the multinational force with a dedicated mission to provide security for the United Nations presence in Iraq, *recognizes* that the implementation of measures to provide security for staff members of the United Nations system working in Iraq would require significant resources, and *calls upon* Member States and relevant organizations to provide such resources, including contributions to that entity;

14.    *Recognizes* that the multinational force will also assist in building the capability of the Iraqi security forces and institutions, through a programme of recruitment, training, equipping, mentoring, and monitoring;

15.   *Requests* Member States and international and regional organizations to contribute assistance to the multinational force, including military forces, as agreed with the Government of Iraq, to help meet the needs of the Iraqi people for security and stability, humanitarian and reconstruction assistance, and to support the efforts of UNAMI;

16.   *Emphasizes* the importance of developing effective Iraqi police, border enforcement, and the Facilities Protection Service, under the control of the Interior Ministry of Iraq, and, in the case of the Facilities Protection Service, other Iraqi ministries, for the maintenance of law, order, and security, including combating terrorism, and *requests* Member States and international organizations to assist the Government of Iraq in building the capability of these Iraqi institutions;

17.   *Condemns* all acts of terrorism in Iraq, *reaffirms* the obligations of Member States under resolutions 1373 (2001) of 28 September 2001, 1267 (1999) of 15 October 1999, 1333 (2000) of 19 December 2000, 1390 (2002) of 16 January 2002, 1455 (2003) of 17 January 2003, and 1526 (2004) of 30 January 2004, and other relevant international obligations with respect, inter alia, to terrorist activities in and from Iraq or against its citizens, and specifically *reiterates* its call upon Member States to prevent the transit of terrorists to and from Iraq, arms for terrorists, and financing that would support terrorists, and *re-emphasizes* the importance of strengthening the cooperation of the countries of the region, particularly neighbours of Iraq, in this regard;

18.   *Recognizes* that the Interim Government of Iraq will assume the primary role in coordinating international assistance to Iraq;

19.   *Welcomes* efforts by Member States and international organizations to respond in support of requests by the Interim Government of Iraq to provide technical and expert assistance while Iraq is rebuilding administrative capacity;

20.   *Reiterates* its request that Member States, international financial institutions and other organizations strengthen their efforts to assist the people of Iraq in the reconstruction and development of the Iraqi economy, including by providing international experts and necessary resources through a coordinated programme of donor assistance;

21.   *Decides* that the prohibitions related to the sale or supply to Iraq of arms and related materiel under previous resolutions shall not apply to arms or related materiel required by the Government of Iraq or the multinational force to serve the purposes of this resolution, *stresses* the importance for all States to abide strictly by them, and *notes* the significance of Iraq's neighbours in this regard, and *calls upon* the Government of Iraq and the multinational force each to ensure that appropriate implementation procedures are in place;

22.   *Notes* that nothing in the preceding paragraph affects the prohibitions on or obligations of States related to items specified in paragraphs 8 and 12 of resolution 687 (1991) of 3 April 1991 or activities described in paragraph 3 (f) of resolution 707 (1991) of 15 August 1991, and *reaffirms* its intention to revisit the mandates of the United Nations Monitoring, Verification, and Inspection Commission and the International Atomic Energy Agency;

23. *Calls on* Member States and international organizations to respond to Iraqi requests to assist Iraqi efforts to integrate Iraqi veterans and former militia members into Iraqi society;

24. *Notes* that, upon dissolution of the Coalition Provisional Authority, the funds in the Development Fund for Iraq shall be disbursed solely at the direction of the Government of Iraq, and *decides* that the Development Fund for Iraq shall be utilized in a transparent and equitable manner and through the Iraqi budget including to satisfy outstanding obligations against the Development Fund for Iraq, that the arrangements for the depositing of proceeds from export sales of petroleum, petroleum products, and natural gas established in paragraph 20 of resolution 1483 (2003) shall continue to apply, that the International Advisory and Monitoring Board shall continue its activities in monitoring the Development Fund for Iraq and shall include as an additional full voting member a duly qualified individual designated by the Government of Iraq and that appropriate arrangements shall be made for the continuation of deposits of the proceeds referred to in paragraph 21 of resolution 1483 (2003);

25. *Decides further* that the provisions in the above paragraph for the deposit of proceeds into the Development Fund for Iraq and for the role of the IAMB shall be reviewed at the request of the Transitional Government of Iraq or twelve months from the date of this resolution, and shall expire upon the completion of the political process set out in paragraph four above;

26. *Decides* that, in connection with the dissolution of the Coalition Provisional Authority, the Interim Government of Iraq and its successors shall assume the rights, responsibilities and obligations relating to the Oil-for-Food Programme that were transferred to the Authority, including all operational responsibility for the Programme and any obligations undertaken by the Authority in connection with such responsibility, and responsibility for ensuring independently authenticated confirmation that goods have been delivered, and *further decides* that, following a 120-day transition period from the date of adoption of this resolution, the Interim Government of Iraq and its successors shall assume responsibility for certifying delivery of goods under previously prioritized contracts, and that such certification shall be deemed to constitute the independent authentication required for the release of funds associated with such contracts, consulting as appropriate to ensure the smooth implementation of these arrangements;

27. *Further decides* that the provisions of paragraph 22 of resolution 1483 (2003) shall continue to apply, except that the privileges and immunities provided in that paragraph shall not apply with respect to any final judgement arising out of a contractual obligation entered into by Iraq after 30 June 2004;

28. *Welcomes* the commitments of many creditors, including those of the Paris Club, to identify ways to reduce substantially Iraq's sovereign debt, *calls on* Member States, as well as international and regional organizations, to support the Iraq reconstruction effort, *urges* the international financial institutions and bilateral donors to take the immediate steps necessary to provide their full range of loans and other financial assistance and arrangements to Iraq, *recognizes* that the Interim Government of Iraq will have the authority to conclude and implement such agreements and other arrangements as may be necessary in this regard, and *requests* creditors, institutions and donors to work as a priority on these matters with the Interim Government of Iraq and its successors;

29.    *Recalls* the continuing obligations of Member States to freeze and transfer certain funds, assets, and economic resources to the Development Fund for Iraq in accordance with paragraphs 19 and 23 of resolution 1483 (2003) and with resolution 1518 (2003) of 24 November 2003;

30.    *Requests* the Secretary-General to report to the Council within three months from the date of this resolution on UNAMI operations in Iraq, and on a quarterly basis thereafter on the progress made towards national elections and fulfilment of all UNAMI's responsibilities;

31.    *Requests* that the United States, on behalf of the multinational force, report to the Council within three months from the date of this resolution on the efforts and progress of this force, and on a quarterly basis thereafter;

32.    *Decides* to remain actively seized of the matter.

