# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

TAHA YASSIN RAMADAN,         :

        Petitioner,        :

        v.                :       Case No. 07-0297 (PLF)

GEORGE W. BUSH, *et al.*,      :

        Respondents.     :

_____:

## PETITIONER'S RESPONSE TO GOVERNMENT'S SHOW CAUSE FILING

While the ultimate determination on the merits of this petition will require a fuller briefing and consideration of the substantial legal issues involved, one thing is certain: In the absence of an order preventing transfer of Petitioner Ramadan out of U.S. custody within Iraq, he will be tortured and hanged to his death and this Court will lose its jurisdiction to prevent unlawful acts by U.S. Officials, protect his life, do justice and issue the relief it finds the law requires. See Ex. 1, Affidavit of Petitioner describing the torture, dated March 22, 2006.

Three of Ramadan's co-defendants, each of whom was in the undisputed physical custody of the United States Government, were "transferred" to the custody of Iraqi authorities literally at the doorway to the gallows. Two were hanged, another beheaded by hanging, all were tormented before execution, as the whole world has seen. Awad Hamed Al-Bandar, a civilian and a former Chief Judge of a court of national jurisdiction, was executed on January 17, 2007

even while his *habeas corpus* petition remained pending before the U.S. Court of Appeals for the D.C. Circuit.[1]

If, as we believe, this court has jurisdiction to hear and review Ramadan's *habeas* corpus petition (or to receive a greater presentation on the threshold issue of jurisdiction), every interest of the United States, the rule of law, justice, peace weigh urgently in favor of this Court ordering that petitioner not be transferred from U.S. custody while his habeas petition is pending, particularly given the finality of death, severity of harm to Ramadan caused by torture and execution, and the interest of the Court in ensuring the integrity and effectiveness of Article III jurisdiction and proceedings. The United States has held Ramadan for three and a half years. It will not be prejudiced by the period of time needed for the *habeas corpus* review of his detention by the United States.

The only basis for this Court to allow Ramadan to be transferred, tortured and executed would be if it conclusively determined it lacked jurisdiction under any and all circumstances.

The established rule is that federal *habeas corpus* jurisdiction "requires nothing more" than a claim that a petitioner is "being held in federal custody in violation of the laws of the

---

[1] The Al-Bandar case was filed on December 26, 2006 and heard before Judge Reggie Walton, sitting as an emergency motions judge, although the case was assigned to Judge Collyer. The case was heard *before* the D.C. Circuit's recent ruling in Omar v. Harvey. Judge Walton found that jurisdiction was lacking and, on that basis dismissed the case on December 28, 2007. He provided Al-Bandar's counsel with a choice: to consent to the dismissal of the petition in order to allow an immediate appeal to the D.C. Circuit, in which case a brief administrative stay preventing the transfer of Bandar from U.S. physical custody to the Iraqis would be granted or to proceed to have the jurisdictional issue fully briefed and heard before Judge Collyer in which case no stay would be entered. If Bandar's counsel opted to follow the latter course, Bandar would be executed before a full briefing and adjudication on the jurisdictional issue could be completed. Bandar's counsel chose the former.

The D.C. Circuit, on an emergency basis, denied Bandar's motion for stay or injunction and declined to rule on a motion by the Government for summary dismissal on the requested basis of lack of jurisdiction. The case remained pending before the D.C. Circuit on the issue of jurisdiction. Dec. 28, 2006

The U.S. Supreme Court denied Bandar's emergency motion for stay or injunction without opinion. Jan. 4, 2007.

United States" once personal jurisdiction over his or her custodian is established. <u>Rasul v. Bush</u>, 542 U.S. 466, 483, 124 S. Ct. 2688, 2698 (2004).

The Government, in its response to the show cause order, identifies only one obstacle to the assertion of jurisdiction: the nine sentence ruling in <u>Hirota v. MacArthur</u>, 338 U.S. 197 (1948) and <u>Flick v. Johnson</u>, 174 F.2d 983 (D.C. Cir., 1949) which it contends are to be read broadly to the effect that U.S. Courts lack Article III jurisdiction to consider the claims of non-citizens detained overseas by the United States who have been convicted of crime by an international court when the U.S. declares itself to be acting as a part of a multi-national force.

This Court now has the benefit afforded by recent appellate opinions, including particularly <u>Omar v. Harvey</u>,[2] which make clear that the brief <u>Hirota</u> opinion casts no such large shadow, if one at all. Notwithstanding the Government's distorted presentation of <u>Omar</u> in its response to the show cause order, <u>Omar</u> confirms that this Court does possess Article III jurisdiction to review the lawfulness of the detention of Petitioner Ramadan, who has been held by the United States since August, 2003 and during that period cruelly tortured by the United States military.

The significance of the recent <u>Omar</u> ruling is threefold as it relates to the pending issues.

First, <u>Omar</u> importantly observed that, in issuing its nine sentence opinion in <u>Hirota</u>, the Supreme Court was "determined to resolve the case *on the narrowest possible grounds.*" Slip op. at 11.

Therefore, <u>Hirota</u> is be viewed as precluding jurisdiction only in cases that include identical material circumstances to those present in <u>Hirota</u> and where no new or additional

---

[2] The opinion in <u>Omar</u> issued on February 9, 2007.

material circumstances are present that were not presented and adjudicated in <u>Hirota</u>. A case

must be a carbon copy of <u>Hirota</u> in order for <u>Hirota</u> to apply. Otherwise the Hirota case neither

"controls" nor defeats jurisdiction.

> "*As is apparent, Hirota nowhere explains which 'circumstances' were controlling [as the basis for the Court's rejection of jurisdiction]. Nor does anything in the opinion hold that federal courts lack habeas jurisdiction whenever, as the government insists, American officials detaining a petitioner are functioning as part of a multinational force. Indeed, the opinion articulates no general legal principle at all.* The Court, moreover, has never cited *Hirota* for any substantive proposition, much less the one the government claims it supports. None of this should be surprising given that the Court heard *Hirota* not on a petition for certiorari granted to resolve an important question of law, *see* SUP. CT. R. 38(5) (1939) ("A review on writ of certiorari . . . will be granted only where there are special and important reasons therefor."), but rather as an original petition for habeas corpus. This, together with the terse per curiam opinion, reveals a Court determined to resolve the case *on the narrowest possible grounds.*"

<u>Omar</u> slip op. at 10 - 11.

Second, <u>Omar</u> makes two important observations about <u>Hirota</u> that are clearly correct:

"…the opinion articulates no general legal principle at all", (Slip op. at p. 11) and subsequent

Supreme Court decisions "provide a basis for questions <u>Hirota</u>'s vitality" (Slip op. at p. 9).

In fairness to both <u>Hirota</u> and <u>Flick</u>, they addressed petitioner convicted in international

court and imprisoned on that basis in the wake of World War II in which alliances were essential

to victory and future peace. Thus, the <u>Flick</u> court observed that Military Tribunal IV was "in its

existence and jurisdiction rooted in the sovereignty of the Four Powers, exercised jointly through

the supreme governing authority of the control Council" <u>Flick v Johnson</u>, 174 F.2d at 986. The

Four Powers were the United States, Great Britain, France and Russia. The petitioners, like

thousands of others, were in custody pursuant to the judgments of these international tribunals.

4

As the Flick Court observed, the authority of the quadripartite Control Council was "paramount" and the U.S. President ordered that the Commander in Chief of the American Forces in Germany and U.S. military officials be subordinate to that ultimate authority, and obligated with full authority to carry out the quadripartite Council's mandates. Flick, 174 F.2d at 984.

These circumstances are simply not present in the instant case in which the United States is subject to no international authority and the relevant judgment of the Iraqi Special Tribunal is decidedly not from such an international court.

Third, Omar held there was *habeas corpus* jurisdiction despite the presence of two of the four "circumstances" found in Hirota: (1) detention overseas and (2) the existence of a multinational force, leaving as the only circumstances in Hirota which might defeat *habeas corpus* jurisdiction (3) "foreign citizenship" and (4) "criminal conviction in an international court". Omar was a U.S. citizen who had not been convicted of a crime, but who had been referred to the Central Criminal Court of Iraq for criminal prosecution. See slip op. at 11.

Omar rejected the Government's contention that the federal courts lacked jurisdiction over petitioner's U.S. military custodians because they purported to act as part of the Multi National Force-Iraq (MNF-I). The Court recognized, as was conceded by the Government finally at oral argument, that the United States is not subordinate to any international authority by or through the MNF-I.

> [A]lthough American personnel in Iraq operate as part of the MNF-I, the government concedes that Omar is "held" by U.S. forces, Appellants' Br. 15, and that those *[United States] forces operate "subject to" no independent MNF-I authority*, Oral Arg. Tr. 11. Omar is thus "in custody under or by color of the authority of the United States."

5

Omar at 14 (emphasis added).

Rasul involved petitions with foreign citizenship from several nations and has removed any doubt that U.S. courts have jurisdiction over *habeas corpus* petitions of foreign citizens in the custody of the U.S. overseas. Omar also rejected the argument that the Hirota case turned on lack of citizenship. Omar slip op. at 11 – 12. After Omar, it is clear that this Circuit holds that Hirota cannot be cited as precluding jurisdiction based on the non-citizenship of the petitioner.

The unlawful trial, conviction, sentencing and re-sentencing of Ramadan to death by the Iraq Special Tribunal/Iraqi High Tribunal do not affect the present exclusive U.S. custody of Ramadan and therefore this court has jurisdictions of his *habeas corpus* petition. The detention of Ramadan, which began before the creation of the Iraqi Special Tribunal/Iraqi High Tribunal and before the creation even of the Interim Government of Iraq, cannot conceivably be "pursuant" to the judgment of the IST.

The government has confirmed the obvious in its Opposition filed February 23, 2007 and the attached Declaration of Quentin K. Crank, a member of the Armed forces of the U.S. on which it relies. Lt. Col. Crank states clearly in this sworn declaration on 21, February 2007 that he is "commander of the internment facility located at Camp Cropper, Iraq in which Ramadan is held "…and transfer of physical custody of Mr. Taha Yassen Ramadan to the Government of Iraq would only occur at the conclusion of these (IHT) proceedings and upon the requests of the Government of Iraq."

In sharp contrast, the very first words of Hirota state, "The petitions are all residents and citizens of Japan, are *being held in custody pursuant to the judgment of a military tribunal in Japan*." Hirota at 197 (emphasis added).  The Flick opinion began "appellant, a German citizen

6

is in custody in Germany, within the American Zone of Occupation. He is under custody of American Army forces, *serving a sentence of imprisonment imposed by a tribunal sitting in said zone*." Flick at 983 (emphasis added). The tribunal was Military Tribunal IV "with its existence and jurisdiction rooted in the sovereignty of the Four Powers." Flick at 986. The detention and custody of Ramadan is not pursuant to the judgment of an international tribunal.

What is before the Court now is the issue of the lawfulness of the detention of petitioner Ramadan and the related but distinct issue of the lawfulness of the transfer from U.S. custody of Ramadan to Iraq, which would both torture and execute Ramadan. There is no collateral attack or modification sought of any judgment of the IST/IHT in any way.

## I. The Court has the Authority to Take Steps to Protect, and Prevent Divestiture of, Its Jurisdiction

It is well settled that a federal Court having jurisdiction to hear an action is empowered to take whatever action is necessary to preserve its jurisdiction.

Under the All Writs Act, 28 U.S.C. § 1651(a), a district court with habeas jurisdiction has the authority to enjoin any action that would deprive it of its jurisdiction. The D.C. Circuit is clear that the All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction." SEC v. Vision Communs, 74 F.3d 287, 291 (D.C. Cir. 1996); 28 U.S.C. §1651(a) ("all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions").

This Court has observed that the threatened transfer of a prisoner to foreign authorities "would assuredly deprive the court of its jurisdiction." Abdah v. Bush, Civil Action No. 04-1254 (HHK) (Memorandum Opinion, March 29, 2005). The underlying need to protect jurisdiction is

even stronger in a foreign transfer situation, as compared to the more usual circumstance in which a prisoner may be transferred from state to state, because in the state-to-state transfer the court would still have authority over the successor custodian. All recourse and ability to protect and preserve constitutional and other rights is lost in a transfer to a foreign custodian.

## II.   Jurisdiction Exists Over Ramadan's Habeas Corpus Petition Exists Because the Court Has Jurisdiction Over His Jailers

A court's jurisdiction over a habeas petition rests on its jurisdiction over the petitioner's custodian. Rumsfeld v. Padilla, 542 U.S. 426, 442 (2004); Rasul v. Bush, 542 U.S. 466, 478 - 79 (2004). Jurisdiction of the courts extend where a petitioner is held in either the actual or constructive custody of a respondent within the court's jurisdiction. 28 U.S.C. § 2241(c)(1) (writ extends to an individual "in custody under or by color of the authority of the United States"); see also United States ex rel. Keefe v. Dulles, 222 F.2d 390, 392 (D.C. Cir. 1955); Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 47 (D.D.C. 2004) (jurisdiction exists where United States officials possess either actual or constructive custody of petitioner).

Federal *habeas corpus* jurisdiction "requires nothing more" than a claim that a petitioner is "being held in federal custody in violation of the laws of the United States" once personal jurisdiction over a custodian is established. Rasul v. Bush, 542 U.S. 466, 483 (2004).

As stated in Omar:

> "Under 28 U.S.C. § 2241, federal courts have authority to issue the writ 'within their respective jurisdictions' to prisoners 'in custody under or by color of the authority of the United States.' 28 U.S.C. § 2241 (a), (c)(1). Omar's petition satisfies both requirements. First, the petition is 'within the jurisdiction' of the district court because respondents, the Secretary of the Army and two high-ranking Army officers, are amenable to service in the District of Columbia. *See Rasul*, 542 U.S. at 478-79 ('[A] district court acts

> within [its] respective jurisdiction within the meaning of § 2241 as
> long as the custodian can be reached by service of process.'
> (second alteration in original) (internal quotation
> marks omitted))."

