RAMADAN v. BUSH et al                                                                Doc. 9 Att.

In the Iraqi High Tribunal

# IN THE MATTER OF SENTENCING OF TAHA YASSIN RAMADAN

---

## APPLICATION FOR LEAVE TO INTERVENE AS AMICUS CURIAE

### AND

## APPLICATION IN INTERVENTION AS AMICUS CURIAE

### OF

## UNITED NATIONS HIGH COMMISSIONER FOR HUMAN RIGHTS

---

Dockets.Justia.co

**In the matter of sentencing of Taha Yassin Ramadan:**

1. Louise Arbour, the United Nations High Commissioner for Human Rights (henceforth "the High Commissioner") respectfully submits the following application for leave to intervene as amicus curiae before the Iraqi High Tribunal and application in intervention in the proceedings of sentence before the Iraqi High Tribunal of Mr. Taha Yassin Ramadan.

## I.    Procedural history before the Court

2. Following a trial commencing on 19 October 2005, the trial chamber of the Iraqi High Tribunal (hereinafter "the Court") convicted the current defendant, Mr. Taha Yassin Ramadan (hereinafter "the current defendant") and six other co-defendants, on 5 November 2006 of a variety of serious crimes in connection with repression of a 1992 failed assassination attempt in the town of Dujail. An eighth co-defendant was acquitted. The current defendant was sentenced to life imprisonment; with three co-defendants sentenced to death. All defendants appealed.

3. On 26 December 2006, the appellate chamber of the Iraqi High Tribunal inter alia affirmed the convictions of all appellants, as well as the sentences of death imposed on three co-defendants. In respect of the current defendant, the appellate chamber annulled the sentence and remitted the matter to the trial chamber "for the purpose of strengthening the penalty against [the current defendant] and raising it to the appropriate legal limit" (in translation from Arabic original). This application for leave to intervene as amicus curiae and application in intervention before the Court upon its reconsideration of the current defendant's sentence follows.

## II.   Application for leave to intervene as amicus curiae

4. The High Commissioner for Human Rights is the United Nations' senior official on human rights. She has mandate of the United Nations which is contained in resolutions of the General Assembly and the Security Council. The High Commissioner's originating mandate is set forth in United Nations General Assembly resolution 48/141 of 7 January 1994. It includes promoting and protecting the effective enjoyment by all of all civil, cultural, economic, political and social rights, carrying out the tasks assigned to her by the competent bodies of the United Nations system and making recommendations to them with a view to improving the promotion and protection of all human rights, preventing human rights violations, enhancing international cooperation for human rights, coordinating relevant activities throughout the United Nations and strengthening and streamlining the United Nations human rights machinery.

5. The High Commissioner's mandate requires her to monitor, assess, investigate and report on the compliance by states with their obligations under international human rights law. This mandate is entrusted to the High Commissioner by the United Nations inter-governmental bodies and requires the High Commissioner to perform those functions for and on behalf of the international community. The High Commissioner

submits that, by accepting to be bound by the Charter of the United Nations, the Member States of the United Nations, including Iraq, have agreed to the special role and mandate of the High Commissioner.

6.     As a result of the exercise of this mandate, the High Commissioner has particular experience in the exercise, interpretation and application of international human rights law, including of international human rights treaties to which Iraq is a party and by which Iraq is bound. The High Commissioner submits accordingly that her views of the relevant provisions of law as applicable to this case are of relevance and utility to the Court, seeking to deliver judgment consonant with fundamental principles of justice and consistent with Iraq's international obligations.

7.     The High Commissioner submits that her mandate to protect human rights must be considered as giving her the powers and means necessary to discharge her mandate effectively. Specifically, where intervention in proceedings before courts national, international and hybrid would further the object and purpose of the protective mandate, such intervention is both appropriate and warranted.

8.     As a result of the foregoing, the High Commissioner applies for leave to intervene as amicus curiae in the current proceedings.

## IV.    Application in intervention as amicus curiae

9.     The High Commissioner recognises that Iraqis have long suffered oppression, gross violations of human rights and successive conflicts. The policies, laws and institutional structures of the rule of Saddam Hussein contributed to political repression, the suppression of freedoms of expression, association and religion; ethnic cleansing and deprivation of property; widespread discrimination against ethnic and religious groups; and widespread and systematic use of torture and summary executions. The egregious violations of human rights that took place in Iraq over decades have been well documented by the United Nations human rights system through the Special Rapporteurs of the then United Nations Commission on Human Rights and non-governmental human rights organizations. There is no doubt that the horrors of the past must be effectively addressed and their perpetrators must be brought to justice. The victims and their families have a right to know what happened to them and to have a full picture of what happened in Iraq over these years. All steps taken with the aim of supporting justice and accountability are the stronger when building upon international standards, practice and experience gathered in recent years.