S/RES/1546 (2004)

## Annex

### Text of letters from the Prime Minister of the Interim Government of Iraq Dr. Ayad Allawi and United States Secretary of State Colin L. Powell to the President of the Council

5 June 2004

Republic of Iraq
Prime Minister Office

Excellency:

On my appointment as Prime Minister of the Interim Government of Iraq, I am writing to express the commitment of the people of Iraq to complete the political transition process to establish a free, and democratic Iraq and to be a partner in preventing and combating terrorism. As we enter a critical new stage, regain full sovereignty and move towards elections, we will need the assistance of the international community.

The Interim Government of Iraq will make every effort to ensure that these elections are fully democratic, free and fair. Security and stability continue to be essential to our political transition. There continue, however, to be forces in Iraq, including foreign elements, that are opposed to our transition to peace, democracy, and security. The Government is determined to overcome these forces, and to develop security forces capable of providing adequate security for the Iraqi people. Until we are able to provide security for ourselves, including the defence of Iraq's land, sea and air space, we ask for the support of the Security Council and the international community in this endeavour. We seek a new resolution on the Multinational Force (MNF) mandate to contribute to maintaining security in Iraq, including through the tasks and arrangements set out in the letter from Secretary of State Colin Powell to the President of the United Nations Security Council. The Government requests that the Security Council review the mandate of the MNF at the request of the Transitional Government of Iraq, or twelve months from the date on which such a resolution is adopted.

In order to discharge the Iraqi Government's responsibility for security, I intend to establish appropriate security structures that will allow my Government and Iraqi security forces to progressively take on that responsibility. One such structure is the Ministerial Committee for National Security, consisting of myself as the Chair, the Deputy Prime Minister, and the Minister of Defense, Interior, Foreign Affairs, Justice, and Finance. The National Security Advisor, and Director of the Iraqi National Intelligence Service will serve as permanent advisory members of the committee. This forum will set the broad framework for Iraqi security policy. I intend to invite, as appropriate, the MNF commander, his Deputy, or the MNF

His Excellency
Mr. Lauro L. Baja, Jr.
President of the Security Council
United Nations
New York, New York

8

Commander's designative representative, and other appropriate individuals, to attend and participate as well, and will stand ready to discuss mechanisms of coordination and cooperation with the MNF. Iraqi armed forces will be responsible to the Chief of Staff and Minister of Defense. Other security forces (the Iraqi police, border guards and Facilities Protection Service) will be responsible to the Minister of the Interior or other government ministers.

In addition, the relevant ministers and I will develop further mechanisms for coordination with the MNF. Intend to create with the MNF coordination bodies at national, regional, and local levels, that will include Iraqi security forces commanders and civilian leadership, to ensure that Iraqi security forces will coordinate with the MNF on all security policy and operations issues in order to achieve unity of command of military operations in which Iraqi forces are engaged with MNF. In addition, the MNF and Iraqi government leaders will keep each other informed of their activities, consult regularly to ensure effective allocation and use of personnel, resources and facilities, will share intelligence, and will refer issues up the respective chains of command where necessary, Iraqi security forces will take on progressively greater responsibility as Iraqi capabilities improve.

The structures I have described in this letter will serve as the fora for the MNF and the Iraqi government to reach agreement on the full range of fundamental security and policy issues, including policy on sensitive offensive operations, and will ensure full partnership between Iraqi forces and the MNF, through close coordination and consultation. Since these are sensitive issues for a number of sovereign governments, including Iraq and the United States, they need to be resolved in the framework of a mutual understanding on our strategic partnership. We will be working closely with the MNF leadership in the coming weeks to ensure that we have such an agreed strategic framework.

We are ready to take sovereign responsibility for governing Iraq by June 30. We are well aware of the difficulties facing us, and of our responsibilities to the Iraqi people. The stakes are great, and we need the support of the international community to succeed. We ask the Security Council to help us by acting now to adopt a Security Council resolution giving us necessary support.

I understand that the Co-sponsors intend to annex this letter to the resolution on Iraq under consideration. In the meantime, I request that you provide copies of this letter to members of the Council as quickly as possible.

(*Signed*) Dr. Ayad **Allawi**

S/RES/1546 (2004)

The Secretary of State
Washington

5 June 2004

Excellency:

Recognizing the request of the government of Iraq for the continued presence of the Multi-National Force (MNF) in Iraq, and following consultations with Prime Minister Ayad Allawi of the Iraqi Interim Government, I am writing to confirm that the MNF under unified command is prepared to continue to contribute to the maintenance of security in Iraq, including by preventing and deterring terrorism and protecting the territory of Iraq. The goal of the MNF will be to help the Iraqi people to complete the political transition and will permit the United Nations and the international community to work to facilitate Iraq's reconstruction.

The ability of the Iraqi people to achieve their goals will be heavily influenced by the security situation in Iraq. As recent events have demonstrated, continuing attacks by insurgents, including former regime elements, foreign fighters, and illegal militias challenge all those who are working for a better Iraq.

Development of an effective and cooperative security partnership between the MNF and the sovereign Government of Iraq is critical to the stability of Iraq. The commander of the MNF will work in partnership with the sovereign Government of Iraq in helping to provide security while recognizing and respecting its sovereignty. To that end, the MNF stands ready to participate in discussions of the Ministerial Committee for National Security on the broad framework of security policy, as referred to in the letter from Prime Minister of the Interim Government of Iraq Allawi dated June 5, 2004. On the implementation of this policy, recognizing that Iraqi security forces are responsible to the appropriate Iraqi ministers, the MNF will coordinate with Iraqi security forces at all levels — national, regional, and local — in order to achieve unity of command of military operations in which Iraqi forces are engaged with the MNF. In addition, the MNF and the Iraqi government leaders will keep each other informed of their activities, consult regularly to ensure effective allocation and use of personnel, resources, and facilities, will share intelligence, and will refer issues up the respective chains of command where necessary. We will work in the fora described by Prime Minister Allawi in his June 5 letter to reach agreement on the full range of fundamental security and policy issues, including policy on sensitive offensive operations, and will ensure full partnership between MNF and Iraqi forces, through close coordination and consultation.

His Excellency
Mr. Lauro L. Baja, Jr.
President of the Security Council
United Nations
New York, New York

Under the agreed arrangement, the MNF stands ready to continue to undertake a broad range of tasks to contribute to the maintenance of security and to ensure force protection. These include activities necessary to counter ongoing security threats posed by forces seeking to influence Iraq's political future through violence. This will include combat operations against members of these groups, internment where this is necessary for imperative reasons of security, and the continued search for and securing of weapons that threaten Iraq's security. A further objective will be to train and equip Iraqi security forces that will increasingly take responsibility for maintaining Iraq's security. The MNF also stands ready as needed to participate in the provision of humanitarian assistance, civil affairs support, and relief and reconstruction assistance requested by the Iraqi Interim Government and in line with previous Security Council Resolutions.

In addition, the MNF is prepared to establish or support a force within the MNF to provide for the security of personnel and facilities of the United Nations. We have consulted closely with UN officials regarding the United Nations' security requirements and believe that a brigade-size force will be needed to support the United Nations' security effort. This force will be under the command and control of the MNF commander, and its missions will include static and perimeter security at UN facilities, and convoy escort duties for the UN mission's travel requirements.