*Omar*, slip op. at 14.

The Government, with striking lack of candor[3], ignoring *Omar*, recycles its rejected

argument that the United States is beyond the jurisdiction of the U.S. Courts because it is acting

as part of the Multi-National Force- Iraq (MNF-I).

This argument was directly presented,[4] and rejected in *Omar* which held:

> "although American personnel in Iraq operate as part of the MNF-
> I, the government concedes that Omar is "held" by U.S. forces,
> Appellants' Br. 15, and that those forces operate "subject to "no
> independent MNF-I authority, Oral Arg. Tr. 11. Omar is thus "in
> custody under or by color of the authority of the United States." As
> a consequence, the district court has jurisdiction to entertain
> Omar's habeas petition."

*Omar*, slip op. at 14.

Ramadan's jailers are the United States Government and military, who may be served

within this Court's jurisdiction. Ramadan is being held by U.S. military officials.

The determination of custody is a legal determination, and not one that can be simply

established by a conclusory statement from a U.S. military jailer, such as that submitted by

Ramadan's custodian in the U.S. military, Army Lieutenant Colonel Quentin K. Crank.

---

[3] The Government repeatedly cites District Court opinions issued earlier than *Omar*, i.e., before February 9, 2007, for the proposition - - squarely rejected by *Omar* - - that U.S. military officials are outside the jurisdiction of U.S. Courts when they act as part of a multinational force. As discussed herein, this was squarely rejected by *Omar*, making it inappropriate for the Government to keep citing such opinions as precedential authority without acknowledgment of the ruling in *Omar* as to this particular issue.

Nor does the Government cite to Judge Urbina's ruling at the District Court level in *Omar v. Harvey* in which he too rejected the Government's MNF-I argument. See *Omar v. Harvey*, 416 F. Supp. 2d 19, 23 – 25.

[4] See *Omar*, slip op. at 8 "Although acknowledging both that U.S. military officials are holding Omar, Appellants' Br. at 15, and that those officials operate 'subject to' no independent MNF-I authority, Oral Arg. Tr. 11, the government contends that federal courts lack jurisdiction to entertain habeas corpus petitions filed by individuals detained by American military officials operating as part of a multinational force."

The Government is disingenuous, if not outright fraudulent, when it presents the declaration of Crank who attests that Ramadan, a detainee at the U.S. military base Camp Cropper, "is in the physical custody of MNF-I." In Al-Bandar, the petitioner was held under similar if not identical circumstances at Camp Cropper. The Government conceded that it possessed physical custody over Bandar, but argued that legal custody rested with the MNF-I and placed the U.S. military jailers beyond judicial reach. In Omar, also, the Government conceded that petitioner was being "held" by U.S. forces, including at Camp Cropper. Omar, slip op. at 14. Now that the Omar opinion has issued from the D.C. Circuit, the Government will no longer make that concession as doing so is clearly disadvantageous to their position in light of the Omar ruling.

In the instant case, as in Omar, the chain of command runs unbroken from the President to the Secretary of Defense to Ramadan's U.S. military custodians. His custodians answer to no authority other than the United States. This was recognized, in law and fact, by Omar.

It is, in fact and law, the MNF-I which is subordinate to the United States according to U.S. General George W. Casey, Jr., former Commander of the Multi-National Force-Iraq. See Ex. 1 of Pet., Advance Questions for General George W. Casey, Jr., U.S., Army Nominee for Commander, Multi-National Force-Iraq. 108th Cong. 3 (2004) available at http://www.senate.gov/~armed_services/statemnt/2004/June/Casey.pdf at 2 (stating repeatedly that "the Multi-National Force-Iraq is a subordinate command to CENTCOM"). In his Senate confirmation hearing, General Casey was asked whether there would be any limits on the U.S. Central Command's authority due to the International nature of the MNF-1. He replied that there were "none at all," adding there is "no reporting chain that goes back to the United Nations... my chain of command is through the secretary of defense and the president." Nomination of General

George W. Casey, Jr., U.S.A. for Reappointment to the Grade of General and to be Commander, Multi-National Force-Iraq: Hearing Before the S. Comm. On Armed Svcs. 108th Cong. (June 24, 2004) (Statement of Gen. George W. Casey, Jr.) (Lexis-News-All) ("Casey Hearing Testimony"). See 10 U.S.C. § 162(b) confirming his testimony.

Ramadan is being held in physical custody as well as under the color and authority of the United States. This Court's jurisdiction reaches to the Respondents who have now appeared before this Court in this matter.

To adopt the fiction that the United States is acting under the authority of the MNF-I when the opposite is actually true and where in reality the U.S. is not subordinate to the MNF-I in any way, would empower the U.S. executive and military to exempt itself from U.S. judicial review just by its own characterization of the capacity in which it acts. This would empower the executive to exempt acts from judicial review, placing it far above the law.

### III.    The Instant Case Is Outside the Narrow Scope of <u>Hirota</u> because Ramadan was Neither Seized Nor Held Pursuant to The Judgment of an International Judicial Tribunal

As resolved by <u>Omar</u>, the narrow ruling in <u>Hirota</u> was that the U.S. Courts lacked jurisdiction to review the criminal conviction issued by an international tribunal where an international force was holding the detainee pursuant to that conviction. See <u>Omar</u>, slip op. at 12.

As referenced above, <u>Omar</u> emphasizes that the <u>Hirota</u> case is to be interpreted as issuing on the narrowest possible of grounds, and that its scope is similarly and sharply limited. Cases arising beyond that narrow scope are distinguished from <u>Hirota</u>.

The immediate case is outside the scope of <u>Hirota</u>. In the <u>Hirota</u> case, the petitioners' U.S. jailers were acting under the authority and direction of the Allied multinational force and

the petitioners were "being held in custody pursuant to the judgment of a military tribunal [the International Military Tribunal for the Far East] in Japan."

Ramadan is not being held in custody pursuant to the judgment of an international tribunal. The Government does not contend the Iraqi Special Tribunal to be an international tribunal.

Ramadan is not being held in custody pursuant to the "judgment" of the Iraqi Special Tribunal. His custody began years before the creation by the United States of the IST.

Ramadan is not being held in custody pursuant to a demand by the Iraqi Government. The U.S. Government seized Ramadan long before even the creation of the Interim Iraqi Government.

At most, Ramadan is unlawfully held pursuant to the authority and action of the United States, which itself has tortured him, and which intends to extradite or release him to Iraqi authorities who intend to torture and hang him after an unfair mock trial before a legally incompetent and illegal court that was neither independent nor impartial and which afforded Ramadan no due process of law. Under these circumstances, Ramadan raises substantial legal issues and challenges the authority of the United States to "release" him or extradite him in this manner. The U.S. will be an accomplice in an extrajudicial execution if it releases Ramadan to torture and hanging in Iraq.

Ramadan asserts there is no legal basis for his release within or extradition to Iraq. Either would expose him to certain and immediate seizure, torture and execution. He must be released outside Iraq and safe from wrongful seizure when his right to the writ of *habeas corpus* is determined. The Government identifies no treaty under which extradition is even authorized.

However, with respect to the legality of the release or extradition of Ramadan, that is an issue that the Court need not resolve now in order to determine that jurisdiction exists for review of Ramadan's *habeas* petition.

**IV.    The Instant Case is Further Distinguished From <u>Hirota</u>, as the Iraqi Special Tribunal Was Established at U.S. Direction and Is Not a Legally Competent Tribunal Having Been Established in Violation of International Law and Since it Has Totally Failed and Refuses to Abide by the Most Minimum and Basic Guarantees of Due Process and Fair Trial**

The instant case is further distinguished from <u>Hirota</u> because there is a substantial challenge to the jurisdiction and competency of the Iraqi Special Tribunal. There is substantial evidence that the trial was a mock trial, devoid of due process and fairness.

The IST/IHT was created illegally by the United States as an occupying power.  The occupation itself was illegal because it resulted from a war of aggression. The U.S. not only created the IST/IHT, it controlled selection of the initial judges and court personnel, financed the entire operation, including judicial salaries, provided training for the judges outside of Iraq and uses U.S. military forces to protect the court and its personnel. For this and other reasons the Court lacks the independence essential to every judicial system. Political interference in the Dujail trial and a profound effect throughout and surely directed the conviction and death sentence. As the Iraqi Study Group reported "intimidation of the Iraqi judiciary has been ruthless."

The Court has a special, unequal and limited jurisdiction determined by the U.S. to serve U.S. geopolitical interests.

The Court was created in violation of international law which prohibits an occupying power from changing the legal system, altering the status of public officials in an occupied state,

13

including judges and that the penal laws of an occupied territory shall remain in force and now

new penal laws shall be enacted. See generally Articles 51, 54 and 64 of the Fourth Geneva

Convention Relative to the Protection of civilian Persons in Time of War; the Hague

Regulations, Articles 43 and 48.

These violations directly caused the tragic failure, miscarriages of law and justice,

violations of fundamental rights and loss of lives that characterize the IST/IHT.

Throughout its filing the Government invokes the United Nations as the source of its

authority to both hold Ramadan and to transfer him for torture and execution upon demand. This

is peculiar, as this same United Nations has expressly condemned the "trial" of Ramadan and the

intended execution as violating international law, due process and Ramadan's human rights.

On February 8, 2007, the United Nations High Commissioner for Human Rights Louise

Arbour filed an *amicus curiae* brief with the Iraqi Special Tribunal condemning the trial and

intended execution of Ramadan as constituting grave human rights violations. Judge Arbour is

the former Chief Prosecutor for both the International Criminal Tribunal for Former Yugoslavia

and the International Criminal Tribunal for Rwanda and former Justice of the Supreme Court of

Canada English: http://www.ohchr.org/english/docs/arbour_amicus_curiae_brief_en.pdf See Ex.

2, *Amicus Curiae* brief.

The High Commissioner found that Ramadan's "trial and appeal . . .  prima facie failed to

meet the standards of due process," (id. at 4) and constituted a "prima facie unfair trial," id. The

High Commissioner concludes that the Ramadan trial lacked "elements [which] count amongst

the basic components of due process recognized in international law and in all legal systems." Id.

at 8. The violations of due process constitute a "prima facie case of an unfair trial." Id. at 11.

14

The United Nations High Commissioner for Human Rights identified systemic defects including the power of the Prime Minister under Article 4 of the IST statute[5] to remove sitting judges for any reason and the systematic removal of judges, including all judges from the prior government, on the basis of political party affiliation. "Regrettably, these devices were resorted to repeatedly at trial, with serious negative impact on both the reality and perception of the trial. Article 4 was reportedly invoked by the Council of Ministers to secure the removal of the presiding judge in September 2006 in the wake of comments allegedly favourable to co-defendant Saddam Hussein. . . . [T]he reported invocation during trial of Article 33[6] by the national de-Baathification commission on repeated occasions secured transfers of judges away from the Court and inevitably conferred the impression, whether intended or otherwise, of judges servicing at pleasure." Id. at 9.

The U.N. High Commissioner observed that senior Government (which, as above, had unrestricted authority to remove sitting judged "for any reason") and legislative figures, including at the highest levels, made public statements "of unmistakeable clarity as to the guilt of the defendants, the appropriate sentence and of the proper function of the courts in this context." Id. at 9.

The U.N. High Commissioner condemned the absence and violation of "equality of arms" between prosecutor and defense in the trial. Equality of arms is "at the centre of . . . criminal procedural guarantees: and "[t]he most important criterion of a fair trial." Id. at 10.

---

[5] Article 4, paragraph 4, of the Iraqi High Tribunal Law provides: "The Presidency Council in accordance with a proposal from the Council of Ministers shall have the right to transfer Judges and Public Prosecutors from the Tribunal to the Higher Judicial Council for any reason."

[6] Article 33 of the Iraqi High Tribunal Law provides: "No person who was previously a member of the disbanded Ba'ath Party shall be appointed as a judge, investigative judge, public prosecutor, and employee or any of the personnel of the Tribunal." All judges in the previous government were required to be Ba'ath Party members.

"Specifically, equality of arms requires fair notice of the evidence adduced against oneself, with opportunity to be fairly able to contest the evidence presented." Id. at 10. However, in proceedings against Ramadan, "on 13 February 2006, the statements of 23 prosecution witnesses - - a substantial portion of the total evidence - - were apparently read into the record for the first time (not being previously included in the dossier of evidence against the defendants), without the witnesses being made available for questioning by the defendants' legal representatives." Id. at 10. *After* closures of the prosecutor's case, and in the midst of the truncated defense case allowed, the Court allowed the surprise introduction of evidence consisting of documents and recorded conversations (the authenticity of which was disputed) allegedly between Ramadan and co-defendant Hussein. Id. Furthermore, the Court suddenly closed the defense case, after it had merely just begun, on the basis that "he had heard insufficient evidence, without having previously established a defence schedule or providing any indication of the time remaining." Id.

After closure of the prosecution case in March 2006, the prosecution confronted [Ramadan] with a document allegedly signed by him concerning the detention of Dujail individuals, while on April 2006, the prosecution introduced a recording of a purported conversation between [Ramadan] and co-defendant Hussein concerning Dujail properties. Again, at the close of the defence case, the prosecutor produced three new documents allegedly signed by [Ramadan] on property seizures and a further recording between him and co-defendant Hussein. Finally, on 13 June 2006, the president of the trial court closed the defence case on the basis that he had heard sufficient evidence, without having previously established a defence schedule or providing any indication of available time remaining. The High Commissioner submits that in the absence of explanation by the Court as to the reasons for admission of late

16

evidence at these stages, or why it was appropriate to close the defence case, these incidents taken together disclose a violation of the right to equality of arms protected by article 14 of the Covenant and have as a necessary consequence the flawed reliability of insufficiently tested evidence."