10.    The High Commissioner also recognises the desire for justice of victims and societies emerging from regimes that have engaged in or procured the most grave and systematic crimes. She also recognises the difficulty and complexity of confronting formerly powerful perpetrators in a judicial setting and the lengths necessary to secure the ends of justice in proceedings that fully respect the rights of the accused. At the same time, experience and history in very different contexts around the world have shown the absolute indispensability of the integrity of such proceedings, both in fact and in

perception, for true understanding of the past, for national reconciliation and for the construction of a just, durable and sustainable society founded on the rule of law and respect of human rights of both victims and defendants.

11. As a matter of principle, the High Commissioner opposes the death penalty in all circumstances. This position is based on a variety of policy grounds, including the impossibility of avoiding irreversible execution of the innocent, the absence of proof that the penalty in fact serves as a deterrence to others in respect of future conduct, the inappropriately vengeful character of the sentence and the capacity of life imprisonment to satisfy all penological purposes of punishment of and prevention of future crime. Not least as a result, there is a worldwide trend towards more restricted application of the death penalty, the application of moratoria and the abolition of the sentence. Alongside this national practice, United Nations sponsored tribunals do not impose the death sentence, and the international community's forum for the most serious international crimes, the International Criminal Court, does not have the power to impose the death penalty. Policy notwithstanding, the High Commissioner however recognises that, on the current understanding of international law, the death penalty is not per se excluded as a matter of law, but remains permitted under strict conditions. In this brief, the High Commissioner addresses the applicable law relevant to the current proceedings.

A. **Summary of argument**

12. The High Commissioner submits that in the circumstances the Court's imposition of the death sentence on the current defendant would violate Iraq's obligations under the International Covenant on Civil and Political Rights, specifically article 6 (which protects against arbitrary deprivation of life and details the limitations on permissible imposition of capital punishment); article 7 (which protects against torture or other cruel, inhuman or degrading treatment or punishment or exposure to a real risk thereof) and article 14 (which guarantees the right to a fair trial and appeal). As a consequence, the High Commissioner submits that Court should refrain from imposing the sentence of death.

B. **Issues for the Court**

13. It is submitted that the Court should consider whether the imposition of sentence of death upon the current defendant would be consistent with Iraq's international obligations, specifically, the International Covenant on Civil and Political Rights (hereinafter "the Covenant"). From the High Commissioner's perspective, the issues before the court are:

   a) Whether the imposition of sentence of death on the current defendant following a trial and appeal that prima facie failed to meet the standards of due process described in article 14 of the Covenant on Civil and Political Rights would breach article 6 of the Covenant;
   b) Whether the imposition of sentence of death on the current defendant following an prima facie unfair trial itself would amount to cruel, inhuman or degrading treatment or punishment prohibited by article 7 of the Covenant;

    c) Whether the imposition of sentence of death on the current defendant in circumstances where the prevailing interpretation of applicable domestic law foreclosed consideration of pardon or commutation of sentence would violate article 6 of the Covenant;

    d) Whether the imposition of sentence of death on the current defendant in circumstances where the execution of three co-defendants had amounted to cruel, inhuman or degrading treatment or punishment prohibited by article 7 of the Covenant, and where it had not been shown that sufficient steps had been taken to prevent a recurrence of such treatment, would amount to cruel, inhuman or degrading treatment or punishment in respect of the current defendant; and

    e) Whether the imposition of sentence of death on the current defendant, in circumstances where the prevailing interpretation of relevant domestic law requires execution within 30 days of confirmation of sentence would breach the rights of third parties under articles 2, 6 and 7 of the Covenant to an effective remedy for other grave human rights violations incurring the current defendant's criminal responsibility.

C.    **Submissions of Amicus Curiae**

The relevant provisions of international law

14.    Following ratification, the Covenant entered into force for Iraq on 23 March 1976, as noted by the judgment of the appeal chamber in its 26 December 2006 judgment in the current proceedings. Once having entered into force, the Covenant applies at all times and in all circumstances in a State, unless specifically derogated from in the narrow circumstances described in article 4. At no time has Iraq lodged a notice of derogation.

15.    The relevant provisions of the Covenant, for present purposes, are set out below.

Article 6, in relation to the right to life, provides in relevant part:

> 1. Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.
>
> 2. In countries which have not abolished the death penalty, sentence of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime and not contrary to the provisions of the present Covenant and to the Convention on the Prevention and Punishment of the Crime of Genocide. This penalty can only be carried out pursuant to a final judgement rendered by a competent court.
>
> 3. When deprivation of life constitutes the crime of genocide, it is understood that nothing in this article shall authorize any State Party to the present Covenant to derogate in any way from any obligation assumed under the provisions of the Convention on the Prevention and Punishment of the Crime of Genocide.
>
> 4. Anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases.

.....

> 6. Nothing in this article shall be invoked to delay or to prevent the abolition of capital punishment by any State Party to the present Covenant.