In order to continue to contribute to security, the MNF must continue to function under a framework that affords the force and its personnel the status that they need to accomplish their mission, and in which the contributing states have responsibility for exercising jurisdiction over their personnel and which will ensure arrangements for, and use of assets by, the MNF. The existing framework governing these matters is sufficient for these purposes. In addition, the forces that make up the MNF are and will remain committed at all times to act consistently with their obligations under the law of armed conflict, including the Geneva Conventions.

The MNF is prepared to continue to pursue its current efforts to assist in providing a secure environment in which the broader international community is able to fulfil its important role in facilitating Iraq's reconstruction. In meeting these responsibilities in the period ahead, we will act in full recognition of and respect for Iraqi sovereignty. We look to other member states and international and regional organizations to assist the people of Iraq and the sovereign Iraqi government in overcoming the challenges that lie ahead to build a democratic, secure and prosperous country.

The co-sponsors intend to annex this letter to the resolution on Iraq under consideration. In the meantime, I request that you provide copies of this letter to members of the Council as quickly as possible.

Sincerely,
(*Signed*) Colin L. **Powell**

_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TAHA YASSIN RAMADAN, | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**DECLARATION OF QUENTIN K. CRANK**

I, Lieutenant Colonel Quentin K. Crank, hereby declare and say as follows:

 1. I am a commissioned officer in the United States Army currently serving as the commander of a Multi-National Force-Iraq (MNF-I) Theater Internment Facility (TIF) located at Camp Cropper, Iraq. In this position, I directly oversee the internment of security internees and other detained persons, including the control of the physical facilities associated with the TIF and commanding the military elements assigned to the TIF.

I make the following statements based upon my personal knowledge:

 2. MNF-I is a coalition force consisting of approximately twenty-seven different nations that operates in accordance with the mandate of United Nations Security Council Resolutions (UNSCR) 1546 (2004), 1637 (2005), and 1723 (2006). These Resolutions authorize MNF-I to undertake "a broad range of tasks to contribute to the maintenance of security and to ensure force protection" including, "internment where this is necessary for imperative reasons of security."

3. Mr. Taha Yassin Ramadan is currently in MNF-I custody pursuant to the aforementioned UNSCR and at the request of the Government of Iraq. He is physically located in the TIF currently under my command.

4. Mr. Taha Yassin Ramadan will remain in the physical custody of MNF-I until his transfer is ordered by the Deputy Commanding General, Detainee Operations, Multi-National Force-Iraq. In accordance with past practice, any transfer of physical custody of Mr. Taha Yassin Ramadan to the Government of Iraq would only occur at the conclusion of these (IHT) proceedings and upon the request of the Government of Iraq.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _21_ day of February, 2007.

QUENTIN K. CRANK
Lieutenant Colonel, U.S. Army
Commanding

2

<u>FEDERAL MILITARY NOTARY</u>

     I, the undersigned, certify that I am a duly commissioned, qualified, and authorized federal, military notary public. Before me, on the date indicated, personally appeared Lieutenant Colonel Quentin Crank, MP, USA, who is personally known by me to be a member of the Armed Forces of the United States serving on active duty and the person who is described herein, whose name is subscribed to, and who signed this written declaration, and who, having been duly sworn, acknowledged that this instrument was executed after its contents were read and duly explained, and that such execution was a free and voluntary act and deed for the uses and purposed herein set forth.

Subscribed, sworn-to and acknowledged before me on the 21st day of February 2007, by Lieutenant Colonel Quentin Crank, MP, USA, the declarant, who is personally known to me. This acknowledgement is executed in my official capacity under the authority granted by Title 10, United States Code, Section 1044a, which also states that no seal is required on this acknowledgement.

With the Armed Forces in Baghdad, Iraq.

(Sign) _____        Official Capacity:

                                            Task Force 134
                                            Magistrate Cell
                                            Staff Attorney

(Print) Michael E. Maffei
       LT, JAGC, USN

Date: _21 FEBRUARY 2007_

1

Translated by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Justice is the Foundation of Governance*

# Al-Waqa'i  Al-Iraqiya

*Official Gazette of the Republic of Iraq*

# • Law of the Supreme Iraqi Criminal Tribunal

―――――――――――――――――――――――――――――――――――――

**14 Ramadan 1426 Hijri**

**Number (4006)**                                    **Forty-Seventh Year**

**18 October 2005**

―――――――――――――――――――――――――――――――――――――

Note: page setup is US letter. Due to variations in length page the numbering in this document does not match that of the Arabic original.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

# Resolution No. 10

## In the Name of the People

## The Presidency Council

Pursuant to what has been approved by the National Assembly in accordance with Article. 33 (A) and (B), and Article 30 of the Law of Administration for the State of Iraq for the Transitional Period, the presidency council decided in its session of 9 October 2005 to promulgate the following law:

## Number 10 of 2005

### Law

### of the Supreme Iraqi Criminal Tribunal

### SECTION ONE

### Establishment and Organization

### of the Tribunal

### PART ONE

### Establishment

### Article 1:

**First**: A Tribunal is hereby established and shall be known as The Supreme Iraqi Criminal Tribunal (the "Tribunal"). The Tribunal shall enjoy complete independence.

**Second**: The Tribunal shall have jurisdiction over every natural person, whether Iraqi or non-Iraqi resident of Iraq, accused of committing any of the crimes listed in Articles 11, 12, 13 and 14 of this law, committed during the period from 17 July 1968 to 1 May 2003, in the Republic of Iraq or elsewhere, including the following crimes:

    A. Genocide;

    B. Crimes against humanity;

    C. War crimes; and

    D. Violations of Iraqi laws listed in Article 14 of this law.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

**Article 2:**

The Tribunal shall have its seat in the city of Baghdad. It may hold its sessions in any governorate, pursuant to a decree by the Council of Ministers upon the recommendation of the President of the Tribunal.

## PART TWO
### Organizational Structure of the Tribunal

**Article 3:**

The Tribunal shall consist of:

**First:**

> A. An Appeals Chamber with the power to review the rulings and decisions of the Trial Chambers or Investigative Judges
>
> B. One or more Trial Chambers.
>
> C. Investigative judges.

**Second:** Prosecutions Department

**Third:** An administration providing administrative and financial services to the Tribunal and the Public Prosecution.

**Fourth:**

> **A.** The Appeals Chamber shall consist of nine judges who shall elect one of its members as a President. The President of the Appeals Chamber shall be the senior President of the Tribunal and shall supervise its administrative and financial affairs.
>
> **B.** The Trial Chamber shall consist of five judges, who shall elect one of them as a President to supervise their work.