Ramadan's right to a defense was not real, but was "illusory." See Id. at 11. Ramadan was denied "the necessary time and facilities to prepare and provide an effective defence." Id. The High Commissioner found that the failure to protect against the foreseeable attacks, and ultimately murders, of defense counsel "were so substantial as to amount to an infringement on the right to a full defence." Id. at 11.

The High Commissioner condemned the absence of a genuine appeal process. The appeals court summarily disposed of "fundamental issues going to the integrity and fairness of the trial" and failed to constitute "genuine review." Id. at 12. The Commissioner noted that, while remitting Ramadan's sentence with a recommendation that he be killed, the appeals court devoted only "a brief paragraph" to the issues of due process and fair trial violations. Id.

The Commissioner also observed that the failure to allow Ramadan an opportunity to request commutation or adjustment from the President violates existing law, including "the Constitution of Iraq – a normatively superior legal instrument – "to the Iraqi Special Tribunal statute. The Iraqi Constitution requires that the President ratify (or commute) all death sentences. Id. at 13 – 14.

The Commissioner further found that Ramadan had been deprived of the right to petition for commutation or pardon id., that the executions of Ramadan's co-defendants had amounted to unlawful cruel, inhuman and degrading treatment or punishment and there was no basis to expect

any difference with Ramadan. Id. at 5, and that the interpretations of Iraqi domestic law which required execution to occur within thirty (30) days of confirmation of sentence would violate the rights of third parties to remedy grave human rights violations, id.

> "The High Commissioner submits that in the circumstances the Court's imposition of the death sentence on the current defendant would violate Iraq's obligations under the International Covenant on Civil and Political Rights, specifically article 6 (which prohibits against arbitrary deprivation of life and details the limitations on permissible imposition of capital punishment); article 7 (which protects against torture or cruel, inhuman or degrading treatment or punishment or exposure to a real risk thereof) and article 14 (which guarantees the right to a fair trial and appeal)."

On February 13, 2007, the United Nations expert on extrajudicial, summary or arbitrary executions, Professor Philip Alston, condemned Iraq for its intended execution of Ramadan as violating international law.

> "Philip Alston, a Professor of Law at New York University and Special Rapporteur of the UN Human Rights Council said that the execution would clearly violate international law. 'The trial of Mr. Ramadan was marred by serious irregularities denying him a fair hearing' Alston observed. These included first, executive interference in the removal of the presiding judge at his trial together with statements by senior Government and legislative figures of the guilt of the defendants. Second, glaring procedural flaws at the trial including the reading of 23 prosecution statements into the court record without giving the defendants any opportunity to question them. Third, three defense counsel were murdered during trial proceedings and one was injured.
>
> After the trial was concluded, the right to have one's conviction and sentence reviewed by a higher tribunal appears to have been treated as a mere formality. After receiving the judgment, the defendants had only weeks to prepare their appeal, and the Appeals Chamber of the IHT then disposed of all of the complex issues involved in less than a month. 'This undue haste mocks the due process requirements of international law', Alston said.

> In addition, the right of anyone sentenced to death to seek pardon or commutation was openly violated by Article 27(2) of the statute of the IHT, which provides that, "No authority, including the President of the Republic, may grant a pardon or mitigate the punishment issued by the Court."

See Ex. 3, February 13, 2007, United Nations Press Release, "UN Rights Expert Calls on Iraq Not to Carry Out Execution of Taha Yassin Ramadan Pursuant to an Unfair Trial"

Human Rights Watch, which monitored the entirety of Ramadan's trial found that "the court has not met essential fair trial standards and that the credibility of the trial process is doubtful. Human Rights Watch has documented serious administrative, procedural, and substantive legal defects in the trial." Human Rights Watch, Judging Dujail: The First Trial before the Iraqi High Tribunal, at page 6, Vol. 18, No.9 (E) November 2006.

Among the defects cited are a judicial lack of competency, capacity and "lack of sufficient understanding of the elements of proof to establish individual criminal responsibility under international criminal law," id. at 5 – 6. Human Rights Watch (Ex. 3 of Pet.) documents failures and concerns in each of the following areas: The impartiality of the tribunal, id. at 37 - 43; the presumption of innocence, id.; defendants' right to be informed of the charges, id. at 44 - 48; equality of arms, id. at 48 - 60; defendants' right to adequate time and resources to prepare a defense, id.; continuous late or same-day disclosure of incriminating evidence and non-disclosure of witness statements, id. at 49 - 52; non-disclosure of exculpatory evidence, id.; non-disclosure of trial session notes and late disclosure of defendants' statements made to the investigative judge, id. at 53 - 55; refusal to require information regarding chain of custody of documentation and refusal to permit defense to nominate own expert for document examination, id. at 55 - 58; ex parte scheduling of trial sessions, id. at 58 - 60; improper closing of the defense case by the Court, id.; the defendants' right to confront and examine key witnesses, including the reading of 29 witness statements into the record, and constructive anonymity, id. at 60 - 63; no

19

reasoned written decisions on key procedural issues, id. at 63 - 64; judicial turnover and "lapses in demeanor" by presiding judge, id. at 64 - 69.

The International Center for Transitional Justice, which also monitored the trial proceedings, also concluded there has been a failure to guarantee or provide a fair trial, to keep the court independent of political intervention and manipulations, and to meet minimal standards for production of evidence and proof of guilt. See International Center for Transitional Justice: Briefing Paper on Dujail, Trial and Error, Nov. 2006, www.ictj.org. (Ex. 3 of Pet.)

The defects in Dujail trial proceedings include the following additional acts and failures by U.S. authorities, the IST/IHCC, and persons acting under their authority.

a. Failure to provide security sufficient to prevent constant threat and endangerment of the defense team, including the murder of three defense attorneys during the trial.

b. Failure to provide Petitioner basic due process rights during interrogations and investigations by denying him legal counsel and the right to see the evidence against him; Ex. 2 at 52-53, 69-70;

c. Failure to ensure a trial before a competent tribunal and instead holding a trial before an exceptional court that was created in violation of Iraqi and international law. Id. at 5-7, 33-35;

d. Failure to ensure a trial before an independent tribunal and instead holding a trial before an exceptional court that is subject to interference by the political authorities in Iraq and outside Iraq that has prejudiced Petitioner[7]; id. at 8-9, 39, 55-59;

---

[7] See generally Ex.3 of Pet. at 55 - 59; Id. at 37 - 43. See, e.g., id. at 38 (The IHT Statute has multiple provisions that seriously undermine the independence of the court, including the

e. Failure to ensure a trial before an impartial tribunal and instead holding a trial before an exceptional court where the judges have repeatedly acted and made statements that reveal deep prejudice against Petitioner and constitute fundamental unfairness[8]; id. at 60-63;

f. Failure to provide Petitioner timely statements of the charges against him by first presenting the charges against him in June 2006 more than two years after he was detained, eight months into his trial[9], and one month after Judge Abdel Rahman cut off all further defense testimony with the statement "If you cannot prove your innocence with 34 witnesses, 100 will not help"; and forced him to proceed at times during the trial and close his defense in the absence of his lawyers of choice; id. at 64;

---

transfer or suspension of judges in the midst of ongoing trials "for any reason" and the prohibition of any person who belonged to the Ba'th Party from holding any position within the court.) See generally Ex. 4 of Pet. at 6 - 9. See, e.g., id. at 6 - 7 ("Iraqi political leaders have continually made remarks and exerted pressure, creating an atmosphere that is not conducive to the exercise of the presumption of innocence or to fair trials."); Id. at 7 ("The IHT has undergone several rounds of de-Ba'athification, a political process which has ignored the high threshold required by international standards before judges can be removed from ongoing cases.").

[8] See generally Ex. 2 of Pet. at 74; id. at 74 (One judge of the tribunal stated that the President "persecuted the Kurds. He killed them, wiped many of them out. He used chemical weapons with the aim of committing genocide against this race, against this people, to eradicate them as a nation. He also went after the Shiites due to their religious beliefs."); Id. (Another judge remarked that the President is "one of the worst tyrants in history."); See generally id. at 37 - 43.

[9] See generally Ex. 2 of Pet. at 64 - 65; id. at 64 ("The specific charges against Ramadan were not provided to the defense until 15 May 2006, approximately two year and nine months after Ramadan had been arrested, and approximately seven months into the trial and after the prosecution had presented its case, including all its witnesses and evidence."); Ex. 3 of Pet. at 44 - 48. See Exhibit 4 of Pet. at 11 ("[The charges were] attached to the charging document presented in May 2006 at the end of the case for the prosecution (an occasion on which charges of disappearances and other inhumane acts were added.).").

g.  Failure to allow Petitioner adequate time and facilities to prepare his defense by confiscating his resources[10], failing to provide resources for a defense[11], withholding and refusing to compel the production of vital exculpatory evidence[12], withholding all transcripts of the proceedings, and rushing the defense unreasonably; Id. at 45, 65-67;

h.  Failure to provide a public trial by denying the general public access to the trial, frequently closing the trial to the attending press, and public by drawing curtains after the glass through which they viewed the trial and cutting off all video-audio transmissions which cut off the media and public elsewhere, and by later showing only edited versions of the trial that present Petitioner in the worst light possible; Id. at 67;

i.  Failure to allow Petitioner time to choose replacement counsel after the murder of his lawyer in June 2006, and to meet adequately with counsel of his own choosing and by assigning counsel to which Petitioner objected when his chosen defense counsel was prevented from participating; Id. at 48-51, 68-70;

j.  Allowing the intimidation of witnesses in which even the judges of the court participated by sending court officials to coach witnesses and by threatening witnesses with repercussion if they provide testimony that is not what the Prosecution wishes; Id. at70-72

---

[10] See generally Ex. 2 of Pet. at 65 - 67. See id. at 66 (The defense was given a matter of minutes after being provided the charges to begin presenting its case with no time to prepare or evaluate the prosecutions' case.). See generally Ex. 3 of Pet. at 48 - 60; Ex. 4 at 12 - 13.

[11] See generally Ex. 3 of Pet. at 60 - 63. See, e.g., id. at 61 (The trial chamber read 23 prosecution statements into the court record without making any available for questioning by defense counsel.); Id. at 63 (The trial chamber - - without a ruling, order or explanation - - allowed blanket usage of protective measures that amounted to "constructive anonymity" of prosecution witnesses and complainants.). See generally Ex. 3 of Pet. at 11 - 12.

[12] See Ex. 2 of Pet. at 66 ("[T]he prosecution did not provide the defense lawyers any exculpatory evidence."); See generally id. at 52 - 53.

k.  Relying on *ex post facto* laws by applying domestic laws of Iraq which did not exist until decades after the acts which are the basis of the charges against Petitioner; Id. at 72-73, see also id. at 79;

l.  Violating the presumption of innocence by Judge Abdel Rahaman stating defendants must prove their innocence and making biased statements and the withholding of relevant exculpatory evidence; Id. at 74;and

m.  Failure to ensure equality of arms between the parties by allowing the prosecution more than eight months to present its case with massive funding and constant major assistance from U.S. lawyers  and others for attorneys of the Prosecution. The U.S. also provided the Court, its Judges and Prosecution full assistance to prepare, present and judge the case while the defense had no capacity to investigate, no security to seek witnesses and documents, no compulsory process was provided, exculpatory evidence, denied any resources or protection to defense counsel for preparation and presentation of their defense, and only five weeks to present the entire defense case; Id. at 74-76.

Fuller descriptions of the factual basis and support for Part IV are in Ex. 2 of Pet.

It is equally unlawful to surrender a person convicted in an illegal and unfair trial to wrongful imprisonment, torture and death.

### V.     Aliens As Well As U.S. Citizens Who Are in U.S. Custody are Entitled Under Law to the Writ of Habeas Corpus

The fact that Petitioner is a citizen of Iraq held by U.S. military personnel at United States Camp Cropper within Iraq does not deprive U.S. courts of jurisdiction over the Respondents. This is so because it is U.S. government officials who hold him in their exclusive custody.

Surely the great issue of whether the U.S. offers justice under law to foreign nationals in its exclusive custody on military bases and prisons outside the U.S. as well as to U.S. citizens in such custody, has been resolved by the Supreme Court in Rasul v. Bush.

In Rasul, foreign nationals held by U.S. military personnel at the U.S. Naval Base at Guantanamo Bay, Cuba were captured abroad during hostilities between the United States and the Taliban and brought to Cuba. The U.S. military was acting pursuant to the Congressional Authorization for Use of Military Force, Pub.L. 107-40 §§1-2, 115 Stat. 324 which followed the September 11, 2001 attack on the U.S. by "agents of the al Qaeda terrorist network."  The petitioners in Rasul, all aliens to the U.S., claimed to be wholly innocent of wrongdoing, as does Ramadan.

The U.S. has recognized that the land it occupies at Guantanamo Bay is under the sovereignty of Cuba and is the property of Cuba.  The treaty under which the U.S. occupies Guantanamo can also reasonably be considered to have been coerced and therefore not binding, but the Naval Base remains.

The land occupied by the U.S. at Camp Cropper, near the Baghdad International Airport, is under exclusive occupancy and control of the U.S. military and under maximum U.S. military protection. U.S. arms and armor control all ingress and egress to Camp Cropper under conditions of highest security.  It is probably the safest place in Iraq.  The U.S. occupation[13] of and jurisdiction and control over Camp Cropper is as absolute and complete as active and alert

---

[13] See, e.g., United States v. Tiede, 86 F.R.D. 227, 242 – 43, 1979 U.S. Dist. LEXIS 13805 (U.S. Ct. Berlin 1979) (fundamental constitutional obligations limit the conduct of U.S. officials in areas of occupation and protect non-citizens from abuses asserted by the Government to be allowable "as a part of the unreviewable exercise of foreign policy").

superior military power can make it, as it has been constantly for nearly four and from all appearances will remain so for the foreseeable future.