Article 7 provides, in relevant part, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

Article 14 provides:

> 1. All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The press and the public may be excluded from all or part of a trial for reasons of morals, public order (ordre public) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; but any judgement rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputes or the guardianship of children.
>
> 2. Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.
>
> 3. In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality: (a) To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;
>
> (b) To have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing;
>
> (c) To be tried without undue delay;
>
> (d) To be tried in his presence, and to defend himself in person or through legal assistance of his own choosing; to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it;
>
> (e) To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;
>
> ...
>
> (g) Not to be compelled to testify against himself or to confess guilt.
>
> ....
>
> 5. Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law.
>
> 6. When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed or he has been pardoned on the ground that a new

or newly discovered fact shows conclusively that there has been a miscarriage of justice, the person who has suffered punishment as a result of such conviction shall be compensated according to law, unless it is proved that the non-disclosure of the unknown fact in time is wholly or partly attributable to him.

....

Article 2, concerning the right to an effective remedy, provides:

1. Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

2. Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

3. Each State Party to the present Covenant undertakes:

(a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

(c) To ensure that the competent authorities shall enforce such remedies when granted.

16.    Iraq did not enter reservations to these provisions, which accordingly apply in full and bind Iraq as a matter of international law. The provisions bind Iraq qua State, independent of intervening changes of government since entry into force of the treaty for Iraq. As to the effect of this treaty in international law, the Vienna Convention on the Law of Treaties makes clear that "Every treaty in force is binding upon the parties to it and must be performed by them in good faith" (article 26) and that "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty" (article 27). Failure by a State to discharge its international obligations entails its international responsibility.

17.    The Human Rights Committee, established under article 40 of the Covenant, is an independent body of experts of high moral standing with authority to interpret and expound the meaning of the provisions of the Covenant. One important means by which the Committee undertakes this function is by consideration of individual communications, alleging violations of the Covenant, submitted by individuals under the first Optional Protocol to the Covenant. The Committee's guidance on the meaning of the Covenant is of relevance and assistance to all States parties bound by the obligations in question. The jurisprudence of other regional and international courts interpreting the

same or substantially similar provisions of international human rights law is further of substantial assistance.

Discussion

**Imposition of the death penalty following proceedings inconsistent with article 14 of the Covenant**

18.     Article 6, paragraph 2, provides that a sentence of death may only be imposed, among other conditions, if it is "not contrary to the provisions of the present Covenant". The consistent view of the Human Rights Committee has been to interpret this provision, applicable in respect of all capital trials, regardless of the crime charged, as requiring that the imposition of death penalty must follow full respect for the due process guarantees contained in article 14 of the Covenant, failing which the imposition of the death penalty becomes arbitrary. In Reid v. Jamaica, the Committee stated the law as follows:

> "[T]he imposition of a sentence of death upon the conclusion of a trial in which the provisions of the Covenant have not been respected constitutes ... a violation of article 6 of the Covenant. As the Committee noted in its general comment 6(7), the provision that a sentence of death may be imposed only in accordance with the law and not contrary to the provisions of the Covenant implies that 'the procedural guarantees therein prescribed must be observed, including the right to a fair hearing by an independent tribunal, the presumption of innocence, the minimum guarantees for the defence, and the right to review by a higher tribunal'."[1]

19.     At the present phase of proceedings, the High Commissioner is concerned as to four discrete aspects of due process that are of particular relevance. These relate to a fair trial before a competent court and the presumption of innocence, the opportunity to contest evidence in a position of equality, the capacity of defence counsel to exercise an appropriate defence and the adequacy of appeal. These issues are addressed in turn below.

       i) Fair trial before a competent court; presumption of innocence

20.     Article 14, paragraph 1, of the Covenant protects the independence of the courts, while paragraph 2, guarantees the presumption of innocence. Each of these fundamental guarantees is key to a criminal process that fairly renders impartial justice, and is seen to do so. These elements count amongst the basic components of due process recognised in international law and in all legal systems. Full protection of these rights requires both sufficiently robust legal and institutional guarantees, as well as respect by the relevant authorities in practice.

21.     At the institutional level, there is credible basis to believe that the Court's legal framework has suffered from at least two systemic defects – article 4 of the Court's

---

[1] Communication No. 250/1987, Views adopted on 20 July 1990, at para 11.5. See also, inter alia, Mbenge v. Zaire, Communication No. 16/1977, Views adopted on 8 September 1977, and Wright v. Jamaica, Communication No. 349/1989, Views adopted on 27 July 1992.

statute provided for a judge's transfer away from proceedings for any reason,[2] while article 33 prohibited Baath Party members, regardless of position or status, from the membership of the Court, even though such membership had been necessary for all judges under the previous regime.[3] Regrettably, these devices were resorted to repeatedly at trial, with serious negative impact on both the reality and perception of the trial. Article 4 was reportedly invoked by the Council of Ministers to secure the removal of the presiding judge in September 2006 in the wake of comments allegedly favourable to co-co-defendant Saddam Hussein. Without prejudice to the propriety of exclusion of judges prior to trial, the reported invocation during trial of article 33 by the national de-Baathification commission on repeated occasions secured transfers of judges away from the Court and inevitably conferred the impression, whether intended or otherwise, of judges servicing at pleasure. For example, certain Government officials blocked the promotion of the Deputy-Presiding judge Sae'ed Al-Hamashy due to his alleged membership of the Baath Party.[4] As the Human Rights Committee has held, executive interference of these types with the judicial function is incompatible with the requirements of article 14, paragraph 1, of the Covenant,[5] in breach of the requirement that judges "may not be subject to directives or in some other manner dependent on other State organs in the exercise of their office".[6]