**Fifth:** The Council of Ministers may, if necessary, and on the basis of a proposal by the President of the Tribunal, appoint non-Iraqi judges who have experience in the crimes stipulated in this Law, and who shall be persons of high moral character, honesty and integrity, in the event that one of the parties is a State. These judges shall be appointed with the assistance of the international community, including the United Nations.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

# PART THREE

## Selection of Judges and Prosecutors and Termination of Service

### Article 4:

**First:** Judges and prosecutors shall be persons of high moral character, honesty and integrity, and shall have experience in the field of criminal law and meet conditions for appointment stipulated in the Judicial Organization Law 160 of 1979 and the Public Prosecution Law 159 of 1979

**Second**: As an exception to the provisions of paragraph First of this Article, candidates for the positions of judges at the Appeals Chamber and the Trial Chambers, and for investigative judges and prosecutors shall be serving judges and prosecutors. Retired judges and prosecutors can be nominated regardless of age, as can Iraqi lawyers who possess a high level of, efficiency and experience, and absolute competence in accordance with the Legal Profession Law. 173 of 1965, and service of a judicial or legal nature or in the field of legal practice of no less than 15 years.

**Third**:

A. The Supreme Judicial council shall nominate all judges and prosecutors to the Tribunal. Following approval by the Council of Ministers, a decision for their appointment shall be issued by the Presidency Council. The appointments shall be of the first category, as an exception to the provisions of the Judicial Organization Law and the Public Prosecution Law. Their salaries and remunerations shall be specified through instructions issued by the Council of Ministers.

**B.** The judges, prosecutors and employees appointed in accordance with the law prior to this legislation shall be deemed legally approved as of the date of their appointment according to the provisions of Article (4)(Third)(A) taking into account the provisions of Article (33) of this law.

**Fourth:** The Presidency Council, upon a recommendation from the Council of Ministers, may transfer judges and prosecutors from the Tribunal to the Supreme Judicial Council for any reason.

**Fifth:** The services of a judge or prosecutor covered by the provisions of this law shall be terminated for one of the following reasons:

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

---

    1. If he is convicted of a non-political felony.

    2. If he presents false information.

    3. If he fails to fulfill his duties without good reason.

**Article 6:**

**First:** A committee comprised of five members elected from among the Tribunal's judges and prosecutors shall be established under the supervision of the Tribunal's Appeals Chamber, and they shall select a president of the committee, which shall be called "Judges and Public Prosecutors Affairs Committee". The committee shall operate for one year and shall have the powers stipulated in the Judicial Organization Law and the Public Prosecution Law. It shall review matters relating to disciplinary measures and conditions of service pertaining to judges and prosecutors. Its decisions can be appealed before the full chamber of the Federal Appeal Court where they involve the termination of the services of a judge or prosecutor. **Second:** The Committee shall, if the appeal before the full chamber of the Federal Appeal Court is rejected, submit a recommendation to the Council of Ministers for the issuance of an order by the Presidency Council to terminate the services of the judge or prosecutor, including the President of the Tribunal if any of the conditions in Article 6 of this Article (sic) is met.

**Third:** Upon completion of the work of the Tribunal, the judges and prosecutors shall be transferred to the Supreme Judiciary Council to work in the federal courts. Those who have reached retirement age shall be pensioned off in accordance with the provisions of the law.

## PART FOUR
### The Presidency of the Tribunal

**Article 7:**

**First:** The president of the Tribunal shall:

    A. Preside over the hearings of the Appeals Chamber.

    B. Assign permanent and reserve judges to the Trial Chambers.

    C. Assign a judge to a Trial Chamber in case of absence.

    D. Ensure the completion of the administrative work of the Tribunal.

---

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

---

     E. Appoint the Tribunal's Administrative Director, Security Director, Public Relations Director and Archives and Documentation Director and terminate their services in accordance with the law.

     F. Name an official spokesperson for the Tribunal from among the judges or prosecutors.

**Second:** The President of the Tribunal may appoint non-Iraqi experts to work in the Trial Chambers and the Appeals Chamber to provide assistance in the field of international law and similar areas, whether international or otherwise. The appointment of these experts shall be undertaken with the assistance of the international community, including the United Nations.

**Third:** Non-Iraqi experts provided for in paragraph Second of this Article shall be persons of high moral character, honesty and integrity. The non-Iraqi expert shall preferably be a person who has previously worked in the judiciary or public prosecution in his country or in international war crimes tribunals.

## PART FIVE
### Investigative Judges

**Article 8:**

**First: A** Sufficient number of Investigative Judges shall be appointed.

**Second:** The Tribunal's Investigative Judges shall be responsible for investigating those accused of committing crimes stipulated in Article 1(Second) of this law.

**Third**: The Investigative Judges shall elect a Chief Investigative Judge and a Deputy from amongst them.

**Fourth**: The Chief Investigative Judge shall assign cases under investigation to individual Investigative Judges.

**Fifth:** Each of the Investigative Judges' Offices shall be composed of an Investigative Judge and such other qualified staff necessary as may be required for the work of the Investigative Judge.

**Sixth**: An Investigative Judge may gather prosecution evidence from whatever source he deems appropriate and to communicate directly with all relevant parties.

**Seventh**: The Investigative Judge shall act with complete independence as a separate organ of the Tribunal. He shall not be subject to or respond to requests or instructions from any governmental body or any other party.

---

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

**Eight:** The decisions of the Investigative Judge can be challenged by appeal to the Appeals Chamber within fifteen days of the notification or deemed notification of the decision in accordance with the law.

**Ninth**: The Investigative Judge, after consultation with the President of the Tribunal, may appoint non-Iraqi experts to provide judicial assistance to the Investigative Judges in the investigation of cases provided for in this Law, whether international or otherwise. The Chief Investigative Judge may appoint these experts with the assistance of the international community, including the United Nations.

**Tenth:** The non-Iraqi experts and observers referred to in paragraph Ninth of this Article shall be persons of high moral character, honesty and integrity. The non-Iraqi expert or observer shall preferably be a person who has worked in the judiciary or public prosecution in his country or at international war crimes tribunals.


## PART SIX

## The Public Prosecution

**Article 9:**

**First:** A sufficient number of Prosecutors shall be appointed.

**Second:** The Prosecution Department shall be composed of a number of Prosecutors who shall be responsible for the prosecution of persons accused of crimes that fall within the jurisdiction of the Tribunal.

**Third**: Prosecutors shall elect a Chief Prosecutor and a Deputy from among them.

**Fourth**: Each Prosecution Office shall be composed of a Prosecutor and such other qualified staff as may be required for the Prosecutor's work.

**Fifth**: Each prosecutor shall act with complete independence since he is considered as a separate entity from the Court. He shall not fall under, nor receive instructions from, any government department or from any other party. Each Prosecutor shall act with complete independence as a separate organ of the Tribunal. He shall not be subject to or respond to requests or instructions from the government or any other party.

**Sixth**: The Chief Prosecutor shall assign to Prosecutors cases requiring investigation and prosecution in court [Literally, presenting the case at the stage of trial] in accordance with the powers granted to the Prosecutors by law.