For the U.S. courts to tell the world at this moment in history that non-combatant civilian foreign nationals, wherever and however they were seized, who are confined in the exclusive custody of U.S. military personnel in military bases like Camp Cropper and former U.S. military prisons like Abu Graib, Iraq and secret detention facilities elsewhere around the world cannot seek protection of their fundamental human rights from U.S. courts, while U.S. citizens held under the same circumstances can, will convince many other peoples and nations that their freedom and dignity is not respected by the United States which respects and protects only its own.

The most harmful message U.S. courts could send the people in nations the U.S. occupies, is that the protections of the United States Constitution and international law which U.S. courts will enforce for people in custody of U.S. troops is exclusively for U.S. citizens, that fundamental and inalienable human and civil rights enforceable in U.S. courts extend only to U.S. citizens.

As referenced above, in the instant case the Government relies on <u>Hirota</u> for its argument that jurisdiction does not exist and the <u>Omar</u> Court is explicit that the <u>Hirota</u> case does not turn on citizenship.

**VI.    Preventing Transfer of Ramadan Will Serve to Preserve the Status Quo and This Court's Jurisdiction**

The order sought by Petition to prevent his transfer does not seek to change the *status quo*. It would merely prevent a unilateral action by the United States that will have the effect of divesting jurisdiction over the custodian of Ramadan and will result in his extra-judicial death.

"An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted); See also Carabillo v. ULLICO Inc. Pension Plan and Trust, 335 F. Supp. 2d 49, 53 (D.D.C. 2004).

Further, where the balance of hardships tips decidedly toward the movant - - as it clearly does here - - it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Id. at 844.

## VII. The Public Interest Lies in Ensuring that the U.S. Government Does Not Violate Constitutional, Domestic or International Laws, Particularly Where the Consequence for the Affected Individual is Death

Here, not to take every possible effort to assure a fair review of Ramadan's petition for a writ of *habeas corpus*, in fact and in appearance, is a historic mistake. The world's eyes fall upon the United States which has engaged in a tragic overreaching and unlawful war that (in the more recent explanations from the Bush administration) is justified by the need to establish constitutional democracy and rule of law.

This situation shows that, at the level of equal justice under the law, the government of the United States is not willing to be fair. It will initiate a war of aggression, impose an unbearable period of torture, cruel and unusual punishment and then, having arbitrarily held civilians throughout a palpably political trial it has provided, hand them off to Iraqi authorities

26

for more torture and then execution when it knows better than anyone that the trial, conviction and sentence were in violation of all principles of law recognized to protect the dignity of every person equally.

The government compounds this lack of justice and unfairness by invoking the President's role as 'Commander in Chief of the Army and Navy of the United States,' noting that "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs" and  urging at length deference in this case to Executive discretion, going so far as to shunt the U.S. judiciary aside entirely, ignoring entirely the subservient and defective nature of the present Iraqi "legal system," to argue in fictitious terms that whether "our Government should honor the Iraqi judiciary's judgment" and "whether our Government should recognize Iraq's sovereign right to punish its own citizens for the criminal wrongs, are inherently foreign policy matters, entrusted solely to the Executive." Govt's Opp. At 23 – 24 (citations omitted).

The United States intervenes in every element of the IST, down to the funding of the gallows and the physical restraint of the prisoners, but dares to claim that the transfer of those they know are to be tortured and put to death to Iraqi authorities for the execution, *per se*, places their actions beyond legal scrutiny. They are not above the law. See Omar (rejecting Government's assertion that the political question doctrine precluded review of petitioner's *habeas corpus* petition).

"Crimes against humanity" are among the most serious violations that can be leveled. The underlying international law and legal doctrines have been developed painstakingly through the most violent and awful periods of recent human history.

27

The law and the public interest requires in such profound crimes to be duly and fairly prosecuted in accordance with the law of nations and that the court system of the United States not, by act or omission, countenance the extrajudicial execution of any human being including Ramadan.

The public interest lies in the prevention of the diminution of the seriousness of charges of "crimes against humanity" which occurs when governments participate in show trials that have a pre-determined political outcome, where judges are replaced mid-trial whenever the executive fears it cannot dictate the judicial outcome with absolute certainty and control, where defense lawyers are murdered for standing up for hated defendants even when their convictions and executions are predetermined, and where there is only contempt for legality, due process and fair trial.

But the U.S. executive is not beyond the reach of the law as determined by the U.S. judiciary. Here the executive controls the custodians who hold Ramadan and who intend to transfer him to be executed despite the absence of due process and a fair trial. This court has the jurisdiction to consider Ramadan's charges that his surrender to Iraq and his continued custody are, directly or indirectly, in violation of Constitutional law of the United States and international law.

The U.S. Constitution and the American people require U.S. officials to act in accordance with the Constitution, the laws of the United States and international law, and that the time honored great writ of *habeas corpus* - - the function of which is to protect the life and liberty of those subjected to wrongful imprisonment or punishment - - be faithfully preserved, protected, defended and fulfilled.

28

**Conclusion**

The issue before this Court, at this particular instant, is simply the Court's show cause order and the Government's response. Petitioner seeks nothing more than maintenance of the *status quo* to enable this Court to address the substantial and pressing legal questions thus presented. Were the Government's position adopted, the result would be that Ramadan and every similarly situated petitioner could be transferred from U.S. custody and executed even before the U.S. Courts have the opportunity to review the lawfulness of that custody and detention. There is simply no basis for the practice urged by the Government to be met with approval. Nor is there any cost to allowing the U.S. Courts to determine the legality of the actions of U.S. officials found to be properly served within the Court's jurisdiction. On the contrary, every legitimate interest and every public interest lies in favor of fair and proper adjudication of petitions that are of such obvious import and upon which the lives of persons, who have never been afforded any due process at all, rests.

Dated: February 26, 2007                    Respectfully submitted,

                                                 __/s/_____

                                                 Ramsey Clark [73833]

                                                 Lawrence W. Schilling

                                                 37 West 12th Street 2B

                                                 New York, NY 10011

                                                 (212) 989-6613

                                                 (212) 979-1583 fax

__/s/_____

Carl Messineo [450033]

Mara Verheyden-Hilliard [450031]

Partnership for Civil Justice

10 G Street, NE Suite 650

Washington, DC 20002

(202) 789-4330

(202) 789-4333 fax

**SWORN STATEMENT**

How I was treated from the moment I was arrested by the American military.

I was captured by the militia of the Allied Kurdistan Party in the 17. Aug. 2003 evening, when I was in a home in Musol – my birth place. The (Kurdish militia) surrendered me to the American military forces. My hands were tied to the back and my head was covered with a black sack. They transported me to Mosul Airport. During the flight which lasted for the hours my chest and legs were tied to the chair in the helicopter. I arrived to Baghdad International Airport and get down. After no more than ten minutes of walking I was stopped; the black sack was removed but I was still blindfolded. I found myself in a room of a medium space. Four men were standing near me. One of them in civilian clothes, trousers and a sky – blue T. shirt as I remember. Later, I know that he was the responsible officer of the group. The (other) three men were tall and tan (yellowish color) and were wearing U.S. army uniform. One of them was a translator. One of them had an aluminum stick hand. I was wearing a garment and was bare footed as they forced me to take off my shoes and to walk bare footed.

Immediately they ordered me to kneel down on the ground and at once they asked me one question: "where is Saddam Hussein? And where can we find him". As soon as I answered by saying that I don't know (his whereabouts), I was thrown to the ground. When I said that I was tiered I was beaten by kicking on my body and they forced me to crawl. The situation remained so (until) I asked them to give me water to drink. They

provided me with water. They put the bottle of water in my mouth and prohibited me from sitting, when I found the water hot; I said to them "Please, I need cold water". He replied "soon" and they began to pour ice – cold water on my head and body for two hours. Blood began to bleed from my knees and elbows as a result of crawling. Then they told me to stand up, tied my hands and put the black sack on my head after they blind folded me and led me into a nearby place, which I felt to be a wooden room. They told me not to sit down but to continue walking forth and back without a stop inside the room. They said: "We will be back after hours. We want you to think well in our question". They left the place and directed the guards not to allow me to stop walking. After a while, I asked the guards to take me to the sanitary facility place to relieve nature (evacuate). After one hour they responded to my request and led me inside a box. They removed the sack off my head so that I can see and they closed the door of the box. They did not untie my hands. I asked them "How can I relieve myself with tied hands". They didn't respond to me and after five minutes, they returned me back to the room and I couldn't evacuate and went back to continue walking forth and back. As a result of walking, being exhausted, dizzy with some loss of consciousness and because more than 12 hours had then passed since I was arrested, urine began to wet my body and the floor. When the guards noticed that, they come in, threw me to the ground, held me from the neck and began to pull me on the spots of urine for about five minutes while I was semi– unconscious.

  After several hours that I can't guess, I found myself led by some one out of that room and after several meters of walking, the sack was removed off and I found myself inside the first

room of crawling and I was asked: "Did you think of the question about the place of Saddam Hussein"? I replied: "The question is clear. I confirm to you that I don't know where he is now".

The said: "Give us the name; home address and phone number of a person who knows were Saddam Hussein is". I asked them "Where is such person? Is there actually any such person?"

Torturing was resumed as in the first time by beating, crawling and ways of providing water. This situation lasted for nearly five days. One day they said: "Fly with us in a helicopter and just point to the possible whereabouts of Saddam and mark these places on a map" I said: "I do not know how to do such things. It is a private nature of a person".

On the seventh day, I was asked a new question about the place of an American pilot named (Rad)? Who was shot down in the western desert in 1991. I told them that all what I know about this matter is that "his problem was resolved after the cease fire was imposed during an exchange of prisoners of war between the two countries   and that I had then heard about this from some of the brothers in the Foreign (Affairs Ministry), this is all what I know about this matter".

The same methods of torture, crawling and walking forth and back in the second room continued until on one day I felt that I lost consciousness and was unable to breath so I uttered that "there is no God but Allah and Mohammad is Allah's Apostle" I prayed for Allah to grant me martyrdom or to help me to tolerate this torture. The officer asked the translator about what I was saying and the latter told him that I am "asking for death and these words are said when a person faces death".

Immediately the officer put his foot on my hand and pressed with all his weight until my hand was moved out of its place. The effect of that is still evident in my finger. He said: "We won't let you die; instead we will bring you close to death and then return you back to life unless you confess and cooperate with us". I replied:" I am asking Allah for His help" They said: "Don't mention God. America can help you if you cooperate with it and not God. From now on, don't mention God before us." Torture continued by crawling, beating by a stick and kicking by feet on my body for about a second week. One day they asked me a third question which was to mention the names of members of the resistance in Musol and Baghdad… I told them that "I don't have information as I was hiding and I was with members of my family and children when I was arrested and that I did not contact any body". My reply did not convince them and beating, kicking and crawling continued. Every two hours, I was returned back to the other room to walk for hours and then back to torture.

As for water, they provided me with one small bottle – less than one liter each day. I used a little amount to drink and keep the remaining water to wash as I was allowed to go the box one time every 24 hours. During three weeks, I couldn't wash my face or my body or even my hands. I was bare footed and almost naked because the soldiers had torn my garment while they were torturing me and I hadn't any under wear so, I became semi – naked. They gave me my shoes only two days before I left the place of torturing (Baghdad International Airport). Only then, did they provide me with blue clothes to wear and to throw the torn garment away.

On 9 Sept. 2003, i.e. after 22 days of continued torture except in the last two days. They brought me to Camp Cropper, held me in a room alone and prevented any of the detainees from talking to me. For three months I was allowed to walk alone for half an hour daily and to go twice (daily) to the sanitary (w.c). I was prohibited from shaving for four months.

During the period of 22 days of torture, I was only twice seen by a doctor. I explained my (physical) situation to him and he saw my swollen knee and the wounds on my elbows and saw how I was unable to stand up. He provided me with two tablets of Aspirin but I did not take them. When he came back in the second visit, he asked me:"Did you take the medicine?" and I asked him "Do you mean the two tablets of Aspirin?" he said: "yes". I wondered whether my case requires (to be treated) with Aspirin. He responded by saying: "This is our medical treatment. You can treat yourself by cooperating with the interrogators". I did not reply him because he was speaking in a kind of logic that has nothing to do with the logic a humane doctor.

Upon my first meeting with the Red Cross, that was after two months, of torture, I explained my situation to them in detail and they saw with their own eyes the wounds and the effects of torture which were then still clear evident. Nevertheless, nothing happened and no inquiry or investigation was made. When investigations began in October 2003, the investigator asked me about my bad health condition and my inability to sit down or to see well, I explained the reason for that. He was rather surprised, but he did nothing. The name of that investigator is Stanley? What is important is that he was the first investigator I met in Camp Cropper since I was transported to it.

Q: Bierce.

A: Ramadan.

Q: Did you write this statement?

A: Yes.

Q: Do you know who your interrogators worked for?

A: They were working with the C.I.A.

Q: Did you ever see anyone from U.S Navy?

A: I don't know uniform or clothes of the Navy Forces, so, I can't decide whether I saw them or not.

Q: Did you ever see anyone from U.S Army?

A: I noticed some members who were wearing the uniform of the U.S army as some of them were guarding the room and were doing some acts of anarchy such as beating the doors and making disturbing noises to prevent me from sleeping, but I don't know whether they belong to the U.S army or any other agency.

Q: Were all of the people who abused you from the CIA?

A: I think that the 4 who tortured me were CIA.

Q: Were the guards who threw you on the floor in the wooden room CIA or military?