22.     Over the period of trial, senior Government and legislative figures, including at the highest level, reportedly made comments of unmistakeable clarity as to the guilt of the defendants, the appropriate sentence and of the proper function of the courts in this context.[7] As the Human Rights Committee has found, such comment by senior public officials prior to a proper determination of guilt is incompatible with the right to be presumed innocent, protected by article 14, paragraph 2, of the Covenant.[8]

(ii) Equality of arms

23.     A basic tenet of fairness and pre-requisite of a fair trial identified by the Human Rights Committee is the notion of equality of arms between prosecutor and defendant,

---

[2] Article 4, paragraph 4, of the Iraqi High Tribunal Law provides: "The Presidency Council in accordance with a proposal from the Council of Ministers shall have the right to transfer Judges and Public Prosecutors from the Tribunal to the Higher Judicial Council for any reason."
[3] Article 33 of the Iraqi High Tribunal Law provides: "No person who was previously a member of the disbanded Ba'ath Party shall be appointed as a judge, investigative judge, public prosecutor, an employee or any of the personnel of the Tribunal."
[4] UNAMI Human Rights Report, January-February 2006, at para 30.
[5] Busyo et al. Democratic Republic of Congo, Communication No. 933/2000, Views adopted on 31 July 2003. See also Bahamonde v Equatorial Guinea Communication No. 468/1991, Views adopted on 20 October 1993, where the Committee stated: "a situation where the functions and competences of the judiciary are and the executive are not clearly distinguishable or where the latter is able to control or direct the former is incompatible with the notion of an independent and impartial tribunal" (at para 9.4).
[6] Nowak, M.: *UN Covenant on Civil and Political Rights: CCPR Commentary* (2nd ed), N.P.Engel, Kehl, 2005, at 320 (hereinafter "Nowak").
[7] See, for example, Opinion No. 31/2006 of the Working Group on Arbitrary Detention, A/HRC/4/40/Add.1 (170 to 178), at para 22, (hereinafter "the Working Group Opinion"), and Human Rights Watch : *Iraq: Judging Dujail – The First Trial Before the Iraqi High Tribunal*, Vol. 18 (No.9(E)), New York, November 2006, at 40-43 (henceforth "Judging Dujail").
[8] Gridin v Russia, Communication No. 770/1997, Views adopted on 18 July 2000.

that is, the placement of both sides in criminal proceedings on an equivalent procedural footing. Respected academic commentary characterises this principle of <u>audiatur et altera pars</u> as being "at the centre of ... criminal procedural guarantees" and "[t]he most important criterion of a fair trial".[9] International criminal law recognises the same principle: the International Criminal Tribunal for the Former Yugoslavia stated the principle thus: "The principle of equality of arms falls within the guarantee of a fair trial provided by the Statute, and has been described as obligating a judicial body to ensure that neither party is put at a disadvantage when presenting its case ... [A]t a minimum 'a fair trial must entitle the accused to adequate time and facilities for his defence' under conditions which do not place him at a substantial disadvantage as regards his opponent."[10] Specifically, equality of arms requires fair notice of the evidence adduced against oneself, with opportunity to be fairly able to contest the evidence presented.[11]

24.    In the current defendant's proceedings, on 13 February 2006, the statements of 23 prosecution witnesses – a substantial portion of the total evidence - were apparently read into the record for the first time (not being previously included in the dossier of evidence against the defendants), without the witnesses being made available for questioning by the defendants' legal representatives.[12] After closure of the prosecution case in March 2006, the prosecution confronted the current defendant with a document allegedly signed by him concerning the detention of Dujail individuals, while on April 2006, the prosecution introduced a recording of a purported conversation between the current defendant and co-defendant Hussein concerning Dujail properties.[13] Again, at the close of the defence case, the prosecutor produced three new documents allegedly signed by the current defendant on property seizures and a further recording between him and co-defendant Hussein.[14] Finally, on 13 June 2006, the president of the trial court closed the defence case on the basis that he had heard sufficient evidence, without having previously established a defence schedule or providing any indication of available time remaining.[15] The High Commissioner submits that in the absence of explanation by the Court as to the reasons for admission of late evidence at these stages or why it was appropriate to close the defence case, these incidents taken together disclose a violation of the right to equality of arms protected by article 14 of the Covenant and have as a necessary consequence the flawed reliability of insufficiently tested evidence.[16]