**Seventh:** The Chief Prosecutor, in consultation with the President of the Tribunal, may appoint non-Iraqi experts to provide assistance to the Prosecutors with regard to

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org, April 12, 2006.

*Laws*

the investigation and prosecution of cases provided for in this Law, whether international or otherwise.  The Chief Prosecutor may appoint these experts with the assistance of the international community, including the United Nations.

**Eighth**: The non-Iraqi experts referred to in paragraph Seventh of this Article shall be persons of high moral character, honesty and integrity.  The non-Iraqi expert shall preferably be a person who has acted in a prosecutorial capacity in his country or at international war crimes tribunals.


## PART SEVEN

### The Administration Department

**Article 10:**

**First:** The Administration Department shall be managed by an officer with the title of Department Director who holds a bachelor degree in law and has judicial and administrative experience. He shall be assisted by a number of employees in managing the affairs of the department.

   **Second:** The Administration Department shall be responsible for the administrative, financial and servicing affairs of the Tribunal and the Prosecutions Department.


# SECTION TWO

## Court Jurisdiction

### PART ONE

### The Crime of Genocide

**Article 11:**

**First:** For the purposes of this Law and in accordance with the Convention on the Prevention and Punishment of the Crime of Genocide, dated 9 December 1948, as ratified by Iraq on 20 January 1959, "genocide" means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnic, racial or religious group as such:

   A. Killing members of the group;

   B. Causing serious bodily or mental harm to members of the group;

   C. Deliberately inflicting on the group living conditions calculated to bring about its physical destruction in whole or in part;

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

D. Imposing measures intended to prevent births within the group.

E. Forcibly transferring children of the group to another group.

**Second:** The following acts shall be punishable

A. Genocide.

B. Conspiracy to commit genocide.

C. Direct and public incitement to commit genocide.

D. Attempt to commit genocide.

E. Complicity in genocide.

## PART TWO

## Crimes Against Humanity

### Article 12

**First**: For the purposes of this Law, "crimes against humanity" means any of the following acts when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack:

A. Willful killing;

B. Extermination;

C. Enslavement;

D. Deportation or forcible transfer of population;

E. Imprisonment or other severe deprivation of physical liberty in violation of fundamental norms of international law;

F. Torture;

G. Rape, sexual slavery, enforced prostitution, forced pregnancy, or any other form of sexual violence of comparable gravity;

H. Persecution against any specific party or population on political, racial, national, ethnic, cultural, religious, gender or other grounds that are impermissible under international law, in connection with any act referred to as a form of sexual violence of comparable gravity;

I. Enforced disappearance of persons; and

J. Other inhumane acts of a similar character intentionally causing great suffering, or serious injury to the body or to the mental or physical health.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

**Second**: For the purposes of implementing the provisions of paragraph First of this Article:

A. "Attack directed against any civilian population" means a course of conduct involving the multiple panel of acts referred to in paragraph First of this Article against any civilian population, pursuant to or in furtherance of a state or organizational policy to commit such attack;

B. "Extermination" means the intentional infliction of living conditions, such as the deprivation of access to food and medicine, with the intent to bring about the destruction of part of the population;

C. "Enslavement" means the exercise of any or all of the powers entailed by the right of ownership over a person and includes the exercise of such power in the course of trafficking in persons, particularly women and children;

D. "Deportation or forcible transfer of population" means forced displacement of the persons concerned by expulsion or other coercive acts from the area in which they are lawfully present, without grounds permitted under international law;

E. "Torture" means the intentional infliction of severe pain or suffering, whether physical or mental, upon a person in the custody or under the control of the accused; except that torture shall not include pain or suffering arising from, or related to legal punishments;

F. "Persecution" means the intentional and severe deprivation of fundamental rights contrary to international law by reason of the identity of the group or population; and

G. "Enforced disappearance of persons" means the arrest, detention or abduction of persons by, or with the authorization, support or acquiescence of, the State or a political organization, followed by a refusal to acknowledge that deprivation of freedom or to give information on the fate or whereabouts of those persons, with the intention of removing them from the protection of the law for a prolonged period of time.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

# PART THREE

## War Crimes

### Article 13

For the purposes of this Law, "war crimes" shall mean the following:

**First**: Grave breaches of the Geneva Conventions of 12 August 1949, namely any of the following acts against persons or property protected under the provisions of the relevant Geneva Convention:

A. Willful killing;

B. Torture or inhuman treatment, including biological experiments;

C. Willfully causing great suffering, or serious injury to body or health;

D. Extensive destruction and appropriation of property not justified by military necessity and carried out unlawfully and wantonly;

E. Compelling a prisoner of war or other protected person to serve in the forces of a hostile power;

F. Willfully denying the right of a fair regular trial to a prisoner of war or other protected person;

G. Unlawful confinement;

H. Unlawful deportation or transfer; and

I. Taking of hostages.

**Second**: Other serious violations of the laws and customs applicable in international armed conflicts, within the established framework of international law, namely any of the following acts:

A. Intentionally directing attacks against the civilian population as such or against individual civilians not taking direct part in hostilities;

B. Intentionally directing attacks against civilian objects, including objects which do not constitute military objectives;

C. Intentionally directing attacks against personnel, installations, material, units or vehicles used in humanitarian assistance or peacekeeping missions in accordance with the Charter of the United Nations, as long as such missions are entitled to the protection given to civilians or civilian objects under the international law of armed conflicts;

D. Intentionally launching an attack in the knowledge that such attack will cause incidental loss of life or injury to civilians or civilian damage which

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

would be clearly excessive in relation to the concrete and direct overall military advantages anticipated;

E. Intentionally launching an attack in the knowledge that such attack will cause widespread, long-term and severe damage to the natural environment, which would be clearly excessive in relation to the concrete and direct overall military advantage anticipated;

F. Attacking or bombarding, by whatever means, towns, villages, dwellings or buildings which are undefended and which are not military objectives;

G. Killing or wounding a combatant who, having laid down his arms or having no longer means of defense, has clearly surrendered;

H. Making improper use of a flag of truce, or the flag, or the military insignia and uniform of the enemy or of the United Nations, as well as of the distinctive emblems of the Geneva Conventions, resulting in death or serious personal injury;

I. The transfer, directly or indirectly, by the Government of Iraq or any of its agencies (including, for clarification, any of the agencies of the Arab Ba'ath Socialist Party), of parts of its own civilian population into any territory it occupies, or the deportation or transfer of all or parts of the population of the occupied territory within or outside this territory;

J. Intentionally directing attacks against buildings which do not constitute military objectives, and are dedicated to religious, educational, artistic, scientific or charitable purposes, or against historic monuments, hospitals and places where the sick and wounded are collected;

K. Subjecting persons of another nation to physical mutilation or to medical or scientific experiments of any kind that are neither justified by the medical, dental or hospital treatment of the person concerned nor carried out in his or her interest, and which cause death to or seriously endanger the health of such person or persons;