A: I think they were from the army but I can't guess for sure.

Q: Do you know what branch?

A: I don't know because I don't know the uniform of U.S army various branches.

Q: What type of uniform were they wearing?

A: I didn't notice any signs on their clothes because I was unable to concentrate. What I remember is that their clothes resemble the clothes which I see now on the guards of our? Camp.

Q: Do you have any thing to add to this statement?
A: No.

# SWORN STATEMENT
## 22 March 2006

كيف عوملت منذ لحظة القبض الأولى؟ اعتقالي على الاعتقال من قبل من القوات الأمريكية وقد تم اعتقالي مساء يوم 17/8/2003 أحد الدور السكنية في مدينة الموصل مسقط رأسي حيث كنت كانه في حينه من قبل ميليشيات الاتحاد الكردستاني بعد اعتقالي من قبله فورا لمام ان تم تسليمي للقوات الأمريكية وعلى الفور تم نقلي الى مطار الموصل بعد ان تم تكبيل يدي من الخلف ووضع الكيس في رأسي ومث وضعي في طائرة هيلكوبتر بعد ان تم ربطي على كرسي من الطائرة و الرجل و الصدر لثلاث ثلاث ساعات تقريبا ومث وصولي الى مطار بعد ارتداد الدولي بعد نزولي من الطائرة مسير بعض خطوات لا تزيد عن عشر امتار تم ايقافي ورفع الكيس من رأسي ومغمم العينين تجد نفسي في غرفة متوسطة المساحة .

وقفي الى جانبي اربعا اشخاص احدهم يرتدي بالباس مدنية بنطلون ومقميص تيشيرت ثلاثة بلون سماني وهو احدهم يرتدي الباس المدني كان مترجم لون سماني مسنا مترجم احدهم يرتدي بالباس الجيش الأمريكي والمحتل وقمقيين يرتدون ملابس الجيش الأمريكي آخر طوال القامة ومقمين يرتدون آخرين طقف للتحقيق يرتدي انبين بينهم بجلد طوس الآخر والمونيم عصم اصنا هديب لمحي احدهم وحافي القدميين ان اجبروني على تركن الحالة واسر سير حافي القدميين .

طلب مني على الفور بالبركوك على الفور على المركبتين ووعلى الفور تم توجيه لي سؤال هو اين انت؟ مث الاجابة ان انين نجد؟ حال قولي لا اعلم مث على كل الأرض وعندما تلقت لهم اني نجد؟ اين انين؟ صدام حسين متعبد بأدب بالضرب بالرجل على ضمي وضيفت واكتفي وضرب بالعصا الألم والمونيم واجبرون على كل للشرب مقدم بعد مام منه تبطلت الحال وعندما استمر الضرب وفحزل وضعي وضعوا الماء لي وارداء بعد على الفور على قلال بار ام ماء تلقت رام حار عندما تجدت الماء وجلوس عدم اجد اذا ان بلطت الملك بشرتب ماام على جلثم على يسار وقلو اكذه استشر بشرتب الملك بلطت و من على الأرض استمر الحال لمدة ساعتين ثأنت ادماء مرفقي بطرطب على يرفي من ومن بعد راسي الكيس والأسود وعلى بطلم بعددهما طبلم مين من والهون ووضم وطبو وضع يدي بطلم والمونيم ومن الغرفة خشبة ولطبي من الغرفة خشبة خرجت مكان آخر قريب عبير شعر عرت منين والعينين الى واتدوني شد العينين والعينين الى مكان آخر قريب عبير شعر عرت مكان عدم اللجوس بل المسير بذهابا و ابابا الخل داخل الغرفق دون توقف واقول سنعد عدو ساعات تركت اتوقف بعد وابتف تبطلت من الحال ان سرري بهذا الى الحال مرفاق الصحية بعد ساعة تمت من دون سكوب و ارفع و الكيس عن رأسي دون اتاجي احتاج متي كيف الذي من يدي كفن دون سكوب باب واغلاقي وأرى لكي احتاج يضاف اراداداتي دون الباب سكوب من يدي القلم دون توقف تمت اعادتي الكيس مدخد عبو الى استجتبي ابو جستم لم يدي القالطا اطري استمرار بالذهاب و الايابا نتجبي الارام الى دقائق 12 من اكثر للملور مولور والورم اعتقالي على ساعة مثو استمار شعيه من الدوران عدم عشلر او دور الادب الى جسمي باسباب الى الادار وعندم الحال ظاحم سرر شهبا وجواز وعلى الأرض واسكم بقربتب أديب على السحب مكان الادار وانأر شهبا فاقد للعوي مقدم خمس دقائق .

وبعد بعض ساعات لا اردي كم هي وجدت من يقودني من الغرفة وبعد بضع خطوات تواطؤ رفع
الكيس من رأسي ووجدت نفسي في نفس الغرفة الاولى غرفة للزح وقيل لي هل
فكرت بالسؤال او هو ابن قلت لهم ان السؤال واضح وا واكداكم لكل انين لا اردي
اين هو الآن؟ حيث تلقى ان قلت حيث هو صدام حسين؟ فكرت بالسؤال او هو ابن الآن .

قال اولا يل قلت انا اسم الشخص الآن وعرفوا مسكن وتفلتون وليكل بذهن هية ليكل يقول انا
اقلت لهم مه اذا هذا الشخص هو فعل العجوى هذا الشخص لاعتبار واستمر بذنب هة، حسين صدام هي اين
كام في المزة الاولى في للضرب والزحف والسلوب واستمر لحال المدت خمس ايام في
تقريبها يومي ابرة اوفي يومي قيل لي لقاي ابخب في طرايق روحية مدروسة ويشير الى المناطق
التي يجب ان يتواجد فيها صدام حسين نين وتثبت ذلك على اكدت لهم مه اضاي اطر الخا انين لا
اعرف فرع كذلك ذكر من خصوصيات الالتات في ناس يانفي هجو عباس المومي يل حول لسؤال اخر هي كان
وجود ادار الامريكي الذين سقط في هجو الاصرار العربية عام 1991 المعدو ( ودار )لهم قلت طقس
لا علم لي بالأمر سوى بأن موضوعه حسم عند لخالق فقط اطلا القالت النار لخول لالدابت لسري
بين البلدين سمعت من هذا من بعض ضعن الخارجيين في الخارج ولا مكح الو موضوع
نفس السلوب التعذيب والزح ودة الواح والزح وتث ماة من الله عز وجل ابادة ابا اوي بايا وفي
يوم شعر ترت الالغام وقيضي للنفس شديدة وتمتين من الله عز وجل ابادة اما اذكاني
العاملة محتملة هذا العذاب لأس الظاباط للمتمرجم اذا يقول ماذا القال المتمرجم هنا طبطي البلب اما
هذه شهادة الموت وعلى للفور رفور وضع رجل ثقيل بكل ثقله على يدي حتى خرجت من موضوعه ولا
لا زال اثار ذلك كذلك حاضر في اصبعي وقالي لي لا تدعك لبل توت من بكبرقك من موضوع الموت وعنيد
الحياة اما ان فرت لعتني عن معني قلت لهم اني وعدا اني لعملوانتي الله ولا اقتل لا للله
ان لعتاون الله لتستطيع ان تعاونك ان تعاون معاه سوية بعد الله لا لتذكر ان لا تكرمكم
واستمر لحال على التعذيب في للضرب بالعصا والرجل على جسمي وقدم
تقرب من اسبوع فياني وفي يوم تجدد وجهو اليل لسؤال ثلاث وهو انا اذكر لهم اسماء
عناصر مقاومة في للموصل بغداد ... قلت لهم لا علم لي و انت كنت مختفي" و القي
القبض على للتلي وطافيلي ملم لصت باحد ، ملم تعقنهم اجباتي يتبع ادبو برنامج
للضرب بالعصا و الرجل و لكل ساعتين يتم تعاداتي الى الغرف الأخرى و بعد
ساعات تمت تعاداتي للتعذيب.

بالنسبة لرتر تكت طقف من اقل من صغيرة عام قنين اونا كل يوم للماء لكل يوم يضرو نون بالنسبة
انها لقيل" 24 ساعة ذاخانوني الى البوكس اغتلست بيقية الماء والخو للاسبيع
الثالثة لم اغسل جسمي لم ايهج والو جسمي يدي اناها حافي القدمين وشبح لم ايري عاري
في التعذيب مزة اوقع الدشاش الى قطع دونو ملابس داخلية كفت تكنت شبح لم ايعيد او
يل الحاذا الا قبل يمين من خروج من منطقة التعذيب (مطر اطر بغداد الدولي) وضع او بدلة
زرقاء البسها على جسمي وارجى الدشاش المزقق وفي يوم 9/9/2003 اي بعد 22 يوم من
التعذيب المتواصل ما عاد اخر يوماين للى اجاز اواي في معسكر كروبر وضعوني في غرف
لوحدي ومنو اي ان اتحدث معي اي من المعتقلين ثلاث اشهر امر جرخ للسير
لوحدي نصف ساعة الى المرافق و منعت من حلق اللحو و لمدة اربعة
اشهر .

خلال فترة ال 22 يوم التعذيب جاني الطبيب مرتين مرة ذكرت له حالتي وهو وجد لمرور
الذلذي في ركبتي و الجروح في المرافق عدم قدرتي على الوقوف قدم لي حبوب
اسبرين عدد اثنين لم اتناولها عندما جاء في المرة الثانية قالو لي اتناولت له ادواء؟
فقلت له فقصدت له حبوب اسبرين؟ قال لي نعم ، قلت انا بحاجة الى حبوب اسبرين
قال هذا هو علاجك وانا تستطيع ان تتعالج بالاعتناون مع المحققين لم اجد لهم لأنه
كان يتحدث بمنطق لا يتعلق بطبيب انساني .

حالتي   لم تذكرت التعذيب من شهرين بعد يا أي الأحمر بالصليب مع لي عقلا اول وعند
لم لكنو امنيه في يحضوا تنتكو والتعذيب اثار و اطلعا على الجروح و التفصيل بال
يحدي شيء حتى استفسار و تحقيق لم تحدث عندما أدب التحقيق في شهر تشرين
2003 و الأسني المحقق عن سبب وضعي السي عدم قدرتي على الجروح و الورو؟
شرحت له السبب و استغرب كثيراً لكنو لم يفعل شيء و اسم هذا المحقق
المهم هو اول محقق التقيت به في معسكر كروبر حال انتقالي اليه .


Q: Bierce
A: Ramadan

Q: Did you write this statement?
A: نعم

Q: Do you know who your interrogators worked for?
A: كانوا يعملون ضمن جهاز المخابرات الأمريكية يس يا ايا هيا

Q: did you ever see anyone from U.S Navy?
A: لم ما مهتمرأيني بأبن لوقا انا استطيع لا اذا هذه البحرية زي او الشكل و هو ما علم لا اينا أرامها

Q: did you ever see anyone from U.S Army?
A: وجدت عدد من العناصر التي تدت تردي للجيش الأمريكي حيث كان
عدد منهم يحرسون الغرفة ويقومون بأعمال فوضوية للضرب الأبواب و اصوات مزعجة من
اجل منعي من النوم لا يعرفني الجيش الأمريكي او اية جهه اخرى

Q: were all of the people who abused you from the CIA?
A: حسب ما اعتقد ان المجموعة الأربعة الذين كانوا يعذبوني يس يا ايا هيا

Q: were the swards who threw you on the floor in the wooden room CIA or military?
A: اعتقدت انهم كانوا من الجيش ولكن لا استطيع انا ازعج ذلك

Q: Do you know what branch?

A: لا اعلم لأني لا اعرف زي الصنعف العسكرية للجيش الأمريكي

Q: what type of uniform were they wearing?

A: لم اشاهد في حينها ايا علامة علىالملابس لأني في وضع غير قادر على التركيز
ولكني اتذكر شكل الملابس التي هي نفسها الاراا الآعلى ارادا حراس معسكرنا

Q: Do you have anything to add to this statement?

A:الك

In the Iraqi High Tribunal

IN THE MATTER OF SENTENCING OF TAHA YASSIN RAMADAN

---

APPLICATION FOR LEAVE TO INTERVENE AS AMICUS CURIAE

AND

APPLICATION IN INTERVENTION AS AMICUS CURIAE

OF

UNITED NATIONS HIGH COMMISSIONER FOR HUMAN RIGHTS

---

**In the matter of sentencing of Taha Yassin Ramadan:**

1.    Louise Arbour, the United Nations High Commissioner for Human Rights (henceforth "the High Commissioner") respectfully submits the following application for leave to intervene as amicus curiae before the Iraqi High Tribunal and application in intervention in the proceedings of sentence before the Iraqi High Tribunal of Mr. Taha Yassin Ramadan.

## I.    Procedural history before the Court

2.    Following a trial commencing on 19 October 2005, the trial chamber of the Iraqi High Tribunal (hereinafter "the Court") convicted the current defendant, Mr. Taha Yassin Ramadan (hereinafter "the current defendant") and six other co-defendants, on 5 November 2006 of a variety of serious crimes in connection with repression of a 1992 failed assassination attempt in the town of Dujail. An eighth co-defendant was acquitted. The current defendant was sentenced to life imprisonment; with three co-defendants sentenced to death. All defendants appealed.

3.    On 26 December 2006, the appellate chamber of the Iraqi High Tribunal inter alia affirmed the convictions of all appellants, as well as the sentences of death imposed on three co-defendants. In respect of the current defendant, the appellate chamber annulled the sentence and remitted the matter to the trial chamber "for the purpose of strengthening the penalty against [the current defendant] and raising it to the appropriate legal limit" (in translation from Arabic original). This application for leave to intervene as amicus curiae and application in intervention before the Court upon its reconsideration of the current defendant's sentence follows.