   (iii) Capacity of defence counsel to exercise legitimate professional functions

---

[9] Nowak, op.cit, at 321.
[10] <u>Prosecutor v. Dario Kordic and Mario Cerkez</u>, International Criminal Tribunal for the Former Yugoslavia, Appeals Chamber, IT-95-14/2-A, 17 December 2004, at paras. 175-177.
[11] Note, in particular, articles 14, paragraph 3, subparagraphs (b) and (e) of the Covenant, and the Human Rights Committee's jurisprudence in, for example, <u>Moreal v France</u>, Communication No. 207/1986, Views adopted on 28 July 1989, <u>Muñoz v Peru</u>, Communication No. 203/1986, Views adopted on 4 November 1988, and <u>Fei v Colombia</u>, Communication No. 514/1992, Views adopted on 4 April 1995.
[12] See the Opinion of the Working Group, at para 24.
[13] Ibid., and "Judging Dujail", at 50.
[14] Ibid.
[15] See the Opinion of the Working Group, at para 24, and "Judging Dujail", at 59.
[16] For the same conclusion of law, see also the Opinion of the Working Group, at para 27.

25.   The right of an accused to defend himself in person or through legal counsel is guaranteed in article 14, paragraph 3, of the Covenant, which also sets out the necessary corollary that the accused and counsel have necessary time and facilities to prepare and provide an effective defence. It is axiomatic that, in order to make the right to defence counsel real rather than illusory, defence counsel must be in a position to discharge their professional responsibilities to their client, consistent with their legal and ethical obligations, without fear for their own safety or other prejudice.[17] Without such assurance, counsel's functions are frequently limited in fact, and always diminished in perception, with attendant consequences for the fairness of a criminal trial required by article 14 of the Covenant. It must be fully recognised that the extreme political and security situation in Iraq during the trial posed particular difficulties with respect to the security of defence counsel. However precisely these concerns should have made a risk of attack foreseeably apparent and called for the institution of appropriate protective measures. In November 2005, the current defendant's counsel was murdered with another counsel in the same proceedings wounded. Further counsel in the same proceedings killed in October 2005 and June 2006.[18] An agreement between defense lawyers and the Government including the provision of three guards per counsel and license to carry sidearms was not properly honoured, with guard salaries going unpaid and license difficulties occurring; formal motion to the Court raising the security issues in December 2005 went unanswered. The resulting limitations imposed on defence counsels' capacity to discharge their professional obligations to the current defendant were so substantial as to amount to an infringement of the right to a full defence.[19]

26.   The High Commissioner submits that these shortcomings, taken together, disclose a prima facie case of an unfair trial at first instance, in breach of article 14 of the Covenant.

   (iv) Comprehensive appeal on law and fact

27.   Article 14, paragraph 5, of the Covenant requires a full appeal, on both fact and law, to be available in respect of a conviction and sentence. The Human Rights Committee has clarified that this provision requires "that a Court [of appeal] conduct an evaluation of the evidence presented at the trial and *and of the conduct of the trial*" (High Commissioner's emphasis).[20] In the present case, it would have been open to the appeal chamber, as a matter of Iraqi law, to address the shortcomings identified in the trial and reach appropriate conclusions as to remedy, such as a retrial.[21] The appeal submissions of

---

[17] See the United Nations Basic Principles on the Role of Lawyers, adopted at the Eight United Nations Congress on the Prevention of Crime and the Treatment of Offenders (Havana, 27 August – 7 September 1990); United Nations Secretariat Report E.91.IV.2, sect. B.3, annex, which recognise that States should ensure that lawyers "are able to perform all of their professional functions without intimidation, hindrance, harassment or improper interference" (at para. 16).
[18] UNAMI Human Rights Reports, November – December 2005, at para 15, and May – June 2006, at para 86.
[19] For the same conclusion of law, see the Opinion of the Working Group, at para 23.
[20] Perera v Australia, Communication No. 536/1993, Decision adopted on 28 March 1985, at para 6.4.
[21] Article 25 of the Iraqi High Tribunal Law provides:
"...

the current defendant, as well as of others, raised extensive argument going to the fairness of the trial, including in respect of issues identified above. The High Commissioner notes that the effectiveness of the appeal process was already prejudiced in limine by the failure to provide defence counsel with the very substantial written judgment at the outset of a narrow timeframe for filing of an appeal (30 days).[22]

28. The appeal judgment, however, inadequately addressed these errors and instead affirmed the current defendant's conviction, while remitting his sentence for reconsideration. In a twenty page judgment, the appeal chamber devoted a brief paragraph to these issues, stating:

> "As for the other defenses, the defendants were given enough guarantees to have a fair trials. Each suspect was informed of the kind of accusations filed against him. [Each suspect] was given ample chance to defend himself and to choose his legal advisors and attorneys in person with the assistance of legal counsellors. [Each suspect] was given the chance to interview the defence witnesses. [Each suspect] used his rights fully to defend himself. [Each suspect] was not forced to say what he did not want to say. Then the defence [each suspect] is using in this regard is rejected too." (in translation from Arabic original)

29. The High Commissioner submits that this summary disposition of fundamental issues going to the integrity and fairness of the trial failed to provide the "genuine review"[23] required by article 14, paragraph 5, of the Covenant. It follows that prima facie violations of article 14 established at trial, therefore, went unresolved and uncured on appeal. The High Commissioner therefore submits that the imposition of the death penalty by the trial chamber at the current stage of proceedings would breach article 6, paragraph 2, of the Covenant, as it would follow proceedings that had failed to respect article 14 of the Covenant.