L. Killing or wounding treacherously individuals belonging to a hostile nation or army;

M. Declaring that no person is still alive[1];

---

[1] This is a literal rendering of the Arabic phrase. It is a possible mistranslation of the English 'Declaring that no quarter will be given'.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

N. Destroying or seizing the civilian property of an adverse party unless such destruction or seizure be imperatively required by the necessities of war;

O. Declaring the abolition, suspension or prohibition of access to a court of law, with the intention of depriving the nationals of the hostile party from seeking their rights;

P. Compelling the nationals of the hostile party to take part in military operations directed against their own country, even if they were in the belligerent's service before the commencement of the war;

Q. Pillaging a town or place, even when taken by force;

R. Using poisons or poisoned weapons;

S. Using asphyxiating, poisonous or any other gases, as well as any other similar liquids, materials or devices;

T. Using bullets, which expand or flatten easily in the human body, such as bullets with a hard envelope, which does not entirely cover the core or is pierced

U. Committing outrages upon personal dignity, in particular humiliating and degrading treatment;

V. Committing rape, sexual slavery, enforced prostitution, forced pregnancy, or any other form of sexual violence of comparable gravity;

W. Utilizing the presence of civilians or other protected persons to render certain points, areas or military forces immune from military operations;

X. Intentionally directing attacks against buildings, material and medical units, means of transport, and personnel using the distinctive emblems of the Geneva Conventions in conformity with international law;

Y. Intentionally using starvation of civilians as a method of warfare by depriving them of material indispensable to their survival, including willfully impeding relief supplies as provided for under international law; and

Z. Conscripting or enlisting children under the age of fifteen years into the national armed forces or using them to participate actively in hostilities.

**Third**: In the case of an armed conflict, any of the following acts committed against persons taking no active part in the hostilities, including members of armed forces

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org, April 12, 2006.

*Laws*

who have laid down their arms and those placed *hors de combat* by sickness, injury, detention or any other cause:

> A. Use of violence against life and persons, in particular killing of all kinds, mutilation, cruel treatment and torture;

> B. Committing outrages upon personal dignity, in particular humiliating and degrading treatment;

> C. Taking of hostages; and

> D. The passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all recognized and indispensable judicial guarantees.

**Fourth**: Other serious violations of the laws and customs of war applicable in armed conflict not of an international character. [sic] within the established framework of international law, specifically any of the following acts:

> A. Intentionally directing attacks against the civilian population as such or against civilian individuals not taking direct part in hostilities;

> B. Intentionally directing attacks against buildings, materials, medical transportation units and means, and personnel using the distinctive emblems of the Geneva Conventions in conformity with international law;

> C. Intentionally directing attacks against personnel, installations, materials, units, or vehicles used in humanitarian assistance or peacekeeping missions in accordance with the Charter of the United Nations, as long as they are entitled to the protection given to civilians or civilian targets under the international law of armed conflict;

> D. Intentionally directing attacks against buildings dedicated to religious, educational, artistic, scientific or charitable purposes, or against historic monuments, hospitals and places where the sick and wounded are collected, provided they are not military objectives;

> E. Pillaging any town or place, even when taken over by force;

> F. Committing rape, sexual slavery, enforced prostitution, forced pregnancy, or any other form of sexual violence of comparable gravity;

> G. Conscripting or listing children under the age of fifteen years into armed forces or groups or using them to participate actively in hostilities;

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

H. Ordering the displacement of the civilian population for reasons related to the conflict, unless the security of the civilians involved or imperative military reasons so demand;

I. Killing or wounding treacherously a combatant adversary;

J. Declaring that no person is still alive;

K. Subjecting persons who are under the power of the other party in the conflict to physical mutilation or to medical or scientific experiments of any kind that are neither justified by the medical, dental or hospital treatment of the person concerned nor carried out in his or her interest, causing death to such person or persons, or seriously endangering their health; and

L. Destroying or seizing the property of an adversary, unless such destruction or seizure is imperatively demanded by the necessities of the conflict.

## PART FOUR
### Violations of Iraqi Laws

**Article 14**

The Tribunal shall have the power to prosecute persons who have committed the following crimes:

**First**: Interference in the affairs of the judiciary or attempting to influence its functioning.

**Second**: The wastage and squandering of national resources, pursuant to Article 2(g) of the Punishment of Conspirators against Public Safety and Corrupters of the System of Governance Law 7 of 1958.

**Third**: The abuse of position and the pursuit of policies that have almost led[2] to the threat of war or the use of the Iraqi armed forces against an Arab country, in accordance with Article 1 of Law 7 of 1958.

**Fourth:** If the Tribunal finds that the special element of any of the crimes stipulated in Articles 11, 12 and 13 of this Law is missing, and establishes that the act involved constitutes a crime punishable under the Penal Code or any other penal law at the time of its commission, the Tribunal shall be competent to hear the case

---

[2] The intended meaning here is 'may lead to…'

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

# SECTION THREE

## Individual Criminal Responsibility

### Article 15

**First**: A person who commits a crime within the jurisdiction of this Tribunal shall be individually responsible and liable for punishment in accordance with this Law.

**Second**: In accordance with this Law, and the provisions of the Penal Code, a person shall be criminally responsible if he [or she]:

A. Commits such a crime, whether as an individual, jointly with another or through another person, regardless of whether that [other] person is criminally responsible;

B. Orders, solicits or induces the commission of such a crime, which has occurred or has been attempted;

C. For the purpose of facilitating the commission of such a crime, aids, abets or by any other means assists in its commission or its attempted commission, including providing the means for its commission;

D. Contributing by any other means, together with a group of persons with a common criminal intent, to the commission or attempted commission of such a crime provided such contribution is intentional and is either:

1. Made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Tribunal;

2. Made with the knowledge of the intention of the group to commit the crime;

E. In respect of the crime of genocide, directly and publicly incites others to commit this crime;

F. Attempts to commit such a crime by taking action with the intention of committing it, but the crime does not occur because of circumstances independent of the person's intentions. However, a person who takes an action that precludes the commission or completion of the crime shall not be liable for punishment, nor will he be liable for punishment under this Law if he completely and voluntarily abandons his criminal purpose.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

**Third**: The official position of any accused person, whether as president of the State, chairman or member of the Revolution Command Council, prime minister or member of the cabinet, or a member of the leadership of the Ba'ath Party, shall not relieve such person of criminal responsibility nor mitigate punishment.  No person is entitled to any immunity with respect to any of the crimes stipulated in Articles 11, 12, 13 and 14 of this Law.

**Fourth**: A superior is not relieved of the criminal responsibility for crimes committed by his subordinates, if he knew or had reason to know that the subordinate had committed, or was about to commit such acts, and the superior failed to take the necessary and reasonable measures to prevent such acts or to refer the matter to the competent authorities for investigation and prosecution.

**Fifth**: The fact that an accused person acted pursuant to an order of the Government or of his superior shall not relieve him of criminal responsibility, but may be considered in mitigation of punishment if the Tribunal determines that justice so requires.