## II.    Application for leave to intervene as amicus curiae

4.    The High Commissioner for Human Rights is the United Nations' senior official on human rights. She has mandate of the United Nations which is contained in resolutions of the General Assembly and the Security Council. The High Commissioner's originating mandate is set forth in United Nations General Assembly resolution 48/141 of 7 January 1994. It includes promoting and protecting the effective enjoyment by all of all civil, cultural, economic, political and social rights, carrying out the tasks assigned to her by the competent bodies of the United Nations system and making recommendations to them with a view to improving the promotion and protection of all human rights, preventing human rights violations, enhancing international cooperation for human rights, coordinating relevant activities throughout the United Nations and strengthening and streamlining the United Nations human rights machinery.

5.    The High Commissioner's mandate requires her to monitor, assess, investigate and report on the compliance by states with their obligations under international human rights law. This mandate is entrusted to the High Commissioner by the United Nations inter-governmental bodies and requires the High Commissioner to perform those functions for and on behalf of the international community. The High Commissioner

submits that, by accepting to be bound by the Charter of the United Nations, the Member States of the United Nations, including Iraq, have agreed to the special role and mandate of the High Commissioner.

6.      As a result of the exercise of this mandate, the High Commissioner has particular experience in the exercise, interpretation and application of international human rights law, including of international human rights treaties to which Iraq is a party and by which Iraq is bound. The High Commissioner submits accordingly that her views of the relevant provisions of law as applicable to this case are of relevance and utility to the Court, seeking to deliver judgment consonant with fundamental principles of justice and consistent with Iraq's international obligations.

7.      The High Commissioner submits that her mandate to protect human rights must be considered as giving her the powers and means necessary to discharge her mandate effectively. Specifically, where intervention in proceedings before courts national, international and hybrid would further the object and purpose of the protective mandate, such intervention is both appropriate and warranted.

8.      As a result of the foregoing, the High Commissioner applies for leave to intervene as amicus curiae in the current proceedings.

## IV.    Application in intervention as amicus curiae

9.      The High Commissioner recognises that Iraqis have long suffered oppression, gross violations of human rights and successive conflicts. The policies, laws and institutional structures of the rule of Saddam Hussein contributed to political repression, the suppression of freedoms of expression, association and religion; ethnic cleansing and deprivation of property; widespread discrimination against ethnic and religious groups; and widespread and systematic use of torture and summary executions. The egregious violations of human rights that took place in Iraq over decades have been well documented by the United Nations human rights system through the Special Rapporteurs of the then United Nations Commission on Human Rights and non-governmental human rights organizations. There is no doubt that the horrors of the past must be effectively addressed and their perpetrators must be brought to justice. The victims and their families have a right to know what happened to them and to have a full picture of what happened in Iraq over these years. All steps taken with the aim of supporting justice and accountability are the stronger when building upon international standards, practice and experience gathered in recent years.

10.     The High Commissioner also recognises the desire for justice of victims and societies emerging from regimes that have engaged in or procured the most grave and systematic crimes. She also recognises the difficulty and complexity of confronting formerly powerful perpetrators in a judicial setting and the lengths necessary to secure the ends of justice in proceedings that fully respect the rights of the accused. At the same time, experience and history in very different contexts around the world have shown the absolute indispensability of the integrity of such proceedings, both in fact and in

perception, for true understanding of the past, for national reconciliation and for the construction of a just, durable and sustainable society founded on the rule of law and respect of human rights of both victims and defendants.

11.    As a matter of principle, the High Commissioner opposes the death penalty in all circumstances. This position is based on a variety of policy grounds, including the impossibility of avoiding irreversible execution of the innocent, the absence of proof that the penalty in fact serves as a deterrence to others in respect of future conduct, the inappropriately vengeful character of the sentence and the capacity of life imprisonment to satisfy all penological purposes of punishment of and prevention of future crime. Not least as a result, there is a worldwide trend towards more restricted application of the death penalty, the application of moratoria and the abolition of the sentence. Alongside this national practice, United Nations sponsored tribunals do not impose the death sentence, and the international community's forum for the most serious international crimes, the International Criminal Court, does not have the power to impose the death penalty. Policy notwithstanding, the High Commissioner however recognises that, on the current understanding of international law, the death penalty is not per se excluded as a matter of law, but remains permitted under strict conditions. In this brief, the High Commissioner addresses the applicable law relevant to the current proceedings.

## A.    Summary of argument

12.    The High Commissioner submits that in the circumstances the Court's imposition of the death sentence on the current defendant would violate Iraq's obligations under the International Covenant on Civil and Political Rights, specifically article 6 (which protects against arbitrary deprivation of life and details the limitations on permissible imposition of capital punishment); article 7 (which protects against torture or other cruel, inhuman or degrading treatment or punishment or exposure to a real risk thereof) and article 14 (which guarantees the right to a fair trial and appeal). As a consequence, the High Commissioner submits that Court should refrain from imposing the sentence of death.

## B.    Issues for the Court

13.    It is submitted that the Court should consider whether the imposition of sentence of death upon the current defendant would be consistent with Iraq's international obligations, specifically, the International Covenant on Civil and Political Rights (hereinafter "the Covenant"). From the High Commissioner's perspective, the issues before the court are:

a) Whether the imposition of sentence of death on the current defendant following a trial and appeal that prima facie failed to meet the standards of due process described in article 14 of the Covenant on Civil and Political Rights would breach article 6 of the Covenant;

b) Whether the imposition of sentence of death on the current defendant following an prima facie unfair trial itself would amount to cruel, inhuman or degrading treatment or punishment prohibited by article 7 of the Covenant;

c) Whether the imposition of sentence of death on the current defendant in circumstances where the prevailing interpretation of applicable domestic law foreclosed consideration of pardon or commutation of sentence would violate article 6 of the Covenant;

d) Whether the imposition of sentence of death on the current defendant in circumstances where the execution of three co-defendants had amounted to cruel, inhuman or degrading treatment or punishment prohibited by article 7 of the Covenant, and where it had not been shown that sufficient steps had been taken to prevent a recurrence of such treatment, would amount to cruel, inhuman or degrading treatment or punishment in respect of the current defendant; and

e) Whether the imposition of sentence of death on the current defendant, in circumstances where the prevailing interpretation of relevant domestic law requires execution within 30 days of confirmation of sentence would breach the rights of third parties under articles 2, 6 and 7 of the Covenant to an effective remedy for other grave human rights violations incurring the current defendant's criminal responsibility.

## C.    Submissions of **Amicus Curiae**

The relevant provisions of international law

14.    Following ratification, the Covenant entered into force for Iraq on 23 March 1976, as noted by the judgment of the appeal chamber in its 26 December 2006 judgment in the current proceedings. Once having entered into force, the Covenant applies at all times and in all circumstances in a State, unless specifically derogated from in the narrow circumstances described in article 4. At no time has Iraq lodged a notice of derogation.

15.    The relevant provisions of the Covenant, for present purposes, are set out below.

Article 6, in relation to the right to life, provides in relevant part:

1. Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.

2. In countries which have not abolished the death penalty, sentence of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime and not contrary to the provisions of the present Covenant and to the Convention on the Prevention and Punishment of the Crime of Genocide. This penalty can only be carried out pursuant to a final judgement rendered by a competent court.

3. When deprivation of life constitutes the crime of genocide, it is understood that nothing in this article shall authorize any State Party to the present Covenant to derogate in any way from any obligation assumed under the provisions of the Convention on the Prevention and Punishment of the Crime of Genocide.

4. Anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases.

.....

6. Nothing in this article shall be invoked to delay or to prevent the abolition of capital punishment by any State Party to the present Covenant.

Article 7 provides, in relevant part, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

Article 14 provides:

1. All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The press and the public may be excluded from all or part of a trial for reasons of morals, public order (ordre public) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; but any judgement rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputes or the guardianship of children.

2. Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.

3. In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality: (a) To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;

(b) To have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing;

(c) To be tried without undue delay;

(d) To be tried in his presence, and to defend himself in person or through legal assistance of his own choosing; to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it;

(e) To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;

...

(g) Not to be compelled to testify against himself or to confess guilt.

....

5. Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law.

6. When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed or he has been pardoned on the ground that a new

or newly discovered fact shows conclusively that there has been a miscarriage of justice, the person who has suffered punishment as a result of such conviction shall be compensated according to law, unless it is proved that the non-disclosure of the unknown fact in time is wholly or partly attributable to him.

....

Article 2, concerning the right to an effective remedy, provides:

1. Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

2. Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

3. Each State Party to the present Covenant undertakes:

(a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

(c) To ensure that the competent authorities shall enforce such remedies when granted.

16.     Iraq did not enter reservations to these provisions, which accordingly apply in full and bind Iraq as a matter of international law. The provisions bind Iraq qua State, independent of intervening changes of government since entry into force of the treaty for Iraq. As to the effect of this treaty in international law, the Vienna Convention on the Law of Treaties makes clear that "Every treaty in force is binding upon the parties to it and must be performed by them in good faith" (article 26) and that "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty" (article 27). Failure by a State to discharge its international obligations entails its international responsibility.

17.     The Human Rights Committee, established under article 40 of the Covenant, is an independent body of experts of high moral standing with authority to interpret and expound the meaning of the provisions of the Covenant. One important means by which the Committee undertakes this function is by consideration of individual communications, alleging violations of the Covenant, submitted by individuals under the first Optional Protocol to the Covenant. The Committee's guidance on the meaning of the Covenant is of relevance and assistance to all States parties bound by the obligations in question. The jurisprudence of other regional and international courts interpreting the

same or substantially similar provisions of international human rights law is further of substantial assistance.

Discussion

### Imposition of the death penalty following proceedings inconsistent with article 14 of the Covenant

18.    Article 6, paragraph 2, provides that a sentence of death may only be imposed, among other conditions, if it is "not contrary to the provisions of the present Covenant". The consistent view of the Human Rights Committee has been to interpret this provision, applicable in respect of all capital trials, regardless of the crime charged, as requiring that the imposition of death penalty must follow full respect for the due process guarantees contained in article 14 of the Covenant, failing which the imposition of the death penalty becomes arbitrary. In Reid v. Jamaica, the Committee stated the law as follows:

> "[T]he imposition of a sentence of death upon the conclusion of a trial in which the provisions of the Covenant have not been respected constitutes ... a violation of article 6 of the Covenant. As the Committee noted in its general comment 6(7), the provision that a sentence of death may be imposed only in accordance with the law and not contrary to the provisions of the Covenant implies that 'the procedural guarantees therein prescribed must be observed, including the right to a fair hearing by an independent tribunal, the presumption of innocence, the minimum guarantees for the defence, and the right to review by a higher tribunal'."[1]

19.    At the present phase of proceedings, the High Commissioner is concerned as to four discrete aspects of due process that are of particular relevance.  These relate to a fair trial before a competent court and the presumption of innocence, the opportunity to contest evidence in a position of equality, the capacity of defence counsel to exercise an appropriate defence and the adequacy of appeal. These issues are addressed in turn below.

   i) Fair trial before a competent court; presumption of innocence

20.    Article 14, paragraph 1, of the Covenant protects the independence of the courts, while paragraph 2, guarantees the presumption of innocence. Each of these fundamental guarantees is key to a criminal process that fairly renders impartial justice, and is seen to do so. These elements count amongst the basic components of due process recognised in international law and in all legal systems. Full protection of these rights requires both sufficiently robust legal and institutional guarantees, as well as respect by the relevant authorities in practice.

21.    At the institutional level, there is credible basis to believe that the Court's legal framework has suffered from at least two systemic defects – article 4 of the Court's

---

[1] Communication No. 250/1987, Views adopted on 20 July 1990, at para 11.5. See also, inter alia, Mbenge v. Zaire, Communication No. 16/1977, Views adopted on 8 September 1977, and Wright v. Jamaica, Communication No. 349/1989, Views adopted on 27 July 1992.

statute provided for a judge's transfer away from proceedings for any reason,[2] while article 33 prohibited Baath Party members, regardless of position or status, from the membership of the Court, even though such membership had been necessary for all judges under the previous regime.[3] Regrettably, these devices were resorted to repeatedly at trial, with serious negative impact on both the reality and perception of the trial. Article 4 was reportedly invoked by the Council of Ministers to secure the removal of the presiding judge in September 2006 in the wake of comments allegedly favourable to co-co-defendant Saddam Hussein. Without prejudice to the propriety of exclusion of judges prior to trial, the reported invocation during trial of article 33 by the national de-Baathification commission on repeated occasions secured transfers of judges away from the Court and inevitably conferred the impression, whether intended or otherwise, of judges servicing at pleasure. For example, certain Government officials blocked the promotion of the Deputy-Presiding judge Sae'ed Al-Hamashy due to his alleged membership of the Baath Party.[4] As the Human Rights Committee has held, executive interference of these types with the judicial function is incompatible with the requirements of article 14, paragraph 1, of the Covenant,[5] in breach of the requirement that judges "may not be subject to directives or in some other manner dependent on other State organs in the exercise of their office".[6]

22.     Over the period of trial, senior Government and legislative figures, including at the highest level, reportedly made comments of unmistakeable clarity as to the guilt of the defendants, the appropriate sentence and of the proper function of the courts in this context.[7] As the Human Rights Committee has found, such comment by senior public officials prior to a proper determination of guilt is incompatible with the right to be presumed innocent, protected by article 14, paragraph 2, of the Covenant.[8]

(ii) Equality of arms

23.     A basic tenet of fairness and pre-requisite of a fair trial identified by the Human Rights Committee is the notion of equality of arms between prosecutor and defendant,

---

[2] Article 4, paragraph 4, of the Iraqi High Tribunal Law provides: "The Presidency Council in accordance with a proposal from the Council of Ministers shall have the right to transfer Judges and Public Prosecutors from the Tribunal to the Higher Judicial Council for any reason."