**Imposition of the death penalty following an unfair trial an inhuman act, in breach of article 7 of the Covenant**

30. The prohibition of cruel, inhuman or degrading treatment or punishment is a core provision of international human rights law reflected, alongside article 7 of the Covenant, in all other regional human rights treaties. In interpreting the equivalent provision of the European Convention on Human Rights and Fundamental Freedoms (article 3),[24] the European Court of Human Rights described thus the imposition of the death penalty following an unfair trial in the case of a notorious head of a large terrorist organisation:

---

(2) The Cassation Panel may affirm, reverse or revise the decisions taken by the Criminal Court or the decisions of the Investigative Judge.
(3) When the Cassation Panel issues its verdict to revoke the judgment of acquittal or release issued by the Criminal Court or the Investigative Judge, the case shall be referred back to the Court for retrial of the accused or for the Investigative Judge to implement the decision. ..."
[22] See article 252 of the Code of Criminal Procedure of Iraq, No. 23, 1971.
[23] Nowak, op.cit, at 348.
[24] Article 3 provides: "No one shall be subjected to torture or to inhuman or degrading treatment or punishment."

> "In the Court's view, to impose a death sentence on a person after an unfair trial is to subject that person wrongfully to the fear that he will be executed. The fear and uncertainty as to the future generated by a sentence of death, in circumstances where there exists a real possibility that the sentence will be enforced, must give rise to a significant degree of human anguish. Such anguish cannot be dissociated from the unfairness of the proceedings underlying the sentence which, given that human life is at stake, becomes unlawful under the Convention. Having regard to the rejection by the Contracting Parties of capital punishment, which is no longer seen as having any legitimate place in a democratic society, the imposition of a capital sentence in such circumstances must be considered, in itself, to amount to a form of inhuman treatment."[25]

31. This view of the law was upheld on appeal to the Grand Chamber of the European Court, which described its view of the law thus:

> "In the Court's view, to impose a death sentence on a person after an unfair trial is to subject that person wrongfully to the fear that he will be executed. The fear and uncertainty as to the future generated by a sentence of death, in circumstances where there exists a real possibility that the sentence will be enforced, must give rise to a significant degree of human anguish. Such anguish cannot be dissociated from the unfairness of the proceedings underlying the sentence which, given that human life is at stake, becomes unlawful under the Convention."[26]

32. The Grand Chamber, noting that "[t]he death penalty has thus been imposed on the applicant following an unfair procedure which cannot be considered to conform with the strict standards of fairness required in cases involving a capital sentence", went on to conclude that "the imposition of the death sentence on the applicant following an unfair trial by a court whose independence and impartiality were open to doubt amounted to inhuman treatment in violation of Article 3 [of the European Convention]."[27]

33. Reasoning by analogy, the High Commissioner submits that, both in theory and in practice, the same interpretation is compelling with respect to the parallel wording of article 7 of the Covenant. It follows that the imposition of the death penalty by the Court following a trial suffering the deficiencies set out above would amount to an inhuman act, in breach of article 7 of the Covenant.

**Imposition of the death penalty in circumstances where the prevailing interpretation of Iraqi law forecloses consideration of a request for pardon or commutation breaches article 6, paragraph 4, of the Covenant.**

34. The High Commissioner notes that the law of the Iraqi High Tribunal provides, in article 27, that its decisions are final and not subject to executive review or adjustment.[28] For its part, however, the Constitution of Iraq – a normatively superior legal instrument – provides that death sentences must be ratified by the President.[29] As a matter both of legal

---

[25] Ocalan v Turkey, European Court of Human Rights (First Section), Application 46221/99, Judgment of 12 May 2003, at para 207.
[26] Ocalan v Turkey, European Court of Human Rights (Grand Chamber), Application 46221/99, Judgment of 12 May 2005, at para 169.
[27] Ibid. at 174-175.
[28] Article 27, paragraph 2, of the Iraqi High Tribunal Law provides: "No authority, including the President of the Republic, may grant a pardon or mitigate the punishment issued by the Court…."
[29] Constitution of Iraq, article 73.

theory and practice, therefore, the relevant legal instruments should be interpreted and construed in a fashion permitting the condemned to exercise the right to seek commutation or pardon by way of appeal to the Presidency Council. The relevant Iraqi executive authorities, however, have apparently taken a narrower view, for reasons that remain unclear, that the Court's own statute occupies the field and prevails over the constitutional provisions, with the result that any avenue of consideration of pardon or commutation is precluded. Accordingly, the executions of the three co-defendants have taken place with no opportunity for such consideration, in manifest violation of article 6, paragraph 4, of the Covenant.