**Sixth:** Amnesty decrees issued prior to this Law coming into force do not apply to persons accused of committing any of the crimes stipulated in it.

## SECTION FOUR
### Rules of Procedure and Evidence

**Article 16**

The Tribunal shall follow the rules of procedure provided for in the Criminal Procedure Law 23 of 1971 and the Rules of Procedures and Evidence appended to this Law, of which it shall be considered an integral part.

## SECTION FIVE
### General Principles of Criminal Law

**Article 17**

**First:** In the absence of provisions in this Law and the rules made thereunder, the general principles of criminal law contained in the following laws shall be applicable in connection with the prosecution and trial of any accused persons:

A-    For the period 17/7/1968 to 14/12/1969, the Baghdadi Penal Code of 1919

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

B-    For the period 15/12/1969 to 1/5/2003, the Penal Code No. 111 of 1969, which was in force in1985 (Third Edition),

C-    The Military Penal Code No.13 of 1940, and the Code of Military Procedure No. 44 of 1941.

**Second**: In interpreting Articles 11, 12 and 13 of this Law, the Trial Chamber and Appeals Chamber may resort to the [relevant] decisions of international criminal tribunals.

**Third**: Grounds for exclusion of criminal responsibility under the Penal Code shall be implemented in a manner consistent with this Law and with international legal obligations concerning crimes within the jurisdiction of the Tribunal

**Fourth**: The crimes stipulated in Articles 11, 12, 13, and 14 of this Law shall not be subject to any statute of limitations.

## SECTION SIX

### Investigations and Indictment

**Article 18**

**First**: The Tribunal Investigative Judge shall initiate investigations on the basis of information obtained from any source, particularly from the police or any governmental or non-governmental source.  The Investigative Judge shall assess the information received and decide whether there is sufficient basis to proceed

**Second**: The Investigative Judge shall have the power to question suspects, victims or their relatives, and witnesses, to collect evidence and to conduct on-site investigations.  In carrying out his tasks, the Investigative Judge may, as appropriate, request the assistance of the relevant governmental authorities, who shall be required to provide full cooperation with the request

**Third**: Upon a determination that a *prima facie* case exists, the Investigative Judge shall prepare an indictment containing a concise statement of the facts and the crime with which the accused is charged under the Law, and shall refer the case to the Trial Chamber.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

# PART ONE

## Rights[3] of the Accused

### Article 19

**First**: All persons shall be equal before the Tribunal.

**Second**: The accused shall be presumed innocent until proven guilty before the Tribunal in accordance with this law.

**Third** Every accused shall be entitled to a public hearing, in accordance with the provisions of this law and the rules of procedure made hereunder.

**Fourth**: When bringing charges against the accused pursuant to this Law, the accused shall be entitled to a fair impartial trial in accordance with the following minimum guarantees:

> A. To be informed promptly and in detail of the content, nature and cause of the charge against him;

> B. To have adequate time and facilities for the preparation of his defense and to communicate freely with counsel of his own choosing and to meet with him in private. The accused is entitled to have non-Iraqi legal representation so long as the principal lawyer of such accused is Iraqi;

> C. To be tried without undue delay;

> D. To be tried in his presence, and to be assisted by counsel of his own choosing, or to be informed of his right to request legal assistance if he cannot afford it; and to have the right to seek such assistance that will allow him to appoint a lawyer without paying the fees;

> E. To have the right to call and examine defence and prosecution witnesses, and to present any evidence in his defense in accordance with the law.

> F. Not to be compelled to confess guilt, and to have the right to remain silent and not to testify without such silence being interpreted as evidence of guilt or innocence

---

[3] The Arabic word used is ضمانات, which literally means guarantees, but the intended meaning is 'rights'.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

# SECTION SEVEN

## Trial Proceedings

### Article 20

**First**: A person against whom an indictment has been issued shall be taken into custody, pursuant to an arrest order or warrant issued by the Tribunal Investigative Judge, and shall be immediately informed of the charges against him and transferred to the Tribunal.

**Second**: The Trial Chamber shall ensure a fair and expeditious trial conducted in accordance with this Law and the Rules of Procedure and Evidence annexed it, with full respect for the rights of the accused and due regard for the protection of victims or their relatives, and witnesses.

**Third**: The Trial Chamber shall read the indictment, satisfy itself that the rights of the accused are respected and guaranteed, ensure that the accused understands the charge or charges against him, and instruct the accused to enter a plea.

**Fourth**: The hearings shall be public unless the Trial Chamber decides to close the proceedings in accordance with the Rules of Procedure and Evidence annexed to this Law. The decision to close the proceedings shall be exercised on a very limited basis.

### Article 21

The Trial Chamber shall provide for the protection of victims or their relatives, and witnesses, in accordance with the Rules of Procedure and Evidence annexed to this Law, including the protection of the identity of the victims or their relatives, and witnesses.

### Article 22

Relatives of victims and harmed persons who are Iraqi nationals may bring civil suits against the accused for damages resulting from acts which constitute crimes under this Law. The Tribunal shall have the power to adjudicate such claims in accordance with the Code of Criminal Procedure No 23 of 1971 and other relevant laws.

### Article 23

**First**: The Trial Chamber shall pronounce judgments and impose sentences and penalties on persons convicted of crimes within the jurisdiction of the Court.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

**Second**: The judgment shall be rendered by a majority of the judges of the Trial Chamber, and shall be delivered by the Trial Chamber in public. The judgment shall not be issued except on the basis of a decision to convict, to which the opinions of dissenting judges may be appended.

## Article 24

**First**: The penalties imposed by the Tribunal shall be those prescribed by the Penal Code No. 111 of 1969, except for a sentence of life imprisonment that means the remaining natural life of the convicted person, taking into account the provisions stipulated in Article 17 of this Law.

**Second**: The penalties for the crimes under Article 14 of this Statute shall be those prescribed under Iraqi Penal Code and other penal laws.

**Third**: Taking into account paragraphs Fourth and Fifth of this article, the Trial Chambers shall determine the penalties for the crimes under Articles 11, 12 and 13 of this Law

**Fourth**: A person convicted of crimes stipulated in the Penal Code shall be punished if committed:

    A. Murder or rape as defined under the Penal Code.

    B. Complicity in the commission of murder or rape.

**Fifth**: The penalty for any crimes under Articles 11, 12, 13 which do not have a counterpart under Iraqi law shall be determined by the Trial Chambers taking into account such factors as the gravity of the crime, the individual circumstances of the convicted person, guided by judicial precedents and relevant sentences issued by the international criminal tribunals.

**Sixth**: The Trial Chambers may order the forfeiture of assets, property or proceeds derived directly or indirectly from a crime, without prejudice to the rights of the *bona fide* third parties.