[3] Article 33 of the Iraqi High Tribunal Law provides: "No person who was previously a member of the disbanded Ba'ath Party shall be appointed as a judge, investigative judge, public prosecutor, an employee or any of the personnel of the Tribunal."

[4] UNAMI Human Rights Report, January-February 2006, at para 30.

[5] Busyo et al. Democratic Republic of Congo, Communication No. 933/2000, Views adopted on 31 July 2003. See also Bahamonde v Equatorial Guinea Communication No. 468/1991, Views adopted on 20 October 1993, where the Committee stated: "a situation where the functions and competences of the judiciary are and the executive are not clearly distinguishable or where the latter is able to control or direct the former is incompatible with the notion of an independent and impartial tribunal" (at para 9.4).

[6] Nowak, M.: UN Covenant on Civil and Political Rights: CCPR Commentary (2nd ed), N.P.Engel, Kehl, 2005, at 320 (hereinafter "Nowak").

[7] See, for example, Opinion No. 31/2006 of the Working Group on Arbitrary Detention, A/HRC/4/40/Add.1 (170 to 178), at para 22, (hereinafter "the Working Group Opinion"), and Human Rights Watch : Iraq: Judging Dujail – The First Trial Before the Iraqi High Tribunal, Vol. 18 (No.9(E)), New York, November 2006, at 40-43 (henceforth "Judging Dujail").

[8] Gridin v Russia, Communication No. 770/1997, Views adopted on 18 July 2000.

that is, the placement of both sides in criminal proceedings on an equivalent procedural footing. Respected academic commentary characterises this principle of <u>audiatur et altera pars</u> as being "at the centre of … criminal procedural guarantees" and "[t]he most important criterion of a fair trial".[9] International criminal law recognises the same principle: the International Criminal Tribunal for the Former Yugoslavia stated the principle thus: "The principle of equality of arms falls within the guarantee of a fair trial provided by the Statute, and has been described as obligating a judicial body to ensure that neither party is put at a disadvantage when presenting its case … [A]t a minimum 'a fair trial must entitle the accused to adequate time and facilities for his defence' under conditions which do not place him at a substantial disadvantage as regards his opponent."[10] Specifically, equality of arms requires fair notice of the evidence adduced against oneself, with opportunity to be fairly able to contest the evidence presented.[11]

24.    In the current defendant's proceedings, on 13 February 2006, the statements of 23 prosecution witnesses – a substantial portion of the total evidence - were apparently read into the record for the first time (not being previously included in the dossier of evidence against the defendants), without the witnesses being made available for questioning by the defendants' legal representatives.[12] After closure of the prosecution case in March 2006, the prosecution confronted the current defendant with a document allegedly signed by him concerning the detention of Dujail individuals, while on April 2006, the prosecution introduced a recording of a purported conversation between the current defendant and co-defendant Hussein concerning Dujail properties.[13] Again, at the close of the defence case, the prosecutor produced three new documents allegedly signed by the current defendant on property seizures and a further recording between him and co-defendant Hussein.[14] Finally, on 13 June 2006, the president of the trial court closed the defence case on the basis that he had heard sufficient evidence, without having previously established a defence schedule or providing any indication of available time remaining.[15] The High Commissioner submits that in the absence of explanation by the Court as to the reasons for admission of late evidence at these stages or why it was appropriate to close the defence case, these incidents taken together disclose a violation of the right to equality of arms protected by article 14 of the Covenant and have as a necessary consequence the flawed reliability of insufficiently tested evidence.[16]

(iii) Capacity of defence counsel to exercise legitimate professional functions

---

[9] Nowak, op.cit, at 321.
[10] <u>Prosecutor v. Dario Kordic and Mario Cerkez</u>, International Criminal Tribunal for the Former Yugoslavia, Appeals Chamber, IT-95-14/2-A, 17 December 2004, at paras. 175-177.
[11] Note, in particular, articles 14, paragraph 3, subparagraphs (b) and (e) of the Covenant, and the Human Rights Committee's jurisprudence in, for example, <u>Morael v France</u>, Communication No. 207/1986, Views adopted on 28 July 1989, <u>Muñoz v Peru</u>, Communication No. 203/1986, Views adopted on 4 November 1988, and <u>Fei v Colombia</u>, Communication No. 514/1992, Views adopted on 4 April 1995.
[12] See the Opinion of the Working Group, at para 24.
[13] Ibid., and "Judging Dujail", at 50.
[14] Ibid.
[15] See the Opinion of the Working Group, at para 24, and "Judging Dujail", at 59.
[16] For the same conclusion of law, see also the Opinion of the Working Group, at para 27.

25.    The right of an accused to defend himself in person or through legal counsel is guaranteed in article 14, paragraph 3, of the Covenant, which also sets out the necessary corollary that the accused and counsel have necessary time and facilities to prepare and provide an effective defence. It is axiomatic that, in order to make the right to defence counsel real rather than illusory, defence counsel must be in a position to discharge their professional responsibilities to their client, consistent with their legal and ethical obligations, without fear for their own safety or other prejudice.[17] Without such assurance, counsel's functions are frequently limited in fact, and always diminished in perception, with attendant consequences for the fairness of a criminal trial required by article 14 of the Covenant. It must be fully recognised that the extreme political and security situation in Iraq during the trial posed particular difficulties with respect to the security of defence counsel. However precisely these concerns should have made a risk of attack foreseeably apparent and called for the institution of appropriate protective measures. In November 2005, the current defendant's counsel was murdered and another counsel in the same proceedings wounded. Further counsel in the same proceedings killed in October 2005 and June 2006.[18] An agreement between defense lawyers and the Government including the provision of three guards per counsel and license to carry sidearms was not properly honoured, with guard salaries going unpaid and license difficulties occurring; formal motion to the Court raising the security issues in December 2005 went unanswered. The resulting limitations imposed on defence counsels' capacity to discharge their professional obligations to the current defendant were so substantial as to amount to an infringement of the right to a full defence.[19]

26.    The High Commissioner submits that these shortcomings, taken together, disclose a _prima facie_ case of an unfair trial at first instance, in breach of article 14 of the Covenant.

(iv) Comprehensive appeal on law and fact

27.    Article 14, paragraph 5, of the Covenant requires a full appeal, on both fact and law, to be available in respect of a conviction and sentence. The Human Rights Committee has clarified that this provision requires "that a Court [of appeal] conduct an evaluation of the evidence presented at the trial and _and of the conduct of the trial_" (High Commissioner's emphasis).[20] In the present case, it would have been open to the appeal chamber, as a matter of Iraqi law, to address the shortcomings identified in the trial and reach appropriate conclusions as to remedy, such as a retrial.[21] The appeal submissions of

---

[17] See the United Nations Basic Principles on the Role of Lawyers, adopted at the Eight United Nations Congress on the Prevention of Crime and the Treatment of Offenders (Havana, 27 August – 7 September 1990); United Nations Secretariat Report E.91.IV.2, sect. B.3, annex, which recognise that States should ensure that lawyers "are able to perform all of their professional functions without intimidation, hindrance, harassment or improper interference" (at para. 16).

[18] UNAMI Human Rights Reports, November – December 2005, at para 15, and May – June 2006, at para 86.

[19] For the same conclusion of law, see the Opinion of the Working Group, at para 23.

[20] _Perera v Australia_, Communication No. 536/1993, Decision adopted on 28 March 1985, at para 6.4.

[21] Article 25 of the Iraqi High Tribunal Law provides:

"…

the current defendant, as well as of others, raised extensive argument going to the fairness of the trial, including in respect of issues identified above. The High Commissioner notes that the effectiveness of the appeal process was already prejudiced in limine by the failure to provide defence counsel with the very substantial written judgment at the outset of a narrow timeframe for filing of an appeal (30 days).[22]

28.    The appeal judgment, however, inadequately addressed these errors and instead affirmed the current defendant's conviction, while remitting his sentence for reconsideration. In a twenty page judgment, the appeal chamber devoted a brief paragraph to these issues, stating:

> "As for the other defenses, the defendants were given enough guarantees to have a fair trials. Each suspect was informed of the kind of accusations filed against him. [Each suspect] was given ample chance to defend himself and to choose his legal advisors and attorneys in person with the assistance of legal counsellors. [Each suspect] was given the chance to interview the defence witnesses. [Each suspect] used his rights fully to defend himself. [Each suspect] was not forced to say what he did not want to say. Then the defence [each suspect] is using in this regard is rejected too." (in translation from Arabic original)

29.    The High Commissioner submits that this summary disposition of fundamental issues going to the integrity and fairness of the trial failed to provide the "genuine review"[23] required by article 14, paragraph 5, of the Covenant. It follows that prima facie violations of article 14 established at trial, therefore, went unresolved and uncured on appeal. The High Commissioner therefore submits that the imposition of the death penalty by the trial chamber at the current stage of proceedings would breach article 6, paragraph 2, of the Covenant, as it would follow proceedings that had failed to respect article 14 of the Covenant.

**Imposition of the death penalty following an unfair trial an inhuman act, in breach of article 7 of the Covenant**

30.    The prohibition of cruel, inhuman or degrading treatment or punishment is a core provision of international human rights law reflected, alongside article 7 of the Covenant, in all other regional human rights treaties. In interpreting the equivalent provision of the European Convention on Human Rights and Fundamental Freedoms (article 3),[24] the European Court of Human Rights described thus the imposition of the death penalty following an unfair trial in the case of a notorious head of a large terrorist organisation:

---

(2) The Cassation Panel may affirm, reverse or revise the decisions taken by the Criminal Court or the decisions of the Investigative Judge.

(3) When the Cassation Panel issues its verdict to revoke the judgment of acquittal or release issued by the Criminal Court or the Investigative Judge, the case shall be referred back to the Court for retrial of the accused or for the Investigative Judge to implement the decision. ..."

[22] See article 252 of the Code of Criminal Procedure of Iraq, No. 23, 1971.

[23] Nowak,op.cit, at 348.

[24] Article 3 provides: "No one shall be subjected to torture or to inhuman or degrading treatment or punishment."

*In the matter of sentencing of Taha Yassin Ramadan*                                                12

> "In the Court's view, to impose a death sentence on a person after an unfair trial is to subject that person wrongfully to the fear that he will be executed. The fear and uncertainty as to the future generated by a sentence of death, in circumstances where there exists a real possibility that the sentence will be enforced, must give rise to a significant degree of human anguish. Such anguish cannot be dissociated from the unfairness of the proceedings underlying the sentence which, given that human life is at stake, becomes unlawful under the Convention. Having regard to the rejection by the Contracting Parties of capital punishment, which is no longer seen as having any legitimate place in a democratic society, the imposition of a capital sentence in such circumstances must be considered, in itself, to amount to a form of inhuman treatment."[25]

31.    This view of the law was upheld on appeal to the Grand Chamber of the European Court, which described its view of the law thus:

> "In the Court's view, to impose a death sentence on a person after an unfair trial is to subject that person wrongfully to the fear that he will be executed. The fear and uncertainty as to the future generated by a sentence of death, in circumstances where there exists a real possibility that the sentence will be enforced, must give rise to a significant degree of human anguish. Such anguish cannot be dissociated from the unfairness of the proceedings underlying the sentence which, given that human life is at stake, becomes unlawful under the Convention."[26]

32.    The Grand Chamber, noting that "[t]he death penalty has thus been imposed on the applicant following an unfair procedure which cannot be considered to conform with the strict standards of fairness required in cases involving a capital sentence", went on to conclude that "the imposition of the death sentence on the applicant following an unfair trial by a court whose independence and impartiality were open to doubt amounted to inhuman treatment in violation of Article 3 [of the European Convention]."[27]

33.    Reasoning by analogy, the High Commissioner submits that, both in theory and in practice, the same interpretation is compelling with respect to the parallel wording of article 7 of the Covenant. It follows that the imposition of the death penalty by the Court following a trial suffering the deficiencies set out above would amount to an inhuman act, in breach of article 7 of the Covenant.

**Imposition of the death penalty in circumstances where the prevailing interpretation of Iraqi law forecloses consideration of a request for pardon or commutation breaches article 6, paragraph 4, of the Covenant.**

34.    The High Commissioner notes that the law of the Iraqi High Tribunal provides, in article 27, that its decisions are final and not subject to executive review or adjustment.[28] For its part, however, the Constitution of Iraq – a normatively superior legal instrument - provides that death sentences must be ratified by the President.[29] As a matter both of legal

---

[25] Ocalan v Turkey, European Court of Human Rights (First Section), Application 46221/99, Judgment of 12 May 2003, at para 207.
[26] Ocalan v Turkey, European Court of Human Rights (Grand Chamber), Application 46221/99, Judgment of 12 May 2005, at para 169.
[27] Ibid. at 174-175.
[28] Article 27, paragraph 2, of the Iraqi High Tribunal Law provides: "No authority, including the President of the Republic, may grant a pardon or mitigate the punishment issued by the Court…."
[29] Constitution of Iraq, article 73.

theory and practice, therefore, the relevant legal instruments should be interpreted and construed in a fashion permitting the condemned to exercise the right to seek commutation or pardon by way of appeal to the Presidency Council. The relevant Iraqi executive authorities, however, have apparently taken a narrower view, for reasons that remain unclear, that the Court's own statute occupies the field and prevails over the constitutional provisions, with the result that any avenue of consideration of pardon or commutation is precluded. Accordingly, the executions of the three co-defendants have taken place with no opportunity for such consideration, in manifest violation of article 6, paragraph 4, of the Covenant.