35.  In the absence of any indication of a contrary interpretation for the future by the relevant Iraqi authorities of the legal position, therefore, the current defendant would be exposed to a similar denial of the right to seek commutation or pardon. It follows that the imposition of the death penalty by the Court would breach article 6, paragraph 4, would thus amount to an imposition of the death penalty "not in conformity with other provisions of the Covenant", contrary to article 6, paragraph 2, and would thus expose the current defendant to a real risk of arbitrary deprivation of life, in breach of article 6, paragraph 1.

**Imposition of the death penalty, where it has not been demonstrably shown that a repeat of the cruel and inhuman circumstances present at the antecedent execution of three co-defendants is excluded, amounts to a cruel and inhuman act, in breach of article 7 of the Covenant.**

36.  The High Commissioner submits that the executions of the first co-defendant, Saddam Hussein, on 30 December 2006, and of the second and third co-defendants, Awwad Hamad al-Bandar and Barzan Ibrahim Al-Hassan, on 15 January 2007, were so flawed as to amount, in their implementation, to cruel, inhuman and degrading punishment. The Human Rights Committee has recognised that, while article 6 of the Covenant does permit imposition of the death penalty in narrow circumstances, the means of execution is not left to the unfettered discretion of the State, but must itself comply with the other requirements of the Covenant, notably the prohibition on cruel, inhuman or degrading treatment set out in article 7. Accordingly, the Committee has found, for example, an execution by gas to be in breach of this provision of the Covenant and consequently unlawful.[30]

37.  The media footage made public of the execution of Saddam Hussein showed the condemned taunted and harassed by a substantial number of attendees at the execution cell, whose presence at the execution was questionable and which was tantamount to public spectacle. The execution itself interrupted the condemned's recital of his last religious rites. In the High Commissioner's submission, the circumstances of execution failed to respect the inherent human dignity of the prisoner, protected by article 10 of the Covenant, and amounted to cruel, inhuman and degrading punishment, prohibited by article 7. Following this execution, undertakings were apparently made that future executions would be free from such criticisms. The execution of Awwad Hamad al-

---

[30] Ng v Canada, Communication 469/1991, Views adopted on 25 September 1991.

Bandar and Barzan Ibrahim Al-Hassan shortly thereafter disclosed, undertakings of improvement notwithstanding, other serious deficiencies in the execution protocol, with Barzan Ibrahim Al-Hassan being decapitated by an improperly executed hanging. Even though only pictoral depiction of the execution has been made available, the decapitation of a prisoner by hanging and the necessary following treatment of the mortal suggest that the treatment was cruel, inhuman or degrading treatment, in contravention of article 7 of the Covenant.

38.  Given this prior history in relation to the selfsame legal proceedings, and unaware of undertakings that, on this occasion, would foreclose recurrence of these or comparable incidents, the High Commissioner submits that the Court's imposition of the penalty of death, and the current defendant's consequent exposure to a real risk of execution in circumstances amounting to cruel, inhuman or degrading punishment, would amount to both an arbitrary deprivation of life, contrary to article 6, paragraph 1, of the Covenant, as well as a breach of article 7 of the Covenant.

**Imposition of the death penalty in circumstances where the defendant is accused of other serious crimes breaches the obligation of the State to investigate and prosecute the most serious violations of the Covenant , in violation of article 2 of the Covenant, read juncto articles 6 and 7.**

39.  The High Commissioner understands that the current defendant is under investigation by the Court in the context of other alleged crimes of great gravity, committed in his former official capacity. These crimes, if established, would amount inter alia to  violations of the Covenant, imputable under rules of State responsibility to the State, of articles 6 (right to life) and 7 (freedom from torture and other cruel, inhuman or degrading treatment or punishment). The Human Rights Committee's consistent jurisprudence has been clear that a State party's obligation to provide an effective remedy, under article 2 of the Covenant, for violations of the Covenant requires criminal investigation and, where the evidentiary threshold is made out, prosecution with respect of persons implicated in the most serious crimes, notably those amounting to violations of articles 6 (right to life) and 7 (freedom from torture and other cruel, inhuman or degrading treatment or punishment) of the Covenant.[31] This obligation of criminal pursuit applies not only to crimes committed after the entry into force for the Covenant for Iraq, but also for crimes committed prior to that date but which have continuing effects, such as crimes of disappearance.[32] It follows that Iraq is under an obligation under the Covenant effectively to prosecute the current defendant for such crimes, and consequently to allow for a comprehensive, independent and impartial judicial

---

[31] For the duty to investigate State killings, see, for example, Baboeram et al. v Suriname, Communication Nos. 146&148-154/1983, Views adopted on 4 April 1985, Herrera Rubio v Colombia, Communication No. 161/1983, Views adopted on 2 November 1987, Sanjuán Arévalo v Colombia, Communication No. 181/1984, Views adopted on 3 November 1989, and Laureano v Peru, Communication No. 540/1993, Views adopted on 25 March 1996. For the duty to punish offenders for State killings, see Bautista de Arellana v Colombia, Communication No. 563/1993, Views adopted on 27 October 1995, and Vicente et al. v Colombia, Communication No. 612/1995, Views adopted on 29 July 1997.