**Seventh**: In accordance with Article 307 of the Code of Criminal Procedure, the Trial Chambers shall have the authority to confiscate any material or goods prohibited by law regardless of whether the case has been discharged for any lawful reason.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

# SECTION EIGHT

## Appeals Proceedings

## PART ONE

## Cassation

### Article 25

**First**: The convicted person or the Prosecutor may contest the verdicts and decisions by appealing in cassation to the Appeals Chamber on the following grounds:

    a. If the verdict is in contradiction with the law or there is an error in interpreting it.

    b. An error of procedure.

    c. An error of material fact which has occasioned a miscarriage of justice.

**Second**: The Appeals Chamber may affirm, reverse or revise the decisions taken by the Trial Chambers or the Investigative Judge

**Third**: Where the Appeals Chamber reverses a verdict of acquittal or release issued by the Trial Chamber or the Investigative Judge, the case shall be referred back to the Trial Chamber for retrial or to the Investigative Judge for implementation of its decision.

**Fourth:** The period allowed for the lodging of appeals shall be in accordance with the provisions of the Code of Criminal Procedure No. 23 of 1971, unless otherwise provided for.

## PART TWO

## Retrial

### Article 26

**First**: Where new findings or facts have been discovered which were not known at the time of the proceedings before the Trial Chamber or the Appeals Chamber and which could have been a decisive factor in reaching the verdict, the convicted person or the Prosecutor may submit to the Tribunal an application for a retrial

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

**Second**: The Tribunal shall reject the application if it considers it to be unfounded. If the Tribunal determines that the application has merit[4], it may, after hearing the parties, and with a view to amending the judgment:

> a. Send the case back to the original Trial Chamber to review it; or
>
> b. Send the case to another Trial Chamber; or
>
> c. The Appeals Chamber reviews the case.

## SECTION NINE
### Enforcement of Sentences

### Article 27

**First:** Sentences shall be carried out in accordance with the law.

**Second:** No authority, including the President of the Republic, may grant a pardon or reduce the penalties issued by this Tribunal. Penalties shall be enforceable within thirty days of the sentence or decision reaching finality.

## SECTION TEN
### General and Final Provisions

### Article 28

Investigative judges, Trial Chamber judges, members of the Prosecutions Department, Director of the Administration Department and Tribunal personnel shall be Iraqi nationals, taking into account Article 4 (Third) of this Law.

### Article 29

**First**: The Tribunal and the national courts shall have concurrent jurisdiction to prosecute persons accused of the crimes prescribed in Article 14 of this Statute

**Second**: The Tribunal shall have primacy over all other Iraqi courts with respect to its jurisdiction over the crimes prescribed in Articles 11, 12 and 13 of this Law.

**Third**: At any stage of the proceedings, the Tribunal may demand of any other court to transfer any case being tried by it involving any crimes prescribed in Articles 11, 12, 13 and 14 of this Law, and such court shall be required to transfer such case on demand.

---

[4] Literally, …'that the application is based on convincing grounds...'

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

**Fourth**: At any stage of the proceedings, the Tribunal may demand of any other court to transfer any case being tried by it involving any crimes prescribed in Articles 13, 14, 15 and 16 of this Law, and such court shall be required to transfer such case upon demand

## Article 30

**First**: No person shall be tried before any other Iraqi court for crimes for which he has already been tried by the Tribunal, in accordance with Articles 300 and 301 of the Code of Criminal Procedure.

**Second**: A person who has been tried by any Iraqi court for a crime or crimes within the jurisdiction of the Tribunal may not be subsequently tried by the Tribunal unless the Tribunal determines that the previous court proceedings were not impartial or independent, or were designed to shield the accused from criminal responsibility. When taking a decision to order a retrial, one of the conditions contained in Article 196 of the Code of Civil Procedure and the requirements of Article 303 of the Code of Criminal Procedure must be met[5].

**Third**: In determining the penalty to be imposed on a person convicted of a crime under this Law, the Tribunal shall take into account the time served of any penalty imposed by an Iraqi court on the same person for the same crime.

## Article 31

**First**: The President of the Tribunal, the Judges, the Investigation Judges, the Prosecutors, the Director of the Administration Department and the Tribunal staff shall have immunity from civil suits with respect to their official duties.

**Second**: Other persons, including the accused, shall be accorded such treatment as is necessary for the proper functioning of the Tribunal.

## Article 32

Arabic shall be the official language of the Tribunal.

---

[5] The last sentence in this paragraph is ungrammatical, probably as the result of a typing error. The word لدى must be إحدى. The English translation is based on this assumption.

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

___

**Article 33**

No person belonging to the Ba'ath Party may be appointed as a Judge, Investigative Judge, Prosecutor, employee or any of the Tribunal's staff[6].

**Article 34**

The expenses of the Tribunal shall be borne by the regular budget of the State

**Article 35**

The President of the Tribunal shall prepare an annual report on the Tribunal's work for submission to the Council of Ministers.

**Article 36**

The provisions of the Civil Service Law No. 24 of 1960, Personnel Law No. 25 of 1960,  State And Socialist Sector Employees Disciplinary Law No 14 of 1991 and Civil Service Retirement Law No.33 of 1966 shall apply to the Tribunal's employees other than the judges and members of Public Prosecution.

**Article 37**

The Statute of the Iraqi Special Tribunal for Crimes Against Humanity, Law No. 1 of 2003, and the Rules of Procedure issued under Article 16 thereof shall be abolished with effect from the date of the coming into force of this Law

**Article 38**

All decisions and rules of procedure[7] issued under Law No. 1 of 2003 are considered correct and in accordance with the law[8].

**Article 39**

In coordination with the President of the Tribunal, the Council of Ministers shall issue[9] instructions to facilitate the implementation of this Law.

___

[6] A literal rendition of the phrase أي شخص منتمي إلى حزب البعث...
[7] Translated as 'rules of procedure' although the Arabic reads 'orders of procedures'.
[8] It is not clear if 'the law' here means 'this Law'.
[9] A literal rendering would be 'The Council of Ministers, in  coordination with the President of the Tribunal, shall issue…'.

___

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

## Article 40

This Law shall come into force on the date of its publication in the Official Gazette.

**Jalal Talabani**              **Adil Abd Al-Mahdi**              **Al-Shaikh Ghazi Ajil Al-Yawir**

**President of the Republic**    **Vice President of the Republic**    **Vice President of the Republic**

Transl. by the International Center for Transitional Justice (http://www.ictj.org); questions and comments can be sent to mena@ictj.org. April 12, 2006.

*Laws*

## JUSTIFYING REASONS

To expose the crimes committed in Iraq from 17 July 1968 until 1 May 2005 against the Iraqi people and the peoples of the region and the subsequent brutal massacres:

To lay down the rules and punishments to condemn after a fair trial the perpetrators of such crimes for waging wars, genocide, and crimes against humanity; To establish an national Supreme Iraqi Criminal Tribunal made up of Iraqi judges with high experience, competence and integrity, with the power to try these criminals

To reveal the truth, and the agonies and injustice caused by the perpetrators of such crimes;

To protect the rights of many Iraqis, redress injustices committed against them, and demonstrate heaven's justice as the Almighty God wants it to be.

This law has been promulgated.