35.    In the absence of any indication of a contrary interpretation for the future by the relevant Iraqi authorities of the legal position, therefore, the current defendant would be exposed to a similar denial of the right to seek commutation or pardon. It follows that the imposition of the death penalty by the Court would breach article 6, paragraph 4, would thus amount to an imposition of the death penalty "not in conformity with other provisions of the Covenant", contrary to article 6, paragraph 2, and would thus expose the current defendant to a real risk of arbitrary deprivation of life, in breach of article 6, paragraph 1.

**Imposition of the death penalty, where it has not been demonstrably shown that a repeat of the cruel and inhuman circumstances present at the antecedent execution of three co-defendants is excluded, amounts to a cruel and inhuman act, in breach of article 7 of the Covenant.**

36.    The High Commissioner submits that the executions of the first co-defendant, Saddam Hussein, on 30 December 2006, and of the second and third co-defendants, Awwad Hamad al-Bandar and Barzan Ibrahim Al-Hassan, on 15 January 2007, were so flawed as to amount, in their implementation, to cruel, inhuman and degrading punishment. The Human Rights Committee has recognised that, while article 6 of the Covenant does permit imposition of the death penalty in narrow circumstances, the means of execution is not left to the unfettered discretion of the State, but must itself comply with the other requirements of the Covenant, notably the prohibition on cruel, inhuman or degrading treatment set out in article 7. Accordingly, the Committee has found, for example, an execution by gas to be in breach of this provision of the Covenant and consequently unlawful.[30]

37.    The media footage made public of the execution of Saddam Hussein showed the condemned taunted and harassed by a substantial number of attendees at the execution cell, whose presence at the execution was questionable and which was tantamount to public spectacle. The execution itself interrupted the condemned's recital of his last religious rites. In the High Commissioner's submission, the circumstances of execution failed to respect the inherent human dignity of the prisoner, protected by article 10 of the Covenant, and amounted to cruel, inhuman and degrading punishment, prohibited by article 7. Following this execution, undertakings were apparently made that future executions would be free from such criticisms. The execution of Awwad Hamad al-

---

[30] Ng v Canada, Communication 469/1991, Views adopted on 25 September 1991.

Bandar and Barzan Ibrahim Al-Hassan shortly thereafter disclosed, undertakings of improvement notwithstanding, other serious deficiencies in the execution protocol, with Barzan Ibrahim Al-Hassan being decapitated by an improperly executed hanging. Even though only pictoral depiction of the execution has been made available, the decapitation of a prisoner by hanging and the necessary following treatment of the mortal suggest that the treatment was cruel, inhuman or degrading treatment, in contravention of article 7 of the Covenant.

38.     Given this prior history in relation to the selfsame legal proceedings, and unaware of undertakings that, on this occasion, would foreclose recurrence of these or comparable incidents, the High Commissioner submits that the Court's imposition of the penalty of death, and the current defendant's consequent exposure to a real risk of execution in circumstances amounting to cruel, inhuman or degrading punishment, would amount to both an arbitrary deprivation of life, contrary to article 6, paragraph 1, of the Covenant, as well as a breach of article 7 of the Covenant.

**Imposition of the death penalty in circumstances where the defendant is accused of other serious crimes breaches the obligation of the State to investigate and prosecute the most serious violations of the Covenant , in violation of article 2 of the Covenant, read juncto articles 6 and 7.**

39.     The High Commissioner understands that the current defendant is under investigation by the Court in the context of other alleged crimes of great gravity, committed in his former official capacity. These crimes, if established, would amount inter alia to violations of the Covenant, imputable under rules of State responsibility to the State, of articles 6 (right to life) and 7 (freedom from torture and other cruel, inhuman or degrading treatment or punishment). The Human Rights Committee's consistent jurisprudence has been clear that a State party's obligation to provide an effective remedy, under article 2 of the Covenant, for violations of the Covenant requires criminal investigation and, where the evidentiary threshold is made out, prosecution with respect of persons implicated in the most serious crimes, notably those amounting to violations of articles 6 (right to life) and 7 (freedom from torture and other cruel, inhuman or degrading treatment or punishment) of the Covenant.[31] This obligation of criminal pursuit applies not only to crimes committed after the entry into force for the Covenant for Iraq, but also for crimes committed prior to that date but which have continuing effects, such as crimes of disappearance.[32] It follows that Iraq is under an obligation under the Covenant effectively to prosecute the current defendant for such crimes, and consequently to allow for a comprehensive, independent and impartial judicial

---

[31] For the duty to investigate State killings, see, for example, Baboeram et al. v Suriname, Communication Nos. 146&148-154/1983, Views adopted on 4 April 1985, Herrera Rubio v Colombia, Communication No. 161/1983, Views adopted on 2 November 1987, Sanjuán Arévalo v Colombia, Communication No. 181/1984, Views adopted on 3 November 1989, and Laureano v Peru, Communication No. 540/1993, Views adopted on 25 March 1996. For the duty to punish offenders for State killings, see Bautista de Arellana v Colombia, Communication No. 563/1993, Views adopted on 27 October 1995, and Vicente et al. v Colombia, Communication No. 612/1995, Views adopted on 29 July 1997.
[32] See, for example, Sarma v Sri Lanka, Human Rights Committee, Communication No. 950/2000, Views adopted on 31 July 2003.

*In the matter of sentencing of Taha Yassin Ramadan*                                    15

accounting of the facts and of the commensurate individual criminal responsibility. Execution of the current defendant, which on the current understanding of Iraqi law is required within 30 days of confirmation of sentence of death,[33] would deprive such proceedings of object and render them moot and devoid of purpose.

40.    Accordingly, the High Commissioner concludes that the Court's imposition of sentence of death, in these circumstances, would breach articles 6 and 7 of the Covenant, read in conjunction with article 2 of the Covenant, given the pendency of other proceedings before the Court against the current defendant.

#### D.    Conclusion

41.    The High Commissioner submits, in the circumstances of the case, that the Court should refrain from imposing the sentence of death on Taha Yassin Ramadan, consistent with Iraq's international obligations under the International Covenant on Civil and Political Rights.

Respectfully submitted,
On the 8th day of February 2007,

_____

Louise Arbour
United Nations High Commissioner for Human Rights

Done in Arabic and English, the English version being original.

---

[33] Article 27, paragraph 2, of the Iraqi High Tribunal Law provides, *in fine*, "The punishment must be executed within 30 days of the date when the judgment becomes final and non-appealable."

## Index of Authorities

### A.    Decisions of the United Nations Human Rights Committee

Baboeram et al. v Suriname, Communication Nos. 146&148-154/1983, Views adopted on 4 April 1985.

Bautista de Arellana v Colombia, Communication No. 563/1993, Views adopted on 27 October 1995.

Fei v Colombia, Communication No. 514/1992, Views adopted on 4 April 1995.

Gridin v Russia, Communication No. 770/1997, Views adopted on 18 July 2000.

Herrera Rubio v Colombia, Communication No. 161/1983, Views adopted on 2 November 1987.

Laureano v Peru, Communication No. 540/1993, Views adopted on 25 March 1996.

Mbenge v. Zaire, Communication No. 16/1977, Views adopted on 8 September 1977.

Morael v France, Communication No. 207/1986, Views adopted on 28 July 1989.

Muñoz v Peru, Communication No. 203/1986, Views adopted on 4 November 1988.

Ng v Canada, Communication 469/1991, Views adopted on 25 September 1991.

Perera v Australia, Communication No. 536/1993, Decision adopted on 28 March 1985.

Reid v Jamaica, Communication No. 250/1987, Views adopted on 20 July 1990.

Sanjuán Arévalo v Colombia, Communication No. 181/1984, Views adopted on 3 November 1989.

Sarma v Sri Lanka, Human Rights Committee, Communication No. 950/2000, Views adopted on 31 July 2003.

Vicente et al. v Colombia, Communication No. 612/1995, Views adopted on 29 July 1997.

Wright v. Jamaica, Communication No. 349/1989, Views adopted on 27 July 1992.

### B.    Decisions of international and regional courts

Ocalan v Turkey, European Court of Human Rights (First Section), Application 46221/99, Judgment of 12 May 2003.

Ocalan v Turkey, European Court of Human Rights (Grand Chamber), Application 46221/99, Judgment of 12 May 2005.

Prosecutor v. Dario Kordic and Mario Cerkez, International Criminal Tribunal for the Former Yugoslavia, Appeals Chamber, IT-95-14/2-A, 17 December 2004.

## C.    Provisions of international and regional human rights law

International Covenant on Civil and Political Rights, articles 2, 6, 7 and 14.

European Convention on Human Rights and Fundamental Freedoms, article 3.

## D.    Provisions of domestic law

Constitution of Iraq, article 73.

Code of Criminal Procedure of Iraq, article 252.

Iraqi High Tribunal Law, articles 4, 25, 27 and 33.

## E.    United Nations Documents

General Assembly Resolution 48/141 (1993).

Opinion No. 31/2006 of the Working Group on Arbitrary Detention, A/HRC/4/40/Add.1, at 170 to 178.

UNAMI Human Rights Reports (various).

United Nations Basic Principles on the Role of Lawyers, adopted at the Eight United Nations Congress on the Prevention of Crime and the Treatment of Offenders (Havana, 27 August – 7 September 1990); United Nations Secretariat Report E.91.IV.2, sect. B.3, annex.

## F.    Miscellaneous Documents

Human Rights Watch : *Iraq: Judging Dujail – The First Trial Before the Iraqi High Tribunal*, Vol. 18 (No.9(E)), New York, November 2006.

Nowak, M.: *UN Covenant on Civil and Political Rights: CCPR Commentary* (2nd ed.), N.P.Engel, Kehl, 2005.

----



# UNITED NATIONS

**Press Release**

## UN RIGHTS EXPERT CALLS ON IRAQ NOT TO CARRY OUT EXECUTION OF TAHA YASSIN RAMADAN PURSUANT TO AN UNFAIR TRIAL

13 February 2007

*Philip Alston, the Special Rapporteur on extrajudicial, summary or arbitrary executions, issued the statement that follows today. Mr. Alston is an independent expert appointed by the United Nations Human Rights Council.*

The United Nations expert on extrajudicial executions today called on the Government of Iraq not to proceed with the execution of Taha Yassin Ramadan. Mr Ramadan was convicted together with six co-defendants of involvement in crimes against the civilian population of Dujail and sentenced to life imprisonment. On 26 December the appellate chamber of the Iraqi High Tribunal annulled this sentence as being too light and sent the matter back to the Trial Chamber for reconsideration. On 12 February, 2007 the Iraqi High Tribunal sentenced Mr Ramadan to death by hanging.

Philip Alston, a Professor of Law at New York University and Special Rapporteur of the UN Human Rights Council said that the execution would clearly violate international law. 'The trial of Mr Ramadan was marred by serious irregularities denying him a fair hearing' Alston observed. These included first, executive interference in the removal of the presiding judge at his trial together with statements by senior Government and legislative figures of the guilt of the defendants. Second, glaring procedural flaws at the trial including the reading of 23 prosecution statements into the court record without giving the defendants any opportunity to question them. Third, three defense counsel were murdered during trial proceedings and one was injured.

After the trial was concluded, the right to have one's conviction and sentence reviewed by a higher tribunal appears to have been treated as a mere formality. After receiving the judgement, the defendants had only weeks to prepare their appeal, and the Appeals Chamber of the IHT then disposed of all of the complex issues involved in less than a month. 'This undue haste mocks the due process requirements of international law', Alston said.

In addition, the right of anyone sentenced to death to seek pardon or commutation was openly violated by Article 27(2) of the statute of the IHT, which provides that, "No authority, including the President of the Republic, may grant a pardon or mitigate the punishment issued by the Court."

## Background

Iraq is a party to the International Covenant on Civil and Political Rights and has a legal obligation to respect its provisions. While the Covenant allows it to retain the death penalty, it prescribes that capital punishment can only be imposed after a trial satisfying the strictest fair trial guarantees. These include the right to a fair and public hearing, the right not to be compelled to confess guilt, and the right to "adequate time and facilities for the preparation of one's defence" with the assistance of a lawyer of ones own choosing. However, by disregarding its legal obligations in the statute establishing the Iraqi High Tribunal (IHT), throughout the trial proceedings and in considering appeals, the Government of Iraq showed contempt for the pleas of the international community that it abide by human rights law.

For Iraq to demonstrate to the international community that it will now take its obligations under international human rights law seriously, will require a change of course. Far-reaching reforms are needed, but a number of basic measures must be taken immediately:

(1) The provisions of the IHT Statute must be immediately amended to ensure their consistency with international law. Especially:

(a) Insofar as it is interpreted to require execution within thirty days of a final judgement, Article 27(2) of the IHT Statute must be amended to ensure that rights to appeal and to seek pardon or commutation are fully respected.

(b) Article 27(2) of the IHT Statute must be amended to permit anyone sentenced to death to petition for pardon or the commutation of sentence, as required by Article 6(4) of the ICCPR.

(c) To ensure the independence of the IHT required by Article 14(1) of the ICCPR, Articles 4 and 33 of the IHT Statute must be amended to eliminate the Government's powers to remove a judge "for any reason" and to selectively remove members of the Ba'ath Party from serving on the IHT or its staff.

(2) The Government must provide effective protection for all participants in criminal proceedings before the IHT — including defense attorneys, judges, prosecutors, and witnesses — in order to ensure the right to life of the participants and the fairness of the trial pursuant to Articles 6 and 14 of the

ICCPR.

(3) The other death sentences inflicted in the Dujail case should be commuted to life imprisonment or other substantial terms of imprisonment. This would prevent more executions on the basis of sentences imposed after a flawed trial, provide time for appeals to be given due consideration and make it possible that these senior members of Saddam's regime be tried for other

Mr. Alston noted that he was aware of the Amicus Curiae application filed by the United Nations High Commissioner for Human Rights and said he was very disappointed that the Tribunal seems to have attached no importance to it.