[32] See, for example, Sarma v Sri Lanka, Human Rights Committee, Communication No. 950/2000, Views adopted on 31 July 2003.

accounting of the facts and of the commensurate individual criminal responsibility. Execution of the current defendant, which on the current understanding of Iraqi law is required within 30 days of confirmation of sentence of death,[33] would deprive such proceedings of object and render them moot and devoid of purpose.

40.     Accordingly, the High Commissioner concludes that the Court's imposition of sentence of death, in these circumstances, would breach articles 6 and 7 of the Covenant, read in conjunction with article 2 of the Covenant, given the pendency of other proceedings before the Court against the current defendant.

### D.     Conclusion

41.     The High Commissioner submits, in the circumstances of the case, that the Court should refrain from imposing the sentence of death on Taha Yassin Ramadan, consistent with Iraq's international obligations under the International Covenant on Civil and Political Rights.

Respectfully submitted,
On the 8th day of February 2007,

_____

Louise Arbour
United Nations High Commissioner for Human Rights

Done in Arabic and English, the English version being original.

---

[33] Article 27, paragraph 2, of the Iraqi High Tribunal Law provides, *in fine*, "The punishment must be executed within 30 days of the date when the judgment becomes final and non-appealable."

## Index of Authorities

A. **Decisions of the United Nations Human Rights Committee**

Baboeram et al. v Suriname, Communication Nos. 146&148-154/1983, Views adopted on 4 April 1985.

Bautista de Arellana v Colombia, Communication No. 563/1993, Views adopted on 27 October 1995.

Fei v Colombia, Communication No. 514/1992, Views adopted on 4 April 1995.

Gridin v Russia, Communication No. 770/1997, Views adopted on 18 July 2000.

Herrera Rubio v Colombia, Communication No. 161/1983, Views adopted on 2 November 1987.

Laureano v Peru, Communication No. 540/1993, Views adopted on 25 March 1996.

Mbenge v. Zaire, Communication No. 16/1977, Views adopted on 8 September 1977.

Morael v France, Communication No. 207/1986, Views adopted on 28 July 1989.

Muñoz v Peru, Communication No. 203/1986, Views adopted on 4 November 1988.

Ng v Canada, Communication 469/1991, Views adopted on 25 September 1991.

Perera v Australia, Communication No. 536/1993, Decision adopted on 28 March 1985.

Reid v Jamaica, Communication No. 250/1987, Views adopted on 20 July 1990.

Sanjuán Arévalo v Colombia, Communication No. 181/1984, Views adopted on 3 November 1989.

Sarma v Sri Lanka, Human Rights Committee, Communication No. 950/2000, Views adopted on 31 July 2003.

Vicente et al. v Colombia, Communication No. 612/1995, Views adopted on 29 July 1997.

Wright v. Jamaica, Communication No. 349/1989, Views adopted on 27 July 1992.

B. **Decisions of international and regional courts**

Ocalan v Turkey, European Court of Human Rights (First Section), Application 46221/99, Judgment of 12 May 2003.

Ocalan v Turkey, European Court of Human Rights (Grand Chamber), Application 46221/99, Judgment of 12 May 2005.

Prosecutor v. Dario Kordic and Mario Cerkez, International Criminal Tribunal for the Former Yugoslavia, Appeals Chamber, IT-95-14/2-A, 17 December 2004.

C.   **Provisions of international and regional human rights law**

International Covenant on Civil and Political Rights, articles 2, 6, 7 and 14.

European Convention on Human Rights and Fundamental Freedoms, article 3.

D.   **Provisions of domestic law**

Constitution of Iraq, article 73.

Code of Criminal Procedure of Iraq, article 252.

Iraqi High Tribunal Law, articles 4, 25, 27 and 33.

E.   **United Nations Documents**

General Assembly Resolution 48/141 (1993).

Opinion No. 31/2006 of the Working Group on Arbitrary Detention, A/HRC/4/40/Add.1, at 170 to 178.

UNAMI Human Rights Reports (various).

United Nations Basic Principles on the Role of Lawyers, adopted at the Eight United Nations Congress on the Prevention of Crime and the Treatment of Offenders (Havana, 27 August – 7 September 1990); United Nations Secretariat Report E.91.IV.2, sect. B.3, annex.

F.   **Miscellaneous Documents**

Human Rights Watch : *Iraq: Judging Dujail – The First Trial Before the Iraqi High Tribunal*, Vol. 18 (No.9(E)), New York, November 2006.

Nowak, M.: *UN Covenant on Civil and Political Rights: CCPR Commentary* (2nd ed.), N.P.Engel, Kehl, 2005.

----